IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PAUL REVERE TRANSPORTATION, LLC<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. NO.: 06 CA 12297 RCL<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

This is a civil action commenced by the Plaintiff, United States of America ("Plaintiff") against the Defendant, Paul Revere Transportation, LLC ("PRT") based on alleged claims that PRT violated the Clean Air Act, 42 U.S.C. §§ 7413 (the "Act") by failing to comply with the federally enforceable Commonwealth of Massachusetts' Department of Environmental Protection's (the "DEP") air pollution control regulation, 310 Code of Massachusetts Regulations Chapter 7.00 - 7.60; specifically 310 C.M.R. 7.11 pertaining to the "idling" of various Transportation Media registered in the Commonwealth of Massachusetts (the "Regulation"). The Regulation prohibits "the unnecessary operation of the engine of a motor vehicle while said vehicle is stopped for a foreseeable period of time in excess of five minutes." 310 C.M.R. 7.11 (1)(b) and contains three (3) exemptions to the five-minute idling limit which are enumerated in sub-section (b) 1-3. Pursuant to 310

C.M.R. 7.11 (1)(c) and 310 C.M.R. 7.52 law enforcement officials are authorized by the DEP to enforce the Regulation. True and accurate copies of the Act, the Regulation and 310 C.M.R. 7.52 are attached hereto as **Exhibit "A" (1)-(3).**

PRT operates a transportation company from various locations in the Commonwealth of Massachusetts. PRT owns approximately One-hundred and forty-seven (147) vans and buses which PRT uses to transport and shuttle commuters in and around the City of Boston and its' surrounding suburbs as well as travelers to and from Logan International Airport. PRT is an environmentally conscientious company which has always strived to meet and supersede regulations of the Environmental Protection Agency ("EPA") and the DEP regarding air pollution control including but not limited to PRT's voluntary and proactive installation of air scrubbing devices in its buses and vans commonly referred to as particulate matter filters and PRT's use of ultra low sulfur diesel fuel.[1]

PRT's efforts to further mitigate air pollution include instructions to all vehicle operators regarding the five-minute idling rule and the need to turn their vehicles off at the end of their shifts. Deposition testimony of Richard M. Brown at 34-38 (hereinafter "Brown Dep. at"_____"); Deposition testimony of Patricia A. Cargill at 10-17 (hereinafter "Cargill Dep.at "_____"); Deposition Testimony of John F. Carney at 47-48 and 60-63 (hereinafter "Carney Dep. at "_____"); Deposition Testimony of Richard J. Daley, Jr. Vol. II at 31-34 , 46-47 (hereinafter "Daley Dep. at "_____"); Deposition Testimony of Frederick P. Jones at 12-13 (hereinafter "Jones Dep. at "____"); Deposition Testimony of James E. Powers, Jr. at 56 (hereinafter "Powers Dep. at "_____"); Deposition Testimony of Gregory Roland at

---

[1] In 2004 PRT received an Environmental Merit Award from the EPA for PRT's use of particulate matter filters and ultra low sulfur diesel fuel in its bus fleet servicing Boston's Medical Academic and Scientific

22-24; (hereinafter "Roland Dep. at "_____"); Deposition Testimony of Michael S. Swartz at 27 (hereinafter "Swartz Dep. at "_____"); Deposition Testimony of James J. Viola at 30-31 (hereinafter "Viola Dep. at "_____"); and Deposition Testimony of James C. Williams at 60-62 (hereinafter "Williams Dep. at "_____") attached hereto as **Exhibit "B"** **(1)-(10).** Each operator is also instructed that the vehicle is to be turned off at any time between trips if the layover exceeds five minutes. (Brown Dep. at 34-38, Cargill Dep. at pgs. 10-17, Carney Dep. at. 47-48, 60-63, Daley Dep. Vol. II at pgs. 31-34,46-47, Jones Dep. at pgs 12-13,  Powers Dep. at pg. 56, Roland Dep. at pgs. 22-24, Swartz Dep. at pg. 27, Viola Dep. at. pgs. 30-31, and Williams Dep. at pgs. 60-62.). PRT's five minute idling rule is reinforced to all employees on a daily basis through hourly announcements to the employees and is further reinforced through a regular reminder on each employee's paycheck.. (Brown Dep. at 34-38, Cargill Dep. at  pgs. 10-17, Carney Dep. at. 47-48, 60-63, Daley Dep. Vol. II at pgs. 31-34, 46-47 Jones Dep. at. pgs 12-13,   Powers Dep. at  pg.  56, Roland Dep. at. pgs. 22-24, Swartz Dep. at pg. 27, Viola Dep. at. pgs. 30-31, Williams Dep. at pgs. 60-62.). At the time that an employee is hired the issue of the five minute idling rule is discussed with them and their compliance with the same is underscored by PRT management personnel. (Cargill Dep. at pgs. 10-17). PRT also issues periodic written notifications and reminders to employees reinforcing that PRT will not accept any variance from the five minute idling rule. (Brown Dep. at pgs.  34-38, Carney Dep. at pgs. 60-63, Cargill Dep. at pgs. 10-17.)

On March 1, 8, 15, 21 and 30, 2006 and April 4, 12, 27, 2006, an inspector from the Environmental Protection Agency (the "EPA") claims to have witnessed alleged violations

---

Community Organization ("MASCO"). EPA New England cited MASCO as "the first private transit agency" "to voluntarily retrofit its bus fleet with particulate filters and ultra-low sulfur diesel fuel".

of the Regulation, when PRT vehicles at PRT's Reading Street facility in Roxbury, Massachusetts (the "Roxbury facility") were idling in excess of five-minutes in violation of the Regulation (the "Violations").[2] A true and accurate copy of the Plaintiff's violation spreadsheet is attached hereto as **Exhibit "C"**.

When not operating, the subject PRT vehicles are parked outside, overnight (with their engines off) at the Roxbury facility. On all of the subject dates the minimum overnight temperature was below forty-five (45) degrees Fahrenheit and on five (5) of the nine (9) days the minimum overnight temperature was below freezing, necessitating the idling of the vehicles for longer than five minutes based on a myriad of mechanical and vehicle safety concerns including but not limited to proper air pressure for the vehicles' air brake systems, engine and oil temperature. True and accurate certified copies of the weather data from the National Climatic Data Center are attached hereto as **Exhibit "D"**.

Prior to the start of each shift the drivers are required to start the vehicle they will be driving on that particular day, in order to conduct the required Pre-Trip Inspection. The Pre-Trip Inspection includes a test of the vehicle's air brake system which in cold weather requires the vehicle to idle in excess of five-minutes to allow the air pressure to build up to a sufficient level for a proper test of the air brake system. (Jones Dep. at pgs. 14-15, Powers Dep. at pg. 24, Swartz Dep. at pg. 21-24.). Once the Pre-Trip Inspection is completed, the operator will begin his or her shift by driving the vehicle from the Roxbury facility to the vehicle's designated route. On occasion a PRT mechanic may start a vehicle and idle its

---

[2] On April 5, 2006, the Plaintiff alleges that PRT vehicles in queue waiting to pick-up passengers at a Brookline Avenue bus stop violated the Regulation; it is PRT's position that the vehicles were in traffic and not subject to the five-minute idling prohibition requiring a dismissal of Plaintiff's claims as to this particular date.

engine for longer than five minutes if the vehicle is having mechanical problems. (Roland Dep. at pg. 21.)

On or about April 13, 2006, PRT was served with an EPA Notice of Violation and Reporting Requirement ("NOV") alleging PRT's above described violations of the Regulation. On December 26, 2006, the Plaintiff filed the Complaint in this action against PRT alleging PRT violated the Regulation.

According to Paragraph No. 13 of Plaintiff's Complaint the Plaintiff is seeking to recover a civil penalty, pursuant to 42 U.S.C.A. §7413(b), of $27,500.00 for each violation of the Regulation occurring prior to March 16, 2004 and $32,500.00 for each violation of the Regulation occurring after March 15,2004 from PRT. A civil penalty of "not more than $25,000.00 per day for each violation" is enumerated in the subject statute; however the Plaintiff alleges that this penalty has been increased pursuant to the Debt Collection Improvement Act of 1996, 31 U.S.C.A. §3701.

## ARGUMENT

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corporation v. Catrett, 477 U.S. 317 (1986)("Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action.") See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). A facial challenge to the constitutionality of a statute is ripe for resolution by summary judgment. Institute of Governmental Advocates v. Fair Political Practices Commission, 164 F. Supp.

2d 1183 (E.D. Cal. 2001); <u>Bullfrog</u> <u>Films, Inc.</u> v. <u>Wick</u>, 847 F. 2d 502, 505-506 (9th Cir. 1988). When facts of a case are not in dispute and the record indicates that only genuine issue is constitutionality of the statute a case is ripe for summary disposition. <u>United Nuclear Corp.</u> v. <u>Cannon</u> 553 F. Supp. 1220 (D.C.R.I. 1982). Determination of the constitutionality of a statute is a question of law. <u>NationsBank of Texas, N.A.</u> v. <u>U.S.</u> 269 F. 3d 1332 (C.A. Fed. 2001). *See also* <u>Griffin</u> v. <u>State</u>, 14 Kan App. 2d 803, 806 (1990).

## II.    THE REGULATION VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

PRT is entitled to judgment as a matter of law because the Regulation's enforcement does not provide due process of law, in violation of the Fourteenth Amendment to the federal Constitution and the statutory term "unnecessary" in the prohibitory language portion of the Regulation is unconstitutionally vague.

### A.    The void for vagueness doctrine

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." <u>Grayned</u> v. <u>City of Rockford</u>, 408 U.S. 104, 108 (1972). A law will be deemed unconstitutionally vague if it does not meet the following two requirements: 1) the law must provide "fair warning by giving the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"; and 2) the law must provide "explicit standards for those who will apply the law in order to prevent arbitrary or discriminatory enforcement". <u>Metro Produce Distributors, Inc.</u> v. <u>City of Minneapolis</u>, 473 F. Supp. 2d 955, 960 (2007)(ordinance prohibiting idling of motor vehicles in residential area found unconstitutionally vague)

*quoting* Thorburn v. Austin, 231 F. 3d 1114, 1120 (8th Cir. 2000)(quoting Grayned at 108).

*See also* Kolender v. Lawson, 461 U.S. 352 (1983)(statute failing to define statutory terms "credible" and "reliable" found unconstitutionally vague on its face); Connally v. General Const. Co., 269 U.S. 385 (1926)(Oklahoma labor statute found unconstitutional for its use of vague statutory terms and failure to define them).

Vague laws may trap the innocent by not providing fair warning and "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." Grayned at 108-109. "All are entitled to be informed as to what the State commands or forbids." Lanzetta v. State of New Jersey, 306 U.S. 451, 453 (1939). "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." Lanzetta at 453 *quoting* Connally. When a law is challenged for vagueness, the statute will be stricken if it is found to be vague as applied to the individual who is challenging it. Health Ins. Assn. v. Harnett, 44 N.Y. 2d 302, 309 (1978).

The United States Supreme Court has expressed greater tolerance of vague statutes and regulations with civil rather than criminal penalties "because the consequences of imprecision are qualitatively less severe." Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 499 (1982) *citing* Barenblatt v. United States, 360 U.S. 109 (1959("[T]he standard of certainty required in criminal statutes is more exacting than in non-criminal statutes"). The due process clause of the federal Constitution requires that the terms of a penal statute creating a new offense be sufficiently "explicit to inform those who

are subject to it what conduct on their part will render them liable to its penalties". Connally at 391. "A penal ordinance must have an ascertainable standard of guilt." Herndon v. Lowry, 301 U.S. 242 (1937). A law that imposes a criminal penalty is subject to a greater degree of scrutiny by a reviewing court. Meisner v. State, 907 S.W. 2d 664, 668 (1995) (motor vehicle ordinance prohibiting unnecessary noise found to be unconstitutionally vague). Thus, when challenged on vagueness grounds criminal or penal statutes are subject to a stricter vagueness test than for example economic regulations. Village of Hoffman Estates at 499. *See also* Town of Brookline v. Commissioner of Dept. of Environmental Quality Engineering, 387 Mass. 372 (1982)(vagueness challenge to Massachusetts air pollution regulation and statute).

In the present action, the application of the vagueness doctrine is appropriate and the Regulation is subject to strict analysis due to the potential criminal penalties involved with the enforcement of the Regulation. [3] The Regulation is unconstitutionally vague because the Regulation does not meet the two requirements necessary to survive a vagueness challenge outlined in the Metro Produce decision. The Regulation contains the undeniably vague (and undefined) term 'unnecessary' in the prohibitory language portion of the statute and does not provide adequate guidance to law enforcement officials charged with enforcing the Regulation.

---

[3] The Regulation appears to be a social and economic regulation; however violations of the Regulation subject parties to the civil and criminal penalties enumerated in 42 U.S.C.A. §7413 *including imprisonment not to exceed five years. See* 42 U.S.C.A. §7413 (b) and (c). Furthermore, Subsection (1)(c) of the Regulation states that subsection (1) (b) "is subject to the enforcement provisions specified in 310 C.M.R. 7.52". See **Exhibit "A"**. 310 C.M.R. 7.52 states that "[a]ny police department, fire department...is hereby authorized by the Department [of Environmental Protection] to enforce...any regulation in which specific reference to 310 CM.R. 7.52 is cited." See **Exhibit "A"**. *310 C.M.R. 7.52*. Even without the Regulation's connection to criminal penalties, the Regulation should be considered quasi-criminal in nature justifying a stricter vagueness test because the Regulation's civil penalty for each violation is severe ($25,000.00 fine) and the Regulation has a prohibitory and stigmatizing effect. See Village of Hoffman Estates at 499-500.

B.    The term "unnecessary"

The statutory term "unnecessary" in the general prohibitory language of a regulation, ordinance or law is unconstitutionally vague. Jim Crockett Promotion, Inc. v. City of Charlotte, 706 F. 2d, 486, 489 (1983)(Court found term "unnecessary noise" in city's noise ordinance to be unconstitutionally vague). See Luna v. City of Ulysses, 28 Kan. App. 2d, 413 (2000)("unnecessarily loud"); Thelen v. State, 272 Ga. 81 (2000) ("unnecessary or unusual sound or noise"); People v. Donato, 179 Misc. 2d 192 (New York 1998)("unnecessary animal noise"); Meisner v. State, 907 S.W. 2d 664, 669 (1995) ("unnecessary noise"); People v. Cohen, 85 Misc. 2d 982 (New York 1976) ("unnecessary smoke or unnecessary offensive vapors"); United Pentecostal Church v. Steendam, 51 Mich. App. 323 (1974)("unnecessary or unusual noise"); People v. Bogner, 20 Misc. 2d 465 (New York 1959)("unnecessarily interferes and unnecessarily endangers"). The adjective 'unnecessary' is inherently vague and elastic and requires persons of common intelligence to guess at its meaning. Thelen at 82.

In all of the above referenced cases the Courts found that the statutes or ordinances were unconstitutionally vague because the laws did not provide a sufficiently clear standard to those charged with enforcing them and the term "unnecessary" (or a variation thereof) was susceptible to a subjective measurement and/or interpretation. The ordinances in the above cited cases including Donato, Luna, Cohen, Bogner, Thelen and Meisner did not implicate the First Amendment to the federal Constitution and they were related to motor vehicles, boats or animals; however the subject ordinances were given a strict constitutional vagueness test by the Courts nonetheless because, as discussed in the above vagueness doctrine discussion, the subject ordinances were penal in nature.

In the present matter, the Regulation prohibits "the unnecessary operation of the engine of a motor vehicle while said vehicle is stopped for a foreseeable period of time in excess of five minutes". 310 CMR 7.11 (1)(b). The term "unnecessary" is not defined in Chapter 7.11 of Title 310 or any other Chapter of Title 310 including Chapter 7.00 which is the definitions section of Title 310. *See* **Exhibit "A"** and a true and accurate copy of 310 C.M.R. 7.00 attached hereto as **Exhibit " E"** (The existence of the term "unnecessary" in the prohibitory language section of the Regulation (without defining the term) makes the Regulation void on vagueness grounds and unconstitutional on the Regulation's face. The Regulation does not adequately address what acceptable idling situations are or when idling over five (5) minutes will be allowed. The Regulation fails to meet either of the two vagueness doctrine requirements enumerated by the Court in Metro Produce because the Regulation fails to give a potential violator fair warning or a reasonable opportunity to know when idling for longer than five minutes is prohibited and the Regulation does not provide law enforcement officials with explicit standards for enforcing the Regulation. The term "unnecessary" in the Regulation requires persons of common intelligence to guess at its meaning and impermissibly leaves this particular air pollution control law to be subjectively interpreted and enforced by Massachusetts or federal law enforcement officials with the attendant dangers of arbitrary and discriminatory application.

The Regulation does contain three (3) ambiguous, general and inadequate exemptions (7.11 (1) (b) 1.- 3.) (the "Exemptions") to the over five minute idling prohibition; however nothing in the Regulation states that the Exemptions are the sole and exclusive exemptions to the over five minute idling prohibition leaving potential violators further confused as to what types of idling are prohibited and what types of idling are legal.

As discussed more fully below, PRT's idling of its' vehicles for longer than five minutes was necessary to heat the engine block and engine oil contained therein to avoid engine seizure and to properly pressurize the pneumatic system in the PRT vehicles which system is used to operate the brakes, doors and handicap lifts. (Affidavit of Victor Wong, at ¶¶ 7-9(hereinafter "Wong at ¶ "___"). The Regulation does not even include an exemption for vehicles idling in traffic in excess of five minutes subjecting any person who has ever found themselves stopped in traffic to a fine for a violation of the Regulation and allowing police officers to randomly charge unlucky commuters stuck in traffic for violations of the Regulation.

Further relevant evidence of the Regulation's vagueness can be found when comparing the Regulation to other jurisdictions' anti-idling regulations which do not use the term 'unnecessary' and contain many more exemptions than found in the Regulation. *See* the State of Rhode Island; State of California; City of Sacramento, California; State of New York; State of Texas; and the State of New Jersey anti-idling regulations and/or municipal codes attached hereto as **Exhibit "F"**. Additionally, a wholesale revision to Massachusetts' current anti-idling statute, M.G.L. Chapter 90, §16A (which contains the exact same prohibitory language and three exemptions as the Regulation) has been proposed as Massachusetts House Bill No. 866. House Bill No. 866 does not use the term 'unnecessary' and contains eleven (11) very clear exemptions to the over five minute idling prohibition as opposed to the three (3) vague exemptions in the Regulation and Massachusetts' current anti-idling statute.[4] A true and accurate copy of Bill No. 866 is attached hereto as **Exhibit "G"**.

---

[4] The Rhode Island, California, Texas, City of Sacramento and House Bill No. 866 anti-idling regulations contain exemptions for operation of heaters or air conditioners which the Regulation does not. The Regulation

For the foregoing reasons, PRT is entitled to judgment as a matter of law as to all the Plaintiff's claims in the present action because the Regulation is void on vagueness grounds and thus in violation of the Due Process Clause of the federal Constitution.

## III. THE IMPOSITION OF THE CIVIL PENALTY UNDER THE CLEAN AIR ACT FOR VIOLATIONS OF THE REGULATION IS UNCONSTITUTIONAL

PRT is entitled to judgment as a matter of law because the civil penalty enumerated in 42 U.S.C.A. § 7413 (b) violates the Excessive Fines Clause of the Eighth Amendment as it relates to violations of the Regulation.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." *U.S. Const., Amendment 8*. The Eighth Amendment's prohibition of excessive fines applies to the states through the Due Process Clause of the Fourteenth Amendment. *See* Cooper Industries, Inc. v. Leatherman Tool Group, Inc. 532 U.S. 424, 433-34 (2001). The Excessive Fines Clause limits the government's power to extract payments as punishment for some offenses. United States v. Bajakajian, 524 U.S. 321, 328 (1998). The Supreme Court has held that the Excessive Fines Clause applies to civil fines. *See* Byrd v. Hunt, 136 F. Supp. 2d 511, 516 (2001) *citing* Hudson v. United States, 522 U.S. 93, 103 (1997) ("The Eighth Amendment protects against excessive civil fines, including forfeitures"). The Supreme Court also held that civil sanctions can constitute punishment, if the civil sanctions serve retributive or deterrent purposes, and therefore are subject to the limitations of the Excessive Fines

---

prevents PRT and other operators of commercial passenger vehicles in Massachusetts from heating the vehicle compartments in the morning before picking-up passengers. In the summer months the interior of PRT's buses can easily exceed 100 degrees Fahrenheit without air conditioning which prevents PRT from idling their vehicles before passenger pick-up and causes PRT drivers to continually circle Logan airport adding to existing traffic and wasting fuel.

Clause. *See* Austin v. United States, 509 U.S. 602, 610 (1993). *See also* Alexander v. United States, 509 U.S. 544 (1993).

Neither the Austin nor the Alexander Court addressed the question of whether a judge or jury should determine the excessiveness issue; however since the Austin and Alexander decisions, the majority of cases have treated the Eighth Amendment issue as a question of law in either the context of a parties' motion to dismiss or motion for summary judgment on constitutional grounds. *See* United States v. Real Property Located at 24124 Lemay Street, West Hills, California, 857 F. Supp. 1373 (1994) and cases cited. *See also* Byrd (issue decided on motion to dismiss); U.S. v. Kruse, 101 F. Supp. 2d 410 (2000) (issue decided on summary judgment motion); Department of Environmental Protection v. Zabielinski, 785 So. 2d 517 (issue decided on summary judgment motion); and Towers v. City of Chicago, 173 F. 3d 619 (1999)(issue decided on motion to dismiss). Support for the above proposition can also be found in the court's decision in Bajakajian; "the question whether a fine is constitutionally excessive calls for the application of a constitutional standard to the facts of a particular case". Bajakajian at 336-337, n. 10.

The constitutional standard to determine whether a fine is excessive for purposes of the Excessive Fines Clause was first enumerated in the Bajakajian decision and is known as the "grossly disproportional" test. If a fine, forfeiture or other type of penalty is grossly disproportional to the gravity of a defendant's offense, it is unconstitutional. Bajakajian at 337. The "grossly disproportional" test first enumerated by the Supreme Court in Bajakajian was expounded upon by the Courts in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996) and Cooper and all three Courts treated the question of excessiveness as a question of law, not fact. In determining whether a particular fine was unconstitutional,

the Cooper Court cited three factors specifically outlined in the Gore decision: 1) the degree of the defendant's reprehensibility or culpability; 2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and 3) the sanctions imposed in other cases for comparable misconduct (the "Gore factors"). Cooper at 435. See also MacLean v. State Board of Retirement, 432 Mass. 339 (2000)(Court applied Bajakajian principles to facts of particular case where plaintiff argued revocation of pension benefits was an "excessive fine" prohibited by the Eighth Amendment to the United States Constitution).

The Plaintiff, through the present action, is attempting to impose upon PRT a $32,500.00 fine for each alleged violation of the Regulation which is either 325 times or 65 times greater than the $100 or $ 500 fine imposed on violators of the Massachusetts anti-idling statute, M.G.L. Chapter 90, §16A (the "Statute") and many other anti-idling statutes found in other jurisdictions throughout the United States.[5] A true and accurate copy of the Statute is attached hereto as **Exhibit "H"**. This fine is excessive and in violation of the federal Constitution because the degree of reprehensibility of PRT's conduct is minimal; the penalty is not proportional to the harm caused or the harm likely to be caused by PRT's conduct; and the penalty the Plaintiff is attempting to impose on PRT is not comparable to the penalty under the Massachusetts anti-idling statute and other jurisdictions' anti-idling laws.

---

[5] The amount of the present fine is extremely relevant evidence as to the excessive nature of the fine and is a recurring theme in all three criteria involved in the excessive fines analysis.

1.     Degree of Reprehensibility or Culpability

The degree of reprehensibility of the defendant's conduct may be the most important indicator as to the reasonableness of a fine or other civil penalty. Gore at 575. ($2,000,000 punitive damages award found to be grossly excessive by the Court in light of low level of reprehensibility of defendant's conduct). "Exemplary damages imposed on a defendant should reflect 'the enormity of his offense'." Gore at 575. quoting Day v. Woodworth, 13 How. 363, 371 (1852). The Gore Court found that the aforementioned principle reflected the accepted view "that some wrongs are more blameworthy than others." Gore at 575. The Gore Court went on to note that they have found in past decisions that non-violent crimes are less serious than violent crimes and that trickery and deceit are more reprehensible than negligence. See Solem v. Helm, 463 U.S. 277, 292-293 (1983) and TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 462 n. 28 (1993).

In the present matter, none of the aggravating factors related to reprehensible conduct enumerated in the Gore decision are present. The PRT employees in this case if they did violate the Regulation did so mistakenly, unintentionally and/or for good cause. As noted above, on five of the nine days the Violations were alleged to have occurred, the overnight temperatures were below freezing. According to expert reports prepared for PRT and filed in this action, it is necessary for the PRT vehicles to idle for considerably longer than five minutes in order heat the engine block (and engine oil contained therein) to an acceptable operating temperature and to properly charge the air tanks to the required pressure necessary to operate the vehicle's air brake system. (Wong at ¶¶ 7-9 and ¶¶ 10-12). See also Analysis of Warm Up Times in Bus Engines (hereinafter the "Warm Up Report") and Supplement to Report on Analysis of Warm Up Times in Bus Engines (hereinafter the

"Supplemental Warm Up Report") by Victor W. Wong, PhD and *Analysis of Air-Pressurization Times in Bus Engines* (hereinafter the "Air Pressure Report") and *Supplement to Report titled Analysis of Air-Pressurization Times in Bus Engines* (hereinafter the "Supplemental Air Pressure Report") by Victor W. Wong, PhD attached as Exhibits to the Affidavit of Victor Wong filed herewith.

a. The Warm Up Report

Under normal engine operating conditions the optimum temperature for engine oil is 180 degrees Fahrenheit or higher. (Wong at ¶ 8).This 180 degree temperature is necessary because at low temperatures the engine oil is highly viscous and does not flow to critical engine areas such as the cylinder liner which houses the engine pistons. If the cylinder liner is not properly lubricated the piston rings within the cylinder wall may seize, causing "catastrophic" engine failure. (Wong at ¶ 8 and Warm Up Report and Supplemental Warm Up Report).Based on the fact that the cylinders are located within the engine block when the engine block reaches a temperature of 180 degrees Fahrenheit, the oil on the cylinder liner is expected to reach 180 degrees Fahrenheit.

Of the thirty-six (36) diesel fuel PRT vehicles cited in the Violation, twenty (20) contained the Detroit Diesel engines referred to in the Supplemental Warm Up Report and twelve contained the Cummins Diesel engine. The Cummins Diesel engines each weigh approximately 458 kg and the Detroit Diesel engines each weigh approximately 1000kg. According to the Supplemental Warm Up Report it takes anywhere from 34 minutes to over 70 minutes for the Cummins Diesel engine to reach a block temperature of 180 degrees Fahrenheit at an idle level of 10 horsepower and up to 135 minutes for the Detroit Diesel engine (which weighs twice what the Cummins engine weighs) at 10 horsepower to reach

16

an engine block temperature of 180 degrees Fahrenheit. (Wong at ¶¶ 8-9 and Warm Up Report and Supplemental Warm Up Report)

### b. The Air Pressure Report

The required pressure level to pressurize the air tanks on the PRT vehicles is 120 psig (pounds per square inch gage). The air which is contained in the air tanks on the buses is generated from the engine located at the back of the bus and flows through the pneumatic lines to the air tanks themselves which are located in the middle undercarriage of the bus. (Wong at ¶ 12). The air tanks supply the air which operates the PRT buses' air brake system as well as the bus doors and handicap lift. Under ideal, good weather conditions with no blockage or leakage in the pneumatic lines it take approximately ten (10) minutes to pressurize the system to the required 120 psig. (Wong at ¶ 10). When the outside air temperature is at or below freezing, condensation in the pneumatic lines freezes, forming ice which blocks the air flow into the air tanks, which in turn delays the air pressure from building up to the necessary 120 psig in air tanks.[6] (Wong at ¶ 10) As evidenced by the calculations in the Air Pressure Report and Supplemental Air Pressure Report even with only a 50% obstruction of the air flow to the air tanks it takes *well over an hour* to pressurize the system to 120 psig tank pressure. (Wong at ¶ 10 (2)). Furthermore, as the pressure in the system increase the air-flow rate decreases resulting in a longer time frame to reach the target pressure as the system approaches the target pressure.

---

[6] This is a documented and recognized problem, even by the manufacturers of the air compressors.

It is quite clear from the above facts and the Wong affidavit and reports filed herewith that it was necessary for PRT to idle the buses for longer than five minutes (especially on days with an overnight temperature of below freezing) to avoid engine seizure and stalling and to properly pressurize the air brake system.

Not only are PRT's actions in and of themselves non-repugnant, but penalties for excessive idling under Massachusetts law as well as penalties under other jurisdiction's anti-idling laws confirm a minimum level of culpability as to any person who violates anti-idling laws. "In considering an offense's gravity, the other penalties that the Legislature has authorized are certainly relevant evidence." Bajakajian at339 n.14. Highly relevant evidence in this action as to the nominal gravity of PRT's offenses, and supporting the fact that the Regulation's fine is excessive and unconstitutional, are the fines contained in the Statute. The prohibitory language of the Statute is identical to the prohibitory language of the Regulation; however the fines for violating the Statute are one hundred dollars ($100) for a first offense and no more than five hundred dollars ($500) for every successive offense. *See* **Exhibit "G"**.

Furthermore, anti-idling laws in many other jurisdictions contain similar fines to the fines found in the Massachusetts anti-idling statute. The following are examples of fines/civil penalties contained in other jurisdiction's anti-idling laws:

1. Maricopa County – Arizona, $100 for the first violation and $300 for a second and subsequent violation;

2. State of Delaware, no less than $50 and not more than $500 for each offense;

3. State of Illinois, $50 for the first violation and $150 for a second or subsequent violation;

4. City of St. Louis – Missouri, no less than $1.00, nor more than $500;

5.  <u>Washoe County - Nevada</u>, not more than $500 for first violation, not more than $1000 for second violation;

6.  <u>City of New Rochelle – New York</u>, not more than a $50 fine for first violation, not more than a $100 fine for a second violation;

7.  <u>Alleghany County- Pennsylvania</u>, warning for first offense, $100 fine for second offense and $500 fine for third and subsequent offenses;

8.  <u>State of Rhode Island</u>, $100 fine for first offense and not more than $500 for each succeeding offense.

Further evidence that the EPA views the reprehensible nature of a violators' conduct as minimal can be found in the EPA's own Model State Idling Law where the penalty for the first offense is a warning and the penalty for the second and/or subsequent offense is $500. Copies of the aforementioned anti-idling laws and the EPA's model state idling law are attached hereto as **Exhibit "I"**.

The DEP does not seem to be of the opinion that a violation of the Regulation is malicious conduct based on the fact that the DEP virtually ignores the Regulation as an effective means to control air pollution in Massachusetts. For example, emission inventories compiled by the DEP which are used to quantify the emissions of different pollutants such as carbon monoxide and particulate matter do not reflect any emission reduction benefit from the Regulation. Affidavit of James M .Lyons at ¶10(1)) (hereinafter "Lyons at ¶ "____") Secondly and even more notable is that the various State Implementation Plans created by the DEP (and presented to the EPA) to mitigate air pollution do not even describe or list the Regulation as a tool to reduce air pollution in Massachusetts. (Lyons at ¶ 10(2))

PRT's alleged misconduct was non-violent in nature and did not involve any sort of dishonesty or deceit justifying a $32,500.00 fine for each alleged violation. One need only look at the $1,000 fine for the crime of assault and battery under Massachusetts law

(M.G.L. Chapter 265, §13A) or the $2,000 fine for fiduciary embezzlement under Massachusetts law (M.G.L. Chapter 266, §57) to see that a $32,500.00 fine for violation of an anti-idling regulation is a punishment which does not fit the crime.

Lastly and as discussed in detail below, PRT's voluntary use of anti-pollution devices on many of its vehicles coupled with PRT's voluntary use of environmentally friendly diesel fuel in all of its diesel fuel powered vehicles additionally minimizes the "reprehensible" nature of its conduct, further supporting the view that PRT's actions do not justify the exorbitant fines which the Plaintiff is attempting to impose on PRT through this action.

   2.   Ratio of Harm to Penalty

While the reprehensibility of the violator's conduct may be the most important factor in determining a fine's excessiveness, the most commonly cited indicator of an unreasonable or excessive fine or penalty is its ratio to the actual harm inflicted on the plaintiff. Gore at 581 *citing* TXO at 459. With regard to the second Gore factor in the excessive fines analysis, the TXO Court held that the proper inquiry is "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred". TXO at 460, *quoting* Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1 (1991). In short, "[t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." Bajakajian at 334.

In Haslip the Court concluded that a punitive damages award more than 4 times the amount of compensatory damages may be crossing the line into the area of constitutional impropriety; while in TXO the Court found that a ratio of approximately 10 to 1 was acceptable under the circumstances. The TXO Court expounded on its proportionality analysis from Haslip by requiring an examining court to take into account *the harm likely to result* (from the defendant's actions) in addition to the actual harm caused by the defendant's actions.

In the present matter, the Plaintiff is attempting to impose a fine on PRT which is either 325 or 65 times greater than the civil fine for the *exact same offense* in the Massachusetts anti-idling statute. This comparison will be discussed more fully below when the third Gore factor is addressed; however it is important to touch on this issue now because the circumstances of this case require us to compare civil fines as opposed to a comparison of compensatory damages versus punitive damages after a trial on the merits as was the case in the Haslip and TXO decisions.[7]

Given the small amount of the civil penalties under the Massachusetts anti-idling statute, similar anti-idling statutes in other jurisdictions and the EPA's model idling law, it is evident that the federal and state authorities charged with monitoring and controlling air pollution believe the harm to the environment and the public likely to result from PRT's alleged actions or the actual harm committed by PRT is minimal.

---

[7] Civil fines are subject to constitutional scrutiny and the Eighth Amendment protects against excessive civil fines. See Hudson, Austin and Alexander.

Further evidence that PRT's actions caused minimal harm to the environment or the public is PRT's voluntary, proactive steps in controlling the amount of air pollution caused by its vehicles. At the time of the 2006 Violations all PRT diesel vehicles were using Ultra Low Sulfur Diesel Fuel ("ULSDF").[8] (Carney at 38-39) In Suffolk County, Massachusetts during March and April 2006 the sulfur content of allowed diesel fuel was limited by federal regulation to approximately 500 parts per million ("ppm") while the sulfur content of ULSDF is, by definition, less than 15 ppm. In short, the sulfur content of the diesel fuel voluntarily used by PRT during 2006 was more than thirty (30) times lower than the average on-road diesel fuel available in Suffolk County. (Lyons at ¶10 (3)).

More than half of the diesel fuel powered PRT vehicles allegedly involved in the Violations were also equipped with one of two types of diesel particulate matter filter devices ("DPF"). Prior to 2006, twelve (12) vehicles were voluntarily retrofitted by PRT with a DPF device called the *Cleaire Longview* Device (the "Longview Device"), while seven (7) of the vehicles came with manufacturer installed DPF devices (the "OEM PM traps").[9] (Lyons at ¶ 10 (6)) According to the Lyons Affidavit the Longview Devices reduced particulate matter emissions by at least 85% while reducing hydrocarbon and carbon monoxide emissions by 90%. (Lyons at ¶ 10(7)). *See also* April 25, 2008 *Estimate of Total Idling Emissions* and July 31, 2008 *Supplemental Estimate of Total Idling Emissions* by Plaintiff's expert witness David Brzezinski (hereinafter "Brzezinski Report" and Brzezinski") (which concurs with Lyons' findings) attached hereto as **Exhibit "J"**.

---

[8] PRT began using this type of fuel in 2003, more than three (3) years before its use was federally mandated.

[9] Similar to PRT's use of ULSDF installation and use of particulate matter filters on many of its diesel fuel powered vehicles is environmentally conscientious, was not mandated, was voluntary and is not the norm throughout the industry.

The PRT vehicles with the OEM PM traps reduced emissions of particulate matter, hydro

carbon and carbon monoxide by 80 to 90%. (Lyons at ¶ 9(6) and ¶10 (4)) and (Brzezinski

Report and Brzezinski Supplemental Report). Therefore, according to the Lyons Affidavit it

would take the PRT vehicle equipped with the Longview device approximately 33 minutes

to emit the same amount of particulate matter a vehicle would have emitted in 5 minutes of

idling without the Longview device and it would take a OEM PM trap vehicle

approximately 30 minutes to emit the same amount of particulate matter a vehicle would

have emitted in 5 minutes of idling with the OEM PM trap. (Lyons at ¶ 10(5)) Lyons'

findings are supported by the February 2007 report on diesel exhaust by the Clean Air Task

Force (the "CATF Report")[10] and the attached Brzezinski reports. According to the CATF

Report diesel fuel powered vehicles with DPFs emit approximately 90% less particulate

matter into the atmosphere compared to diesel powered engines without DPFs. A true

accurate copy of the CATF Report is attached hereto as **Exhibit "K"**. One Boston test from

the CATF Report even suggested that emissions from DPF equipped buses may be cleaner

than the actual outdoor air. CATF Report at 6.

     Given PRT's voluntary use of ULSDF and DPFs in its vehicles (and the small

amount of the fines in other jurisdictions for the exact same offense), it is clear that the

fines which the Plaintiff is attempting to impose on PRT are not reasonably or rationally

related to the actual harm PRT caused to the environment; therefore the fines sought by the

Plaintiff are "grossly disproportional" to the gravity of PRT's offenses and are

unconstitutional.

---

[10] The CATF Report studied diesel emissions in four U.S. cities: 1) Columbus, OH; 2) Austin, TX; 3) Boston,

3.    Sanctions for Comparable Misconduct

"Comparing a punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." Gore at 583. The Court in Gore also noted that a reviewing court in determining whether an award of punitive damages is excessive "should accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." Gore at 583 quoting Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc. 492 U.S. at 301. See also Bajakajian at 336 ("judgments about the appropriate punishment for an offense belong in the first instance to the legislature").

In the present matter, we are confronted with the comparison of the federal civil fine under 42 U.S.C.A §7413(b) for a violation of the Regulation to the civil fine under the Statute. Both the Regulation and the Statute prohibit the exact same conduct; however the Statute imposes a fine of $100 for a first offense and $500 for each subsequent offense while the Plaintiff is attempting to impose a fine of $32,500.00 per violation on PRT circuitously through the Plaintiff's supposed authority under the Clean Air Act.[11] In this case it is obvious that the $32,500.00 fine the Plaintiff is attempting to impose on PRT is substantially greater than the statutory fine under the Statute and other jurisdictions' anti-idling statutes for the identical offense. Upon information and belief, it is also the first time the Plaintiff has charged a violator of the Regulation with the civil penalties under 42 U.S.C.A. §7413(b).

---

MA; and 4) New York, NY.

[11] The aforementioned analysis is proper because the TXO, Haslip and Gore courts compared punitive damages awards to related civil fine while in Gore the Court not only compared the jury's punitive damages award with the Alabama statute for a comparable offense but it also compared the award with that of civil fines from other states.

Lastly, it is clear from the language of the Statute that the Massachusetts Legislature intended to impose a fine of $100 or $500 for excessive idling while it is wholly illogical (given the existence of M.G.L. Chapter 90, §16A and the non-existence of fines in the Regulation) that the Legislature intended to impose a $32,500.00 fine on an offender for excessive idling. For the foregoing reasons, PRT is entitled to summary judgment as a matter of law because the imposition of a $32,500.00 fine per violation on PRT would violate the Excessive Fines Clause.

## CONCLUSION

The Defendant, Paul Revere Transportation LLC is entitled to summary judgment as a matter of law as to Count I of Plaintiff's complaint because the Regulation is unacceptably vague, therefore unconstitutional on its face and the Plaintiff's attempt to impose a civil fine of $32,500.00 per alleged violation of the Regulation violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.

Respectfully submitted,

Defendant, Paul Revere Transportation, LLC

By its Attorney,

/s/ Jonathon D. Friedmann

_____

Jonathon D. Friedmann
BBO #180130
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA 02109
(617) 723-7700

## **CERTIFICATE OF SERVICE**

     I, Jonathon D. Friedmann, hereby certify that I have this day served a true copy of the above document upon the opposing party by mailing a copy thereof to counsel of record this 18th day of September, 2008.

                            /s/ Jonathon D. Friedmann

                           _____

                           Jonathon D. Friedmann

Rachel Hankey, Esq.
Environmental Enforcement Section
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044-7611


Gregory Dain, Esq.
United States Environmental Protection Agency
Region 1
1 Congress Street, Suite 1100
Mail Code: SEL
Boston, MA 02114-2023