UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PAUL REVERE TRANSPORTATION, LLC,<br><br>Defendant. | ) | Civil Action No. 06-cv-12297 RCL<br><br>The Honorable Reginald C. Lindsay<br>REQUEST FOR ORAL ARGUMENT |

<u>MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT</u>

## I. INTRODUCTION

The Complaint in this matter, filed on December 26, 2006, alleges repeated violations of the Clean Air Act, 42 U.S.C. § 7401, et. seq. (CAA). Specifically, this case arises from Defendant, Paul Revere Transportation, LLC's ("Paul Revere"), longstanding practice of idling vehicles for lengthy periods in violation of the federally enforceable motor vehicle regulation found at 310 Code of Massachusetts Regulations ("CMR") § 7.11(1)(b) ("the Massachusetts idling regulation") to the detriment of the environment and its neighbors. Because no genuine issue of material fact exists regarding Paul Revere's liability, this Court should grant summary judgment against Paul Revere as a matter of law. Determination of the United States' claim for penalties and injunctive relief will await trial.

## II. SUMMARY

Paul Revere is a company operating a fleet of vehicles, including full-sized buses and shuttle vans, in Boston, Massachusetts.[1/] In March and April of 2006, the EPA completed inspections at Paul Revere's Roxbury facility and witnessed Paul Revere repeatedly and regularly violating the Massachusetts idling regulation. Indeed, the undisputed evidence demonstrates that Paul Revere's idling violations occurred consistently for a number of years in addition to the violations found during EPA's inspections.

## III. STATEMENT OF FACTS

### A. Paul Revere's Vehicles Were Idling Over the Five Minute Limit on Numerous Occasions.

In March and April of 2006, an inspector from EPA, Abdi Mohamoud, observed

[1/] A separate Statement of Material Facts is provided and any citations not provided herein can be found there.

operations at the Paul Revere Roxbury facility (hereinafter "the facility") located at 59 Reading Street in Roxbury, Massachusetts. Statement of Material Facts ¶3 (hereinafter S.M.F.). Mr. Mohamoud inspected the facility seven separate times in seven weeks. S.M.F. ¶ 4. On each inspection, Mr. Mohamoud witnessed numerous vehicles idling for extensive periods of time. Id. Regularly, vehicles idled for periods of one hour or more. Id. During his inspections, Mr. Mohamoud witnessed someone go from vehicle to vehicle and start the engine and allow them to continue to run, i.e. idle; and they continued to idle until driven off the lot. S.M.F. ¶ 13. Mr. Mohamoud did not witness anyone working on any of the buses, despite the engines being clearly visible, at the back of the bus. S.M.F. 14. The inspector's observations included:

- On Wednesday March 1, 2006 between 5:27 a.m. and 6:30 a.m., 13 vehicles idled for periods between 12 minutes and an hour and three minutes. Of these, three vehicles idled for more than an hour. During 5:28 a.m. and 5:50 a.m., 8 vehicles idled at the same time for this 22 minute period. S.M.F. ¶ 6.
- On Wednesday March 8, 2006 between 5:31 a.m. and 7:02 a.m., 13 vehicles idled for periods between 31 minutes and an hour and thirty one minutes. Of these, 6 vehicles idled for over an hour, including one for over an hour and a half. Between 5:31 a.m. and 6:08 a.m., 12 vehicles idled at the same time for this 38 minute period. Id.
- On Wednesday March 15, 2006 between 5:26 a.m. and 6:58 a.m., 13 vehicles idled for periods between 22 minutes and an hour and thirty two minutes. Of these, 6 vehicles idled for over an hour, including 3 for over an hour and a half. Between 5:26 a.m. and 6:01 a.m., 12 vehicles idled at the same time for this 35 minute period. Id.
- On Tuesday March 21, 2006 between 5:24 a.m. and 6:59 a.m., 14 vehicles idled for periods between 10 minutes and an hour and twenty eight minutes. Of these, 3 vehicles

idled for over an hour. Between 5:24 a.m. and 5:56 a.m., 9 vehicles idled at the same time for this 32 minute period. Id.

- On Thursday March 30, 2006 between 5:09 a.m. and 7:00 a.m., 23 vehicles idled for periods between 20 minutes and an hour and fifty one minutes. Of these, 12 vehicles idled for over an hour, including 2 for over an hour and a half. Between 5:09 a.m. and 5:50 a.m., 18 vehicles idled at the same time for this 41 minute period. Id.
- On Tuesday April 4, 2006 between 4:28 a.m. and 7:00 a.m., 26 vehicles idled for periods between 13 minutes and two hours. Of these, 7 vehicles idled for an hour or more, 4 for over an hour and a half. Between 5:00 a.m. and 5:40 a.m., 7 vehicles idled at the same time for this 40 minute period. Id.
- On Wednesday April 12, 2006 between 4:39 a.m. and 6:55 a.m., 28 vehicles idled for periods between 16 minutes and an hour and fifty eight minutes. Of these, 12 vehicles idled for over an hour, including 7 for over an hour and a half. Between 5:06 a.m. and 5:40 a.m., 14 vehicles idled at the same time in this 34 minute period. Id.

Overall at the facility, Mr. Mohamoud documented 132 vehicles that were being excessively idled, totaling 6,110 minutes. S.M.F. ¶ 17. In addition, on April 5, 2006, Mr. Mohamoud witnessed 11 other vehicles idling for more than five minutes, totaling 53 minutes, at a bus stop where Paul Revere vehicles wait for passengers on Brookline Ave. S.M.F. ¶ 18.

Significantly, Paul Revere has not denied this excessive idling occurred. S.M.F ¶ 19.[2/]

---

[2/]Q. On March 15, 2006, an EPA inspector visited the Roxbury facility and he arrived at 5:26 a.m. and found twelve vehicles idling and they idled for each a minimum of thirty-five minutes. Do you have any understanding as to the reason that these vehicles were idling?
A. No, I do not.
Q. Does Paul Revere deny that this idling occurred?
A. No, Paul Revere does not deny that there were vehicles idling.

EPA sent a Notice of Violation ("NOV") to Paul Revere on April 13, 2006 regarding the violations. Ex. M. After receiving the NOV, Richard Daley, General Manager of Paul Revere, questioned two employees regarding the idling. S.M.F. ¶ 21. Mr. Daley testified Mr. Powers admitted he was instructing employees to start the engines of buses on cold mornings because of complaints from customers and drivers about the cold temperature in the mornings. S.M.F. ¶ 21. Mr. Powers also told him he wanted to make sure the buses were able to start and be ready for service. S.M.F. ¶23. After his meeting with Mr. Swartz and Mr. Powers, Mr. Daley issued disciplinary warnings to both employees. S.M.F. ¶25. Mr. Daley's letter to Mr. Swartz stated:

> Over the past 3 weeks, I have investigated the complaint and during the investigation it was determined that Jim Powers, the AM Dispatcher, ordered the buses to be started on cold days, to allow the buses to build up air pressure and warm up. This act is in fact a violation of the EPA 5 minute idling rule. . . . When I questioned you regarding the buses running in the yard on cold mornings, you stated that you were aware the buses were running. You also stated that you were aware that Mr. Powers told the shifter to start the buses at 5:00 AM on cold days.

Ex. N. At his deposition, Mr. Swartz confirmed the statements in the disciplinary letter authored by Mr. Daley are accurate. S.M.F. ¶ 29. In Mr. Daley's disciplinary letter to Mr. Powers he further stated:

> Specifically, you have violated the company's five minute idling rules which are also violations of state and federal mandates. . . Notwithstanding our repeated admonitions to you and to other employees, it has come to our attention that you have violated these guidelines.

Ex. O. Mr. Daley testified he went to the facility to discuss the "issue that we had a violation that the buses were idling in the morning," with Mr. Powers, and "he started the buses and that's why he was disciplined." S.M.F. ¶ 30. Thus, Paul Revere has admitted, through this 30(b)(6)

---

Ex. L, Brown at 32:18-33:4.

witness, that its vehicles idled in violation over the proscribed limit.

B. The Facts Demonstrate No Reason for the Excessive Idling.

Paul Revere has not provided any explanation for the excessive idling. Mr. Powers testified that in cold weather, i.e. below 35 degrees, he directed employees to start the buses in the morning to ensure they were working and the engines would start. S.M.F. ¶ 31. Throughout the morning several buses, five or six at a time, would be started. S.M.F. ¶ 33. Mr. Powers testified he believed the vehicles were being turned off. S.M.F. ¶ 34. However, Mr. Powers' instructions did not include a request to the employees that the vehicles be turned off.[3/] Id. Additionally, Mr. Powers had no knowledge of how long the vehicles were idled, or if they were shut down, as he never witnessed employees to whom he gave instructions perform this check. S.M.F. ¶ 35. Mr. Powers confirmed he followed this procedure for the last four to five years, as did his supervisor, Mr. Swartz. S.M.F. ¶ 36.

While Mr. Powers explained why he asked employees to start vehicles (to "check" them), he cannot explain, nor has Paul Revere produced in discovery any employee who can explain,

[3/]Q. And I guess, I'm going to ask you to be very specific in telling me exactly what the instruction was that you give.
A. To who?
Q. To whoever you instructed to turn the vehicles on that day.
A. I will tell the mechanic or I will tell the driver to check to see if the bus is going to start, number one.
Q. Did you say anything else?
A. Let me know if the air is building up.
Q. Anything else?
A. Let me know -- let me know if the brakes work.
Q. Anything else?
A. Let me know if the doors work. Make sure the lights work. Make sure the heat works.
Q. Anything else?
A. No.

Ex. Q, Powers at 47:20-48:12.

why the vehicles were left idling for lengthy periods. In interrogatory responses only the following individuals were identified as having knowledge about the reasons for idling: Mr. Powers, Mr. Swartz, Mr. Viola, Mr. Gedaminsky and Mr. Daley. Ex. R, #3. However, none of these individuals could explain the reason the vehicles idled for lengthy periods. Mr. Powers did not have knowledge since he never witnessed the idling. S.M.F. ¶ 35. Mr. Swartz testified he believed the vehicles were being turned off, but only because Mr. Powers told him they were. S.M.F. ¶ 37. Mr. Daley and Mr. Viola were also designated as witnesses under Rule 30(b)(6), and as quoted below, neither had an understanding of why the vehicles were idling. Lastly, Mr. Gedaminsky could not explain because his only involvement was collecting documents for discovery for this action. S.M.F. ¶ 46.

Additionally, Paul Revere testified, under Fed. R. Civ. P. Rule 30(b)(6), it has no understanding of why the vehicles were idling. James Viola, Director of Maintenance, was designated to testify on behalf of Paul Revere regarding the reasons and procedures for idling including during the inspections. Exs. U, V. Mr. Viola could not provide an explanation:

> Q. In March and April of 2006, EPA visited the Roxbury facility and witnessed numerous instances in which Paul Revere vehicles were idling for more than five minutes.
> Do you have any understanding of why those vehicles were being idled?
> A. No specific reason no.

Ex. S at 19:10-17. Nor could he explain why several vehicles would idle for extensive periods:

> Q. Do you have any understanding of why 12 vehicles would be idling for more than half an hour at one time?
> A. I do not.

Ex. S at 21:22-25, S.M.F. 42, 47. Richard Daley, General Manager, was designated to testifying on the same topics as Mr. Viola, he did not explain the length of the idling. Exs. U, V.

> **Q. Does Paul Revere deny that this Idling occurred?**
> **A. No**
> Q. Do you know who started them?
> A. The buses, I don't. . . .
> **Q. Do you have any understanding why 12 vehicles would all run for over half an hour at one time?**
> **A. No.** . . .
> **Q. On March 1, 2006, the EPA inspector visited and he found 13 vehicles idling for over the five minute limit. Three for over an hour. Do you have any understanding why these vehicles were idling?**
> **A. No, I do not. . . .**
> Q. If I asked you this question for the rest of the days, is you're answer going to be the same?
> A. I believe it will be, yes ma'am. Again it depended- **the bus shouldn't be running for an hour.** . .

Ex. K at 28:13-30:19 (emphasis added), S.M.F. 42, 47. James Carney, former Director of Maintenance, was also designated under Rule 30(b)(6) regarding the procedures and reasons for idling. Exs. U, V (#8). Mr. Carney could not explain the reason for idling:

> Q. On March 15, 2006 an EPA inspector visited the Roxbury facility. And when he arrived, he found 12 vehicles idling all at the same time. 12 of those vehicles idled for 35 minutes all at the same time. Do you have any understanding of - from your understanding and- from when you worked at Paul Revere, do you have any understanding of why 12 vehicles would be idling for 35 minutes?
> A. No

Ex. T at 45:15-46:7, S.M.F. 42, 47. Nor could the only other person designated regarding the reasons for idling, Mr. Brown, offer an explanation. S.M.F. 42, 47.

It is also clear that the vehicles were not idling because they were being serviced. Paul Revere only had two mechanics on site during the hours of 4:00 a.m. and 6:00 a.m., and only one other mechanic who might be on site between 6:00 a.m. and 7:00 a.m. S.M.F. ¶ 48 Therefore, it is not possible the vehicles were being serviced by mechanics, as far more than three vehicles were idling at one time. Id. Drivers are not trained to diagnose problems on the vehicles, so Paul

Revere cannot validly claim that drivers were servicing the vehicles either. S.M.F. ¶ 49.

While cold weather may be the reason why Mr. Powers had the vehicles "checked," it does not explain or justify the length of idling witnessed by EPA's inspector. Paul Revere schedules its drivers to arrive just ten minutes prior to departure. S.M.F. ¶ 50. The time allotted is not changed in cold weather. Id. Paul Revere employees testified that unless a vehicle needed repair, it would be ready in minutes. For example, Mr. Andrews, a driver, testified it would normally take two minutes for a vehicle to build up pressure, and if the pressure had not built up within five minutes he would ask for another vehicle. S.M.F. ¶ 51. Similarly, Mr. Williams, another driver, said he never waited more than six minutes for the pressure to build before getting another vehicle; there is no way he would sit there for 10-15 minutes. Id. Paul Revere's mechanic stated he would know within seven or eight minutes if a vehicle needed repair Id.

Nor do the vehicle manuals, provided by Paul Revere during discovery in this action, suggest a reason to idle for lengthy periods. In fact to the contrary, the vehicle manuals warn against prolonged idling. S.M.F. ¶ 52. Paul Revere operates a number of buses, but most are either "Thomas" buses or "Neoplans." S.M.F. ¶ 53. The manual for the Thomas bus recommends vehicles idle for only 3-5 minutes before operation. S.M.F. ¶ 54. The Neoplan manual also recommends running the engine at part throttle only for five minutes before applying a load. S.M.F ¶ 55. The Thomas manual only recommends idling for more time, 10-15 minutes, when the temperature drops below negative ten degrees. S.M.F. ¶ 54. According to the National Climatic Data Center, the minimum temperature in Boston has never dropped below negative ten degrees in the preceding five years or during EPA's inspections. S.M.F. ¶57.

It is obvious from Paul Revere's testimony that the vehicles can be operated without

excessive idling, and in fact, Paul Revere has done so since receiving the NOV from EPA. S.M.F. ¶ 71. Mary Jane Fay, a neighbor abutting the facility (as discussed below) testified that she had not noticed long periods of idling recently. S.M.F. ¶ 73. The manager of the Roxbury facility, Fred Jones, testified under Rule 30(b)(6), that since the NOV, vehicles do not idle for more than a 10 minute pre-trip inspection. S.M.F. ¶ 74.

C. There is Evidence of a Pattern and Practice of Additional Extensive Idling.

Others confirmed that extensive idling has been occurring at the Roxbury facility for years. A neighbor living next to the Roxbury facility, Mary Jayne Fay, testified during her deposition that Paul Revere vehicles have idled for extensive periods of time for many years. S.M.F. ¶ 58. Ms. Fay complained to Paul Revere about the idling numerous times over the years. Ex. II, S.M.F. ¶ 59. Ms. Fay kept notes of some of her complaints to Paul Revere. Ex. II, S.M.F. ¶ 61. Entries in these notes reflect complaints as early as the year 2000 and as late as 2005. Id. Ms. Fay testified that her complaints do not represent the only idling, but only the times she was frustrated enough to call. S.M.F. ¶62. Moreover, she would only call to complain if several vehicles had been idling for at least thirty minutes. S.M.F. ¶ 63. Ms. Fay confirmed that often vehicles were unattended when they were left idling. S.M.F. ¶ 64.

Mr. Peter Henderson worked at the Paul Revere Roxbury facility from 1995 until January 2004 as a bus cleaner. S.M.F. ¶65 . Mr. Henderson testified that when he was a Paul Revere employee, he would start the vehicles in the mornings in cold weather before the runs. S.M.F. ¶66. He would check the run sheets prepared by the dispatcher and try to start the vehicles 10 minutes prior to their run and leave them running for the driver. Id. However, sometimes the schedule would change and a driver would take a different bus and the bus Mr. Henderson

turned on would be left running. S.M.F. ¶ 67. Mr. Henderson admitted he was not a mechanic who was trained to address problems; rather the mechanics did that. S.M.F. ¶ 68. He, like other Paul Revere employees, testified that it only took five to 10 minutes for the air pressure to build before you knew it was a problem a mechanic had to address. S.M.F. ¶ 69

## IV. ARGUMENT

### A. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The party moving for summary judgment bears responsibility for showing those portions of the discovery record that demonstrate an absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, after the moving party has fulfilled this obligation, the burden shifts to the non-moving party to demonstrate that a trier of fact could reasonably find in its favor. Denovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citing Celotex, 477 U.S. at 322-25). The Supreme Court has noted "[a]t the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." Scott v. Harris, 127 S. Ct. 1769, 1776 (U.S. 2007) (citing Fed. Rule Civ. Proc. 56(c)). "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. (citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587 (1986)).

### B. The Massachusetts Anti-Idling Regulation

Under Section 113 of the Clean Air Act, the United States, on behalf of EPA, may bring a civil action for injunctive relief and/or civil penalties for violations of an applicable state implementation plan. 42 U.S.C. §7413(a)(1) and (b)(1). The Massachusetts anti-idling regulation is part of the Commonwealth's original State Implementation Plan submittal, approved by EPA on May 31, 1972 (37 Fed. Reg. 10872). The Massachusetts regulation provides:

> No person shall cause, suffer, allow, or permit the unnecessary operation of the engine of a motor vehicle while said vehicle is stopped for a foreseeable period of time in excess of five minutes. This regulation shall not apply to:
> (1) vehicles being serviced, provided that the operation of the engine is essential to the proper repair thereof, or
> (2) vehicles engaged in the delivery or acceptance of goods, wares, or merchandise for which engine assisted power is necessary and substitute alternate means cannot be made available, or
> (3) vehicles engaged in an operation for which engine power is necessary for an associated power need other than movement and substitute alternate power means cannot be made available provided that such operation does not cause or contribute to a condition of air pollution.
>
> 310 CMR. 7.11(1)(b).

The United States easily meets its burden of demonstrating that Paul Revere permitted the operation of the engine of a motor vehicle while stopped for a foreseeable period of more than five minutes.

C. There Is No Genuine Issue of Material Fact that Paul Revere Repeatedly Exceeded the Five Minute Idling Rule.

The record demonstrates that there is no genuine issue of fact with respect to repeated violations of the anti-idling rule.

1. There is No Genuine Issue of Material Fact That the Idling Witnessed by EPA's Inspector Violated the Idling Regulation.

Paul Revere has not denied that it idled far in excess of the five minute limit numerous times. S.M.F. ¶19. As noted above, the EPA inspector witnessed Paul Revere vehicles idling for

more than five minutes 143 times, more than 6,000 minutes. S.M.F. ¶ 17,18. A Paul Revere employee went from vehicle to vehicle, turning on multiple vehicles at the same time and leaving them idling for periods of sometimes over an hour. S.M.F.11-13. No one was witnessed servicing the vehicles, nor could the vehicles all have been undergoing service concurrently, as Paul Revere had only two mechanics on staff at that time, yet far more vehicles were witnessed simultaneously. S.M.F. ¶6, 7, 14,48.

Not only did Paul Revere admit the vehicles were being idled in excess of the permitted amount, but also that the idling was a violation of the law. Mr. Powers, the dispatcher responsible for operations at the facility in the morning, admitted both in testimony and to Mr. Daley, the General Manager, that he directed other employees to idle the vehicles. Mr. Daley even reprimanded both Mr. Powers and Mr. Swartz, admitting Paul Revere violated the idling rule. Ex. N, O. These letters constitute an admission by Paul Revere. There is no dispute, and Paul Revere has not denied that it repeatedly idled its vehicles in excess of the five minute limit. Indeed, at the Roxbury facility, vehicles idled for an average of 45 minutes.[4/]

2. <u>There is No Genuine Issue of Material Fact That Idling Witnessed by Paul Revere's Neighbor Demonstrates Further Violations.</u>

The Court also should grant summary judgment for violations witnessed by Mary Jane Fay, a neighbor to the Roxbury facility, who also observed repeated excessive idling at that facility. Ms. Fay testified that excessive idling in cold weather was common practice at Paul Revere. S.M.F. ¶58-64. In fact, Ms. Fay knew about the five minute idling regulation, and complained numerous times to Paul Revere, even calling the City . <u>Id</u>.; Ex. II. Ms. Fay has

---

[4/] 6,110 divided by 132.

documented, in the five years since April of 2001, six complaints to Paul Revere. Ex. II. On January 27, 2003, Ms. Fay noted that buses were running for over an hour. Id. On February 6, 2005, she noted that 10 buses were running. Id. On February 21, 2005, her notes reflect that eight buses were running. Id. She also has notations of complaints on January 25 and February 22, 2004, and January 17, 2005. Id. Ms. Fay testified that she would only complain when several vehicles had idled for periods of over half an hour, and her notes reflect as many as 10 vehicles idling. S.M.F. ¶ 63. The Court should grant summary judgment for at least these six complaints documented. Ex. II. Accordingly, in addition to the 143 violations witnessed by EPA's inspector, the Court also should grant summary judgment for a minimum of six violations witnessed by Mary Jane Fay.

3. There is No Genuine Issue of Material Fact That A Pattern and Practice of Idling is Established for the Entire Seven Week Period the Inspections Occurred.

The EPA inspector visited the Paul Revere Roxbury facility seven times over a period of seven weeks, one day each week, with the day of the week varying. S.M.F. ¶ 4, 8. Every single time the inspector observed the facility during this time, he found numerous violations. S.M.F. ¶ 7-9. Only the start time of the inspections impacted the number of observed violations:

- Wednesday March 1, the inspection began at 5:27 a.m. and documented 13 violations. .
- Wednesday March 8, the inspection began at 5:31 a.m. and documented 13 violations. Id.
- Wednesday March 15, the inspection began at 5:26 a.m. and documented 13 violations. Id.
- Tuesday March 21, the inspection began at 5:24 a.m. and documented 14 violations. Id.
- Thursday March 30, the inspection began at 5:09 a.m. and documented 23 violations. Id.
- Tuesday April 4, the inspection began at 4:28 a.m. and documented 26 violations. Id.

- Wednesday April 12, the inspection began at 4:39 a.m. and documented 28 violations. Id.

On days when the inspector arrived at around the same time he also found similar numbers of violations. These facts clearly demonstrate a pattern and practice of extended idling.

The practice of consistent excessive idling was confirmed by Mr. Powers' testimony. Mr. Powers testified that he would regularly instruct employees to start the vehicles and "check" them in cold weather. S.M.F. ¶ 31. The Supreme Court has stated that where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." Matsushita Elec. Industrial Co., 475 U.S. 574, 586-587 (1986). Under the circumstances, given the pattern and practice established by the evidence, no reasonable factfinder could find that the preponderance of the evidence does not establish violations of the five minute idling rule on each weekday during the entire seven week period the inspector visited the facility.[5/] The average number of vehicles witnessed over the seven week period on a given day was just over eighteen, and he minimum number of vehicles was thirteen. Based on this evidence, the Court should grant summary judgment for an additional 364 violations. S.M.F. ¶77.

4. There is No Genuine Issue of Material Fact as to a Pattern and Practice of Idling Regarding Excessive Idling Since December 2002.

Mr. Powers has been the morning dispatcher at Paul Revere since November 2002, and he confirmed this practice of idling the vehicles on cold mornings has been the same since that time. S.M.F. ¶36, Ex. KK (No. 9). This was also confirmed by Mr. Swartz who testified it was Paul Revere's practice since 2001. S.M.F. ¶ 36. Additionally, Mr. Henderson, who was

[5/]Paul Revere conducts the same routes Monday through Friday. S.M.F. ¶75.

employed at Paul Revere from 1995 until 2004, would also start the vehicles on cold mornings and leave them idling. This historical pattern and practice of excessive idling in cold weather also was confirmed by Paul Revere's neighbor, Ms. Fay.

Since December 2002, there have been 281 weekdays, excluding holidays, where the minimum temperature was below 35 degrees in Boston according to the National Climatic Data Center. S.M.F. ¶ 78. Mr. Powers testified that on days where the temperature was below 35 degrees, he would request that the vehicles be idled. S.M.F. ¶ 31. As noted, this pattern was confirmed by multiple witnesses. Thus, the Court should grant summary judgment to the United States for an additional 280 violations based on the testimony and this data. The United States is requesting the Court grant summary judgment only with respect to a single violation on each of the days under 35 degrees, despite the fact that the inspector never witnessed less than 13 vehicles idling at any one inspection, and Mr. Powers testified it was his practice to have several vehicles started at once. S.M.F. ¶ 33. Additionally, on three of the seven days the inspector witnessed idling, the minimum temperature never reached below 35 degrees. S.M.F. ¶79. Therefore, violations likely occurred on many more days than when the minimum temperature dropped below 35 degrees.

As with the violations above, there is no evidence disputing these violations in the record, only evidence supporting the pattern and practice of idling by Paul Revere. Finding that no genuine dispute of fact exists as to the pattern and practice of extended idling in weather below 35 degrees, and based on the preponderance of the evidence, the Court should grant summary judgment for an additional 280 violations since December 2002.

D. Paul Revere cannot meet its Burden of Showing that Idling was Necessary

Paul Revere admitted that it had no understanding of why vehicles were idling in excess of the five minute limit, indeed for an average of 45 minutes. S.M.F. ¶ 47. Even without Paul Revere's admission, the facts demonstrate there was no reason for the idling. Paul Revere clearly cannot establish that idling was necessary.

Nonetheless, Defendant has pleaded as an affirmative defense the excessive idling was necessary. Ex. B . Because the defense of "necessity" is an affirmative defense, Paul Revere as the party asserting the defense bears the burden of proving it.[6/] Defendant in its pleadings has acknowledged that "necessity" should be treated as an affirmative defense. Otherwise, the United States would unreasonably bear the burden of proving, as part of its prima facie case, that Defendant's operation of its buses at the time of the excessive idling was "unnecessary." This would be contrary to established case law that courts generally do not require a party to "prove a negative" as part of a prima facie case. See, e.g., Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 589-90 (1st Cir. 1979); In re Acushnet River & New Bedford Harbor, 722 F. Supp. 893, 901 n.21 (D. Mass. 1989).[7/] Furthermore, "[t]he ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary." United States v. New York, New Haven & Hartford R.R. Co., 355 U.S. 253, 256 n.5 (1957); see also United States v. Cortez-Rivera, 454 F.3d 1038, 1041 (9th Cir. 2006).

---

[6/] To meet its burden of showing that the idling was necessary, Defendant must establish that the entire period of idling was necessary. Defendant could not escape liability if it idled for 20 minutes, when only 10 minutes was necessary.

[7/] See e.g, Kingsland v. City of Miami, 382 F.3d 1220, 1227-28 (11th Cir. 2004); Bayway Refining Co. v. Oxygenated Marketing and Trading A.G., 215 F.3d 219, 225 n.4 (2d Cir. 2000) Harrow Products, Inc. v. Liberty Mut. Ins. Co., 64 F.3d 1015, 1020 (6th Cir. 1995).

Additionally, the term "unnecessary" as used in the regulation must be interpreted extremely narrowly. An accepted rule of interpretation is that one must examine a statute as a whole, giving due weight to design, structure, and purpose, as well as to aggregate language.[8] See e.g., O'Connell v. Shalala, 79 F.3d 170, 176 (1st Cir. 1996); see also, Dowell v. Commissioner of Transitional Assistance, 424 Mass. 610, 613 (Mass. 1997); Singer Friedlander Corp. v. State Lottery Comm'n, 423 Mass. 562, 565 (Mass. 1996). A narrow construction is warranted by the environmental objectives of the regulation. See e.g. Arnold v. UPS, 136 F.3d 854, 860 (1st Cir. 1998) (citing Dickerson v. New Banner Inst., 460 U.S. 103, 118 (1983)(a statute should be read in light of its objectives)). Webster's Third New International Dictionary defines "unnecessary" as "not necessary." Ex. MM. "Necessary" is defined by Webster in several ways, but the most appropriate definition is that which is "absolutely essential" or "absolutely required". Id. The three categorical exemptions demonstrate that what is deemed "necessary" under the regulation is extremely limited. Therefore, Defendant can only meet its burden of showing that idling was "necessary" if it can demonstrate that it was absolutely required.

The evidence submitted herewith demonstrates that idling was not. While Mr. Powers may have asked that the vehicles be turned on to "check" that they would be working for service, there is no explanation for why the vehicles were left idling unattended for extended periods. Employees gave binding testimony, on behalf of Paul Revere, that it had no explanation or understanding of the reasons for the idling. Nor could they explain why multiple vehicles would

---

[8] In determining the meaning of a regulation, courts employ the same principles of construction as with statutes. See e.g., Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia, 524 F.3d 54, 57 (1st Cir. 2008).

idle at the same time for periods of more than 30 minutes and sometimes hours. Additionally, Paul Revere explicitly stated, in its 30(b)(6) testimony, that vehicles should not be idling for an hour, yet the inspector witnessed this 49 times. S.M.F. ¶ 6, 43.

In response to interrogatories, however, Paul Revere claimed that idling was necessary for pre-trip inspections or diagnosing mechanical problems:

> Paul Revere is compiling evidence and conducting research and investigations related to its assertions and affirmative defenses that the idling of Paul Revere's motor vehicles at the Roxbury facility was necessary during the subject dates . . . Accordingly, Paul Revere will supplement its response to this Interrogatory with evidence that becomes available at a later date,. . . Subject to the above response, Paul Revere states that the idling was necessary for pre-trip inspections, and/or to diagnose mechanical problems including but not limited to electrical problems, fuel leaks, and air leaks.

Ex. R (#4). In the same interrogatory responses, Paul Revere identified only Mr. Powers, Mr. Swartz, Mr. Daley, Mr. Viola, and Mr. Gedaminsky as persons who "were involved in or have knowledge of any idling at the Roxbury facility after April 15, 2001." Ex. R (#3). Paul Revere has never supplemented these responses. Nor did Paul Revere provide any other witnesses with knowledge during the 30(b)(6) deposition. Ex. U, V. None of these people, nor any of the 30(b)(6) witnesses, were able to provide an explanation for why the idling would be necessary.[9]

[9] Paul Revere has produced in discovery an expert report by Dr. Victor Wong concluding that idling over five minutes is necessary. Dr. Wong's report is not based on fact, is contradicted by the record, including Paul Revere's own testimony and vehicle manuals, and is also purely theoretical and conjectural in nature. Presuming Defendant intends to proffer his testimony, the United States does not believe Paul Revere can meet its burden of showing Dr. Wong's opinion is admissible and, therefore, it cannot be used to establish a genuine issue of material fact. See e.g., Ervin v. Johnson & Johnson, Inc. 492 F.3d 901, 904 (7th Cir. 2007). Discovery with respect to Dr. Wong has not concluded, the United States has yet to take its deposition of Dr. Wong on his supplemental reports, for which leave was granted by the Court on September 9, 2008. The Court did not extend the remaining deadlines, including those for summary judgment.

Significantly, there was not a single Paul Revere employee who testified that the idling witnessed by the EPA inspector was for mechanical reasons. In fact, the opposite is true. Paul Revere's 30(b)(6) testimony was that it had no understanding of the reasons for the idling. The First Circuit has noted that the evidence illustrating a factual controversy cannot be conjectural or problematic. See Medina -Munoz, etc., et al v. R.J. Reynolds Tobacco Company, 896 F.2d 5, 8 (1st Cir. 1990). "Indeed, if the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation, summary judgment may be appropriate. See Id., (citing Rossy v. Roche Products, Inc., 880 F.2d 621, 624 (1st Cir. 1989)). Any attempt by Paul Revere to provide reasons for the idling is purely conjectural. Not a single employee provided an explanation as to why the vehicles were left idling. Contrary to Paul Revere's responses to interrogatories, the vehicles could not have been undergoing diagnoses of mechanical issues, as there were simply not enough mechanics onsite to work on the number of vehicles found idling. S.M.F. ¶48. Nor could pre-trip inspections explain the hours of idling witnessed because Paul Revere schedules only ten minutes for pre-trip inspections, and the vehicle manuals themselves recommend only 5 minutes of idle time. S.M.F. ¶ 50, 52-56. Furthermore, since the NOV, it is apparent that Paul Revere is not idling in violation of the rule, making clear that idling is not necessary. [10/]

Defendant cannot rely on any of the categorical exemptions under which excessive idling is allowed under the regulation. Defendant bears the burden of showing it falls within one of those three express circumstances recited. See Kelli K. Goodrow v. Lane Bryant, Inc., 432

---

[10/] Mohamoud Aff ¶ 27; Ex. I, Fay at 43:6-19, 47:16-48:3; Ex. Z, Jones at 14:9-15:3; Ex. Y, Roland at 22:10-23:5, 25:19-26:6. Ex. P, Swartz at 34:3-5.

Mass. 165, 170, 732 N.E.2d 289, 294 (Mass. 2000); see also Harry C. Crooker & Sons, Inc. v. OSHRC, 537 F.3d 79, *16 (1st Cir. 2008); EEOC v. Chicago Club, 86 F.3d 1423, 1429 (7th Cir. 1996). The regulation provides only three specific exemptions to the prohibition on excessive idling, i.e., for more than five minutes, and other exemptions can be implied. See District Attorney for Plymouth Dist. v. Board of Selectmen, 395 Mass. 629, 633 (Mass. 1985); Commonwealth v Germano, 379 Mass. 268, 273 (1979); see also, Andrus v. Glover Constr. Co., 446 U.S. 608, 616-17 (1980). Defendant has presented no evidence that would demonstrate any of the exemptions apply.

The evidence simply does not present any genuine issue of material fact with respect to the 143 violations witnessed by EPA's inspector, and Paul Revere cannot possibly meet its burden of proving that idling was necessary.[11/]

## V. CONCLUSION

For the reasons stated herein, the United States requests the Court grant summary judgment in favor of the Plaintiff and grant judgment as to liability for the following violations: 143 violations witnessed by the EPA inspector totaling 6,163 minutes; 6 violations witnessed by Paul Revere's neighbor; 364 violations over the seven week period of inspections; and 280 violations since December 2002 for a total of 794 violations.

Respectfully submitted,

---

[11/]Even if the Court were to find that the United States has the burden of proof in this regard, this burden has clearly been met when the facts and Paul Revere's testimony make clear that there is simply no sufficient explanation that demonstrates the need for multiple buses to idle for extended periods of time.

RONALD J TENPAS
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

/s/Rachel A. Hankey
RACHEL A. HANKEY
Trial Attorney
Environmental Enforcement Section
Environmental and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
(202) 514-4454
rachel.hankey@usdoj.gov

MICHAEL J. SULLIVAN
United States Attorney

GEORGE B. HENDERSON, II
Assistant U.S. Attorney
United States Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3272
George.henderson2@usdoj.gov

OF COUNSEL:
GREG DAIN
Senior Enforcement Counsel
U.S. Environmental Protection Agency
One Congress Street
Boston, MA 02114
(617) 918-1777

# TABLE OF CONTENTS


I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. Paul Revere's Vehicles Were Idling Over the Five Minute Limit on Numerous Occasions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. The Facts Demonstrate No Reason for the Excessive Idling. . . . . . . . . . . . . . . . . . .5

C. There is Evidence of a Pattern and Practice of Additional Extensive Idling. .. . . . 9

IV. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A. Summary Judgment Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

B. The Massachusetts Anti-Idling Regulation . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . 11

C. There Is No Genuine Issue of Material Fact that Paul Revere Repeatedly Exceeded the Five Minute Idling Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

1. There is No Genuine Issue of Material Fact That the Idling Witnessed by EPA's Inspector Violated the Idling Regulation. . . . . . . . . . . . . . . . . . . . . 12

2. There is No Genuine Issue of Material Fact That Idling Witnessed by Paul Revere's Neighbor Demonstrates Further Violations. . . . . . . . . . . . . . . 12

3. There is No Genuine Issue of Material Fact That A Pattern and Practice of Idling is Established for the Entire Seven Week Period the Inspections Occurred.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

4. There is No Genuine Issue of Material Fact as to a Pattern and Practice of Idling Regarding Excessive Idling Since December 2002. . . . . . . . . . . . . 14

D. Paul Revere cannot meet its Burden of Showing that Idling was Necessary . . . . 16

V. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Acushnet River & New Bedford Harbor*,
722 F. Supp. 893 (D. Mass. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Andrus v. Glover Construction Co.*, 446 U.S. 608 (1980) . . . . . . . . . . . . . . . . . . . . . 20

*Arnold v. UPS*, 136 F.3d 854 (1st Cir. 1998) ....................................................................17

*Bayway Refining Co. v. Oxygenated Marketing and Trading A.G.*,
215 F.3d 219 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Denovellis v. Shalala*, 124 F.3d 298 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Dickerson v. New Banner Inst.*, 460 U.S. 103 (1983) .................................................... 17

*EEOC v. Chicago Club*, 86 F.3d 1423 (7th Cir. Il. 1996) . . . . . . . . . . . . . . . . . . . . . . . 20

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901 (7th Cir. 2007) . . . . . . . . . . . . . . . . . 18

*Harrow Products, Inc. v. Liberty Mutual Insurance Co.*,
64 F.3d 1015 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Harry C. Crooker & Sons, Inc. v. OSHRC*, 537 F.3d 79 (1st Cir. 2008) . . . . . . . . . . . 20

*Kingsland v. City of Miami*, 382 F.3d 1220 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . 16

*Mashpee Tribe v. New Seabury Corp.*, 592 F.2d 575 (1st Cir. 1979) . . . . . . . . . . . . . . 16

*Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ........... . 10,14

*Medina -Munoz, etc., et al v. R.J. Reynolds Tobacco Company*,
896 F.2d 5 (1st Cir. 1990)................................................................................ . . . 19

*Morales v. Sociedad Espanola de Auxilio Mutuo y Beneficencia*,
524 F.3d 54 (1st Cir. P.R. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*O'Connell v. Shalala*, 79 F.3d 170 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Rossy v. Roche Products, Inc*., 880 F.2d 621 (1st Cir. 1989) .......................................... 19

*Scott v. Harris*, 127 S. Ct. 1769 (U.S. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*United States v. Cortez-Rivera*, 454 F.3d 1038 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . 16

*United States v. New York, New Haven & Hartford R.R. Co.*,
355 U.S. 253 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**STATE CASES**

*Commonwealth v Germano*, 379 Mass. 268 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*District Attorney for Plymouth District v. Board of Selectmen*,
395 Mass. 629 (Mass. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Dowell v. Commissioner of Transitional Assistance*
424 Mass. 610, 613 (Mass. 1997) ........................................................................17

*Kelli K. Goodrow v. Lane Bryant, Inc*.,
432 Mass. 165, 170, 732 N.E.2d 289, 294 (Mass. 2000) ....................................19

*Singer Friedlander Corp. v. State Lottery Comm'n*,
423 Mass. 562, 565 (Mass. 1996) ..........................................................................16

**FEDERAL STATUTES**

Clean Air Act, 42 U.S.C. §7401, et. seq . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Sections 113, 42 U.S.C.7413(a)(1) and (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11

**REGULATIONS**

Code of Massachusetts Regulations (CMR) § 7.11(1) .............................................. 1, 11