UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Plaintiff,                 )
                                    )   Civil Action
v.                                  )   No. 06-12297-GAO
                                    )
PAUL REVERE TRANSPORTATION, LLC,    )
                                    )
         Defendant.                 )
                                    )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**FINAL PRETRIAL CONFERENCE**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Monday, May 4, 2009
2:15 p.m.

Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    APPEARANCES:

 2         UNITED STATES DEPARTMENT OF JUSTICE
           ENVIRONMENTAL ENFORCEMENT SECTION
 3         By: Rachel A. Hankey, Esq.
               Scott D. Bauer, Esq.
 4         P.O. Box 7611
           Ben Franklin Station
 5         Washington, D.C. 20044-7611
           - and -
 6         U.S. AIR FORCE DEPARTMENT OF LAW
           By: Jeffrey K. Sands, Esq.
 7         HQ USAFA/DFL Suite 8J100
           USAFA, Colorado 80840
 8         On Behalf of the Government

 9         RUDOLPH FRIEDMANN, LLP
           By: Jonathon D. Friedmann, Esq.
10             Isaac Borenstein, Esq.
           92 State Street
11         Boston, Massachusetts 02109
           On Behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

|  |  |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | THE CLERK:  And last up, USA versus Paul Revere, |
| 3 | 06-12297.  Would counsel identify themselves for the record, |
| 4 | please. |
| 5 | MS. HANKEY:  Rachel Hankey from the Department of |
| 6 | Justice for the United States. |
| 7 | MR. BAUER:  Scott Bauer also for the United States. |
| 8 | MR. SANDS:  Jeffrey Sands for the United States. |
| 9 | MR. FRIEDMANN:  Jonathon Friedmann for the defendant, |
| 10 | your Honor. |
| 11 | MR. BORENSTEIN:  Isaac Borenstein also for the |
| 12 | defendant. |
| 13 | THE COURT:  It's a pleasure to see you, sir. |
| 14 | All right.  This is new to me, as you probably know. |
| 15 | I -- Judge Young had set some dates -- you can have a seat. |
| 16 | Judge Young had set some dates, and my intention is to |
| 17 | hold them.  That's why you're here today.  But I don't think we |
| 18 | can do a full pretrial -- resolve all the issues.  First of |
| 19 | all, there appears to be some briefing still going on on in |
| 20 | limine motions and so on and so forth.  But why don't I get |
| 21 | from both of you your general overview of the case and where |
| 22 | you think it's going and what the trial will be like and so on. |
| 23 | Just give me an introduction. |
| 24 | I've read the pretrial memo, I should say, but I'm |
| 25 | still not intimately familiar with the case. |

1          MS. HANKEY:  Basically, your Honor, under the Clean

2    Air Act each state can enact its own state implementation plan

3    to meet the goals of the Clean Air Act.  And in Massachusetts

4    the state implementation plan includes the Massachusetts idling

5    regulation.  And what the idling regulation prohibits is the

6    idling of -- basically, to allow the unnecessary operation of a

7    motor vehicle for more than a foreseeable period of five

8    minutes, and then it states three exceptions.

9          In this case an EPA inspector went to Paul Revere, the

10   defendant's facility in Roxbury, Massachusetts.  And he went

11   there seven times over a period of seven weeks -- once a week

12   during those seven weeks -- and during the period he saw

13   multiple vehicles on each day idling for far more than the

14   five-minute period.

15          THE COURT:  This is when?  I'm sorry?  The time?

16          MS. HANKEY:  This was in 2006.  In April and May of

17   2006.  March and April.  March and April of 2006.

18          And basically he saw vehicles idle sometimes for

19   periods up to two hours.  He documented more than 131 vehicles

20   idling for more than 100 hours.  And based on that evidence the

21   EPA also talked to neighbors in the area, and a neighbor who

22   lives literally next door to the facility.  And she was deposed

23   in this matter, and she testified that this was something that

24   was ongoing for years and was a regular practice in cold

25   weather at Paul Revere.

1          The United States also deposed several of Paul

2    Revere's employees.  And a dispatcher who worked at Paul Revere

3    testified that on cold mornings he would send somebody out to

4    start the vehicles.  And that confirms what the inspector saw,

5    basically someone going from vehicle to vehicle, starting the

6    vehicles, and then they sat there until the vehicles were

7    driven off the lot.

8          Additionally, the United States took Paul Revere's

9    deposition under 30(b)(6), and Paul Revere testified that it

10   didn't -- it had no understanding of why those vehicles were

11   left idling, didn't know who the person was who left the

12   vehicles idling.  And based on that testimony and based on the

13   inspector's observations, the United States has alleged,

14   basically, that there have been violations over a period of

15   five years -- a pattern and practice of violations.

16          THE COURT:  Okay.  And the relief?

17          MS. HANKEY:  The relief is a penalty under the Clean

18   Air Act.  The Clean Air Act has several statutory factors that

19   the Court considers to award a penalty.  And it's a penalty of

20   up to 32,500 per day.  And injunctive relief as the Court sees

21   fit.

22          THE COURT:  Is the problem, from the agency's point of

23   view, persisting; in other words, is there something to enjoin

24   and --

25          MS. HANKEY:  At this point our understanding is that

1    it is not continuing.

2          THE COURT:  Okay.  Mr. Friedmann?

3          MR. FRIEDMANN:  Thank you, your Honor.

4          Your Honor, I would like to address scheduling at the

5    end of this -- with you, because there are some problems.

6    Maybe I should do that first with your Honor.

7          THE COURT:  No, don't do it first.  Let me hear about

8    the case first.

9          MR. FRIEDMANN:  Our position on this is, your Honor,

10   that the statute in Massachusetts is a very general statute.

11   It says you shall not idle a vehicle over five minutes if it's

12   not in motion, period.  And then it does have some limited

13   exceptions.  But one of the issues is, what is necessary and

14   what is unnecessary?

15         Our position is, and our witnesses have testified,

16   that the only time a vehicle idled for more than five minutes

17   was when it was mechanically necessary or necessary for safety

18   reasons.  These are sometimes old vehicles that are 19, 20

19   years old that needed to warm up in the morning so that they

20   would build up sufficient air pressure so that their brakes

21   would work or so that the lifts would work or so the doors

22   would work or so that you could see out of the windshield of

23   these vehicles.

24         The so-called inspection was done by one individual

25   seven times at our location in Roxbury and one time at another

1  location -- a completely different factual circumstance on the

2  second location -- who never even came upon the property to

3  inspect but did it from across the street, and has acknowledged

4  he couldn't tell if there were drivers in the busses or not in

5  the busses, he couldn't tell if they were being jump-started,

6  if they were being run to charge or for any other reason.

7       And one of the issues that I'm sure your Honor has

8  picked up on in the papers is who is required to prove the

9  necessity or lack of necessity of the idling.  The government

10 seeks to push that burden onto the defendant here

11 notwithstanding the fact that this has both civil and criminal

12 penalties.  It's our position that it is their obligation, that

13 their inspector could easily have come onto our property on any

14 of those visits and asked, "Why is this vehicle idling?" after

15 having observed it for five minutes, but he chose not to.  And

16 so he has never established whether there was a mechanical

17 necessity of the nature that I've described to your Honor in

18 any of these instances.

19      Now, we also don't dispute that our neighbor next

20 door, who has lived there for ten years, has acknowledged --

21 I'm sorry -- has said that she has complained to us on 12

22 occasions or so over the ten-year period, but primarily it was

23 because of noise in our location.  And she acknowledged when

24 she was deposed -- this is Dr. Fay -- that when she would look

25 out the window from her second-story apartment next door, that

PDF created with pdfFactory trial version www.pdffactory.com

1  she would oftentimes see the jump truck -- the truck that is

2  used to come up to the vehicles and jump them when they won't

3  start -- attached to the trucks and vehicles that were running,

4  which we say is the mechanical necessity that the vehicles

5  needed to be charged to get them out on route because once

6  they're out on route if they get turned off because there was a

7  layover, they don't get started again, then there's a problem

8  both in service and getting service to them.

9       So there's a significant dispute with regard to the

10 number of violations and whether violations exist.  The

11 government has viewed seven times over a seven-year period and

12 is extrapolating over 900 violations from seven visits,

13 contradicted by their own witnesses' testimony that, number

14 one, they never came on to the property to see the necessity;

15 and contradicted, number two, by the doctor next door who said

16 she saw the vehicles being worked on.  So we dispute whether

17 violations occurred; we dispute the number of violations.

18      Those are the core.  There's also a series -- or

19 another violation or series of violations that they claim to

20 have occurred at an alternate location, a stop along the route,

21 if you would.  New England Medical Center is one of the

22 customers of Paul Revere Transportation.  We drive a route for

23 them where we pick up and drop off their employees and take

24 them to ancillary lots, either in the morning or in the

25 afternoon.

PDF created with pdfFactory trial version www.pdffactory.com

1          And what the witness, the inspector, testified to is

2     that he took the time of when a bus pulled in until when it

3     picked up the passengers and pulled out.  He admitted that they

4     would start at the end of the line, and he would keep track of

5     how long it took them to get from the back of the line to the

6     front of the line.  However, the distance that he traveled, the

7     inspector just decided that didn't constitute movement as the

8     standard under the statute; but notwithstanding the fact that

9     the busses moved one and a half football fields, that he didn't

10    consider that to be movement.  So we dispute in that case also

11    whether there was any excess idling.

12         So our position, in essence, is, your Honor, that

13    there has been no excess idling; that all of the idling that

14    was done was done as necessity.  My sister took the deposition

15    of two drivers, both of which denied that on the dates in

16    question that the vehicles were idling in excess of five

17    minutes.  She took the depositions of two of the mechanics,

18    both of whom denied it.  She took the deposition of management

19    personnel who have denied it.  And all we have is this one

20    person -- their one observer who, from across the street,

21    claims that he saw these violations.

22         With regard to the trial itself, your Honor, I believe

23    both parties have indicated that we believe it's a bifurcated

24    trial with liability and then penalty.  The penalty portion

25    would be something that your Honor would be deciding.  We have

PDF created with pdfFactory trial version www.pdffactory.com

1    had some discussions regarding resolution, both injunctive and

2    monetary.  I think we have come to an understanding on the

3    injunctive end; we have not been able to reach a resolution on

4    the monetary end.

5            I would be asking your Honor -- and this is partially

6    based on my schedule -- when Judge Young set the schedule, he

7    unilaterally put us on his rolling trial list to begin in June.

8    I have a vacation that's starting at the end of June.  We

9    supposed -- the government thought it was going to be two

10   weeks; I thought four weeks.  We settled in our memo on three

11   weeks.  But I have a vacation in June, I have -- with what the

12   vacation schedules of my experts are, I have the vacation

13   schedule of my co-counsel, and also my trial schedule with

14   other matters that are previously scheduled.

15           And I would be asking the Court, if you could, to give

16   us a firm date in September.  It doesn't seem to me that it is

17   practical that we would be able to reach a time -- a three-week

18   time zone -- in which I would be able to participate in this

19   trial before that date.  So I would ask your Honor to consider

20   that.  And I know Judge Young had also, in his normal statement

21   to all counsel, said, "If there's a vacation that you have

22   scheduled, I'm not going to schedule you during your vacation."

23   So I would ask your Honor -- I don't know if you do the same

24   rolling list that Judge Young does.

25           THE COURT:  No.

1          MR. FRIEDMANN:  But he had just put us in in June, to

2     begin in his rolling list.  And as I say, with my schedule -- I

3     have my calendar here if you have specific questions.  But it

4     appears to me that September would be the earliest that we

5     could try the case.

6          And I am hopeful still that we've had some meaningful

7     settlement discussions, that it's possible that we could

8     resolve the case.  I was going to suggest that perhaps within

9     the time frame between today and the September trial date that

10    you could refer us to the federal mediation program, because I

11    do believe we worked out on the restraint side all of the

12    relief, and it's just a matter of dollars now.

13         Again, your Honor, that's not meant to indicate in any

14    way that we agree we have violated anything; it's just that

15    sometimes the cost of litigation exceeds the cost of what you

16    can resolve a matter for.  You should understand also that Paul

17    Revere is a very forward-looking company.  It has received

18    awards for its environmental compliance and switching to

19    ultra-low diesel fuel years before it was required and was

20    extremely, extremely environmentally conscious well before this

21    claim was brought.

22         MS. HANKEY:  If I might, your Honor.  This is the

23    first that we've heard about the request to move the trial

24    date.  In our pretrial -- in our meet-and-confer before the

25    pretrial this was never raised by counsel.  And we had actually

PDF created with pdfFactory trial version www.pdffactory.com

1   agreed on two weeks, not three weeks, as an estimated trial

2   time.  And we aren't -- we don't believe that the trial should

3   be moved until September.

4        If you want to hear more on the ongoing settlement

5   discussions, Mr. Bauer is our settlement counsel.

6        THE COURT:  Well, no, I don't.  Particularly if I'm

7   going to be resolving some things without the jury, I don't

8   want to get into the settlement.  We can arrange for settlement

9   discussions --

10        MR. FRIEDMANN:  Your Honor, it's true in our

11   meet-and-confer we didn't discuss it because we were on the

12   assumption we were going with what Judge Young had said which

13   is, "I'll put you on the list beginning in June, and when we

14   reach you we will give you a call the week before.  But if you

15   have a problem, let us know and we'll deal with it."  I'm just

16   trying -- I understand your Honor doesn't use the same process

17   that Judge Young does, and so I'm trying to just flag early for

18   you the problems that I see over the next few weeks -- or few

19   months.

20        THE COURT:  Okay.  I want to talk about other things

21   besides scheduling for a while.

22        Let me come back to the main event.  I guess everybody

23   agrees that on the question of liability, violation of the

24   regulation or whatever, that there is a right to a jury trial?

25        MS. HANKEY:  Yes, your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1          MR. FRIEDMANN:  Correct.

2          THE COURT:  All right.  Now, with respect to the prima

3    facie case, there was a controversy about who proves that the

4    operation of the engine of the motor vehicle was, quote,

5    "unnecessary," right?

6          MS. HANKEY:  That's correct, your Honor.  And the

7    three listed --

8          THE COURT:  I'm not sure I'm ready to resolve that now

9    because I haven't read it in depth enough, but let's assume for

10   a moment that the burden is on the government to prove that.

11   What would the government's proof be?  What would it consist

12   of?  What kinds of things would you show to meet the element of

13   the claim that the operation was unnecessary?

14         MS. HANKEY:  Well, I guess it would be easy to say

15   that I disagree with the version of the facts that counsel has

16   presented to you.

17         THE COURT:  Right now it's at least a 50/50 shot,

18   right?  So you might have to do it.  If you do have to do it,

19   how would you do it?

20         MS. HANKEY:  First of all, although the inspector did

21   not go on and talk to the people, of course that would have

22   interfered with his ability to do and continue the inspections.

23   What he saw was multiple vehicles idling for very long periods

24   of time all at the same time.  Contrary to what counsel has

25   said is the version of the facts, what the Paul Revere

PDF created with pdfFactory trial version www.pdffactory.com

1    employees testified to is that in their normal practice they

2    can get vehicles ready in two to three minutes, and that the

3    drivers testified that they never would wait more than six

4    minutes, for a vehicle, to be necessary.  We're talking about

5    idling of periods up to two hours, not ten minutes, not 15

6    minutes.  We're talking about up to two hours.  And the average

7    period witnessed was 45 minutes.

8           In addition to that, Paul Revere only had two

9    mechanics on-site in the morning and yet there were as many as

10   12 vehicles idling all at the same time.  And the only

11   justification for why vehicles would idle for more than the six

12   minutes without the drivers in it is the mechanic had to work

13   on the vehicle.  And it's physically impossible that mechanics

14   could have been working on the vehicles when you had as many as

15   12 vehicles idling at the same time.

16          I would also add Paul Revere testified in its 30(b)(6)

17   it had absolutely no understanding why these vehicles were

18   idling.  It is not true that they testified that they were

19   idling for air pressure or because they couldn't see through

20   the windows; they testified they had no understanding

21   whatsoever why these vehicles were idling.  In addition, the

22   vehicle manuals for these busses say that busses should be

23   ready in periods of three to five minutes, not periods of 20

24   minutes, half an hour, 45 minutes, as was witnessed.  And I

25   would add that the dispatcher testified that it was his

PDF created with pdfFactory trial version www.pdffactory.com

1   practice to send somebody out to start five or six vehicles at

2   the same time.  And that's what the inspector witnessed.

3           THE COURT:  Okay.  Anything you want to say on that

4   question?

5           MR. FRIEDMANN:  Absolutely, your Honor.  First off,

6   with regard to the manuals, the manuals say that it is not

7   good, if you have the vehicle in gear, to idle it for more than

8   five minutes.  We're not talking about vehicles that were in

9   gear; we're talking about vehicles that were neutral and --

10          THE COURT:  How do you idle a vehicle in gear?

11          MR. FRIEDMANN:  Sometimes there's a practice where

12  people do that because it puts more strain on the engine, and

13  then it will cause the engine to warm up faster.  But the

14  manufacturer recommends against that in the 2001 manual, and of

15  course most of these violations are for '84 and '87 vehicles

16  that there is no manual for.  But that's another issue.  That's

17  a different issue.

18          With regard to what my sister says about what was said

19  versus what wasn't said, she's confused two different

20  processes.  You have the dispatcher who got in at 4:30 in the

21  morning that would have the shifters -- these are people who

22  work on swing shifts -- and there were also the cleaners that

23  would still be there and the fuelers.  On extremely cold

24  weather where there was high humidity, high wind and cold

25  weather, he would send them out in advance to start the

PDF created with pdfFactory trial version www.pdffactory.com

1    engines, to see if the vehicles would start, number one, or

2    whether they needed to be jumped; number two, to see if they

3    would build up air pressure; number three, if they would, when

4    you pressed on the accelerator, continue to run or stall out,

5    because obviously if you have 40 people on a 24-ton bus and you

6    step on the gas and it stalls in the middle of traffic, you've

7    got a lot of problems.  Not just traffic problems, but you're

8    going to get hit.

9         So he would send people out early in the morning

10   before the drivers came in to do this inspection and

11   run-through.  And as he testified to, whatever the vehicles

12   were that were the earliest to go out, he would send these

13   people to start first, sort of like doing triage, okay?  "I've

14   got six busses that are going out, four of them are okay, move

15   on to the next two."

16        Well, later on when the drivers get in, the drivers

17   would start it up.  And in good weather, yes, it would warm up

18   in three minutes.  And in bad weather it would take them

19   sometimes ten minutes to do the warm-up and the circle check.

20   Those are two very different and discrete events.  They are

21   testified to as separate types of events.  So when a driver

22   comes in and says, "It only took me six minutes to warm it up,"

23   that's because it had already been checked and already had the

24   air pressure warmed up an hour before or two hours before.

25        With regard to the statement about there were only two

PDF created with pdfFactory trial version www.pdffactory.com

1   mechanics, that's correct.  There were only two mechanics.  But

2   there were all of these other shifters and all of these other

3   personnel who were sent out to start that could read the gauge

4   just as well as a mechanic and who testified they would start

5   one and then they would go next door to the next one and start

6   it, and they would come back and forth sort of like a ping-pong

7   ball checking to see if it would build up air pressure or

8   didn't build up air pressure.  If it would build it up they

9   would turn that one off, they'd move on to the next one that

10  they already had on as the one next to that and see if that one

11  would start and that one would function.

12          So it wasn't that you had to have one person there for

13  every bus; the mechanics were necessary when you had fuel

14  lines -- excuse me, air line freezes.  They would be the ones

15  who would have to come with the jump trucks.  They were the

16  ones who would have to come with the torches to unfreeze the

17  frozen lines.  That's different, though, than the normal

18  warmup.  And there are times when busses would have to sit in

19  order to thaw out to be functional where they would run for 35

20  or 40 minutes.  And, in fact, one of our experts, Dr. Wong,

21  gives his opinion as to the warmup times because of what they

22  refer to in the industry as "cold soak."

23          And "cold soak" is -- and I don't know, your Honor may

24  remember years ago when you had a car that did not have an

25  automatic choke, when you would have to come out in the morning

1    and you would have to use the choke to get the air and fuel

2    mixture correct.  What the cold soaks involve is that a vehicle

3    that hasn't been run for a long time, overnight, and has been

4    exposed to the elements, the cold essentially soaks into the

5    metals of the vehicle, and it takes a certain amount of time

6    for those metals to warm up and the oils to warm up for the

7    vehicle to be properly operative.

8            And so my sister may say, "Well, we believe it took

9    too long to warm up."  Their inspector could easily have come

10   onto the property on any of those days and said, "I see that

11   bus is running.  I've been watching it run for 23 minutes.  Why

12   is it running for 23 minutes?"  They would have had their

13   alleged violation and they would have known why.

14           They don't tell us that, though.  They come to us

15   months later and say, "Tell me on April 1st at 4:30 in the

16   morning why this bus was running."  And the driver says, "I

17   wasn't running it."  But we don't have any records, so our

18   30(b)(6) designee, when he comes out, he can't say, in all

19   honesty, "I know on that date it was doing this" or it was

20   doing that because they didn't give us the opportunity to.

21           However, every single person that got up and testified

22   has said, "I didn't do it for more than five minutes."  "I know

23   what the rule is."  If there was a mechanical reason for it, is

24   the only time that these vehicles were run in excess of the

25   five minutes, and they gave the very specific reasons why it

PDF created with pdfFactory trial version www.pdffactory.com

1   would need to be done.

2            THE COURT:  Okay.

3            MS. HANKEY:  I just want to clarify one thing because

4   you'll see this in our papers.  He just went through a long

5   explanation of how a shifter would go from bus to bus to

6   start that vehicle, and you won't find anything in the record

7   that supports that.  Paul Revere has never identified to us in

8   discovery a shifter and who the shifter is.  In preparation for

9   their 30(b)(6) testimony they did not talk to a single shifter;

10  they did not present a single shifter as a 30(b)(6) deponent.

11  And you'll see this is the basis for some of our motions in

12  limine.

13           In terms of Dr. Wong, that was also -- he is also

14  subject to one of our motions in limine.

15           THE COURT:  That's a good segue.  I wanted to hear

16  about Dr. Wong.  Why don't you tell me about Dr. Wong.

17           MS. HANKEY:  How much do you want to hear?  Give me an

18  idea because I could go for a long time.

19           Basically, Dr. Wong has presented two expert reports.

20  The first expert report is how using a model -- a computer

21  model developed by a student at MIT about 20 years ago -- how

22  long it would take an engine to warm up to 180 degrees.  Now,

23  Paul Revere has testified and, in fact, stipulated that they

24  don't idle to a specific temperature requirement.  So how that

25  report is relevant is beyond me.  If they don't idle to reach a

PDF created with pdfFactory trial version www.pdffactory.com

1    temperature requirement, I don't know how his estimate of how

2    long it takes to reach that temperature can be relevant, but

3    that -- the first thing is he's offering an opinion that you

4    have to idle to reach 180 degrees Fahrenheit.  That's what's,

5    in his opinion, the required operating temperature.  He cites

6    nothing for that statement and opinion.

7             THE COURT:  Who is he?

8             MS. HANKEY:  Who is he?

9             THE COURT:  Yeah.

10            MS. HANKEY:  He's a professor at MIT.

11            MR. FRIEDMANN:  He's actually the head of the MIT

12   automotive --

13            THE COURT:  Okay.  I'll come back to you.

14            MS. HANKEY:  As head of the -- he could cite to

15   nothing --

16            THE COURT:  All right.  He has his own standard or

17   something.  Is that basically the idea?

18            MS. HANKEY:  He hasn't presented anything to support

19   180 degrees as the required temperature.  The thesis that he

20   used to develop the computer model is a -- was developed by a

21   student for a small gasoline engine.  In the thesis itself, it

22   says that if you were to use this for other engines, it should

23   be validated; that you should check it against experimental

24   results to test its accuracy.  And Dr. Wong did not do that

25   before he used it on the large diesel engines, not gasoline

PDF created with pdfFactory trial version www.pdffactory.com

1    engines, that were involved in this case.

2         In addition to that, he made many changes to the

3    models which if you read his reports are not at all described

4    in his reports.  He didn't use the complete model, but he

5    doesn't explain what he used and what he didn't use.  He did

6    things like added wind to the model; he did a calculation to

7    get to a wind factor of two.  That's what's in the model he's

8    produced, the calculations.  And in it, it uses a wind factor

9    of two.  He apparently tossed the calculation he used to come

10   up with that wind factor of two.  He literally threw it away.

11        And you'll see his -- in his testimony, his

12   explanation was that he used some sort of number, or Reynolds

13   number -- not one, not two, not three, not four, but a

14   number -- to come up where he multiplied it by a wind.  He

15   thinks he used five miles an hour but he can't be sure because

16   he didn't save it; he tossed it.  And this, again, was not in

17   his report, and this is in addition to many other changes.

18        I could go on.

19        THE COURT:  I get the idea.  Okay.

20        MR. FRIEDMANN:  Did you want me to address Dr. Wong --

21        THE COURT:  No.

22        MR. FRIEDMANN:  -- or the first part of it?

23        THE COURT:  Yeah.

24        MR. FRIEDMANN:  The first part, your Honor, was about

25   our failure, allegedly, to identify.  A notice of violation was

1    issued to Paul Revere Transportation pre-suit.  Pre-suit we

2    responded to it and gave them the name and address of every

3    driver, every shifter, every mechanic and every management

4    person that was on duty on the days in question and at the

5    hours in question.  We gave that to them.

6          When we did our initial disclosures we gave them that

7    same information for a second time.  When they asked us for

8    interrogatories, we gave them the same information for a third

9    time.  And when we produced documents, we gave them the same

10   information for the fourth time.  When my sister last week

11   served us with a motion in limine, she wrote 14 times in that

12   motion that we had never disclosed these people.  We only

13   disclosed them four times.  And, in fact, the first two

14   depositions she took were of drivers from the list that she

15   claims we didn't give her.  The second -- excuse me, the third

16   and fourth deposition were the mechanics that she says we

17   didn't disclose to her that were on the same list.

18         This was all before the 30(b)(6) depositions were

19   noticed, now.  And when you look at the requests under her

20   30(b)(6), and these are the motions I think that we got on

21   Wednesday -- we haven't even filed our oppositions to them yet,

22   but this is part of our responses.  But when you look at what

23   they asked for --

24         THE COURT:  You had a round of this with the summary

25   judgment, though, right?

1          MR. FRIEDMANN:  We did.  Judge Young denied their

2    motion for summary judgment.  The same issues were raised by

3    them both as to Dr. Wong and as to -- well, not as to

4    witnesses, but this allegation that the 30(b)(6) people didn't

5    say anything.  Well, the 30(b)(6) were the people most

6    knowledgeable.  And there were different people that were

7    designated because there were different timeframes also when

8    somebody was a manager.  But there's a difference between when

9    you ask on a 30(b)(6) request for the person most knowledgeable

10   of -- you know, what are your policies and what are your

11   procedures, that doesn't necessarily get you the name of every

12   single driver that's been given to you four separate times

13   previously and you've already taken depositions of.

14          So this idea that we didn't disclose to them these

15   people, we gave it to them in writing four separate times.  And

16   they also know from the responses to requests for admissions

17   that we told them specifically what inquiry was made of each of

18   the shifters and each of the drivers and each of the management

19   personnel in order to respond to the request for admissions.

20          With regard to Dr. Wong, Dr. Wong is the chief

21   scientist in the Sloan Automotive Lab of MIT.  And he's

22   testified -- he's given two different subjects that he's given

23   testimony on -- and he's done an original report and a

24   supplemental report, both of which were timely filed.  He gave

25   three days of depositions to my sister and, believe me, is a

1    very qualified expert.  In fact, their own experts acknowledged

2    that what he did was fundamentally sound, that these are the

3    basic principles of thermodynamics and that he followed those

4    basic principles.

5         What he did is he said, "I can't pinpoint a particular

6    temperature, I can't pinpoint a particular input because we're

7    dealing with different types of engines on different types of

8    vehicles that have different inputs."  So I gave -- excuse

9    me -- he gave in his report a range -- a range of temperatures

10   and a range of inputs -- and said, "If your temperature that

11   you say is the necessary temperature is 180 degrees, and if

12   it's this size engine and the input was this, then this is the

13   range you get."  So it's a sliding scale.  He didn't use one

14   static point like my sister would like to say; he used a range.

15        THE COURT:  Okay.  I get the general drift.  What

16   value is he or his testimony to your case?  Why is he --

17        MR. FRIEDMANN:  He confirms what the on-street people

18   continually say happened, which is on cold days that they would

19   need to start the vehicles and it would take more than five

20   minutes to warm them up to a point where they were safely

21   operable.  He gave two reports:  One is on the engine itself

22   reaching a temperature where it won't stall out if you put your

23   foot on the gas, and the other is on how long it takes to build

24   up sufficient air pressure for the air brakes and the air

25   functions that are necessary for the operation of the vehicle

1    to occur.  So he's confirming --

2           THE COURT:  What's his opinion?

3           MR. FRIEDMANN:  Well, he gives a range depending upon

4    how much blockage there is.  I mean, he gives ranges anywhere

5    from four to five minutes on some occasions to 20 to 30 minutes

6    on other occasions on the air pressure.  On the temperature, he

7    gives ranges up to 45 minutes in a cold-soak circumstance.  And

8    the reason he used things like wind and things like the

9    moisture in the air is because those are factors that affect

10   the ability to warm up -- on a colder, damper day you're going

11   to have more freezing of lines than you are -- and, quite

12   frankly, he testified he used a four-mile-an-hour.  And on

13   every single day that these alleged problems occurred on, the

14   wind is much greater than four miles an hour during the

15   relevant time frame; it's usually around 11 to 14 miles an

16   hour.  So he took a very conservative approach to it.

17          THE COURT:  Okay.  I see on the government's list that

18   there are some experts who are listed as rebuttal experts.  Are

19   there affirmative experts before you get to the rebuttal of Dr.

20   Wong?

21          MS. HANKEY:  Only for penalty purposes.

22          THE COURT:  Only for penalty purposes?  And are there

23   other defense experts besides Dr. Wong?

24          MR. FRIEDMANN:  There is Dr. Lyons, I understand --

25          THE COURT:  Oh, yeah.  I saw something about him.

1          MR. FRIEDMANN:  -- on the penalty phase who the

2    government also objects to.

3          THE COURT:  And what are those issues, just generally,

4    the penalty phase issues?

5          MS. HANKEY:  We presented two expert reports.  One is

6    an estimate of the emissions from the days on which the

7    inspector witnessed violations.

8          THE COURT:  This is to gauge how offensive the

9    violations were or something like that?

10          MS. HANKEY:  He calculates the emissions from --

11          THE COURT:  No.  I mean for the fact-finder.  The

12    evidence would be to show this is a more-serious rather than

13    less-serious kind of thing?

14          MS. HANKEY:  Right.  And then the second is a health

15    physicist regarding the health effects of the emissions.

16          THE COURT:  Same drift?

17          MS. HANKEY:  Yeah.

18          THE COURT:  And on that phase you have Lyons?

19          MR. FRIEDMANN:  Dr. Lyons, yes.

20          THE COURT:  And who is he?

21          MR. FRIEDMANN:  I'm sorry?

22          THE COURT:  Who's he?

23          MR. FRIEDMANN:  He's with -- I'm trying to remember

24    the name of the company out in California.  I'm having a senior

25    moment.  But he has worked for the California Air Quality

1    Control Board for a number of years and he did the

2    calculation -- what we did was we used the model the government

3    has used in the past and applied the correct numbers to it.

4    And what I mean by "correct numbers" is, as I mentioned to you,

5    your Honor, we had gone to this ultra-low diesel fuel many

6    years before it was required.  The government's own witness had

7    written articles on the fact that if you use that type of fuel,

8    that these busses run about 90 percent cleaner than the average

9    bus.  And so when their expert did his first report, he just

10    apparently forgot to use the adjustment that he has written is

11    supposed to be used when you use this type of fuel.

12        So Dr. Lyons did the same analysis using the correct

13    numbers, and then the expert from the government then did

14    another report which, interestingly, after dropping down by the

15    90 percent concludes that there was more pollution because he

16    then put different numbers into his report as to the number of

17    minutes of violations and the different number of busses and

18    the fact that the busses aren't even consistent -- if you look

19    at a particular day, on one report he might have 30 minutes of

20    operation for the bus and in his next report he has 130 minutes

21    of operation for that bus.

22        THE COURT:  Okay.

23        MS. HANKEY:  Just to clarify, Mr. Lyons didn't present

24    an emissions estimate; he simply presented an argument as to

25    why the use of the ultra-low sulfur and the particulate filters

1    should have been considered.  The use of the filters is what we

2    have moved to exclude because there's no data to support the

3    conclusion that the filters were at idle.  And the supplemental

4    report that he -- counsel was just referring to has adjusted

5    the emissions estimate to consider the particulate filter,

6    although I'd represent to the Court information on the fact

7    that there isn't any data on whether they work at idle and to

8    what efficiency they work at idle.

9            THE COURT:  Your trial time estimates cover both

10   phases of the case?

11           MR. FRIEDMANN:  Mine do not, your Honor.

12           MS. HANKEY:  Including penalty?

13           THE COURT:  Yeah.

14           MS. HANKEY:  We have stipulated, frankly, to a lot of

15   the facts that would be relevant to penalty and --

16           THE COURT:  Right.  But when you say two weeks or

17   three weeks or whatever it might be, are you contemplating that

18   as the jury portion of the case?

19           MS. HANKEY:  I believe that it can all be done in the

20   two weeks.  I believe the penalty phase would be --

21           THE COURT:  So if jury is less than 100 percent of the

22   time, and 100 percent is two or three weeks, what's jury's

23   percent?

24           MS. HANKEY:  The jury's percent is probably 85

25   percent.  I believe that you can do penalty in one day.

1          THE COURT:  All right.  Do you agree -- disagree with

2     the percentage -- the relative proportion of the jury to

3     non-jury?

4          MR. FRIEDMANN:  I have never even thought of it that

5     way, your Honor.

6          THE COURT:  I'm just trying to understand when you say

7     two weeks or three weeks, is that everything to the end or is

8     that just the jury?

9          MR. FRIEDMANN:  When I was saying three weeks -- I was

10    originally saying four weeks, and my sister was saying two

11    weeks, and I thought we had agreed on three weeks, but I was

12    including none of the penalty phase in that; I was considering

13    the jury phase only.

14         THE COURT:  Okay.  When's your vacation?

15         MR. FRIEDMANN:  I am starting on March --

16         THE COURT:  Not March.

17         MR. FRIEDMANN:  Excuse me.  June -- excuse me --

18    June --

19         THE COURT:  Do you need a vacation?

20         MR. FRIEDMANN:  Excuse me?

21         THE COURT:  Never mind.

22         MR. FRIEDMANN:  Mine is -- this is why I brought this

23    with me.  I'm starting on June 26th, and I'm through to the

24    13th --

25         THE COURT:  Well, if we start on June 1st we'll be

PDF created with pdfFactory trial version www.pdffactory.com

1   done by June 26th.  You'll be able to go on vacation a happy

2   man.

3         MR. FRIEDMANN:  I have a problem, your Honor, that my

4   expert is away two of the weeks of June also.

5         THE COURT:  That's Dr. Wong or the other one?

6         MR. FRIEDMANN:  That is Dr. Wong.

7         THE COURT:  We work with -- take them out of order.

8         MS. HANKEY:  I have jury duty June 22nd, just so --

9         MR. FRIEDMANN:  Your Honor, I am really --

10        MS. HANKEY:  But I believe we will be done by June --

11   if we start on June 1st, I believe we will be done by mid-June.

12        MR. FRIEDMANN:  I'm really not sure that if we start

13   that I'm not going to miss this vacation, and I don't feel like

14   getting divorced.

15        THE COURT:  Well, I don't -- you know, I don't know as

16   much about the case as you do, obviously.  It doesn't look like

17   a more than -- I'm not going to say any numbers.  June 26th

18   looks safe to me, is all I would say.  Unlike Judge Young, we

19   know that we'll start on June 1st.  So I'm inclined to keep the

20   date.

21        Now, so let's talk about this.  You're going to oppose

22   the motions in limine?

23        MR. FRIEDMANN:  We will.

24        THE COURT:  I looked at the calendar, and I thought

25   maybe the 20th?

PDF created with pdfFactory trial version www.pdffactory.com

1          The 20th?  Wednesday afternoon, the 20th?

2          THE CLERK:  Wednesday, May 20th, at 2:30 for --

3          THE COURT:  We'll have a hearing on the motions in

4   limine.

5          And now with respect -- I want to get back to the

6   burden of proof because I think that makes a big difference.

7   As I said, I haven't totally gone through the materials, but we

8   could do one of two things, and it's really for your benefit so

9   I'll see what you think about it.  If you think the issue is

10  framed well in the papers, I'll decide it on the papers, and if

11  we take that course we can do it sooner rather than later.  If

12  you think it is appropriate for argument, we'll put it on for

13  the 20th, the same time as the motions in limine.

14         MR. FRIEDMANN:  I would prefer to have the input on

15  the same day as the motions in limine.

16         THE COURT:  All right.  We'll put that issue on the

17  docket, then, too, the question of the burdens --

18  burden/burdens of proof.  I think those are the principal legal

19  matters that would have to be resolved.

20         MS. HANKEY:  Is there any way we could do it sooner

21  than the 20th?

22         THE COURT:  Well, they have to -- they have their time

23  to respond to the -- I don't know when that runs out, but --

24         MR. FRIEDMANN:  I think --

25         THE COURT:  Probably next week.  I don't think we

PDF created with pdfFactory trial version www.pdffactory.com

 1   could do it before then.  We're booked next week; we can't do

 2   it.  It's really -- it really is the most realistic time for

 3   us -- for everybody.

 4          What else?  Anything else?  Okay.  Let's leave it at

 5   that.  We'll see --

 6          MR. FRIEDMANN:  Your Honor, may I ask another question

 7   on a procedural issue?  I know the government has designated a

 8   number of deposition transcripts that they're going to utilize.

 9   And some judges -- most judges require that there be a

10   disclosure of which portions a certain number of days prior to

11   trial so we have notice of that.  I don't know what your policy

12   is on that.

13          THE COURT:  Nothing hard and fast, but you're right.

14   That should be done.  I didn't notice that was going to be --

15   how much deposition testimony volume-wise?

16          MS. HANKEY:  Like that 30(b)(6) testimony.

17          THE COURT:  How much is it?  What kind of volume are

18   we looking at?

19          MS. HANKEY:  I mean, the testimony was taken in pretty

20   much one day, so it's not a huge volume.

21          THE COURT:  Is it the deposition of the 30(b)(6)

22   witness?  Is that what you're saying?

23          MS. HANKEY:  Right.  There were eight 30(b)(6)

24   witnesses.

25          THE COURT:  And you're going to offer eight

1  depositions?

2          MS. HANKEY:  Not the entire deposition but portions of

3  it.  And then in addition, we will seek to offer admissions

4  from the other depositions.

5          THE COURT:  Do you have a proposed schedule?  I mean,

6  there's got to be a designation so there could be a

7  counter-designation.

8          MR. FRIEDMANN:  That's what I was thinking of.  I

9  mean, I guess maybe by the 22nd of May to have the

10  designations?  That's a week and a half before trial.

11          THE COURT:  For both?  Ideally what I would like you

12  to do, to the extent there are any issues, that you negotiate

13  over them --

14          MS. HANKEY:  How about by the 15th?  We'll do our depo

15  designations by the 15th and then meet and confer before the

16  20th, so that perhaps if there are any issues we could raise

17  them on the 20th.

18          MR. FRIEDMANN:  If you give them to the 15th I'm not

19  going to be able to meet and confer before the 20th because I'm

20  out of town for a graduation on that weekend of the 16th.

21          THE COURT:  Well, it doesn't have to be done by the

22  20th, but the 15th is good because it gets it done earlier.

23  How about if --

24          MR. FRIEDMANN:  Right.  Can we have until the 25th to

25  respond?

1          THE COURT:  Is that Monday?

2          MR. FRIEDMANN:  Yeah.

3          THE COURT:  That's Memorial Day.  So the 26th.  Then

4     you could spend the rest of that week ironing out the problems.

5          MS. HANKEY:  And does the Court have a preference for

6     how those are presented to the Court?

7          THE COURT:  Well, two things:  One is if there are

8     issues, I guess I would like a transcript which indicates that

9     there's an objection to the question and answer and a basis for

10    it.  Usually that's enough.  And then I'll rule on -- I can

11    rule on the paper.  But this is going to be presented to the

12    jury, right?

13         MS. HANKEY:  Right.

14         MR. FRIEDMANN:  Right.

15         THE COURT:  So you're going to have somebody on the

16    stand?

17         MS. HANKEY:  That was my next question.  How does the

18    Court prefer that the depo testimony be presented?

19         THE COURT:  Well, if it's just a paper transcript,

20    that's probably the way to do it.  But I'm amenable to

21    suggestions.  If you want to -- I've never done it, but it

22    wouldn't be unheard of.  If you want to give the jurors a

23    booklet and ask them to read it, we could do that, I suppose,

24    but normally it's presented in the courtroom.  It's sort of --

25    it's a wooden procedure no matter how it's done.

1          MS. HANKEY:  But you would be okay with us having a

2   witness read the testimony in on the stand?

3          THE COURT:  That's the traditional way.

4          MR. BORENSTEIN:  Judge O'Toole, I wanted to just see

5   if you were open enough to revisiting the June 1 starting date

6   or -- okay.

7          THE COURT:  No.  I know it's going to put some

8   pressure on, but that's what I intend, actually.  I mean, this

9   case -- the alleged events are two years old.  The case is an

10  '06 case.  It's time, so...

11         MS. HANKEY:  And on exhibits, does the Court have a

12  preference for how exhibits are presented and how many copies?

13         THE COURT:  No.  We do have a lot of electronic

14  equipment that facilitates the presentation of evidence.  I

15  encourage the parties to think about using it, particularly

16  with documents.  If you have them on disk we can display them

17  to the jurors.  If you're going to do that, you have to make an

18  appointment with our IT staff and learn how to use the

19  equipment so we don't have problems in the middle of the trial,

20  but --

21         MS. HANKEY:  Do we call the court reporter's office?

22         THE CLERK:  No.  It would be Chris Gross, G-R-O-S-S,

23  at (617)748-9088.

24         MR. FRIEDMANN:  Your Honor, what about the videotapes

25  in this case?  There was one that was produced to us -- the

1    30(b)(6) designee of the government, the inspector -- so-called

2    inspector testified under oath during discovery that he never

3    made a videotape of any of these events, and after all

4    discovery closed the government all of a sudden found a

5    videotape that allegedly is one of the days of the alleged

6    violations.  It's undetermined what date it is and of course

7    was not produced during discovery.  It was held, allegedly

8    found, after discovery was completed.

9         There's significant narrative in it.  I mean, you've

10   got to see this tape, I think, yourself to decide admissibility

11   on it at some point in time.  And then there's the newest

12   videotape that we just got -- I think it was April 9th of

13   2009 -- from the government that's allegedly another

14   inspection, 14 months after close of discovery, with a

15   narrative from the person about his other visits to the

16   location, not even describing this visit to the location.  And

17   interestingly, you hear his car running the whole time, the two

18   hours of the tape, contrary to the five-minute-idle rule.

19        THE COURT:  It might have been necessary.

20        MR. FRIEDMANN:  It might have been necessary.

21        And, your Honor, not meaning to joke about it, that

22   really is an issue for the jury --

23        THE COURT:  I understand.  Okay.  Let me just hear

24   quickly about the tapes.

25        MS. HANKEY:  Sure.  Just so you know, we provided --

1    when we objected to defendant's exhibits, we provided them with

2    a list of our objections and the basis for the objection, and

3    the defense has not done the same thing for us, so this is the

4    first time we've heard the basis of defendant's objections to

5    the videotapes.  And frankly, we'd like to know the basis for

6    their objection to the rest of the exhibits which they've

7    objected to including many exhibits which they produced in

8    discovery.

9           On the videotapes, yes, it's true that the inspector

10   did not remember videotaping the -- during his inspection

11   during his deposition, and he testified he didn't remember.  He

12   didn't remember doing it.  And after discovery was closed one

13   of -- someone at EPA found the videotape of the -- one of the

14   inspections.  And that was provided to defendant immediately.

15   That was almost a year ago, that it was provided to defendant,

16   along with an affidavit explaining why -- how the -- why the

17   inspector didn't remember and what his current memory was.

18          The first video is not --

19          THE COURT:  There are a couple of issues:  One is the

20   timing of the discovery, but the other that I'm picking up is

21   there's some narrative or commentary.

22          MS. HANKEY:  That's not true of the first video, but

23   it is of the second video.

24          THE COURT:  Do you think that's admissible, the

25   narrative?

1          MS. HANKEY:  I don't really care whether his narrative

2     is admissible.  We could turn the sound off if that's what the

3     Court would prefer.  I think it might be more appropriate for

4     him to explain it on the stand.

5          MR. FRIEDMANN:  Your Honor, with the second narrative,

6     they've also given us a set of notes that were allegedly

7     created, I guess, about April 1 of 2009, when they took this

8     video.

9          THE COURT:  Well, I guess maybe the orderly way, if

10    you have these objections, is to present them in a motion.

11         MR. FRIEDMANN:  Well, we have objected to the

12    admissibility of them already.  We've identified that.

13         THE COURT:  Well --

14         MS. HANKEY:  And I would point out, your Honor, that I

15    don't think we had any obligation to produce a video which

16    didn't exist.

17         THE COURT:  So if you're content to rest on having

18    made the objection and wait till it's offered, we can handle it

19    that way.

20         MR. FRIEDMANN:  I just wanted to flag it for your

21    Honor because videotapes are often treated differently by the

22    Court than other types of evidence.  Because it may take your

23    Honor time to review it and to decide its admissibility.  So

24    that's why I was --

25         THE COURT:  What's the running time of these?

1        MR. FRIEDMANN:  I think one is about 40-some-odd

2   minutes and the other --

3        MS. HANKEY:  A little bit slightly less than that.

4   Maybe 35 minutes.  And then the second video is longer.

5        THE COURT:  What's the quality?

6        MS. HANKEY:  They're not great.

7        THE COURT:  Videotapes usually aren't.

8        MS. HANKEY:  I have a few more questions.

9        THE COURT:  Okay.

10        MS. HANKEY:  We submitted a set of jury instructions

11   but --

12        THE COURT:  I haven't looked at them.

13        MS. HANKEY:  -- I wanted to find out if the Court had

14   a general set of jury instructions that it used.

15        THE COURT:  I don't know.  I probably do.

16        MS. HANKEY:  We would supplement --

17        THE COURT:  I don't consciously use a general set, but

18   I probably say the same thing over and over.

19        And as to the statute, I don't have any.  I'll

20   guarantee you that.

21        MR. FRIEDMANN:  Your Honor, we've agreed between

22   counsel -- and I just wanted to make you aware of this,

23   although there has been a submittal of jury instructions, we

24   both reserve the right to give you additional jury instructions

25   based on how the evidence comes in.

1          THE COURT:  Sure.  Sure.

2          MR. FRIEDMANN:  My sister has also provided the Court

3   with a series of voir dire questions which we've expressed that

4   we object to a number of --

5          THE COURT:  Well, you can submit your own; you can

6   object to theirs.  I should tell you that I am spare in my voir

7   dire questions.  I do it.

8          MS. HANKEY:  Do you have a general set of voir dire

9   that you use?

10         THE COURT:  No.  No.  Well, I do to some extent.  I

11  ask whether they have any connection with parties, witnesses

12  and so on.  But as to the subject matter, I ask general

13  questions that will surface the most egregious partiality but

14  otherwise does not -- I don't probe to try to find problems.

15         MR. FRIEDMANN:  So then your Honor will not be asking,

16  by example, their --

17         THE COURT:  I haven't looked at theirs.

18         MR. FRIEDMANN:  -- question on the burden of proof?

19         THE COURT:  No, I probably wouldn't ask a

20  burden-of-proof question.  They will be told what the burden of

21  proof is, that they'll be expected to follow it.

22         MR. FRIEDMANN:  I understand that.  But I saw a

23  comprehensive set that looked like a jury instruction rather

24  than voir dire questions.

25         THE COURT:  Okay.  I haven't looked at them but don't

1    expect a lot.

2          We will seat 12 jurors.  You know we have the option

3    here under the civil rules to have between six and 12.  I use

4    12.

5          MR. FRIEDMANN:  Do you sit all 12 ultimately --

6          THE COURT:  Yes.  Well, yeah.  Twelve or whoever's

7    left.  And it's unanimous here, unlike the state practice.

8          You would each have -- on a 12-person jury, you would

9    each have three peremptories.

10         What else?  Nine-to-one trial day, so...

11         All right.  We'll see you on the 20th.

12         MR. FRIEDMANN:  Thank you.

13         THE CLERK:  All rise.

14         Court is in recess.

15         (The proceedings adjourned at 3:08 p.m.)

16                    C E R T I F I C A T E

17         I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

18    the United States District Court, do hereby certify that the

19    foregoing transcript constitutes, to the best of my skill and

20    ability, a true and accurate transcription of my stenotype

21    notes taken in the matter of Civil Action No. 06-12297-GAO, USA

22    v. Paul Revere Transportation, LLC.

23

24                        /s/ Marcia G. Patrisso
                          MARCIA G. PATRISSO, RMR, CRR
25                        Official Court Reporter