UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )   Civil Action
v.                                  )   No. 06-12297-GAO
                                    )
PAUL REVERE TRANSPORTATION, LLC,    )
                                    )
        Defendant.                  )
                                    )
```


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


**MOTION HEARING**


John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Wednesday, May 20, 2009
3:15 p.m.


Marcia G. Patrisso, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

1    APPEARANCES:

2         UNITED STATES DEPARTMENT OF JUSTICE
          ENVIRONMENTAL ENFORCEMENT SECTION
3         By: Rachel A. Hankey, Esq.
          P.O. Box 7611
4         Ben Franklin Station
          Washington, D.C. 20044-7611
5         - and -
          U.S. AIR FORCE DEPARTMENT OF LAW
6         By: Jeffrey K. Sands, Esq.
          HQ USAFA/DFL Suite 8J100
7         USAFA, Colorado 80840
          On Behalf of the Government

8

          RUDOLPH FRIEDMANN, LLP
9         By: Jonathon D. Friedmann, Esq.
              Emily Murphy, Esq.
10        92 State Street
          Boston, Massachusetts 02109
11        On Behalf of the Defendant

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    **P R O C E E D I N G S**

2            THE CLERK:  All rise.  The United States District

3    Court for the District of Massachusetts.  Court is now in

4    session.

5            Please be seated.

6            For a motion hearing, the case of United States of

7    America versus Paul Revere Transportation, LLC, Docket

8    06-12297.

9            Would counsel identify yourselves for the record.

10           MS. HANKEY:  Rachel Hankey for the United States

11    Justice Department for the United States.

12           MR. SANDS:  Jeffrey Sands, the United States

13    Department of Justice.

14           MR. FRIEDMANN:  Paul Friedman for Paul Revere

15    Transportation with Emily Murphy beside me, your Honor.

16           THE COURT:  Okay.  Well, there are a number of

17    outstanding motions.  And they've been well briefed, so I don't

18    think we have to repeat everything that's been in the briefs

19    about them.  And as a matter of fact, I think some of them

20    maybe we can shortcut a little bit, and then others maybe we

21    can have a further discussion on.

22           Let me just see --

23           MR. FRIEDMANN:  Your Honor?

24           THE COURT:  Go ahead.

25           MR. FRIEDMANN:  I would like to address that with you,

```
 1    if I could.  Quite frankly, from our perspective, many of the
 2    motions may very well disappear depending upon how you rule on
 3    the issue of burden of proof.  Some of the witnesses that we've
 4    designated, it may not -- no longer be necessary for certain of
 5    the motions.
 6              THE COURT:  Fair enough.  I've given that a lot of
 7    thought.  So let's start there, and that will set the tone, and
 8    then we can come back to the motion.  That's fair.  That's a
 9    good idea.
10              We get no help in understanding what might be intended
11    to be a burden of proof allocation from the language of -- we
12    get little help -- not no help -- from the language of the
13    regulation itself or from any cases that have construed it or,
14    so far as I've been able to determine, similar regulations in
15    other jurisdictions.  So we have to do the best we can with
16    giving a sensible construction to the regulation, having in
17    mind its purpose and policy and so on, but also having in mind
18    the nature of the cause of action which is civil, nonetheless
19    punitive.
20              So with all of those things in mind, it seems to me an
21    appropriate way to conceive of it is in a burden-shifting
22    framework.  And the analogy, although I'm not following this
23    because I think it's applicable but just -- because it's a
24    well-known analogy, this is like the McDonald-Douglas
25    framework; and that is, I think it is the initial burden on the
```

1  plaintiff to establish a prima facie violation -- case of

2  violation.  And that, I think, is a low burden that can be

3  carried by evidence of idling in excess of five minutes, which

4  is an objective standard in the regulation, coupled with no

5  observed or apparent necessity to the observer for the

6  excessive idling.

7       In other words, just on the face of things, it's

8  idling longer than it should be and nothing appears -- like a

9  mechanic bent over an open hood, for example -- nothing appears

10 that would suggest that there's something going on that that's

11 needed.  So it's fairly low.  It's basically a time frame, in

12 many cases.  If that's done, then the burden would shift to the

13 defendant to offer some evidence that there was some necessity,

14 or justifiable purpose, in idling longer than the five minutes

15 that had been observed.

16      If the defendant offers evidence of that, tending to

17 show that, then the burden would return to the plaintiff to

18 show either that the idling in excess of five minutes was not

19 necessary to accomplish what might be a concededly legitimate

20 purpose, or that the claimed purpose was not legitimate or

21 reasonable.  So either five minutes was -- more than five

22 minutes was too much or any amount of time was too much because

23 it wasn't a purpose that should be recognized.

24      That's a little, I should say, general, but the

25 statute doesn't tell us what standards of statute -- the

PDF created with pdfFactory trial version www.pdffactory.com

1    regulation doesn't tell us what criteria of necessity might

2    have to be satisfied.  And so I'm inclined, just for the

3    purposes of the trial, to leave that open.  We'll see how it

4    plays out.  I think it's going to play out because the defense

5    has in mind some particular reasons.  And so we don't have to

6    worry about hypothetical reasons that may be off in other

7    cases; for this case we'll probably deal with the ones that are

8    asserted and feel our way along.

9          But anyway, the point is that ultimately the burden

10   will be on the plaintiff to establish the violation, which

11   includes establishing that, in context, any asserted reason of

12   necessity is not sufficient to justify the excessive idling.

13   How I will actually explain that to the jury will have to be

14   developed, okay?  So it's mixed.

15         MR. FRIEDMANN:  Your Honor, as you know, we filed a

16   motion about the 406 and 404 issues.  And I'm wondering how,

17   under that paradigm of shifting, you reconcile that with the

18   requirements in 406, that the proponent be able to establish

19   specificity for each incident in order to have that -- by

20   example, in this case, the hundreds of alleged violations that

21   were never -- there were never any observations of, that they

22   are then trying to shift to us to try to disprove unknown dates

23   to us.

24         THE COURT:  I think that's a problem for the prima

25   facie case --

1          MR. FRIEDMANN:  Okay.

2          THE COURT:  -- for those occasions.

3          I don't think it's impossible.  We'll have to hear

4     what their evidence is on it.

5          MR. SANDS:  Your Honor, just to address

6     Mr. Friedmann's remarks.  To the extent that this was part of

7     their motion that was recently filed, the United States has not

8     had an opportunity to respond.  We do not necessarily concede

9     that under 406 we must prove each of the violations that may be

10    inferred from the evidence presented with the degree of

11    specificity to which defendant attributes to us, but we do

12    understand that we have that burden of putting forth evidence

13    that would tend to prove violations of the statute that are

14    alleged.

15         THE COURT:  Yeah.  I think the practical thing is --

16    we'll reserve this and see what develops at trial.  I mean --

17         MR. FRIEDMANN:  Can I ask your Honor a procedural

18    question on that?  I know some of the judges up here do a

19    precharge after the jury is seated.  And I think it is an issue

20    that definitely --

21         THE COURT:  I don't typically do it on the interactive

22    law; I do it on the procedures of the trial.

23         MR. FRIEDMANN:  Okay.  Because I was concerned if

24    there was an instruction that was going to be given pretrial on

25    this 406 issue or the 404 issue --

```
 1          THE COURT:  No, because I'm not sure how it will
 2   develop.
 3          MR. FRIEDMANN:  Okay.  And that's why we had raised
 4   the issue when we did, because we weren't sure if you were
 5   going to do a precharge or not.
 6          THE COURT:  No, I don't expect to.
 7          MR. FRIEDMANN:  Okay.
 8          THE COURT:  So I don't think -- first of all, I would
 9   say -- let me just say that the last two motions, this one and
10   there's a motion about the statute of limitations, I guess we
11   can talk about --
12          MR. FRIEDMANN:  Your Honor, on that one, that's with
13   regard to one specific witness, Ms. Fay -- Dr. Fay.  And as I
14   told my brother before he filed the motion to strike, we
15   weren't asking that the Court address it today; we were only
16   raising an issue that needs to be addressed before she
17   testifies --
18          THE COURT:  Preserving it?
19          MR. FRIEDMANN:  -- which I don't know when they intend
20   to call her.  But we just wanted to get it out there so the
21   Court wouldn't be ambushed with an issue -- and so that
22   plaintiffs wouldn't be ambushed with an issue -- that we
23   thought would perhaps need a little more attention and be a
24   little more rudimentary evidence issue that your Honor would be
25   more used to dealing with.
```

```
 1          MR. SANDS:  As the Court knows, the United States has
 2    filed a motion to strike both of those motions, primarily on
 3    procedural grounds; however, again, we have not had an
 4    opportunity yet to respond substantively.  However, we do
 5    find -- or take exception to the idea that this is not a
 6    surprise to us because, in fact, on the exhibit list that the
 7    parties filed as part of their pretrial memorandum, plaintiffs
 8    had an opportunity -- excuse me -- defendants had an
 9    opportunity to object to certain pieces of evidence that were
10    on our proposed exhibit list.  Of those -- one of those items
11    was the notes of Dr. Fay that they recited to you in their
12    motion in limine.  And they did not object to those notes, so
13    we would argue -- at least intend that they have to waive that
14    objection, and now are seeking to go back on that agreement
15    between the parties.
16          MR. FRIEDMANN:  Your Honor, we're only objecting to
17    that portion of the notes that are beyond the statute of
18    limitations.  We don't object to her notes, per se, being
19    admissible, but to the extent --
20          THE COURT:  As what, a regularly recorded activity or
21    something like that?
22          MR. FRIEDMANN:  I think she just used them really to
23    refresh her memory of specific dates of occurrences and the
24    dates they were.  And to the extent they helped her recall
25    specific dates and events, you know, we weren't objecting to
```

1    it.  But we object to evidence that would be in the nature of

2    character evidence or habit evidence that's beyond the statute

3    of limitations to try to prove other occurrences that were

4    within the statute of limitations.

5            And so in her notes there are portions of it that are

6    outside the statute of limitations, there are portions of it

7    that are inside the statute of limitations.

8            THE COURT:  Okay.  Well, I think I agree with you that

9    we don't have to resolve it.  We have time before she -- well,

10   maybe -- I don't know when she would be called -- maybe you

11   could tell me that -- in the government's case, you know, this

12   particular witness.

13           MR. SANDS:  Well, the beginning of June, early on.

14           THE COURT:  Yeah.  That sort of relates to the motion

15   to strike.  I'm in sympathy with the motion to strike.  I mean,

16   rules are rules, and they didn't do it.  But even if I grant

17   it, at least you can raise an objection, not in limine, but

18   when the witness is on the stand.  So I can deal with the issue

19   at some point anyway.

20           MR. FRIEDMANN:  I did offer, your Honor, to change the

21   title of the motion, you know, for a ruling of the law on it as

22   opposed to a motion in limine, because certainly we didn't

23   waive all of our evidentiary objections --

24           THE COURT:  I think that's probably right.  Unless

25   someone thinks that the order meant that you had to anticipate

PDF created with pdfFactory trial version www.pdffactory.com

1    testimonial objections.  So it's going to happen anyway at some

2    point, so...  But I think we can wait on that.  And -- well,

3    let me just leave it at that.

4              MR. SANDS:  Your Honor, one issue for clarification on

5    your explanation of burden.  The exceptions that are noted --

6              THE COURT:  Oh, yeah.  The exceptions, I think, are

7    best viewed as safe harbors; that is, that the preamble to the

8    listing of the three exceptions is "this regulation shall not

9    apply to."  And I think that's significant because it's not

10   "the following may be deemed necessary"; in other words, it is

11   not -- at least as it's written.

12             It's not an explication of the concept of

13   necessary/unnecessary; it is an exemption, in a sense, from the

14   applicability of the rule, whatever it is, of the regulation.

15   And so that if -- the burden on that would -- as a safe harbor,

16   the burden would fall to the defendant to show that they were

17   entitled to the safe harbor.

18             MR. SANDS:  Thank you, your Honor.

19             THE COURT:  Okay.  Let me turn to the motions

20   regarding the experts.  As I understand it, the expert --

21   putative expert, Lyons, is a penalty-phase expert, correct?

22             MR. FRIEDMANN:  Correct, your Honor.

23             THE COURT:  So I think we can postpone on that.

24             MR. FRIEDMANN:  Your Honor, with regards to Wong, we

25   haven't even decided yet if we're going to call Dr. Wong,

because Dr. Wong was retained to help explain to the jury the
phenomenon that was observed by every driver, every mechanic,
every maintenance person, every starter, every shifter.  And in
all of the 20 depositions that were taken in this case, every
single person said:  This is what happens when it's cold
weather.  There are a certain number of busses that are
extremely hard to get started because of an electrical problem,
battery problems, having to jump them; there are a number of
them when it's very cold weather that will not build up air
pressure, you can't open the doors, you can't work the brakes;
there are a certain number of them that won't warm up so you
can pull them out because these are heavy, old vehicles.  Every
single one of them testified to this, if you would, on-street
phenomenon that every company that runs busses suffers.

        Dr. Wong was retained to try to explain from a
scientific standpoint the phenomenon that every single witness
testified to that, you know, when it was cold, it would take a
certain amount of time.  Sometimes it would take three minutes;
sometimes it would take eight minutes; sometimes it would take
20 minutes.  It depended on how cold it was; it depended on how
humid it was; it depended on how windy it was; it depended on
the wind chill; it depended whether it was the small busses or
the large busses.

        And these people who worked on the vehicles year after
year after year for nine, ten, eleven years at a time all say

1   this is what happened.  We haven't, quite frankly, decided

2   whether we're going to call Wong or not to try to even explain

3   that from a scientific standpoint because we're not sure we're

4   even going to need to do that.

5          I mean, we're weeks away from having to make that

6   decision, so I don't know if --

7          THE COURT:  Well, I can make it easy on you by

8   excluding it, but I'm not going to do that because I'm --

9          MS. HANKEY:  Well, if I could, your Honor.

10          THE COURT:  Yeah, go ahead.

11          MS. HANKEY:  In the pretrial order you were required

12   to say who you were going to call and who you were maybe going

13   to call.  And this is the first we've heard that Dr. Wong is a

14   "maybe going to call."

15          THE COURT:  Well, that's to give you an idea of the

16   hierarchy, really.  It doesn't make somebody call somebody that

17   they decide in the course of the trial is unnecessary, for

18   example.

19          MS. HANKEY:  Your Honor, they have a list of 80

20   witnesses on their list.

21          THE COURT:  That's a separate issue.  We'll get back

22   to that.  Let's stay with Wong.

23          MR. FRIEDMANN:  There's also the burden of proof

24   issue.

25          THE COURT:  Anyway, let's stay with Wong.  I think

PDF created with pdfFactory trial version www.pdffactory.com

1    it's -- I want to hear -- if he does testify.  I want to hear

2    the foundation before I decide on whether there's an opinion

3    that can be admitted or not.  So I'm not going to do it on the

4    papers.  So that's, in a sense, reserved.  Whether it's voir

5    dire or it's foundation in his testimony before the jury, I'm

6    not certain yet.  But I don't want to do it on the papers; I

7    want to actually have a live impression of his testimony before

8    I make a ruling on it.  So he's -- that's left uncertain.

9         Now, if you decide you don't want him or need him,

10   that would be interesting.

11        MS. HANKEY:  If I could, your Honor, he was deposed

12   three times.  So I think we've provided the Court with a wealth

13   of testimony from his deposition on what he --

14        THE COURT:  But I'm not looking at him.  I want to see

15   him.

16        MS. HANKEY:  And, you know, your Honor, we have three

17   rebuttal witnesses who we do not need to call if Dr. Wong is

18   not going to testify.  And I think you're putting us in a

19   difficult position if you're waiting until --

20        THE COURT:  That's the nature of trials, that you

21   adapt as the case goes on.

22        MS. HANKEY:  If, your Honor, we could -- if you would

23   be willing to hear argument on the matter, I --

24        THE COURT:  Well, the matter has been extensively

25   argued in the papers.  I'm sure it would be supportive of the

1    papers.  So, anyway, we're going to wait on him.

2            MS. HANKEY:  Okay.

3            THE COURT:  And it might go away because they choose

4    not to call him.  I don't know.

5            Let me -- a couple of other motions going to what

6    might or what might not be offered, I think is the question.

7    So, again, I'm not sure it's appropriate to decide it if it's

8    not going to be offered.  But I think they're 60 and 63:

9    exclude evidence pertaining to efforts to comply with the

10   regulation, and 63 is to exclude witnesses not -- well, not

11   identified in discovery of it.

12           MS. HANKEY:  Right, not identified in discovery with

13   respect to the 62 witnesses on the witness list who had not

14   been identified in response to any interrogatories and who, you

15   know, were not either proffered or consulted, even, in

16   preparing for depositions under Rule 30(b)(6).

17           And I actually think, your Honor, under the pretrial

18   order, defendant was required to make a proffer as to the basis

19   of the testimony, and they did not do so.  And the local rules

20   require also that they be prepared to do that at the pretrial

21   conference.  And I guess I would suggest -- I don't understand

22   why the 63 witnesses are not cumulative of the 30 ones that we

23   did not move to exclude -- or 20 that we did not move to

24   exclude and the witnesses who have been deposed.

25           And I guess I would ask for a proffer on why these 62

PDF created with pdfFactory trial version www.pdffactory.com

1   witnesses are not cumulative of testimony that was, in fact,

2   taken.

3            MR. FRIEDMANN:  Your Honor, prior to approximately

4   April 1, 2006, the government served my client with a notice of

5   violation.  On approximately November -- excuse me -- April 16

6   of 2006 we filed our response to the notice of violation.  And

7   as part of the notice of response to violation, we provided

8   them with the name, phone number and address of every driver

9   for every bus that they claimed had a violation from their

10  person's alleged observations.

11           So if you chose the date of, say, March 7th where they

12  say there was a violation in bus 557, we gave them a list

13  showing who was the driver on that bus that day, who were the

14  mechanics who were on duty on the times they alleged; we gave

15  them their phone numbers, their addresses, their contact

16  information.

17           We did that in April of 2006 before the case was even

18  filed, and we gave it to them by location also, because some of

19  the allegations were that the Brookline Avenue stop, there were

20  violations.  And we gave them who the drivers were on those

21  busses that they claimed the violations were.

22           So if you took a particular day -- and remember, there

23  were seven days, of certain days there were a certain number of

24  claims violations, and you add up the names of the numbers of

25  drivers, the mechanics, the people who they claim -- who they

1    claim violated the statute, they have a list of every single

2    one.  We gave it to them back in April of '06.

3            Then when we did our automatic disclosures in February

4    of 2007, we gave them the exact same information again.  And,

5    in fact, they started out -- they started noticing out

6    depositions of people from that list and, in fact, took

7    depositions of people on that list, including drivers,

8    including mechanics, including the maintenance manager, the

9    yard manager, et cetera, all well before the 30(b)(6) was ever

10   even submitted.

11           In fact, they took the deposition of Doc Daley, our

12   general manager.  They took his deposition on August 29, 2007,

13   and questioned him about these exact documents they say they

14   never got.  They questioned Mr. Daley about the specific

15   drivers on the specific busses, the specific mechanics that

16   were on duty on that day, but they say they didn't get these

17   materials notwithstanding the fact they were marked as exhibits

18   at the depositions.

19           We gave it to them a third time as part of our

20   September 10, 2007, interrogatory answers where we did a

21   designation to the -- you can find the answers in the following

22   documents, and gave them directions to which documents, which

23   they then came and photocopied in response also to our document

24   request, which was the fourth time they got them.

25           So they keep saying they didn't get this information.

1   They don't know why a driver would want to get up on the stand,

2   like the drivers that they already deposed who said, "I didn't

3   idle that bus for the amount of time you claim I idled it for

4   on that specific day."  We have that testimony from the people

5   from those lists that they chose to depose.

6           But notwithstanding the fact that they were given this

7   material four or five times, notwithstanding that they marked

8   these materials as exhibits to the depositions, notwithstanding

9   the fact that they deposed these people and the people denied

10  it, they're saying that these were not people that were

11  disclosed to them.

12          The fact that they chose not to go through the list

13  and depose every driver and let that driver deny that he did

14  what their one observer says they did, that's not our burden.

15          THE COURT:  Let me -- I have what was Appendix E to

16  the pretrial memo, which was the defendant's witness list.

17          MR. FRIEDMANN:  Yes.

18          THE COURT:  I see a table of people, but it does not

19  differentiate; for example, it doesn't say who is a likely and

20  who is a non-likely.

21          MR. FRIEDMANN:  We explained this to them as part of

22  our conference with them.  We broke it into categories.  The

23  first category -- and I don't have the document in front of me,

24  but by memory I believe it was the principals, Jane Daley,

25  Richard Brown, James O'Leary; then there was the management

1    group, was the next group; then there was the balance of the

2    people who had actually been deposed; and then the rest of it

3    was the drivers and maintenance people that were on duty on the

4    dates of each of the alleged violations.

5         THE COURT:  But that sort of breaks them down by who

6    they are but not necessarily by whether they're going to

7    testify or are likely to testify.

8         MR. FRIEDMANN:  Well, again, your Honor, part of the

9    issue was we didn't know if we were going to need to have each

10   and every driver come in and say, "Yeah, I was driving bus 557

11   on March 6, 2006, and I did not drive it for an hour" -- "I did

12   not idle it for an hour as your person claims I did."

13        THE COURT:  All right.  So can we now get a

14   designation of who's a defense case-in-chief witness and who

15   isn't?

16        MR. FRIEDMANN:  Yeah.  I'll be happy to do that, your

17   Honor.  I obviously don't have it prepared right this minute in

18   front of me.  I would say this:  Our primary witnesses will not

19   be anybody who hasn't been deposed in the case already.  So

20   there's a category of approximately 20 or 21 people, and if you

21   include whether we noticed out their deposition or they noticed

22   out the deposition.

23        MS. HANKEY:  Well, your Honor, we haven't objected to

24   any of the people who were already deposed; we've only objected

25   to the 63 --

1          THE COURT:  Right.  So let's find out if any of those

2     people are going to testify.

3          MS. HANKEY:  If I could, your Honor, just to respond.

4     He went through at great length explaining to you how the

5     United States could have figured out who the drivers were on

6     each day, and said the United States said those drivers were

7     idling the busses and they could have deposed each of those

8     drivers to say they idled the busses.

9          The United States is not alleging that the drivers

10    idled the busses.  And as a matter of fact, at the pretrial

11    conference we had last week.  Mr. Friedmann went through a long

12    explanation of what Paul Revere was alleging happened.  And,

13    specifically, he referred to the fact that someone who was a

14    shifter or a cleaner or a fueler would go in, turn on a number

15    of busses, and then jump back and forth between the busses to

16    see whether the air pressure was working.

17          Now, what he doesn't tell you -- they're not

18    suggesting that the drivers turned on the busses so -- and the

19    United States was not told in discovery that the drivers were

20    turning on the busses.  So why would the United States go

21    depose 80 people regarding whether the drivers had idled the

22    busses?

23          And, in fact, the list that was provided to us as part

24    of the NOV, the United States attached to a reply memorandum.

25    And contrary to what Mr. Friedmann says, first of all, all it

1    does is gives you a list of operators.  There's no shifter

2    identified; there's no fueler identified.  So this person who

3    Paul Revere is claiming is the person who would each day go out

4    and idle these busses was never identified to the United

5    States.  I, to this day, do not know the name of a single

6    shifter.

7         And I would like to hear a proffer from defense

8    counsel as to who the --

9         THE COURT:  It only matters if it's going to be

10   evidence, I guess.

11        MS. HANKEY:  Well, he --

12        THE COURT:  If the proffer is now that the expected

13   defense witnesses are people who have been deposed, then we may

14   not have a problem.

15        MS. HANKEY:  But I would like, your Honor -- he made a

16   proffer to the Court at the pretrial hearing as to what the

17   facts were going to show.  And what he proffered was that a

18   shifter and a fueler idled the busses.  And I would like to

19   know who is it who's going to testify to those facts.

20        MR. FRIEDMANN:  Your Honor, in response to the NOV we

21   not only gave them the names of the drivers, we gave them the

22   names of the mechanics that were on duty and every other person

23   that was on duty at the time -- not just drivers but every

24   person -- so that they could -- there's a difference between

25   the drive sheets, which was what was marked as the exhibits at

PDF created with pdfFactory trial version www.pdffactory.com

1    the deposition of Doc Daley, which are the daily log sheets

2    that show who was assigned each bus.  That was one portion of

3    the documents we gave them.  Another portion was they asked for

4    every person that was employed at the Roxbury location; they

5    asked for the names of every person at the Brookline Ave.

6    location.  And we gave them all of those people.

7         MS. HANKEY:  None of which, your Honor, identified who

8    a shifter is.  And defense counsel still has not made a proffer

9    as to who a shifter is, the person who he came into court and

10   told the Court is the person who idled these busses and that's

11   what the facts were going to establish.

12        THE COURT:  Okay.

13        MR. FRIEDMANN:  And, your Honor, these were identified

14   by witnesses who the various people were, giving some of the

15   names.  And other names were not remembered by the witnesses.

16   I think, however, your Honor, as I've said, I believe

17   substantially all of our witnesses would be within the group

18   that was deposed.

19        MS. HANKEY:  If I could, your Honor --

20        THE COURT:  There's sort of two different issues here,

21   I think, it sounds like.  One is:  Are people expected to

22   testify who you weren't clearly appraised might be witnesses so

23   you could depose them?  And it sounds like that may not be the

24   case.  And we'll deal with that individually if some witness

25   comes up who might fall in that category.

1          But it seems like you're also expressing concern that

2     there is information that you don't have about who was a

3     shifter or various other things as a result of the discovery.

4          MS. HANKEY:  Well, I mean, as we outlined in our

5     motion, we took Paul Revere's 30(b)(6) deposition and asked

6     them, "Who was idling these busses?" and every single person

7     said, "I don't know."  And when we asked them what procedure

8     did they follow when they went out and were idling these

9     busses, and they said, "I don't know."  And yet Mr. Friedman

10    came in at pretrial conference and offered this great detailed

11    explanation --

12         THE COURT:  Well, I suppose if every single potential

13    defense witness has already committed on the record, under

14    oath, to not knowing, it's going to be hard for such a

15    witness -- without pretty convincing impeachment to say that

16    they do now know.  So, again, I'm not sure how much of a

17    problem that --

18         MS. HANKEY:  I think we're in a very difficult

19    position.  If we come in next week and in opening statements

20    Mr. Friedmann gives the same speech to the jury that he gave to

21    the Court last week --

22         THE COURT:  Well, his opening can include anything he

23    expects reasonably he could get into evidence.  With respect to

24    the witnesses who have been deposed, that would be based, I

25    presume, on what they already said.  And to the extent there's

1   a difference, they're committed on the record and can be

2   impeached by -- again, it seems like something we can deal with

3   as we proceed along on the presentation of evidence.

4          But your basic concern that there are strangers here

5   that are going to get on the stand that haven't been deposed,

6   it sounds like it is not going to be -- at least -- it's not

7   going to be a 52-person problem, if it's a problem.  It might

8   be a one or two.  And we'll deal with that.

9          MR. FRIEDMANN:  Your Honor, this problem is of the

10  government's creation.  Their so-called inspector, who never

11  came on our property, and never once went to any single bus and

12  said, "Why is this bus running?" so that the people standing

13  there that he saw could be identified, and only subsequently

14  came to us and said, "Oh, there were violations on this date,"

15  and we go to the shift manager and say, "Do you know who

16  started bus 557 that morning?"  They don't keep records of

17  that.

18         We gave them the names of the group of individuals

19  that it could be any one of, but we don't know for ourselves

20  because we don't keep a record.  By example, if a bus needed to

21  be jump-started on March 1st, there's no record of that made,

22  so we wouldn't know, and we couldn't tell them, who

23  jump-started it on March 1st.

24         Had their inspector actually come on our property and

25  said, "Why is this bus running?  What's the necessity for it?"

1   we would know who had started it, we would know who the persons

2   were.  But they didn't do that.

3        MS. HANKEY:  Well, your Honor, last week counsel's

4   statements to the Court made it seem like they knew who started

5   these busses.  And that was the United States's concern, that

6   person had never been disclosed to the United States.  And if

7   Paul Revere is going to come into court and testify, as they

8   did in their 30(b)(6) deposition, that they do not know who

9   idled these vehicles, then the United States has no objection.

10       But if they are going to try to introduce testimony in

11  contravention of what they testified at their Rule 30(b)(6),

12  that they do know who was idling these vehicles and why that

13  person idled the vehicle and how long that person idled that

14  vehicle, then we have a problem.

15       THE COURT:  And we'll deal with it if and when it

16  arises, I think is the way we'll deal with it.

17       Let's go back to the other one, which is the efforts

18  to comply with the Massachusetts Idling Regulation.  It's the

19  government's motion to exclude such evidence.  Is there going

20  to be such evidence?

21       MR. FRIEDMANN:  Your Honor, yes.  First off, on the

22  penalty phase, that is exactly what the statute says --

23       THE COURT:  Let's limit it to the liability.

24       MR. FRIEDMANN:  On the liability phase, yes, your

25  Honor.  Because how we trained our people helps tell what we

PDF created with pdfFactory trial version www.pdffactory.com

1    understood to be necessary and I think would aid a jury in

2    trying to come up with the conclusion of what is necessary and

3    what is not necessary.  If we say that we trained somebody that

4    you can only start a vehicle and run it for more than five

5    minutes for these particular purposes, and they have evidence

6    that it was idling for a purpose other than what we said were

7    within what we thought was necessary, that's proof of a

8    violation.

9         And our proof of what is -- and this dovetails also

10   into the other motion in limine about what other states and

11   other regulations provide for.  But we believe that is evidence

12   of what is necessary.  By example, in Connecticut, if it is

13   below a certain temperature or above a certain temperature,

14   you're allowed to idle for more than five minutes.  That's

15   their recognition of the problems with cold weather and hot

16   weather for these vehicles.  Now --

17        THE COURT:  Do you operate in Connecticut?

18        MR. FRIEDMANN:  We do have vehicles that run through

19   Connecticut.  We're not -- --

20        THE COURT:  Are you concerned with those regulations?

21        MR. FRIEDMANN:  No, your Honor.  But we think it would

22   be helpful to a jury to help understand what is necessary

23   because other states have defined "necessary" where

24   Massachusetts has not.  And so these regulations, and what we

25   have done to comply in Massachusetts -- the amount of training

1  we give the people, how much time we spend, you know, notifying

2  them, reminding them on a particular day -- goes to whether

3  this really was necessary or unnecessary and our belief.

4        So we could be wrong and a jury may ultimately decide

5  that we're wrong on what we define as necessary or unnecessary,

6  but I think we should be able to tell what we do to train

7  people so that we try to get our people to comply with this

8  regulation based on what we, as an operator, believe the word

9  "necessary" means.

10        MR. SANDS:  Mr. Friedmann has kind of muddled two

11  motions, your Honor, and --

12        THE COURT:  Yeah, they are sort of related, but...

13        MR. SANDS:  -- we're prepared to argue different

14  motions.

15        To the extent we're talking about the other idling

16  regulations and presenting evidence of other idling regulations

17  to the jury to prove that they're necessary, we find that to be

18  a little disingenuous.  First of all, counsel indicated to us

19  early on they did not intend to present this evidence of other

20  idling regulations in to the liability phase, and it was only

21  to go to penalty.

22        To the extent that, as your Honor has already pointed

23  out, we're not talking about a violation, we're not alleging a

24  violation of a Connecticut statute or a San Bernardino County

25  statute or a San Francisco statute or any number of West Coast

1    and southern state regulations that they wish to cite to, those

2    are not relevant to the question at issue.  The question at

3    issue is whether or not Paul Revere idled their busses for five

4    minutes -- for more than five minutes without -- unnecessarily,

5    and whether or not that is a violation of this particular

6    statute.

7           This particular statute, which is part of the

8    Massachusetts State Implementation Plan, which is federally

9    enforceable under the state -- under the Clean Air Act.  The

10   other statutes that he's referring to are, in many cases, part

11   of the vehicle code or some other provision which is not part

12   of a federally enforceable statute.

13          So to the extent that they want to introduce evidence

14   of other statutes to convince a jury that what may have been

15   determined necessary by the legislature of the State of

16   Connecticut or the legislature of the State of Colorado, it

17   seems to me that maybe counsel's argument is with the

18   Massachusetts legislature and not with what we're dealing with

19   here.

20          The statute is what it is; it is what is written.

21   This is the only statute under which we're pursuing Paul Revere

22   and, therefore, evidence of other statutes is not probative of

23   what is necessary or not necessary in this context but would

24   be, in fact, prejudicial and would only serve to confuse a jury

25   as to whether or not they are entitled to consider the intent,

1    quite frankly, of other legislatures.

2         MR. FRIEDMANN:  Your Honor, may I address two points

3    on that?  The first is, one of the documents we're looking to

4    introduce is an EPA document, the EPA's own model code on this.

5    Secondarily is --

6         THE COURT:  And what purpose would you want to

7    introduce that for?

8         MR. FRIEDMANN:  Because they have also set boundaries

9    for temperature and duration, both high levels of temperature

10   and low levels of temperature.

11        In addition, the Massachusetts legislature --

12        THE COURT:  And so what?

13        MR. FRIEDMANN:  Well, I think it's helpful to jurors

14   to see that the EPA themselves have recognized that in certain

15   types of weather conditions it's necessary to run a vehicle,

16   and they've decided to exempt it from enforcement, just as the

17   Massachusetts legislature has done since this case was pending.

18   The Massachusetts legislature has enacted new regulations that

19   relate to school busses and have just said, you know, for a

20   school bus you can idle it.  So the driver of a school bus can

21   idle that school bus -- without children on it -- for more than

22   five minutes for that driver's comfort, but our driver on the

23   same day cannot idle our vehicle for his comfort, according to

24   their interpretation of the law.

25        Now, I would think that that kind of information in

PDF created with pdfFactory trial version www.pdffactory.com

1      the hands of a jury of what the legislature here has said is

2      reasonable under other statutes in similar usages would be an

3      indication to them of what is reasonable and unreasonable.

4              THE COURT:  All right.  You said there was a --

5              MR. FRIEDMANN:  Those were the two that I was using as

6      examples.

7              THE COURT:  Is the EPA document?

8              MR. FRIEDMANN:  Uh-huh.

9              THE COURT:  And what's the other?

10             MR. FRIEDMANN:  The school bus statute that was just

11     amended recently.  I don't remember the citation to it offhand.

12             MR. SANDS:  If I may, your Honor.  The fact that the

13     Massachusetts legislature has opted to revise the rule with

14     respect to school busses should be actually more telling that

15     they had an opportunity -- this was before them -- that the

16     idea of idling -- they chose not to modify this particular

17     regulation.  They did with respect to school busses; they did

18     not with respect to this.  Therefore, it's -- the intent of the

19     legislature cannot be presumed that they intended to but it

20     therefore somehow slipped their mind.

21             THE COURT:  Well, it's post-talk, anyway.  I think

22     it's irrelevant, the Massachusetts amendment.  I don't see any

23     purpose.

24             But, now, I don't know enough about the EPA guidance,

25     so whatever it might be.  Is there a document you want to use?

```
1              MR. FRIEDMANN:  There was the EPA guidelines.

2              THE COURT:  Do I have that?

3              MR. FRIEDMANN:  I believe you do.

4              THE COURT:  In the response?

5              MR. FRIEDMANN:  Yes.

6              THE COURT:  All right.  I'll look at that.

7              MR. FRIEDMANN:  I'm sorry.  It's on our exhibit list.

8      I'm not sure --

9              THE COURT:  So I have the actual document?

10             MR. FRIEDMANN:  Correct.  It's on the exhibit list.

11     If you'd like, I can get the EPA document filed with the Court

12     electronically today or tomorrow.

13             THE COURT:  I just want to see it, that's all.

14             MR. SANDS:  We contend that the EPA model regulation

15     is not relevant to the consideration of whether or not --

16             THE COURT:  Does it at least escape the post-talk

17     argument; in other words, does it predate these events, the

18     EPA, or not?

19             MR. SANDS:  I don't think it does, your Honor.

20             THE COURT:  I'm sorry.  You don't believe it does?

21             MS. HANKEY:  It appears to have been published in

22     April of 2006, and the violations were in March and April of

23     2006.

24             MR. FRIEDMANN:  Prior to us receiving our notice of

25     violations.
```

1          MS. HANKEY:  The notice of violation was received on

2     April 16th, two days after the last violation.

3          THE COURT:  Yeah.  Then I think the same relevance

4     problem would exist.  So it's unlikely they'll get those in.

5     But I want to see them before making a final ruling, but it

6     doesn't sound like they're going to get those in.

7          MR. FRIEDMANN:  Your Honor, do you want that

8     delivered?  Do you want that electronically?

9          THE COURT:  Yeah, deliver it.  Paper will be just as

10    easy rather than muddying up the docket with it.

11         MS. HANKEY:  With respect to the efforts to comply,

12    your Honor, there are a number of different types of evidence

13    that the defendants have at least indicated that they're going

14    to seek to admit.  One is, for example, pay stubs that were

15    given to each employee.  On each employee's pay stub it has a

16    reminder at the top of the five-minute idling rule.  That pay

17    stub does not explain to each employee "Here's when you are

18    allowed to idle under the statute and here's when you're not

19    allowed to idle under the statute."

20         So the argument that defense counsel just made as to

21    why it should be admitted doesn't apply.  All the document says

22    is that you are reminded to comply with the five-minute idling

23    law.  And the fact that Paul Revere employees were told not to

24    idle does not prove whether they did or not -- not relevant to

25    the question of whether they, in fact, did idle.

1            THE COURT:  Is it relevant to your proposed evidence

2      on which you would ask the jury to infer habitual violation?

3            MS. HANKEY:  No.

4            THE COURT:  Why not?

5            MS. HANKEY:  It isn't relevant to whether they, in

6      fact, idled.  Just because someone is told to do something

7      doesn't prove whether they did, in fact, do it.  I mean, our

8      habitual evidence is -- the evidence is testimony from the

9      dispatcher himself that he followed the same routine.  That he

10     would, whenever it was cold outside, as Mr. Friedmann

11     explained, send a shifter or a fueler or someone outside and

12     ask them to go start the busses and make sure they worked.  And

13     that's the testimony which is the basis for the habitual -- it

14     isn't any document.

15            And I just want to remark also, by the way, your

16     Honor, that all of this -- all of the efforts that they made to

17     comply with the law were a direct result of the fact that they

18     had a prior violation, and it's after they had a prior

19     violation and had been cited by EPA that they then undertook

20     these efforts to comply.  And we would submit that if --

21            THE COURT:  That's good, isn't it?

22            MS. HANKEY:  I'm sorry?

23            THE COURT:  Isn't that good?

24            MS. HANKEY:  I'm not disagreeing -- we have stipulated

25     to its admission for penalty purposes, your Honor.  But if

PDF created with pdfFactory trial version www.pdffactory.com

1    defense -- if the defendant is going to try to tell the jury,

2    "Look at all these good things that we did to try to comply

3    with the law," we would submit that we get to tell the jury,

4    "But they only did it because they had been found to be in

5    violation."

6            MR. FRIEDMANN:  Your Honor, there will be testimony

7    from Mr. Carney, who was a prior manager of our location, that

8    they undertook significant steps -- that he would train his

9    people who were the shifters and the fuelers and the cleaners

10   to not idle more than five minutes; to just do -- only idle for

11   more than five minutes if it was mechanically necessary.

12           And he told -- excuse me -- he said at his deposition

13   the exact steps that he went through with these people to make

14   sure that they were complying with that mandate that came down

15   all the way from the top.  And it was repeated.  It wasn't just

16   that there was one occurrence and this happened only as a

17   result of a violation over at the airport when on a hot day

18   somebody was running the bus for air-conditioning purposes.

19   This is a much different circumstance.

20           And he explained how they trained them.  He explains

21   how they made announcements on the intercompany radio every

22   hour to remind every driver about what he can and can't do; you

23   have these pay stubs; you have standard operating procedures in

24   writing; you have manuals that these people were trained with.

25   So there's a lot of evidence here of what we deemed was

PDF created with pdfFactory trial version www.pdffactory.com

1    necessary and unnecessary and what our people were trained as

2    to what was necessary and unnecessary.

3          Again, a jury may ultimately decide that what we

4    deemed mechanically necessary the jury could decide, you know,

5    against us as to it being necessary.  But I think they should

6    hear what training we did, why we did it, our reasons for it,

7    and why we believed it was necessary, and then they get to

8    decide was this necessary or wasn't it necessary?

9          MS. HANKEY:  If I could, your Honor, the three

10   examples he just went through -- the pay stub, the hourly

11   idling announcements and what he described as a manual -- the

12   pay stub does not describe what is necessary and what was not

13   necessary; the hourly idling announcement does not describe

14   what is necessary and what is not necessary; the manual --

15   there is no such thing as a manual.  Paul Revere would send out

16   a one-page document reminding people of the five-minute idling

17   rule.  It too does not describe what is necessary and what is

18   not necessary.

19          To the extent that the defendant is seeking to admit

20   those three things does not illustrate to the jury what

21   defendant thought was necessary and what defendant thought was

22   not necessary.  And that evidence is purely an attempt to

23   prejudice the jury into believing that because they were told

24   not to idle, they didn't idle.  And to --

25          THE COURT:  I don't know what the evidence is going to

```
 1    be, but that would not be an unimaginable inference, that
 2    people do what they're asked to do.  It happens sometimes.
 3         MS. HANKEY:  For example, your Honor, he just
 4    described how Mr. Carney went down and told people not to idle.
 5    Mr. Carney --
 6         THE COURT:  It might be overcome by other evidence,
 7    but the question is, should the jury hear it?  I mean, somebody
 8    says, "Go do your homework," sometimes the instructed person
 9    goes and does his homework, sometimes he doesn't.  But if the
10    question is does he do his homework, you may take into evidence
11    that he was told to and so on.  You might take into account
12    that the TV was blaring upstairs as well.  And you decide
13    whether he's doing his homework or not.  But it seems --
14         MS. HANKEY:  How is it not hearsay, your Honor, an
15    out-of-court statement telling someone what to do?  How is that
16    not the true definition of an out-of-court hearsay statement?
17         THE COURT:  That is not a true-or-false statement.
18         Anyway, we may have to play this a little bit by ear
19    as I hear exactly what people want to say on the stand.  I
20    think there's no controversy that it's admissible on the
21    penalty phase?
22         MS. HANKEY:  No controversy.
23         THE COURT:  It may also depend on the nature -- as I
24    think I said before -- on the nature of the evidence and what
25    inferences the government would have the jury draw from
```

1    evidence of habit or routine practice or whatever else it might

2    be and what might be a reasonable response in the context of

3    that and so on and so forth.  Again, I'm not sure it's anything

4    we could categorically resolve at this point.

5            MR. FRIEDMANN:  There is one more issue I would like

6    to -- two more issues I would like to raise with your Honor.  I

7    think we went through all of the motions --

8            THE COURT:  I think we've touched on most of them,

9    anyway.

10           MR. FRIEDMANN:  We have received the government's

11   designations and we're working on our objections to

12   counter-designations.  And this is more administrative --

13           THE COURT:  On depositions?

14           MR. FRIEDMANN:  On depositions, yeah.  This is more an

15   administrative thing.

16           We're making the assumption that if they designated

17   portions of a transcript that we don't object to, that you

18   don't care to see those portions; you're only going to want

19   those pages that relate to what they designated and our

20   objection to that.  Is that a fair assumption?

21           THE COURT:  You mean, are you just talking in terms of

22   volume of what you produce?

23           MR. FRIEDMANN:  Yeah.  Yeah.

24           THE COURT:  Designations, counter-designations,

25   objections?

PDF created with pdfFactory trial version www.pdffactory.com

 1          MR. FRIEDMANN:  Correct.  That's what we're doing, is

 2    we're taking their designations by witness, and we've added a

 3    couple of columns.  One is, you know, if we have an objection.

 4    And we're assuming that we'll give you the pages of the

 5    transcript that relate to those objections.

 6          I didn't know if you wanted also the documents, the

 7    pages that went with the counter-designations, and I also

 8    didn't know how you wanted that all transmitted to the Court,

 9    whether that's something that you want in hard copy or whether

10    it's something that you want electronically.

11          THE COURT:  Well, it should be part of the record, so

12    I don't care really whether it's a hard-copy part of the record

13    or an electronic part of the record, but --

14          MR. FRIEDMANN:  I guess what I'm saying is in the

15    first instance where they designated portions that we don't

16    have an objection to, I'm assuming you don't care to see those

17    pages that there's no objection over.

18          THE COURT:  Why not?  I'm going to have to read them,

19    aren't I?  Or are you going to read them?  Did we talk about

20    this last time?

21          MS. HANKEY:  We would have a witness read them.

22          THE COURT:  Then I don't have to read them, I guess,

23    except if it's necessary to understand the objections.

24          MR. FRIEDMANN:  Yeah, that's what I was --

25          THE COURT:  So it might be.  Yeah, I guess more is

1    better than less.

2              MR. FRIEDMANN:  I just wanted to know.

3              THE COURT:  More is better than less.

4              MR. FRIEDMANN:  So we'll put it together that way.

5              THE COURT:  I can work up -- if I can resolve the

6    objection in a small context, we can do that; if I need a

7    bigger context, I'll have do it that way.

8              MR. FRIEDMANN:  That's fine.  There's also an

9    objection related to the designations.  We've gotten

10   designations -- and I don't know if you want to address it now

11   or you want me to wait until later.

12             THE COURT:  No.

13             MR. FRIEDMANN:  But certainly under Rule 32(a)(3) as

14   to somebody who was deposed as a 30(b)(6) designee, they would

15   have a right to use it as they see fit under the rule.  On

16   somebody, though, who was a part-time driver for us, I don't

17   consider that to be part of the Rule 32(a)(3) penumbra when

18   you're talking about designees and agents and the like.  So I

19   just wanted to flag for the Court that there are some

20   depositions that we have no objection -- we have objection to

21   them, but we don't have a basis to object under 32(a)(3), to

22   them coming in.  Because somebody like Richard Brown, who's a

23   principal of the company, or Doc Daley, who was a designee

24   under 30(b)(6), they have certain rights to use.  But somebody

25   who was a former employee who worked as a part-time driver for

1  us, we don't view that as a 32(a)(3) deposition designation

2  that is appropriate.

3          So I wanted to just point out we're not waiving that

4  by putting in our objections.  What we intended to do was, if

5  there was somebody that we felt was not proper for a 32(a)(3),

6  that we would just put it at the beginning of their objection,

7  you know, 32(a)(3), and let you ultimately decide when the

8  issue comes up.

9          THE COURT:  And how many such persons might there be?

10          MR. FRIEDMANN:  There were about six of them.  There

11  were -- as I said, people like former mechanics or former

12  drivers or former part-time drivers, things like that.

13          MS. HANKEY:  They weren't former at the time of their

14  testimony.  And we -- I guess I wanted to raise two points, one

15  of which is that my understanding from the pretrial conference

16  is that you were telling the parties to meet and confer with

17  respect to the depo designations with respect to objections,

18  and from the way that he -- he suggested was that he was simply

19  going to submit his objections to the Court.  And I just wanted

20  to make sure that, in fact, there is going to be a

21  meet-and-confer with respect to the objections to the depo

22  designations.

23          MR. FRIEDMANN:  Quite frankly, I didn't get that

24  impression from your Honor.  I thought your Honor said they

25  would submit to us, we were to have until Tuesday to get our

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   objections --
 2           THE COURT:  Well, I thought you would have an exchange
 3   and then you would talk about it.
 4           MR. FRIEDMANN:  Okay.
 5           MS. HANKEY:  That was my understanding.  And I just
 6   wanted to make sure that that was going to happen.  And one of
 7   the reasons was, for example, that we had provided two separate
 8   lists, one of which was 30(b)(6) testimony and one of which was
 9   a list where we sought the admissions that were of current
10   employees at the time of their testimony and we believe the
11   testimony was within their agency.
12           MR. FRIEDMANN:  I guess we disagree on the scope of --
13           THE COURT:  That will be the question as to these, I
14   guess, whether the agency reaches down to bus drivers.  I don't
15   know.
16           MS. HANKEY:  They simply have to be acting within the
17   scope of their employment.  And if they're testifying about
18   what they did as bus drivers -- I mean, before we designated
19   the testimony we went in and looked at Rule 801 with respect to
20   admissions.
21           MR. FRIEDMANN:  I don't think it's a Rule 801 issue,
22   your Honor.  I think it's a 32(a)(3) issue.
23           THE COURT:  All right.  Well, we're not going to
24   resolve it now anyway because we don't have the body
25   of testimony.
```

1          MR. FRIEDMANN:  Your Honor, there's one last sort of

2     general issue, just again a procedural.  A number of our

3     employees -- a dozen, 16 of them -- have been subpoenaed all

4     for June 1st.  And we had sent the government a letter just

5     saying, you know, "If you could, could you try to give us some

6     indication of who you're going to need and when," just so we

7     can, you know, make appropriate business decisions about

8     staffing at our offices -- I mean, my client's offices.

9          And we would like some guidance from the Court.  You

10     know, do we have to have all 12 people here every single day of

11     the trial if they're not going to be called for a week or ten

12     days or whatever?  I mean, we haven't heard back on that.

13          MS. HANKEY:  I actually have not received the letter,

14     which is why they haven't heard back.  So that's that.  We

15     don't -- I mean, we have to subpoena witnesses, and we

16     attempted to reach agreement with defense counsel and were

17     unable to reach agreement on it.  They had questioned as to

18     whether they could accept subpoenas for all of their employees,

19     so we issued subpoenas.  They are for June 1st and continuing,

20     because at this point we obviously don't know what date.  We

21     have every intention, to the extent that we can, of narrowing

22     it as much as possible.

23          MR. FRIEDMANN:  In fairness, your Honor, what we said

24     is we couldn't for drivers and people who were the union

25     members, but for anybody who was management we could.

```
1            THE COURT:  Anyway, the subpoenas have been served.
2     But you have to work it out for the convenience of the
3     witnesses, that they have some expectation of when they're
4     going to be needed.  I think the local rule may even address
5     that, but I'm not sure.  But at least it tells counsel to
6     advise each other what the order will be and they expect the
7     witness, I think, within 48 hours or something like that under
8     the rule.
9            MS. HANKEY:  I guess that's what I was referring to.
10           THE COURT:  Anyway, I expect you'll resolve that.
11           What else?  Did we talk about jury selection at all
12    last time?
13           MS. HANKEY:  We talked about how you use the procedure
14    of -- I don't have it --
15           THE COURT:  We talked a little bit about the voir
16    dire.  Did I tell you how many jurors and strikes and so on?
17           MR. FRIEDMANN:  You did.
18           THE COURT:  Okay.  So I guess we've covered all of
19    that, then.  Okay.
20           MS. HANKEY:  I had one question, your Honor, which is
21    under the normal rules we would be required to submit trial
22    briefs five days before the first day of trial.  In this case
23    our pretrial order was quite expansive.
24           THE COURT:  Yeah, I don't think it's necessary for
25    further briefing.
```

```
 1              MS. HANKEY:  Okay.

 2              THE COURT:  There are proposed instructions from the

 3    plaintiff, I think, proposed instructions.  I don't know if I

 4    have any from --

 5              MR. FRIEDMANN:  You don't, your Honor.  We felt that

 6    theirs was extremely comprehensive and, in fact, went into some

 7    issues --

 8              THE COURT:  You don't have to, but if you're going to,

 9    I would like them no later than the first day of trial.  And,

10    of course, they can be supplemented or amended or whatever as

11    trial developments require.

12              MS. HANKEY:  And we'll work on submitting a new

13    instruction based on your ruling today on the burden of proof.

14              THE COURT:  Okay.

15              Now, designation of likely witnesses by Friday?

16              MR. FRIEDMANN:  Yes.  Is it fair to say, your Honor,

17    we're not going to go off of the list of those who have already

18    been deposed; if we don't designate anybody additionally by

19    Friday, that that's acceptable?

20              THE COURT:  I didn't understand the question.

21              MR. FRIEDMANN:  We have a list already of 18 or 20

22    that have already been deposed.  If we're going to use anybody

23    beyond that, is what you're saying, to give them notice?

24              THE COURT:  Well, notice of who you expect you would

25    call in your case in chief --
```

```
1              MR. FRIEDMANN:  Okay.  Okay.

2              THE COURT:  -- wherever they are on that list.

3         Okay.  Thank you.

4              MR. FRIEDMANN:  Thank you, your Honor.

5              THE CLERK:  All rise.  Court is in recess.

6              (The proceedings adjourned at 4:13 p.m.)

7

8                   C E R T I F I C A T E

9

10             I, Marcia G. Patrisso, RMR, CRR, Official Reporter of

11        the United States District Court, do hereby certify that the

12        foregoing transcript constitutes, to the best of my skill and

13        ability, a true and accurate transcription of my stenotype

14        notes taken in the matter of Civil Action No. 06-12297-GAO, USA

15        v. Paul Revere Transportation, LLC.

16

17                        /s/ Marcia G. Patrisso
                           MARCIA G. PATRISSO, RMR, CRR
18                         Official Court Reporter

19

20

21

22

23

24

25
```

PDF created with pdfFactory trial version www.pdffactory.com