UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,           )
                                    )
        Plaintiff,                  )
                                    )  Civil Action
v.                                  )  No. 06-12297-GAO
                                    )
PAUL REVERE TRANSPORTATION, LLC,    )
                                    )
        Defendant.                  )
                                    )

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**DAY TWO**
**JURY TRIAL**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Tuesday, June 2, 2009
9 a.m.

Marcia G. Patrisso, RMR, CRR
Brenda K. Hancock, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   APPEARANCES:

 2        UNITED STATES DEPARTMENT OF JUSTICE
          ENVIRONMENTAL ENFORCEMENT SECTION
 3        By: Rachel A. Hankey, Esq.
          P.O. Box 7611
 4        Ben Franklin Station
          Washington, D.C. 20044-7611
 5        - and -
          U.S. AIR FORCE DEPARTMENT OF LAW
 6        By: Jeffrey K. Sands, Esq.
          HQ USAFA/DFL Suite 8J100
 7        USAFA, Colorado 80840
          On Behalf of the Government
 8
          RUDOLPH FRIEDMANN, LLP
 9        By: Jonathon D. Friedmann, Esq.
              Zachary J. Tuck, Esq.
10        92 State Street
          Boston, Massachusetts 02109
11        On Behalf of the Defendant

12
     IN ATTENDANCE:
13
          Gregory Dain, Senior Enforcement Counsel
14        Environmental Protection Agency

15

16

17

18

19

20

21

22

23

24

25
```

1                                I N D E X

2                          DIRECT   CROSS   REDIRECT   RECROSS
   WITNESSES FOR THE
3      PLAINTIFF:

4  MARY JAYNE FAY

5      By Mr. Sands            36              68
       By Mr. Friedmann               61              69
6
   ABDI MOHAMOUD
7
       By Ms. Hankey           71              144
8      By Mr. Friedmann               121

9                              E X H I B I T S

10
   PLAINTIFF'S
11 EXHIBIT NO.        DESCRIPTION                        RECEIVED

12
   No. 4      Handwritten inspection notes of Abdi Mohamoud   79
13
   No. 9      Notes prepared by Mary Jayne Fay               48
14
   No. 101    Photographs                                    39
15
   No. 101-1  Photographs                                    85
16
   No. 101-3  Photographs                                    85
17
   No. 101-7  Photographs                                    85
18
   No. 119    Videotape                                      95
19
   No. 123A   Redacted versions of Exhibit 123 -
20            Typewritten spreadsheet of Mohamoud
              Inspection Notes                              118
21

22

23

24

25

1              (The following proceedings were held in open court

2      before the Honorable George A. O'Toole, Jr., United States

3      District Judge, United States District Court, District of

4      Massachusetts, at the John J. Moakley United States Courthouse,

5      One Courthouse Way, Boston, Massachusetts, on June 2, 2009.)

6              THE CLERK:  All rise.  The United States District

7      Court for the District of Massachusetts.  Court is now in

8      session.

9              Please be seated.

10             USA versus Paul Revere Transportation.

11             THE COURT:  The clerk said, Mr. Sands, you had

12     something wanted to raise?

13             MR. SANDS:  Yes, your Honor.  I believe the parties

14     have a slight disagreement over the scope of your sequestration

15     ruling yesterday, and we wanted to clarify that before we

16     started with the jury this morning.

17             THE COURT:  To wit?

18             MR. FRIEDMANN:  I think it's probably me that needed

19     clarification, although Mr. Sands was kind enough to raise it.

20     I wanted to clarify who we could have sit in here.  We are --

21     we have, as you know, three principals to the company.

22             THE COURT:  Yeah.

23             MR. FRIEDMANN:  Richard Daley -- excuse me -- Jim

24     O'Leary and Jane Daly -- Richard Brown, I meant to say the

25     first time.  And then there is the general manager, Doc Daley.

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Brown and Mr. Daley are both going to be testifying in this

2    phase, but we would like to have both of them sit in here.

3         Mr. Daley was deposed twice and Mr. Brown once, but we

4    understood that your Honor said we could only have one

5    representative that would potentially be testifying in here.

6    So I wanted to clarify with you, your Honor, whether that meant

7    that our general manager had to sit outside because he may be

8    called as a witness later on.

9         MR. SANDS:  And, your Honor, our understanding of the

10   ruling was that they were allowed to have one representative of

11   the company.  Our understanding was that it would be -- since

12   there were representatives who were going to be non-testifying

13   witnesses during this phase, that it would be a non-testifying

14   witness.

15        THE COURT:  Well, no.  Yeah.  One -- I think one.  And

16   they could designate it even if it's a witness.

17        MR. SANDS:  Then we would ask your Honor that there be

18   an instruction that that person, if it is a testifying witness,

19   be instructed not to communicate with other testifying

20   witnesses.

21        THE COURT:  That's part of the sequestration order

22   implicitly, yes.

23        MR. FRIEDMANN:  So we get one testifying --

24        THE COURT:  Right.

25        MR. FRIEDMANN:  -- representative in here?

```
 1              THE COURT:  Right.  Well, it's two different things.
 2    You can designate the representative you want to be present,
 3    and that can be a testifying person.
 4              MR. FRIEDMANN:  If we have representatives that are
 5    not going to be testifying?
 6              THE COURT:  They're like the general public.
 7              MR. FRIEDMANN:  Okay.  I just wanted to clarify that.
 8              MR. SANDS:  And that person who is going to be
 9    designated as a testifying witness is instructed not to
10    communicate --
11              THE COURT:  Right.  Not to communicate --
12              MR. FRIEDMANN:  They are both in the courtroom now, so
13    I think they have heard your Honor.
14              THE COURT:  All right.  Okay.
15              Are we with ready for the jurors?
16              MR. FRIEDMANN:  May I just have one moment, your
17    Honor?
18              MR. SANDS:  Sir, one more issue, your Honor.  Mr.
19    Dain, who is sitting at counsel table, with the EPA, would the
20    Court allow Mr. Dain to be present at sidebar conferences?
21              THE COURT:  Yes.
22              While we're just waiting, can you tell me who your
23    lineup is?
24              MR. SANDS:  Yes, your Honor.  We're going to be
25    starting this morning with Dr. Mary Jayne Fay, and followed by
```

PDF created with pdfFactory trial version www.pdffactory.com

1  our EPA inspector, Mr. Abdi Mohamoud.

2          THE COURT:  And that will probably consume the day,

3  those two?

4          MR. SANDS:  That's our indication, your Honor.

5          MR. FRIEDMANN:  Your Honor, with regard to Dr. Fay,

6  that's one of the witnesses that we had filed a motion in

7  limine regarding that your Honor said you would hold off on

8  making a decision until it was time for her to testify.  So I

9  would like to raise that issue at this point.

10         THE COURT:  This is the temporal issue?

11         MR. FRIEDMANN:  This is.

12         That she not be permitted to testify to events beyond

13 the statute of limitations, which my understanding is the

14 government's intent is to have her testify to events outside

15 the statute of limitations, presumably prior bad acts, to prove

16 habit, I guess, under 406, would be their conclusion -- or

17 character under 404 -- neither of which would be appropriate.

18         She certainly would not -- by this limitation she

19 would not be precluded from testifying about events that they

20 are claiming are the subject matter of this lawsuit, but the

21 ones that are beyond the statute of limitations would only tend

22 to confuse the jury because they'd be hearing testimony about

23 events that they then couldn't even decide on.  So I think that

24 evidence of events beyond the statute of limitations should be

25 prevented from being introduced at the time of trial since they

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   truly are irrelevant to the claimed events that are the subject

 2   matter of the lawsuit.

 3           THE COURT:  Are these -- well, maybe I should hear

 4   from you first, then.

 5           MR. SANDS:  Your Honor, first, if counsel was willing

 6   to stipulate that these are, in fact, bad acts, we would be

 7   happy to accept that stipulation; however, we intend to ask

 8   Ms. Fay about her experiences.  And I believe that the jury's

 9   entitled to hear about the entirety of her experiences and what

10   formed the basis for her reasons for contacting the company in

11   certain instances, or for being here at all.  She's --

12           THE COURT:  Why is that relevant in this phase?

13           MR. SANDS:  Well, your Honor, because Ms. Fay will --

14   we believe will testify that she, on several occasions, both

15   before the statute of limitations period expired and after, was

16   frustrated by idling, and that caused her to contact the

17   company.  And it's a cumulative effect.  And the jury needs to

18   understand that this was a cumulative matter for her and that

19   that's why she took the actions that she took.

20           THE COURT:  Well, it sounds like a good --

21           MR. SANDS:  Your Honor, if I may?

22           THE COURT:  Yeah.

23           MR. SANDS:  Sorry.

24           In addition, the notes that I think counsel is

25   referring to, and some of which I believe are on your screen
```

1    right now, have already been stipulated to by the parties.

2         MR. FRIEDMANN:  You could easily just take that one

3    page.  They are severable pages, and it's one page that would

4    include these notations.  We could easily just remove the one

5    page from the exhibit.

6         I would suggest, your Honor -- we filed a motion with

7    the Court.  I have a copy of it.  But we filed it back on May

8    13th.  And in there we cited for the Court the law on this,

9    that there has to be special relevance to show something other

10   than propensity.  This is under 404(b).  "Other crimes, actions

11   not admissible to prove a person acted in a similar fashion."

12   That's the *Lataille* case and the *Udemba* case that we cited in

13   our motion to your Honor.  I do have an extra copy of it, if

14   your Honor would like to look at it at this point in time.

15   Again, it was previously filed with the Court electronically.

16        The issue is whether they are trying to take act --

17   whether they are trying to utilize acts beyond the statute of

18   limitations to try to prove acts within the statute of

19   limitations.  And that's just not permissible as a matter of

20   law.  They are not -- they are not even events that this jury

21   could make an award on and find us responsible, if they were so

22   inclined.

23        I'm not suggesting that they are prior bad acts, but

24   that is the way they are trying to couch it, as events that are

25   not within the statute of limitations, that are outside the

1    statute of limitations, and try to show something within the

2    statute of limitations.

3          THE COURT:  I guess this raises a whole question -- it

4    raises a question on both sides.  And I think this touches on

5    some of the objections that were being made to your opening a

6    little bit in terms of -- I mean, to put it sort of simply,

7    it's kind of a good-faith/bad-faith exchange.  And so the

8    question is why is any of that relevant on a strict liability

9    event-based claim, in the liability phase particularly?

10          I mean, I could see there could be some relevance in

11   the -- what the company's good faith or bad faith might have

12   been would affect an assessment of a penalty, perhaps, but how

13   does it help prove or disprove 132 2006 discrete incidents of

14   violation? I guess is my question.

15          MR. SANDS:  Your Honor, we are not claiming to allege

16   these as evidence of prior bad acts, but we believe we have

17   evidence on behalf of the company, a pattern that they have

18   exhibited over a course of time, that is relevant for the

19   jury's inquiry.

20          THE COURT:  To what?

21          MR. SANDS:  To determine --

22          THE COURT:  Yeah?

23          MR. SANDS:  -- the question of necessity.

24          MR. FRIEDMANN:  She can't testify to necessity.

25   She's -- again, from her deposition, she said she doesn't know

1  what was necessary or wasn't.  But we're talking about events

2  in 2000, which are April 15, 2001, is where the statute of

3  limitations ends.  The events that I made reference to, your

4  Honor, if you recall, were events in 2002 --

5        THE COURT:  Well, apart from whether they were within

6  or without the limitations period, my question is a broader

7  one, as to why prior behavior, attitudes or whatever,

8  receptiveness to complaints, whatever the evidence might be,

9  why that is relevant at the liability phase to prove that in

10  2006 there were observed occasions of idling in excess of five

11  minutes that appeared to be unnecessary.  I don't understand

12  how the -- I mean -- well --

13        MR. SANDS:  Again, your Honor, we believe that what

14  Ms. Fay will testify to is on a number of occasions she

15  witnessed the busses running, she saw no one out there working

16  on the busses.  Again, this goes to the question of whether or

17  not the running of the busses was, in fact, necessary.  And it

18  does show that there is a practice within the company of

19  running busses without having any observed evidence of

20  necessity.

21        MR. FRIEDMANN:  Your Honor, Ms. Fay's last note is

22  February of 2005, and she says in her deposition that she had

23  no observations in 2006.  So how these tend to prove 2006

24  events when her last note, as your Honor can see from the

25  exhibit that's before you, is in February of 2005 -- that's a

PDF created with pdfFactory trial version www.pdffactory.com

1    long period of time to have expired for those three events in

2    2005 to prove habit in 2006.

3          I'd remind your Honor -- and we submitted a memo on

4    this, on habit -- that the First Circuit has found 75 to 100

5    events insufficient to prove habit.  Here they're trying to

6    prove habit on a nonspecific basis based on three observations.

7    And I would suggest, your Honor -- and that is an issue that is

8    very much alive in this case.

9          If your Honor recalls, on the 20th when we were here

10   before you we had the issue of the burden of proof.  And after

11   you enunciated your standard I immediately asked you how you

12   were going to address this issue of habit.  And you indicated

13   that they would have to prove specific instances, which is what

14   406(b) [sic] requires, and that they would have to prove

15   specific observations and have something more than just idling.

16   This gets really to the nub of that entire area of habit that

17   they're trying to introduce.

18          MR. SANDS:  Your Honor, we don't believe that that

19   was, in fact, the Court's ruling on habit evidence at the time.

20          THE COURT:  Well, I guess this is really a kind of

21   fundamental question of what the case is going to look like, I

22   think.  I'm looking at the complaint, Paragraph 13, and

23   Paragraph 13 says -- alleges, "An inspector from EPA observed

24   on numerous occasions between March and April 2006 over 100 of

25   PRT's motor vehicles idling in excess of five minutes."  And

PDF created with pdfFactory trial version www.pdffactory.com

1   that is -- the opening included charts, which we talked about,

2   shown to the jury, which focused on that time period and

3   particular observed violations.

4        Paragraph 13 of the complaint goes on in the second

5   sentence and alleges that "After reasonable opportunity for

6   further investigation and discovery, the United States will

7   likely be able to prove that PRT stopped and idled its motor

8   vehicles unnecessarily" -- for more than five minutes,

9   basically -- "numerous additional times over the last five

10  years."

11       So I guess the question is:  Is it the government's

12  view -- the plaintiff's view -- that the case is focused on the

13  occasions referred to in the first sentence as occurring in

14  March and April 2006 and which were a part of the charts, or is

15  it your view that we're going to talk about numerous additional

16  times over the last five years?  I guess that's one question,

17  anyway.

18       MR. SANDS:  It would be our view, your Honor, that

19  we're going to be talking about both.  We believe that the

20  evidence will show what the inspector observed, what Dr. Fay

21  observed, and that the jury is entitled to draw inferences from

22  that information about the likelihood that there were

23  additional violations by the company based upon their pattern

24  and practice.

25       THE COURT:  Are you going to ask the jury to make a

PDF created with pdfFactory trial version www.pdffactory.com

1    finding about that?

2            MR. SANDS:  Yes.

3            THE COURT:  What would it be?

4            MR. SANDS:  That based upon the information presented,

5    the evidence presented to you, do you find that on -- between X

6    date and X date that the defendant violated the Massachusetts

7    idling regulation by idling its vehicles in excess of five

8    minutes without justification? or something to that effect.

9            THE COURT:  On occasions as to which there is no

10   direct evidence of a violation?

11           MR. SANDS:  Based upon the evidence that --

12           THE COURT:  In other words, you have -- you have some

13   identified dates and observations in March and April.  Are you

14   going to suggest the jury could find, for example, in February

15   there were also particular violations?

16           MR. SANDS:  What we expect to ask the jury for, your

17   Honor, is for special questions on the specific violations that

18   were witnessed by Dr. Fay, the specific violations that were

19   witnessed by Mr. Mohamoud and, in addition, additional

20   violations based upon the evidence of Paul Revere's practice of

21   idling their vehicles.

22           THE COURT:  As to which there is no direct

23   observational evidence.

24           MR. SANDS:  There is --

25           THE COURT:  In other words, they each -- I'm

1    understanding you to say that each of them -- the inspector and

2    Dr. Fay, each have some testimony they could give about

3    particular identified observed violations, they could give it a

4    date --

5            MR. FRIEDMANN:  Claimed violations.

6            THE COURT:  -- and a time, right?

7            But in addition, beyond what they can testify about

8    having observed, you would have the jury infer there are other

9    days as to which there are no observations when it must also

10   have happened because it was habit, because of whatever; is

11   that right?

12           MR. SANDS:  Based upon testimony that we expect will

13   be elicited from our witnesses as well as from defendant's

14   witnesses to establish the fact that this was a pattern by the

15   company.

16           THE COURT:  Okay.

17           MR. FRIEDMANN:  Your Honor, to answer your question

18   directly, I think it's appropriate evidence for the jury to

19   hear Mr. Mohamoud's observations.  All of those came in, we

20   know, March and April of 2006, so they're clearly within the

21   statute of limitations.  Ms. Fay is going to testify to alleged

22   additional violations where she'll have to testify to dates,

23   the number of vehicles, what the necessity was or the lack of

24   necessity.  And those are a discrete number of dates also.

25           What I'm saying, though, is that those discrete number

PDF created with pdfFactory trial version www.pdffactory.com

1    of dates that she's going to testify to, she should not be

2    permitted to testify to dates beyond the statute of limitations

3    because they are not something that we could be -- even if we

4    were found liable, they are not something that we are legally

5    responsible for anymore because they are beyond the statute of

6    limitations.

7           On the third group, which is this speculative group

8    of, "Well, we think there's a habit and practice," they will

9    have no observations on any of those days -- of these unknown

10   days; they will have no person that can testify that that event

11   actually occurred and that there was any, at all, even the

12   slightest, necessity or lack-of-necessity testimony on that.

13          I would suggest, first, that under Rule 406, they

14   don't meet the requirements for habit.  Under 406, they can

15   take numerous actions to prove -- if you look at Rule 406, it

16   says "a specific instance," singular.  You can use 150, 200,

17   300 occurrences to prove that on a particular date somebody

18   must have acted that way even though we don't have specific

19   proof of it.  What they're trying to do is go in the opposite

20   direction.  They're taking seven observations and saying

21   "Because we saw what we believe to be a violation on seven

22   occurrences, you can infer that 500 other times there were

23   violations."

24          The problem with that is the rule doesn't work that

25   way.  The rule is set up to prove a specific instance after you

PDF created with pdfFactory trial version www.pdffactory.com

1    have numerous observations.  And the First Circuit has ruled on

2    this.  And the First Circuit case, *U.S. v. Newman*, which we

3    cited in our motion in limine on habit which we filed with the

4    Court, which I also have a copy of if your Honor needs it, they

5    say that observations of 75 to 100 instances was not sufficient

6    to prove habit in a single instance.

7             Here what they're doing is they're saying, "We think

8    we saw something seven times, so we're going to go back for the

9    entire statute of limitations and say it must have occurred

10   because it happened these seven times."  That is not a specific

11   instance.  And I would point out, your Honor, the rule goes

12   further and it puts a specific burden of proof on the proponent

13   to establish this with specificity.

14            So with the standard that you've given us of they have

15   to prove observation plus before there's a shifting of the

16   burden of proof, they have no observation plus any way you look

17   at it because nobody ever saw these.  And certainly we can't

18   defend them and prove that they didn't happen because we don't

19   even know the dates of them.  They're just saying, "Well,

20   because it happened so many times, it must have happened more

21   times."

22            406(b) is not designed for the purpose that they're

23   trying to utilize it for, and that's at the very fulcrum of

24   this case, your Honor, which is -- a major portion of our

25   defense of this case is you have dates that are observations.

PDF created with pdfFactory trial version www.pdffactory.com

1    It's fair for us to fight over those.  You have Ms. Fay, what

2    she says, you have Mr. Mohamoud, what he says.  But you can't

3    go back and try to foist on us hundreds of dates of violations

4    with no specific proof, no observation, and nothing on the

5    element to actually put the burden on us, which is the

6    observation plus something on the necessity component.

7           So I know we've gone a long way from us objecting just

8    to the -- barring Ms. Fay from testifying to anything beyond

9    the statute of limitations.  We don't oppose her testifying to

10   whatever specific observations she had within the statute of

11   limitations.  We may disagree with her on her observations and

12   the merits of her observations, but that's what this trial is

13   about.  On Mr. Mohamoud, we may disagree with him on the merits

14   of his observations, but that's fair game.  That's also what

15   the trial is about.  But this attempting to turn Rule 406(b) on

16   its head and use it diametrically opposed to the way it's

17   designed to prove a specific instance is where we object.

18           THE COURT:  Well, I'll get back to you in a minute,

19   but let me just set the table a little bit.  There are at least

20   three things -- three different issues involved here:  One is

21   the impact, or not, of the statute of limitations on what is

22   admissible; one is what might be admissible under Rules 404 or

23   406.  But I think in order to answer both of those we also have

24   to answer the question which I was trying to focus on and which

25   Mr. Friedmann has now addressed -- and I'll hear from Mr. Sands

1    on it -- and that is the scope of the proof.

2         It does seem to me that on the -- on the burden of

3    proof rule that we've established, an element of the prima

4    facie case is observational evidence.  And so that without

5    observational evidence of a violation on a particular occasion,

6    the plaintiff would not satisfy the prima facie part of the

7    test.  The consequence would be that those occasions that are

8    provable have to be ones on which there are specific

9    observational evidence.  And so that, I think, has consequences

10   for the scope of the whole claim, if I can call it that, by the

11   plaintiff.

12        And then if that's the case -- and we would only ask

13   the jury to consider those particular occasions when there has

14   been a prima facie showing of observational violation -- a

15   putative violation -- then we proceed from that scope to

16   consider what might be admissible in proof of those events, and

17   that would implicate how we understand and apply rules 404 and

18   406, and it might have some implications for the limitations

19   period as well.

20        But it seems to me a fundamental part is:  Is this

21   going to be -- are we going to be focused on identified

22   occasions when somebody -- Mr. Mohamoud, Dr. Fay -- has made --

23   can testify to the prima facie standard?

24        MR. SANDS:  If I may, your Honor.  I understand the

25   Court's concern.  We believe that the jury is entitled to at

1    least draw the inference that based upon evidence presented of

2    the practice of the company as far as idling in certain

3    situations, and whether or not there was any showing of

4    necessity in those situations, they could draw the inference as

5    to whether or not there was, in fact, idling on other occasions

6    during this time period that also would be violative of the

7    Massachusetts idling regulation.

8         Mr. Friedmann argued to the jury yesterday that it was

9    the practice of this company to start these busses in cold

10   weather because they had to build up the pressure.  He laid

11   that out for the jury, that this is what their regular practice

12   was.  We're allowed to rebut that with a showing from Dr. Fay

13   and from others that, in fact, while, in fact, they did start

14   these busses, that there was no observed reason for the

15   extensive idling that was occurring.

16        The jury then is allowed to draw the inference based

17   upon that evidence, evidence of what defense witnesses will say

18   about their practice of starting busses in certain conditions,

19   and to draw that inference that, okay, during this time period

20   that there were likely other -- or that there were other

21   instances where the company also idled these busses without any

22   showing of necessity.  They are -- they have the burden of

23   proving that, in fact, the reason that they are idling the

24   busses in both the observed instances and by inference in the

25   non-observed instances would satisfy the burden of showing it

PDF created with pdfFactory trial version www.pdffactory.com

1    was necessary.

2          MR. FRIEDMANN:  Your Honor, you gave us back on May

3    20th your paradigm for burden of proof and what had to be met

4    and what then would shift the burden to us.  My brother's

5    articulation of their position is not in conformity with your

6    Honor's ruling on that.  Your Honor said very specifically that

7    they would have to show -- they would have to have observation

8    plus, such as a mechanic bending over or no mechanic bending

9    over, before the burden of proof would be placed on us.  And

10   this is why your decision on burden of proof was so important

11   to everybody.

12         THE COURT:  Right.  I agree with that.  But there may

13   be other ways of -- may be multiple ways of proving that

14   proposition.  The most obvious is a witness who says, "I saw

15   it, I made notes about it, and these are my observations."

16   That's one.

17         MR. FRIEDMANN:  Right.

18         THE COURT:  Another way might be an admission by the

19   defendant that that had happened without the observation.  If

20   someone said, for example, "Yes, it is true on March 16th we

21   idled a bus for 15 minutes, and we had a good reason for it,"

22   but the idling for the 15 minutes admission might be enough,

23   question mark, to satisfy the government's prima facie case.

24         MR. FRIEDMANN:  Your Honor, the testimony from the two

25   individuals that they're referring to is that they never

 1    started a bus except when it was mechanically necessary, they

 2    never ran it for more than five minutes except for when it was

 3    mechanically necessary.  That's not an admission that there was

 4    anything that is a violation -- that's not an admission that it

 5    was started and run more than five minutes -- and putting the

 6    burden on to us; in fact, it's just the opposite.  It is:

 7    There was no violation.

 8         How the government can say because we had seven

 9    observed situations where we think -- not that we've proven --

10    but where we think the five minutes may have been exceeded

11    improperly, how they can then say, "Well, on these other 500

12    cases, you now have to disprove every single one with

13    particularity even though we have no knowledge of the dates."

14         Remember, under 406 the onus is on them, which is a

15    separate onus from the burden of proof, to show with

16    particularity.  It's not just a general, it's a

17    with-particularity standard with the burden of proof on them

18    and to show a specific instance.  And, really, they're turning

19    that on its head, or trying to turn it on its head, even with

20    the example that your Honor cited where you could at best

21    consider it an admission except for the person saying, "I

22    didn't do it," that "We started it for mechanical reasons."

23    How does that get them over their burden of proof when the

24    statement is, "We did it for mechanical reasons"?  How does

25    that get to operation plus?

1          MR. SANDS:  Rule 406, your Honor, does not, in this

2     matter, establish what the burden of proof is.  The Court has

3     established that.  And what the Court told us on the 20th was

4     that our burden was to show idling in excess of five minutes,

5     which is an objective standard in the regulation, coupled with

6     no observed or apparent necessity.

7          THE COURT:  Right.

8          MR. SANDS:  What we intend to show, through our

9     witnesses and through cross-examination of defense witnesses,

10    is that they, in fact -- there were numerous occasions, more

11    than just the times that are noted on Dr. Fay's notes -- she

12    will testify that there were additional times when she noted

13    busses idling and there was no apparent reason; there was no

14    one seen working on the busses.

15         And what Rule 406 says is that evidence of habit of a

16    person of the routine practice or -- of an organization,

17    whether corroborated or not, and regardless of the presence of

18    eyewitnesses, is relevant to prove the conduct of the person or

19    organization on a particular date within conformity of that

20    conduct.

21         THE COURT:  Is it your intention to just take a

22    calendar out for the jury and say, "Let's turn to February

23    2003"?  "We know they were doing it as a matter of habit" --

24    this is your view, anyway, from the observational periods,

25    whether it's Fay's observational period or the inspector's --

PDF created with pdfFactory trial version www.pdffactory.com

1    "and, therefore, they must also have been doing it all those

2    other months.  And so let's go through February.  February 6th.

3    Jury:  Yes or no?  February 7th, jury?"

4         I mean, is that -- I may be characterizing it a little

5    bit for effect, but is that your view?  I mean, are you going

6    to ask the jury just to tick off the days on the calendar as to

7    which there's no -- there is the inference of habit but nothing

8    else?

9         MR. SANDS:  There is the inference of habit, there's

10   the inference of practice by the company of idling these

11   vehicles on certain days, on cold days.  We have stipulated --

12   the parties have stipulated about the issue of the weather

13   during a particular time period.  What we expect the jury to be

14   asked is on those days, as defense witnesses have testified to,

15   we expect, it was their practice to idle these vehicles,

16   coupled with evidence that on similar days there were observed

17   violations -- excuse me, observed instances -- by Mr. Mohamoud

18   as well as Dr. Fay, not just the ones that she's noted on her

19   notes but additional dates that she will testify to; there was

20   no apparent reason for the idling, that this is sufficient

21   evidence for the jury to draw the inference, your Honor, based

22   on this -- based on this evidence, circumstantial as it may be,

23   that there were, in fact, additional violations between X date

24   and Y date.

25        THE COURT:  I raised the issue with Mr. Friedmann

1    whether an admission might suffice of some cases.  Do you have

2    such evidence?

3            MR. SANDS:  We believe we do.

4            THE COURT:  What would it be?

5            MR. SANDS:  We have testimony that either will be

6    elicited in court or through deposition designations from

7    representatives of the company that it was their practice to

8    idle these -- to go out and start these busses on cold mornings

9    because of their -- what they allege are specific reasons that

10   they hope to prove satisfy their burden of necessary.  We

11   obviously disagree with that.

12           But there is this evidence that this was their

13   practice of the company to go out on cold days and start these

14   busses early in the morning.  And we have evidence that these

15   busses -- observed evidence that these busses on similar days

16   sat there for sometimes more than an hour and that there was no

17   one ever noticed working on these busses; there was no apparent

18   reason for this idling.

19           THE COURT:  Well, unless the admission includes the no

20   apparent reason aspect, I'm not sure it would meet the prima

21   facie cases.

22           MR. FRIEDMANN:  Your Honor, the witnesses testified --

23   two witnesses in question testified --

24           THE COURT:  Who?

25           MR. FRIEDMANN:  Mr. Powers and Mr. Swartz testified

1   very specifically that, number one, they never idled for more

2   than five minutes unless it was necessary, and that on cold

3   mornings they would send people out to start the busses, make

4   sure they built up air pressure and would function, and then

5   turn them off.  That's what is the alleged admission of excess

6   idling.

7           THE COURT:  Okay.  Well --

8           MR. SANDS:  Your Honor, we disagree that that's what

9   the testimony will bear out.  In addition, you asked about

10  whether or not just the statement by a party witness that it

11  was their practice to start would, in fact, satisfy the

12  admission.  We believe that coupled with the other evidence

13  that -- in addition, we -- as the Court has laid out the burden

14  standard, that if they do state that it was their practice and

15  they state that it was for a particular reason, that we then --

16  the burden shifts back to us to show that this was, in fact,

17  not a legitimate reason.  So it's not cut and dry that if they

18  just say that "We started them and this was our practice," that

19  that's not enough.  It may be enough.  And we believe that

20  that's enough to take it to the jury.

21          THE COURT:  Well, okay.  Because I don't know the body

22  of evidence you expect to put in, I'm not sure exactly where

23  this will go, but we're going to at least start by sticking

24  with the rubric that we established with the burden, which is

25  there has to be a showing by the government by whatever

1    evidence, either its own witnesses or an admission from the

2    other side, that there was idling in excess of five minutes

3    with no observed or apparent justification, parenthesis.  I'm

4    not sure that a statement by the company which includes an

5    assertion of a justification would meet that.  It may depend on

6    the exact form that the evidence takes when it's offered.

7    We'll have to see.

8            I don't rule out that it's possible; I don't want to

9    give a blanket indication that a general exculpatory

10   explanation would suffice because I think some level of, call

11   it direct evidence of a day and circumstance -- particular day,

12   particular circumstances -- is necessary for the jury to find a

13   liability-producing violation.  And the vague evidence of "They

14   must have also been doing it on other days when we don't have

15   observations" I think should not be sufficient to support a

16   violation on those unidentified occasions -- or unobserved

17   occasions, if you want to call it that.

18           We're proceeding here with very little guidance from

19   any source other than the raw text of the regulation and the

20   general outline of the cause of action in the Clean Air Act.

21   So some of this we'll find out the answer years down the road,

22   maybe.  But right now we're going to tie it to particular

23   occasions and not the general sweep of inference about vast

24   periods of time when it was winter and the temperature was low.

25   That's just too vague to support a penalty.

PDF created with pdfFactory trial version www.pdffactory.com

1          Now, it might be relevant later on in a penalty phase

2     in considering the scope of an injunction, for example, but for

3     monetary assessments it seems to me something more direct has

4     to be proved.

5          MR. FRIEDMANN:  Your Honor, we got off course a little

6     bit.  My original request was related to --

7          THE COURT:  Right.

8          MR. FRIEDMANN:  -- Ms. Fay and testifying to events

9     outside the statute of limitations.

10         THE COURT:  Right.  I guess -- well, I guess I'm -- I

11    guess I don't see the relevance of it.

12         MR. SANDS:  And, your Honor, we submit that this is

13    what Ms. Fay's observations were from beginning to end.

14         THE COURT:  Because Rule 406 does have -- you have

15    to -- I agree with Mr. Friedmann to the extent that you have to

16    identify -- you're trying to prove that it occurred on a

17    particular occasion.  I think you have to identify the

18    occasion.  Now, if you were free to pick a date in February

19    2003, any date and multiple dates, and say "Those are the

20    occasions I want to prove," you might have a point.  That's why

21    it was important to settle what we just settled.  If you're not

22    going to be able to do that, then the dates you're concerned

23    about proving that it occurred are those dates as to which you

24    already have observational evidence.  So it's unnecessary, so

25    it seems to me.

1          MR. SANDS:  Your Honor, we're not seeking in our

2     complaint dates before the statute of limitations.

3          THE COURT:  No, I understand.  But take a date that --

4     well, I don't know.  I don't know what -- I'm not sure that Dr.

5     Fay's testimony could prove anything about the inspector's

6     observations, but assume it could.  Pick one of the dates that

7     we saw the chart of, March something or other, in '06.  How

8     would testimony by Dr. Fay of five years earlier, or whatever

9     it might be, under Rule 406 permit an inference about a date in

10    March '06, which I think would be required, or some other date

11    as to which there's going to be a particular controversy?

12         MR. SANDS:  Part of it goes to the witness's state of

13    mind, your Honor.  And for her, again, painting a complete

14    picture for the jury stating why it is this woman felt on these

15    occasions to write these notes, et cetera.  In addition, at

16    least on a couple of these notes on her first page there is a

17    notation about her contact with the company and --

18         THE COURT:  Maybe it would help me if I saw what it

19    is -- do the notes say something about her -- what you want to

20    get in?

21         MR. FRIEDMANN:  Well, we have one page here -- there

22    were three pages of notes, your Honor.  We only object to the

23    one page of notes that's her observations beyond the statute of

24    limitations.  We don't object to the -- we're not happy with

25    the other pages, but we don't have a basis for seeking

1    exclusion of them.

2          But these notes about events that happened in January

3    of 2000 don't prove in 2006 or in 2003 or in 2005 that

4    violations occurred.  And all we're saying is this discrete

5    page, which is beyond the statute of limitations -- the statute

6    of limitations runs as of January 15th, 2001 -- that this page

7    should be excluded.  All of her notes for other dates within

8    the statute of limitations we have to deal with.  Those are her

9    observations.  She can testify to her reasons for taking those

10   notes.  It doesn't impede the government that way.

11         But those are -- this page contains events that are

12   not charged and are not chargeable, and the jury shouldn't hear

13   that because it's only going to tend to mislead them.  When

14   they're asked to decide something, how is this jury going to

15   say, "Okay" --

16         THE COURT:  I may agree with you on 406.  Why aren't

17   they admissible under 404(b) as discrete prior occasions?

18         MR. FRIEDMANN:  Outside the statute of limitations?

19         THE COURT:  Yeah.

20         MR. FRIEDMANN:  How would that be proof --

21         THE COURT:  To prove one of the special relevance

22   factors in 404 --

23         MR. FRIEDMANN:  Actually, they would have to prove

24   special relevance.  But even if your Honor thought for a minute

25   that this was special relevance, what does it specially prove?

1        THE COURT:  I guess that's -- I don't know.  That's a

2  question for them.

3        MR. FRIEDMANN:  If that's the issue, it shows the same

4  types of events --

5        THE COURT:  Maybe I jumped ahead a little bit.  I'm

6  suggesting an argument of admission for the plaintiff.

7        Is there an argument that you have under 404(b)?

8        MR. SANDS:  I believe, your Honor, that would be

9  conflicting proof of a plan, that this was, again, their

10  regular practice, this was their -- they admitted that this was

11  their plan for addressing issues with these busses on certain

12  days.  So it does go to one of the enumerated reasons under

13  404(b).

14        MR. FRIEDMANN:  Your Honor, 404(b) specifically

15  excludes propensity as one of the special circumstances.

16        THE COURT:  Let me ask this, a more practical

17  question:  Why do you need it?  What's so good here?  I need an

18  understanding of why this fight.  It seems rather anodyne to

19  me.  I mean, is there a nugget here or something that I'm

20  missing?

21        MR. SANDS:  There's information, your Honor, that's

22  noted on here about her contacts with personnel at the company

23  who counsel has indicated will be testifying.  And there's

24  actually some discrepancy between defense witnesses'

25  recollection of when this contact occurred and Ms. -- Dr. Fay's

1    recollection of when this occurred.  So there's -- but we

2    believe that the content of the communications, or the fact

3    that they had these communications, does go to the idea that

4    the company was on notice that this was occurring, that it was

5    a repeated act by the company, and that there was no observed

6    reason for it, no observed -- no reason was given to Dr. Fay,

7    no reason was observed by Dr. Fay.  And this is not just

8    starting on April 15th of 2001, this was going back to when she

9    first started contacting the company about these instances.

10          So this does show that there was -- again, goes to the

11   practice -- the plan of the company -- for idling their

12   vehicles.

13          MR. FRIEDMANN:  Again, your Honor, they're trying to

14   establish propensity, which is one of the things that 404 --

15   excuse me -- 404(b) specifically says is not a special

16   circumstance.  If our witnesses -- I mean, we can give the same

17   admonition to our clients -- to our witnesses as are given to

18   this witness of "You're not to testify as to anything before

19   April 15, 2001."  To the extent that there is a disagreement on

20   the dates that discussions took place and notice, I'm not sure

21   how the notice plays into -- at least in this phase of the

22   case, how notice plays into whether in 2006 violations took

23   place or didn't take place.

24          Ms. Fay is going to get up there and testify to what

25   she observed.  She has a limited time frame in which to do that

1    because there are only -- there's a limited time frame which

2    are chargeable events.  And if she wants to get up here and

3    say, "I saw on this date, and here's my note," and "I saw on

4    this date and here's my note," and "I saw on this date and

5    here's my note," then that's what she's going to testify to, to

6    what she actually remembers and what her notes reflect.

7           But that doesn't mean that the events that are outside

8    the statute of limitations somehow prove other events.  Just

9    the opposite.  They prove specific events which are

10   non-chargeable events, and they don't show any specific

11   propensity -- I'm sorry.  They're being offered to show a

12   propensity, which is precisely what the cases under 404(b) say

13   is not a special circumstance and is not admissible.

14          THE COURT:  Yeah, I think that's right.  We just have

15   to move on.  So I'll exclude the testimony prior to the statute

16   of limitations.

17          MR. FRIEDMANN:  Could we also, your Honor, just the

18   one page, have it removed from the exhibit list?  This one

19   page, since it's not going to be testified to now, if we could

20   just as a matter of housekeeping remove it from the exhibit?

21   And, also, if we could ask that the government --

22          THE COURT:  You could do that at some point.

23          MR. FRIEDMANN:  And the government instruct Ms. Fay

24   that her testimony should not go backwards beyond that April

25   15, 2001, date, which is the end of the statute of limitations?

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  That's an agreed -- I mean, there's no

2     controversy about that, as to the marker, April 15, '01?

3          MR. SANDS:  We believe that's correct, your Honor.

4          THE COURT:  Okay.

5          MR. SANDS:  Point of clarification:  Dr. Fay will

6     testify that on occasion she had -- she called the city and the

7     local authorities to complain about the idling, and she will

8     testify that the reason why she did that was because after

9     contacting the company on numerous occasions, including the

10    occasions that are now precluded, that she got no satisfaction,

11    and so --

12         THE COURT:  If there were numerous occasions after

13    April 15th, she can say it.  But, you know -- anyway.

14         MR. FRIEDMANN:  That's why I was asking for the

15    specific instruction, your Honor.

16         THE COURT:  Okay.

17         MR. FRIEDMANN:  Thank you.

18         THE COURT:  Ready for the jury?

19         MR. SANDS:  May we have a minute to talk to our

20    witness just so she's clear on that?

21         THE COURT:  Sure.  We could be lining up the jury at

22    the same time --

23         MR. FRIEDMANN:  Thank you, your Honor.

24         THE COURT:  -- so we could get going.

25         (Pause.)

PDF created with pdfFactory trial version www.pdffactory.com

```
 1            MR. FRIEDMANN:  Your Honor, I just checked my notes

 2   and I think I misled the Court -- not substantially -- but the

 3   date is April 16th, not 15th.  For some reason April 15th

 4   sticks in my mind.  I can't imagine why.

 5            THE COURT:  All right.

 6            THE CLERK:  All rise for the jury.

 7            (Jury in at 9:54 a.m.)

 8            THE CLERK:  You may be seated.

 9            THE COURT:  Good morning, jurors.

10            THE JURORS:  Good morning.

11            THE COURT:  I apologize for keeping you waiting.  The

12   lawyers and I had a couple of issue we had to iron out before

13   we began the evidence this morning, and we've now done that.

14            The clerk has given you notebooks.  Let me just say a

15   word about that.  We often, in cases, permit jurors to take

16   notes as the case is going along.  It may help you to be able

17   to do that, to jot down a note or two as you're taking in the

18   evidence.  We -- it is intended as an assist to you in

19   following and understanding the evidence; it's not any

20   requirement that you have to do it.  People have different

21   habits and preferences when it comes to things like

22   note-taking.

23            And it's customary -- it's usual, I guess I should

24   say -- in my observation that in a jury of 12 people there will

25   be widely different use of the notebook.  And that's fine.  Do
```

PDF created with pdfFactory trial version www.pdffactory.com

1   whatever is suitable for you.  If it helps you to take notes,

2   by all means do so.  Some people find it's a little bit of a

3   distraction, even, to do it, and they would rather just pay

4   close attention to the evidence without taking so many notes.

5           To the extent there's any documentary evidence or

6   things like that that are shown to you in the course of the

7   trial, you're going to have all of that as exhibits in your

8   deliberations anyway, so keep that in mind.  But don't be --

9   don't feel compelled to do what your neighbor is doing; do

10  whatever is most helpful to you in following the evidence,

11  okay?

12          With that, Mr. Sands, your first witness, please.

13          MR. SANDS:  The United States calls Dr. Mary Jayne Fay

14  to the witness stand.

15                      MARY JAYNE FAY, sworn

16          THE CLERK:  Please state your name, and spell your

17  last name for the record.

18          THE WITNESS:  Mary Jayne Fay, F-A-Y.

19          THE CLERK:  Thank you.

20                      DIRECT EXAMINATION

21  BY MR. SANDS:

22  Q.   Good morning, Dr. Fay.  How are you?

23  A.   Good morning.

24  Q.   Just so we can clarify, are you a doctor of medicine?

25  A.   No, I am not.

1    Q.    Can you explain to us what your doctorate is in?

2    A.    Doctor in education.

3    Q.    When did you receive your degree?

4    A.    2005.

5    Q.    And from where?

6    A.    University of Massachusetts at Amherst.

7    Q.    Are you currently employed?

8    A.    Yes.

9    Q.    How -- where are you employed?

10   A.    At the Massachusetts Department of Elementary and

11   Secondary Education.

12   Q.    And how long have you been in that position?

13   A.    Since 1999.

14   Q.    Where do you currently reside?

15   A.    In Lexington, Massachusetts.

16   Q.    And how long have you lived there?

17   A.    One year.

18   Q.    And where did you live prior to that?

19   A.    In Roxbury, Massachusetts.

20   Q.    Can you provide us with the address?

21   A.    6 Alther Street.

22   Q.    And is that address near the Paul Revere facility in

23   Roxbury?

24   A.    Yes.

25   Q.    Can you describe where in relation to the Paul Revere

1  facility your home -- your residence was located?

2  A.   Our residence was directly located behind the Paul Revere

3  bus station, about ten feet away from the facility itself.

4  Q.   Showing you a picture here, does this picture represent

5  your recollection of what the Paul Revere facility looked like?

6           THE COURT:  Excuse me.

7           Jurors in the back row, you may want to get your

8  monitors up and running.

9           Right now I have excluded the jury while you're laying

10  the foundation; I'll cut them in when you move the admission.

11  BY MR. SANDS:

12  Q.   Can you identify for us what is shown in this photo?

13  A.   It appears to be the intersection of Melnea Cass Boulevard

14  and Hampden Street.  The northwest side of that intersection.

15  Q.   Can you determine from this photo where your apartment was

16  in relation to?

17  A.   My apartment building can be seen behind the trees on the

18  right side.  Do you want me to touch the screen?

19           THE COURT:  Well, the jury isn't seeing it yet, so I

20  don't think it would be worth doing.

21  BY MR. SANDS:

22  Q.   And this is an accurate representation of that

23  intersection and the facility?

24  A.   Yes.

25           MR. SANDS:  Move to enter into evidence, your Honor.

```
 1              MR. FRIEDMANN:  No objection.

 2              THE COURT:  Okay.  Admitted.  And I'll exhibit it to

 3     the jury.

 4              THE CLERK:  What's the number?

 5              MR. SANDS:  101, page 4.

 6              (Exhibit No. 101 received into evidence.)

 7     BY MR. SANDS:

 8     Q.    Dr. Fay, for the benefit of the jury, can you, again,

 9     identify what we're seeing here in this photo?

10     A.    This is the view of one side of the Paul Revere bus depot.

11     Again, it appears to be taken from the northwest corner of

12     Melnea Cass Boulevard and Hampden Street.

13     Q.    Where in relation to the Paul Revere facility was your

14     residence located?

15     A.    You can see in about the middle of the photograph there is

16     a white building.  Our apartment building was to the right of

17     that, immediately behind that white building.

18     Q.    You can point to it.

19     A.    Okay.

20     Q.    That building there?

21     A.    Yes.

22     Q.    And from your residence, did you have a clear view of the

23     Paul Revere facility?

24     A.    Yes.

25     Q.    Can you describe for the jury what you were able to see
```

1    from your vantage point?

2    A.    From our living room windows we could see the rear of the

3    white building and the majority of the bus parking lot itself,

4    including the parking area where vans were parked immediately

5    beside the white building.

6    Q.    Can you indicate on the photo which white building you're

7    referring to?

8    A.    (Witness complies.)

9    Q.    And you mentioned that there were both busses and vans on

10   the lot and you could see both; is that correct?

11   A.    Correct.

12   Q.    How long did you live at this location?

13   A.    Nearly ten years.

14   Q.    And going back to mid 2001, did you ever witness Paul

15   Revere vehicles idling on the lot for more than five minutes?

16   A.    Yes.

17   Q.    For more than 30 minutes?

18   A.    Yes.

19   Q.    For more than an hour?

20   A.    Yes.

21   Q.    How many times would you estimate you witnessed vehicles

22   idling on the lot for more than an hour?

23            MR. FRIEDMANN:  Objection.

24            THE COURT:  Overruled.

25            You may answer.

```
 1            MR. FRIEDMANN:  Can we just have a time frame, your

 2    Honor?

 3            THE COURT:  I assume it's the same time frame, but why

 4    don't you make that clear.

 5    BY MR. SANDS:

 6    Q.  During that same time period, after April -- starting from

 7    May of 2001 forward, how many times would you estimate that you

 8    witnessed vehicles idling on the lot for more than an hour?

 9            MR. FRIEDMANN:  Objection as to an estimate, your

10    Honor.

11            THE COURT:  Overruled.

12            You may answer.

13            THE WITNESS:  On average, more than ten times per

14    year.

15    BY MR. SANDS:

16    Q.  And can you let us know -- or can you indicate for us how

17    many vehicles you would view idling during that time period?

18    A.  Typically I could see anywhere from six to ten busses at

19    any one time running.

20    Q.  Did you ever witness more than ten busses running at one

21    time?

22    A.  Yes.

23    Q.  Did you ever witness more than 15 busses running at any

24    one time?

25    A.  I would say approximately 15.
```

1  Q.   And how could you tell that the busses were idling?

2  A.   From the direction that my apartment faced the parking

3  lot, you could see the signage on the busses lit up.  The older

4  busses, the lighting was blue, the newer busses, the lighting

5  was orange.

6  Q.   Any other indication that the busses were running?

7  A.   You could hear them, you can feel it -- you could feel the

8  vibration of the busses operating in the building -- and on

9  some occasions you could smell the fumes from the busses.

10 Q.   At what time did these busses generally get turned on?

11 A.   There were two different times of day that they would run

12 for extended periods of times:  early in the morning and then

13 in the evenings.

14 Q.   When you say "early in the morning," about what time?

15 A.   They could start at five, five-thirty in the morning.

16 Q.   And how is it that you're aware that that's the time that

17 they started?

18 A.   Sometimes by being woken up by them, and sometimes, again,

19 by feeling the vibration in the building as we were proceeding

20 with our morning routines.

21 Q.   Did you ever witness anyone going around and turning on

22 the vehicles?

23 A.   Yes.  In the morning sometimes you could see an individual

24 make the rounds of the busses, turning them on.  He would go in

25 one bus, turn it on, go to the next, turn it on, and go to the

1  next.

2  Q.    Just one person or were there multiple people?

3  A.    Whether they were one and the same I'm not sure, but

4  sometimes there would be an individual that was in blue

5  coveralls, a blue -- dark blue top, dark blue bottoms, whether

6  that was a mechanic or someone working in the facility.  Other

7  times it could be somebody who I would assume was a bus driver

8  who had the dark blue pant and a light blue top with the logo

9  on it.

10  Q.    And this would, again, be in the early-morning hours?

11  A.    Yes.

12  Q.    And just to clarify, did you see both -- two people going

13  around on those occasions when you saw someone starting the

14  busses or was it just one person?

15  A.    Typically just one person.

16  Q.    And when that person would turn on the busses, did they

17  stay with the bus or did they leave it unattended?

18  A.    No, they were typically moving from vehicle to vehicle.

19  Q.    Did they come back to that bus and sit with it while it

20  was idling?

21  A.    I didn't specifically sit and watch until they returned.

22  Q.    Can you give us an estimate of how many times you

23  witnessed this person going around and starting these vehicles

24  in the mornings?

25          MR. FRIEDMANN:  Objection.

1           THE COURT:  Overruled.

2           THE WITNESS:  It was several times a year.

3    BY MR. SANDS:

4    Q.   Did you ever witness anyone going around and turning off

5    the vehicles?

6    A.   Not in the mornings.

7    Q.   Were you still at home when the busses would leave the

8    lot?

9    A.   Sometimes.

10   Q.   And around what time did you witness busses leaving the

11   lot?

12   A.   They seemed to start exiting at seven, and usually the lot

13   was empty by eight, eight-thirty in the morning.

14   Q.   And did you ever observe anyone turn off the busses

15   between the time that you saw them started and the time that

16   they would leave the lot?

17   A.   I did not note that.

18   Q.   Other than the person that you saw starting the busses in

19   the morning, did you see anyone else on the lot in those

20   early-morning hours?

21   A.   In the early-morning hours the bus drivers when they would

22   arrive or when they were pulling in their personal vehicles

23   into places where the busses had been parked.  Occasionally

24   there would be a mechanic out there with the blue, what I

25   assume was a utility truck.

1  Q.   And let's start with the bus drivers.  Were the bus

2  drivers there at five or five-thirty when you saw the busses

3  started?

4  A.   Except for the one individual, again, that I assume was a

5  bus driver by what he was wearing, I didn't typically see bus

6  drivers there at that time of morning.

7  Q.   Did you see anyone -- at five or five-thirty in the

8  morning did you see anyone other than the person you witnessed

9  starting the busses?

10  A.   Again, the person I presumed to be the mechanic who was

11  working on the busses or the person who was starting the busses

12  in the morning.

13  Q.   You mentioned that you saw a mechanic working on the

14  busses.  How many mechanics did you view working on busses?

15  A.   I didn't say I saw them working on the busses, it was

16  someone I presumed to be a mechanic given what he was wearing.

17  But typically I would only see one person dressed as such in

18  the mornings.

19  Q.   Let me ask you, then:  Did you ever see anyone working on

20  the busses?

21  A.   In the evenings, on the weekends, sometimes overnight

22  there would be a mechanic working on busses to the rear of the

23  lot.

24  Q.   How about in those early-morning hours from five o'clock

25  to, say, seven o'clock in the morning?

1  A.   I did not notice.

2  Q.   Did you ever witness any of the vehicles on the lot in the

3  early-morning hours getting their batteries charged?

4  A.   Yes.

5  Q.   And which vehicles did you see getting charged?

6  A.   The vans that would be parked directly in front of our

7  home.

8  Q.   The vans that were -- I think you indicated before were

9  parked near that white building; is that correct?

10  A.   Yes.  They were parked right up -- basically, there's a

11  sidewalk between the maintenance building.

12  Q.   How could you tell that they were being charged?

13  A.   They had a portable battery kit that they would wheel out

14  on a cart, and they'd put the hoods of the vans up and start

15  the van -- hook up the battery, start the van, and then leave

16  the vans running.

17  Q.   How long would they leave the vans running?

18  A.   They could be running 30 minutes, an hour, longer.

19  Q.   And from your vantage point could you see what -- what

20  part of the busses could you see from your vantage point?

21  A.   I could see the front, and depending on the angle of the

22  bus, sometimes the side.

23  Q.   Did you ever see any busses being charged in the mornings?

24  A.   No.

25  Q.   Again, talking about the time period from May of 2001

1    going forward, did you ever have occasion to contact Paul

2    Revere about this idling that you witnessed?

3    A.    Yes, several times.

4    Q.    And can you give us an estimate as to how many times you

5    believe you contacted Paul Revere?

6    A.    It could be as much as ten times per winter season.

7    Q.    And why did you call the company?

8    A.    Because the busses would be running -- or the vans would

9    be running -- for an extended period of time, and both the

10   idling, the noise from them and the vibration from them and the

11   fumes from them, was disruptive.

12   Q.    Did you ever document your contacts with the company?

13   A.    I did on a few occasions.

14         THE COURT:  Well, again, I can go back and forth

15   leaving the jury out.  Are some of these exhibits agreed

16   exhibits so that we could smooth the process?  I mean --

17         MR. FRIEDMANN:  This is an agreed exhibit, your Honor.

18         THE COURT:  Okay.  I'll put it back for the jury,

19   then.

20   BY MR. SANDS:

21   Q.    Showing you what's been marked as Government Exhibit No.

22   9, are these the notes that you took of your contacts with the

23   company?

24   A.    Those are some of the notes, yes.

25         MR. SANDS:  Move to enter these notes into evidence,

1    your Honor.

2            MR. FRIEDMANN:  No objection, your Honor.

3            THE COURT:  Okay.  Could you identify that and give us

4    the exhibit number?

5            MR. SANDS:  Exhibit 9.

6            MR. FRIEDMANN:  I believe it consists of two pages,

7    your Honor.

8            MR. SANDS:  Two pages.

9            THE COURT:  Okay.

10           (Exhibit No. 9 received into evidence.)

11   BY MR. SANDS:

12   Q.   Do these notes represent the only times from May 2001

13   through the time that you moved from that residence that you

14   contacted Paul Revere about the idling?

15   A.   They do not.

16   Q.   How many other times do you estimate that you contacted

17   the company?

18   A.   Again, probably about ten times per winter season.

19   Q.   And that's in addition to those that are noted here in

20   your notes?

21   A.   Correct.

22   Q.   You took notes of certain contacts with the company but

23   not of others?

24   A.   Yes.

25   Q.   Can you explain why?

1  A.   Sometimes -- well, it was on a piece of paper that was on

2  my desk.  Sometimes I could locate the piece of paper easily,

3  sometimes I would use a different piece of paper.  Sometimes if

4  I could get someone to pick up the phone right away, I would

5  just forget to write it down, other times if I had to look up

6  on the computer another of the Paul Revere depot phone numbers

7  to try to get a live body, that would prompt me to try to find

8  my piece of paper to write it down.

9  Q.   Looking at the first page of your notes here, it appears

10  that the date is 1/25/04; is that correct?

11  A.   Correct.

12  Q.   And the notation, can you read what that says for the

13  jury?

14  A.   "11:05 to 11:40.  11:21 called" -- I'm sorry.  The copy

15  isn't clear here -- "and Vinny said he'd have them shut off."

16  Q.   Do you recall who Vinny was?

17  A.   I assume he was the individual who answered the phone.

18  Q.   And did he follow through and have the busses shut off?

19  A.   He must have.

20  Q.   Do you recall how many busses you witnessed idling on that

21  date?

22  A.   At any one time?

23  Q.   On this particular time that prompted you to contact the

24  company.

25  A.   Not at that particular time.

1  Q.   And do you recall how long you witnessed the busses

2  idling?  Is that what's noted here?

3  A.   That is what's noted there.

4  Q.   Was there ever any minimum criteria, I guess for want of a

5  better word, a better phrase, that you used that prompted you

6  to call the company?

7  A.   Typically, if they were running 30 minutes or more, then I

8  would call.

9  Q.   And would it -- would you call if it was just one or two

10  busses running?

11  A.   Typically, one bus wasn't enough to cause enough vibration

12  in the building to get our attention; it had to be more than a

13  few busses that were running at once to cause the level of

14  vibration in the building.

15  Q.   Moving down to the next entry, it appears to be February

16  22nd of 2004; is that correct?

17  A.   Correct.

18  Q.   And, again, can you read for us what you have written

19  here?

20  A.   "Called supervisor Paul in the a.m."

21  Q.   Do you recall who Paul is that's referenced here?

22  A.   I assume from my note that Paul was the supervisor at that

23  location.

24  Q.   And what was discussed on this occasion?

25  A.   From the note I don't recall whether that was the date I

1  called someone or that was what I was told by the individual

2  with whom I spoke at the bus depot.

3  Q.   And to your recollection, did you -- was this another

4  occasion when you witnessed multiple busses idling for more

5  than 30 minutes?

6  A.   That would be typical.

7  Q.   And the final notation on this page appears to be dated

8  February 21st, 2005; is that correct?

9  A.   Correct.

10  Q.   Again, would you mind reading for us what you have written

11  here?

12  A.   "Called shift supervisor (had heavy accent) and he asked

13  for ten more minutes because of cold.  Eight busses were

14  running.  Reminded him of Mass. state law."

15  Q.   Do you recall the name of the person you spoke to on that

16  occasion?

17  A.   I don't.  I probably noted "heavy accent" because he would

18  not give me his name.

19  Q.   And you indicate here that he asked for ten more minutes.

20  Ten more minutes to do what?

21  A.   I'm assuming either work or clean --

22          MR. FRIEDMANN:  Objection, your Honor.

23          THE COURT:  Well, what he said, not what her

24  assumption is.

25          You may give what you recall him saying but not

1   speculation about what he must have said.

2   BY MR. SANDS:

3   Q.    What do you recall was the conversation with that person?

4   A.    I don't recall.

5   Q.    Did you get any explanation at that time for why ten more

6   minutes were needed?

7           MR. FRIEDMANN:  Objection.

8           THE COURT:  No, you may answer that.

9           THE WITNESS:  I don't recall.

10  BY MR. SANDS:

11  Q.    How long had the vehicles been idling in this instance

12  before you called?

13  A.    Again, it was typical of running 30 minutes or more in

14  order for me to call.

15  Q.    And you note that eight busses were running.  You could

16  see those busses from your vantage point?

17  A.    Yes.

18  Q.    Did you see anyone working on those busses?

19  A.    I don't recall seeing anyone.

20  Q.    And, finally, you mention here that you reminded him of

21  the Massachusetts state law.  What state law are you referring

22  to?

23  A.    There was a Massachusetts state law that I came across

24  that stated that vehicles could not be idling for more than

25  five minutes.

1    Q.    And do you recall what the reaction was of this supervisor

2    when you mentioned the state law to him?

3             MR. FRIEDMANN:  Objection.

4             THE COURT:  No.  If you recall, you may answer.

5             THE WITNESS:  I don't recall.

6    BY MR. SANDS:

7    Q.    Moving to page 2 of your notes, it appears that the first

8    entry is from January 27th, '03; is that correct?

9    A.    Correct.

10   Q.    And, again, can you read for the jury what's written here?

11   A.    "Spoke with evening supervisor 8:30 p.m.  Busses running

12   over an hour."

13   Q.    Do you recall what was discussed with that supervisor?

14   A.    That the busses had been running for an extended period of

15   time.

16   Q.    And do you recall how many busses you witnessed idling for

17   over an hour on that occasion?

18   A.    Not specifically.

19   Q.    Do you believe it was more than three?

20             MR. FRIEDMANN:  Objection.

21             THE COURT:  Again, if you recall rather than whether

22   you're speculating.

23   BY MR. SANDS:

24   Q.    Do you recall whether it was more than three busses?

25   A.    Again, typically it would be more than three busses.

1          MR. FRIEDMANN:  Your Honor, motion to strike.

2          THE COURT:  No, it may stand.

3    BY MR. SANDS:

4    Q.   Going on to the next notation, it appears to be from

5    January 17th.  And I'm not certain what the year is.  Can you

6    identify what's written here?

7    A.   It looks like my version of a five.

8    Q.   Okay.  Again, can you read for the benefit of the jury

9    what's written here?

10   A.   "8:05 p.m.  Spoke with evening super in Boston.  Female."

11   Q.   And do you recall what prompted your call on this

12   occasion?

13   A.   No one was picking up at the Paul Revere depot next to my

14   home, so I looked up the phone number for another Paul Revere

15   depot.

16   Q.   And do you recall what you talked about with that evening

17   supervisor?

18   A.   Again, that the busses had been running for an extended

19   period of time.

20   Q.   And the final entry is -- again, it appears to be February

21   6th of 2005; is that correct?

22   A.   Correct.

23   Q.   And can you tell us what's noted here?

24   A.   "445-4334.  9 p.m. ten busses running."

25   Q.   Do you recall whose phone number that is?

1    A.    I believe that's the Roxbury Paul Revere phone number.

2    Q.    And these ten busses that you noted, they were all running

3    at the same time?

4    A.    Yes.

5    Q.    Did you speak to anyone at the Roxbury facility on this

6    occasion?

7    A.    I don't recall whether anyone picked up on that occasion.

8    Q.    Your notes appear out of chronological order.  Can you

9    explain to us why that might be?

10   A.    Again, I would write down information, put the piece of

11   paper aside.  It might be days before I might need it again,

12   and it wasn't always easy to locate, so I would take whatever

13   piece of paper I could find to write the information down on.

14   Q.    Were you -- on these occasions that you contacted Paul

15   Revere -- let me go back a step.  Again, these notes, are these

16   the only instances when you contacted Paul Revere?

17           MR. FRIEDMANN:  Objection.  Asked and answered three

18   times.

19           THE WITNESS:  No.

20           THE COURT:  Go ahead.

21           THE WITNESS:  No, these were the only instances that I

22   wrote them down.

23   BY MR. SANDS:

24   Q.    And on those occasions when you contacted Paul Revere,

25   were you ever provided with an explanation as to why the

1    vehicles were idling for so long?

2    A.    The one entry where the individual mentioned that it was

3    cold out; I do recall one supervisor mentioned because they

4    were cleaning the busses.

5    Q.    Any other reason ever given?

6    A.    Not that I recall.

7    Q.    Did you ever send a letter or contact Paul Revere other

8    than by phone?

9    A.    No.

10    Q.    Why not?

11    A.    It didn't occur to me.

12    Q.    Generally, how did Paul Revere -- what kind of response

13    did you get when you contacted the company?

14    A.    It was mixed.  Sometimes they were very courteous and

15    apologetic and would go right out and shut the things down,

16    other times they were extremely rude.

17    Q.    And on those occasions when they would go out and shut the

18    things down, did the instances happen again after that?

19    A.    Yes.

20    Q.    So -- and I apologize, that is probably not a very clear

21    question, but you mentioned that on certain occasions they

22    would go out and they would shut the things down.  How soon

23    after that happened would you notice the idling occurring

24    again?

25    A.    It could be the very next day.

1   Q.   Did you ever have occasion to contact any state, city or

2   local agencies regarding the idling at the Paul Revere

3   facility?

4   A.   Yes.  On two separate occasions I tried to determine what

5   agency might have oversight to try to get the idling to stop,

6   and I called several different city -- local and state

7   agencies.

8   Q.   And, again, why did you call the local and state agencies?

9   A.   To see if they could get the busses to stop idling.

10  Q.   And you said "on two separate occasions."  Can you explain

11  to us what those two occasions were?

12  A.   I don't remember the exact date of the first occasion, but

13  the second occasion was just prior to my daughter's birth, so

14  that would have been in the winter of '01.

15  Q.   Have you ever contacted the city to complain about any

16  other matter?

17  A.   Only about the lack of snow-plowing on our street.

18  Q.   You mentioned that the second occasion was in the winter

19  of '01.  Was that from --

20          MR. SANDS:  Can we have a sidebar, your Honor,

21  quickly?

22          THE COURT:  I'll see you at the side.

23          (Discussion at sidebar and out of the hearing of the

24  jury:)

25          MR. SANDS:  I just want to make sure I'm not going to

1    run afoul of our prior discussions.

2            MR. FRIEDMANN:  You said the winter of '01.  I wasn't

3    clear whether you were talking January of '01 or December of

4    '01.

5            MR. SANDS:  I would like to clarify because she said

6    prior to her daughter's birth, and her daughter was born in

7    2002.

8            MR. FRIEDMANN:  That's why I assumed it was --

9            THE COURT:  So it's the end of.

10            MR. SANDS:  Okay.  So that's acceptable.

11            (In open court:)

12    BY MR. SANDS:

13    Q.   My apologies.  You said the second occasion you had to

14    contact the state or local authorities was in the winter of

15    2001.  When you were referring to that, are you talking about

16    the latter part of 2001 into 2002?  Is that the time period you

17    were talking?

18    A.   Correct.

19    Q.   And how do you know, again, that was the time period?

20    A.   Because I was pregnant with my daughter.

21    Q.   And why did you contact the city on that occasion?

22    A.   I was concerned about what the effects of the exhaust

23    might have on a newborn.

24    Q.   Have you ever contacted the city to complain about any

25    other matter?

1   A.   As I stated before, just about lack of snow-plowing on our

2   street.

3   Q.   Again, going back again and taking a look at your notes,

4   the February 21st, '05, entry, you testified that you mentioned

5   the Massachusetts state law to the supervisor that you talked

6   to.  Do you recall ever discussing the Massachusetts law with

7   anyone from Paul Revere other than on this occasion?

8   A.   I may have mentioned it to other supervisors as part of

9   the phone calls.

10  Q.   Did you call Paul Revere every time that you witnessed a

11  vehicle idling?

12  A.   No.

13  Q.   I think that -- you lived near this facility, you said,

14  for about how long?

15  A.   About ten years.

16  Q.   Ten years.  And during that time period you contacted the

17  company on a number of occasions about this; is that correct?

18  A.   Correct.

19  Q.   Why didn't you just move?

20  A.   Unfortunately, not all of us are as economically blessed

21  to be able to simply pick up a family and move.

22  Q.   Did you ever see a mechanic working on an idling bus on

23  any occasion that's either reflected in your notes or not

24  reflected in your notes?

25  A.   Yes.

1  Q.   How often would that occur?

2  A.   I would be estimating.  A few times a year.  It depended

3  on whether it was a van or a bus.

4  Q.   And how did you know that they were working on the

5  vehicle?

6  A.   Sometimes you could physically see them working on the

7  vehicle, sometimes you could hear them banging on the vehicle.

8  Q.   Was this in the early-morning hours that we were

9  discussing before, the 5 to 7 a.m. time frame?

10 A.   It could be in the early morning, the evening or the

11 weekends.

12 Q.   Again, how many people would you witness at any one time

13 working on these vehicles?

14 A.   Just one.

15 Q.   Just one?

16     How many vehicles would you witness idling during that

17 time period?

18 A.   If it was the van -- sometimes all of the vans would be

19 running all at once and you could see just one individual

20 inside one of the vans.  With the busses, depending on whether

21 it was the evening or the weekends, you could see the blue

22 utility truck in the southwest corner of the lot with the

23 mechanic in that area.  Which bus that was running he was

24 working on was difficult to tell.

25 Q.   And on those occasions when you did witness someone

PDF created with pdfFactory trial version www.pdffactory.com

1    working on a vehicle, were the other vehicles still running?

2    A.    Correct.

3    Q.    Did you ever see anyone come out and turn off those other

4    vehicles while the vehicle that was being serviced was being

5    serviced?

6    A.    Only if it were somebody who had been in the back of one

7    of the vehicles, presumably cleaning them, when they exited the

8    vehicle, they turned it off.  But the other vehicles would

9    still be idling.

10   Q.    In the morning hours when you saw someone starting up the

11   vehicles at five -- between five and seven, did you see, again,

12   someone working on the vehicles during that time period?

13   A.    No.

14        MR. SANDS:  No further questions at this time, your

15   Honor.

16        THE COURT:  All right.  Mr. Friedmann?

17        MR. FRIEDMANN:  Thank you, your Honor.

18                        CROSS-EXAMINATION

19   BY MR. FRIEDMANN:

20   Q.    Hi, Dr. Fay.  How are you?

21   A.    Good.  How are you?

22   Q.    Good.

23        If I heard you correctly, you said that you observed

24   people cleaning the busses, you observed people repairing the

25   busses, and you were told the busses were being run because it

1  was cold; is that correct?

2  A.   Yes.

3  Q.   And you did see busses being charged, or the cut vans

4  being charged quite a bit, didn't you?

5  A.   I noted the vans being charged.

6  Q.   And sometimes they would have the jumper cables still

7  attached to them and other times they wouldn't; they would be

8  running while they charged, right?

9  A.   When they were running without the jumper cables attached,

10  I would have no idea why they were running.

11  Q.   You used to also hear -- one of the noise complaints you

12  had was they had this jump truck, the truck with the batteries

13  on it, that would come out and jump the other vehicles.  Do you

14  remember that truck?

15  A.    I don't know what it was called, but there was a blue

16  utility vehicle.

17  Q.   Okay.  I was just calling it the jump truck.  But there

18  was a utility vehicle that they would send out to jump-start

19  busses and vans, and it would create a lot of noise when that

20  was happening, right?

21  A.   That blue utility vehicle was typically parked in the

22  southwest corner of the lot in the morning and didn't tend to

23  move.

24  Q.   When the cut vans needed to be jumped, isn't that the van

25  that came over to jump them?

1    A.    I'm sorry.  Cut van?  I don't understand the term.

2    Q.    The smaller vans that were parked near your end of the

3    property.

4    A.    When those were jumped, again, that was typically a mobile

5    battery that they rolled over.

6    Q.    So you did see Paul Revere personnel out there working on

7    the vehicles and jumping the vehicles and charging the vehicles

8    to get them to run, correct?

9    A.    On occasion.

10   Q.    Okay.  Now, the notes that we looked at, the Exhibit 109,

11   do you remember looking at those a minute ago?

12   A.    Yes.

13   Q.    Those were the notes that you took during the period of

14   time from April of 2001 to when you moved out in 2008, correct?

15   A.    Correct.

16   Q.    And there were six entries on that, right?

17   A.    Without having them in front of me, I...

18          MR. FRIEDMANN:  Would you put that up?  That's great.

19   Thank you.

20   BY MR. FRIEDMANN:

21   Q.    Do you remember there were two pages, there were six

22   entries?  You have one of the pages in front of you that has

23   three entries, and now you have the other.  One entry from

24   2003?

25   A.    Those are six of the dates that I logged.

1    Q.    Right.   So over the seven-year time frame that we're

2    talking about, there were six times that you made notes, right?

3    A.    That is not correct.

4    Q.    Are there other notes that you made that haven't been

5    produced?

6    A.    There are other notes that were produced; yes.

7    Q.    Okay.   During that time frame of January 15, 2001, to when

8    you moved out in 2008, this shows all of the notes that you

9    took of operation, correct?

10   A.    From that time period.

11   Q.    Right.   During that time frame, during that seven-year

12   period -- you had six entries during that seven-year time

13   period?

14   A.    Correct.

15   Q.    And they're all from either January or February of each

16   year, correct?

17   A.    Correct.

18   Q.    In the cold weather you would see this starting of busses

19   in the morning or in the evening, correct?

20   A.    Correct.

21   Q.    And during the warmer weather it wasn't a problem?

22   A.    They often --

23              MR. SANDS:   Objection, your Honor.   Assumes facts not

24   in evidence.

25              THE COURT:   Well, no, you may have the question.

```
 1          THE WITNESS:  They may have started the busses in the
 2    morning, but typically, again, we were busy with our morning
 3    routines.
 4    BY MR. FRIEDMANN:
 5    Q.    You didn't really see any lengthy idling during the warmer
 6    weather, did you?
 7    A.    Not at other times of the day, no.
 8    Q.    Now, I notice on your notes the last entry is in February
 9    of 2005, correct?
10    A.    Correct.
11    Q.    So from February of 2005 to the end of 2005 you made no
12    additional notes?
13    A.    No.
14    Q.    For all of the year 2006 you made no notes?
15    A.    Correct.
16    Q.    All of the year 2007 you made no notes?
17    A.    Correct.
18    Q.    And all of the year 2008 until you moved out, whatever
19    time of year that was, you made no additional notes?
20    A.    Correct.
21    Q.    Okay.  You saw people working on the busses when they were
22    running, didn't you?
23    A.    You could see on occasion one individual working on the
24    bus.
25    Q.    You saw the hoods open on the vans, didn't you?
```

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Correct.

2    Q.    You saw jumper cables on the vans?

3    A.    On some occasions.

4    Q.    Sitting here today can you tell us any specific dates that

5    you saw those occurrences taking place on the vans with hoods

6    open, the workmen under a bus, the cleaners cleaning the

7    busses?  Can you tell us which days those were?

8    A.    I wish my memory were better than the notes that I made.

9    Q.    Okay.  But these are events that you saw happening when

10   the busses were running.  You saw the cleaners on them cleaning

11   the busses, right?

12   A.    Cleaner, yes.

13   Q.    And you would see a mechanic out there working on a bus,

14   right?

15   A.    Correct.

16   Q.    And you'd see them jump-start it?

17   A.    Correct.

18   Q.    Okay.  You don't know in terms of the operation of the

19   busses or the vans when you saw them running whether there was

20   some mechanical reason for those busses to be running, do you?

21   A.    I do not.

22   Q.    You don't know if they were building up air pressure

23   because they had a blocked line or something like that?  I

24   mean, some of the times you knew it because you saw them

25   jumping it, or you saw the mechanic working on it, but other

1    times you didn't know, did you?

2    A.    No.

3    Q.    Now, this morning when you got here you prepared your

4    testimony with Mr. Sands, didn't you?

5    A.    I did not.

6    Q.    You sat outside here, went over with him -- right outside

7    the courtroom here this morning?

8    A.    I was led into the courtroom, shown the room, the box.

9    Q.    You didn't sit out in front of the courtroom here with him

10    this morning?

11    A.    I sat out there myself.

12            MR. SANDS:   Sidebar, your Honor?

13            THE COURT:   All right.

14            (Discussion at sidebar and out of the hearing of the

15    jury:)

16            MR. SANDS:   The only purpose, your Honor, for this

17    discussion was to show her the photos, to see if --

18            MR. FRIEDMANN:   So she went over to photographs?

19    Okay, I'll just ask her about that.

20            THE COURT:   Okay.

21            (In open court:)

22    BY MR. FRIEDMANN:

23    Q.    Ma'am, do you remember sitting outside here this morning

24    with Attorney Sands going over some photographs and him asking

25    you if you could identify those photographs?

1    A.    Oh, yes.

2    Q.    Okay.  So you did meet with him and at least discuss the

3    pictures this morning?

4    A.    Yes.

5          MR. FRIEDMANN:  Okay.  I have no further questions at

6    this time, your Honor.

7          THE COURT:  Mr. Sands, any redirect?

8          MR. SANDS:  Yes, just a little bit, your Honor.

9          THE COURT:  Okay.

10                    REDIRECT EXAMINATION

11   BY MR. SANDS:

12   Q.    Dr. Fay, on those occasions when you did witness anyone

13   working on a vehicle on the Paul Revere lot, did you see, was

14   it multiple people working on multiple vehicles or one person

15   working on one vehicle?

16   A.    It was typically one person working on one vehicle.

17   Q.    And during that time period while that person was working

18   on that one vehicle, the other vehicles, were they on

19   continuously?

20   A.    Some of them could be, yes.

21   Q.    Mr. Friedmann asked you about your notes and the fact that

22   your notes -- your last entry is from February of 2005.  Again,

23   do your notes reflect the only times that you contacted the

24   company?

25   A.    They do not.

1   Q.   Were there other times that are not reflected in your

2   notes in that period of time between 2001 and 2005, that

3   seven-year period, that are not reflected in your notes?

4   A.   Yes.

5   Q.   And, finally, he talked a little bit about the -- what you

6   saw as far as vehicles charging, and I believe you called it a

7   cut van being charged.  Did you ever witness the busses being

8   charged in the mornings?

9   A.   No.

10   Q.   But you did witness the busses running in the mornings?

11   A.   Correct.

12        MR. SANDS:  No further questions, your Honor.

13        MR. FRIEDMANN:  Just a couple, your Honor.

14                   RECROSS-EXAMINATION

15   BY MR. FRIEDMANN:

16   Q.   Ma'am, when you saw the mechanic working on a bus, what

17   you described as one-on-one, you've indicated that other times

18   there were other vehicles around that?

19        MR. SANDS:  I'm sorry.  I couldn't hear you.  Did you

20   say mechanic or mechanics?

21        MR. FRIEDMANN:  Mechanic.

22   BY MR. FRIEDMANN:

23   Q.   Do you recall testifying just a second ago, or a minute

24   ago, to a mechanic working on a van one-on-one, or on a bus

25   one-on-one?

1    A.    Correct.

2    Q.    And you testified that you saw other vehicles around it

3    sometimes running?

4    A.    Correct.

5    Q.    You don't know what the mechanical necessity of those

6    other vehicles running for were, do you?

7    A.    I do not.

8    Q.    You don't know if one vehicle was charging while another

9    vehicle was building up air pressure?

10    A.    I'm sorry.  Is that a question?

11    Q.    Yeah.  You don't know if one vehicle was charging and

12    another one building up air pressure, the same mechanic doing

13    what we refer to sometimes as multitasking?  You don't know

14    that, do you?

15    A.    I do not.

16    Q.    All right.  With regard to all those occurrences that you

17    say occurred that you do not have notes of, on those occasions

18    you don't know the mechanical or safety necessity of any of

19    those operations either, do you?

20    A.    I do not.

21    Q.    Okay.

22         MR. FRIEDMANN:  Thank you.  I have no further

23    questions, your Honor.

24         THE COURT:  Okay, Dr. Fay.  Thank you.  You may step

25    down.

```
 1              (The witness is excused.)

 2              THE COURT:  We're a little ahead of our time to take a

 3    morning recess, but since we're changing witnesses I think

 4    we'll do that at this time.  We'll take a short morning recess.

 5              THE CLERK:  All rise.

 6              The Court will take the morning recess.

 7              (There is a recess in the proceedings at 10:47 a.m.)

 8

 9              THE CLERK:  All rise for the jury.

10    (The Honorable Court and the Jury entered the courtroom at

11    11:10 a.m.)

12              THE CLERK:  Please be seated.

13              MS. HANKEY:  The United States calls Mr. Abdi

14    Mohamoud.

15              THE CLERK:  Step up in the box, please.

16                      ABDI MOHAMOUD, SWORN

17              THE CLERK:  State your name and spell your full name,

18    for the record, and speak into the mic.

19              THE WITNESS:  Abdi, A-B-D-I, T middle initial, last

20    name Mohamoud, M-O-H-A-M-O-U-D.

21              THE CLERK:  Thank you.

22                       DIRECT EXAMINATION

23    BY MS. HANKEY:

24    Q.   Mr. Mohamoud, in what city do you reside?

25    A.   Boston, Massachusetts.
```

```
 1    Q.    In what area?

 2    A.    Roxbury.

 3    Q.    And how long have you lived in the Boston area?

 4    A.    Over 20 years.

 5    Q.    And where were you before you came to Boston?

 6    A.    Indianapolis, Indiana.

 7    Q.    And how long are you in Indianapolis?

 8    A.    About six months.

 9    Q.    And where were you before that?

10    A.    New York City, New York.

11    Q.    And how long were you in New York?

12    A.    About eight months.

13    Q.    And when did you -- where were you before you were in New

14    York?

15    A.    In Somalia.

16    Q.    When did you come to the United States?

17    A.    September 15, 1984.

18    Q.    And why did you come to the United States?

19    A.    For education.

20    Q.    And are you a United States citizen?

21    A.    Yes, I am.

22    Q.    Since when?

23    A.    Since 1991.

24    Q.    And where are you currently employed?

25    A.    United States Environmental Protection Agency.
```

1    Q.    Where?

2    A.    In Boston.

3    Q.    In what position?

4    A.    Environmental Engineer.

5    Q.    And how long have you been employed at EPA?

6    A.    Since February 1992.

7    Q.    Do you have a college degree?

8    A.    Yes, I do.

9    Q.    From where?

10   A.    From the University of Massachusetts at Amherst,

11   Massachusetts.

12   Q.    In what year did you graduate?

13   A.    1991.

14   Q.    Did you receive a degree in any specific subject area?

15   A.    Yes, I did.

16   Q.    And what subject was that?

17   A.    Chemical Engineering.

18   Q.    And how long after graduating did you come to work at the

19   Environmental Protection Agency?

20   A.    About eight months.

21   Q.    Did you work anywhere before you came to EPA?

22   A.    Yes, I did.

23   Q.    And where was that?

24   A.    Hertz Rental Car.

25   Q.    Were you a student when you were working at Hertz?

```
1    A.    Yes.   During my school years I used to come back to Boston
2    and work for them.
3    Q.    When you first started at EPA, what was your first
4    position?
5    A.    Environmental Engineer.
6    Q.    So, has your job title changed at all since you were
7    hired?
8    A.    No.   Since I was hired, my title hasn't changed.
9    Q.    And have you received any promotions since you were hired?
10   A.    Yes.   I was promoted up to grade 12.
11   Q.    So, what grade did you start out at?
12   A.    Grade GS-5.
13   Q.    So, over the years, you've been promoted from a Grade 5 to
14   a Grade 12?
15   A.    Yes.
16   Q.    What are your duties as an environmental engineer?
17   A.    I do inspections.
18   Q.    Is there any particular type of inspections that you do?
19   A.    Yes.   Air-related inspections.
20   Q.    I'm sorry.   You said air-related inspections?
21   A.    Yes.
22   Q.    And are there any particular type of air-related
23   inspections that you do?
24   A.    Yes.   I mainly do CFC inspections and idling inspections,
25   even though I do other inspections.
```

1    Q.    And how long have you been doing inspections regarding the

2    Massachusetts idling law?

3    A.    Since early 2006.

4    Q.    Did you receive any specific training regarding how to

5    conduct an idling inspection?

6    A.    Yes, I did.

7    Q.    And what was that?

8    A.    I accompanied with other inspectors who used to do this

9    type, types of inspections, and I accompanied with them several

10   times to observe and also do with them at the same time those

11   inspections.

12   Q.    And what procedures were you taught to follow on an idling

13   inspection in Massachusetts?

14   A.    Idling inspections are observation inspections, and I was

15   told to concentrate --

16           MR. FRIEDMANN:  Objection as to what he was told.

17           THE COURT:  Overruled.  No.  Overruled.  Go ahead.

18   You may finish the answer.

19   A.    Idling inspections are observation inspections, and I was

20   taught, while I was accompanied with those inspectors, to

21   observe and collect information from the vehicles that I was

22   observing.

23   Q.    And what information were you taught to record during an

24   idling inspection in Massachusetts?

25   A.    I was told to collect the name of the company who owns

PDF created with pdfFactory trial version www.pdffactory.com

1  those vehicles.  I was told to record and collect the location

2  of those vehicles where they were idling.  I was told to

3  collect the information, the time I came to notice that those

4  vehicles started idling and until they either leave or stop

5  idling.

6  Q.   Mr. Mohamoud, have you ever testified before?

7  A.   In deposition, yes.

8  Q.   And before your deposition in this case had you ever

9  testified before?

10  A.   No.

11  Q.   In the four years that you've been doing inspections

12  regarding the Massachusetts idling law, how many inspections

13  have you conducted in Massachusetts?

14  A.   Over 50.

15  Q.   Have you ever conducted inspections at defendant Paul

16  Revere Transportation's Roxbury facility?

17  A.   Yes, I did.

18  Q.   And where, precisely, was that facility?

19  A.   On Reading Street.

20  Q.   And what were the cross streets?

21  A.   Meinea Cass and Hampden Street.

22  Q.   And how did you come to inspect the Paul Revere Roxbury

23  facility?

24  A.   I live in Roxbury, and I travel on Meinea Cass most of my

25  travel, and one morning, when I was driving my children to

1    school, I came upon Paul Revere vehicles idling.

2    Q.    And what did you do?

3    A.    When I saw those vehicles idling, I stopped my car and I

4    waited five minutes to see if those vehicles were idling, and

5    when I realized that they idled five minutes and I knew that

6    they were still idling, I continued my journey.

7    Q.    And then did you tell anyone about it?

8    A.    Yes, I did.

9    Q.    And who did you tell?

10    A.    My supervisor.

11    Q.    And what did your supervisor instruct you to do?

12    A.    She asked me to initiate inspecting this facility.

13    Q.    And when was this?

14    A.    It was -- when I told her, it was sometime in February

15    2006.

16    Q.    Now, had you seen the vehicles on before in this Roxbury

17    lot when you had driven by?

18    A.    I might, but I don't recall.

19    Q.    How long had you been doing idling inspections when you

20    drove by?

21    A.    About two months.

22    Q.    And what mode of transportation are you usually using when

23    you go by the Roxbury facility?

24    A.    My vehicle.

25    Q.    Now, were you given any instructions on what day to

PDF created with pdfFactory trial version www.pdffactory.com

1   inspect the Roxbury facility?

2   A.    No.  I was left to do that myself.

3   Q.    And how many times did you inspect the Roxbury facility in

4   2006?

5   A.    Seven times.

6           MS. HANKEY:  May I approach the witness, your Honor?

7           THE COURT:  You may.

8   BY MS. HANKEY:

9   Q.    Now, I'm showing you what has been marked as government

10  Exhibit 4.

11          MS. HANKEY:  Your Honor, this exhibit is stipulated

12  to.

13          MR. FRIEDMANN:  Yes, your Honor.

14          THE COURT:  Okay.  I'll exhibit it to the jury.

15  BY MS. HANKEY:

16  Q.    Can you, please, describe this document?

17  A.    Yes.  This is my notes of inspection on March 1st, 2006.

18  Q.    And what's this?

19  A.    My inspection notes on March 8th, 2006.

20  Q.    And what's this page?

21  A.    My third inspection on March 15th, 2006.

22  Q.    And what's this?

23  A.    My notes, inspection notes, on March 21st, 2006.  My

24  inspection notes on March 30th, 2006.

25  Q.    And what are these?

1    A.    My inspection notes on April 4th, 2006.

2    Q.    And what are these?

3    A.    My inspection notes on April 12th, 2006.

4    Q.    And when, exactly, did you take these notes?

5    A.    During my inspection.

6              MS. HANKEY:  I move to admit government Exhibit 4,

7    your Honor.

8              THE COURT:  All right.

9              MR. FRIEDMANN:  No objection, your Honor.

10   (Exhibit No. 4 received into evidence)

11   Q.    And what was the date of your first inspection?

12   A.    According to my notes, March 1st, 2006.

13   Q.    And do your notes reflect what time you arrived at the

14   facility?

15   A.    No.  My notes don't reflect the time I went to the

16   facility.

17   Q.    Do you know what time you arrived at the facility?

18   A.    I came -- I went before 5:27.

19   Q.    And how do you know that you arrived before 5:27?

20   A.    When I came to this facility, all my inspections I am

21   driving, and when I come up on this facility, I have to park my

22   car, I have to collect my notebook, my inspection material and

23   then go across the street, where I park for my car, and then

24   start taking notes from these cars.

25   Q.    Mr. Mohamoud, there's some water in the courtroom there,

1    if you need it.

2    A.    Okay, thanks.

3    Q.    And, then, so, what does the first time represent in your

4    notes?

5    A.    Sorry.

6    Q.    And, so, what does the first time represent in your notes?

7    A.    5:27 a.m.

8    Q.    And what does that represent in terms of when you arrived

9    at the facility?

10   A.    It represents the time I came upon this vehicle idling.

11   Q.    When you came to the facility on March 1st, where did you

12   park your car?

13   A.    On Hampden Street.

14   Q.    And can you please describe the Roxbury facility?

15   A.    The Roxbury facility of Paul Revere is located along the

16   side of Meinea Cass, and it is exactly located across a section

17   of Meinea Cass and Hampden Street, and anyone who is traveling

18   on Meinea Cass can see from his right all these vehicles parked

19   against the fence.

20         MS. HANKEY:  Your Honor, this picture was admitted

21   earlier.

22         THE COURT:  I'm not sure it was, but I don't think

23   it's objected to, is it?

24         MR. FRIEDMANN:  This is -- there was a different one

25   that was admitted.

```
 1              THE COURT:  Right.

 2              MR. FRIEDMANN:  This one is objected to.

 3              THE COURT:  This is?

 4              MR. FRIEDMANN:  Yes.

 5              THE COURT:  Then, all right.  I've taken it down from

 6      the jury, then.

 7              MS. HANKEY:  I'm sorry.  Page 4.  This one was

 8      admitted.

 9              THE COURT:  Yes, okay.  Right?

10              MR. FRIEDMANN:  Agreed.

11              THE COURT:  Okay.

12      BY MS. HANKEY:

13      Q.   Can you show us in this picture what you were just

14      describing in terms of how the vehicles are parked?

15      A.   Yes.  The manner of these vehicles is parked -- on this

16      photo is the manner I was observing during my inspection.

17      Q.   And I believe you said there was a fence.  Can you

18      describe this fence?

19      A.   Yes.  The fence cannot be shown -- I cannot see from the

20      picture, but it is right behind those buses.

21      Q.   So, what did you do when you first arrived on March 1st?

22      A.   When I came -- when I went there first, I parked my car, I

23      collected my inspection materials, and I went across the

24      street, right behind these buses where there is a sidewalk

25      behind -- outside the fence.
```

1    Q.   You said that you took your inspection materials.  Can you

2    tell us what are you referring to as your inspection materials?

3    A.   Yes.  My pen, my notebook, my cell phone, my watch and my

4    stopwatch.

5         MS. HANKEY:  I just put up another picture but not for

6    the jury this time.

7    BY MS. HANKEY:

8    Q.   So, I'm showing you what has been marked as government

9    Exhibit 101, page 1.  Can you describe this document?

10   A.   Yes.  This is a picture of the fence.  The fence where

11   these buses are located is really wider, and this is a very

12   small portion of the facility.  My vision, when I'm doing these

13   inspections, are broader than this picture, but this is the

14   manner.  If you keep continuing to the left, you will see this

15   fence is stretched along the Meinea Cass Street -- Boulevard.

16   Q.   And I'm showing you what has been marked as government

17   Exhibit 101, page 3, and can you describe this document?

18   A.   This is a continuation of the picture we saw prior, and

19   this is the similar way of observing these buses.  I could see

20   these buses, and this was the fence I was talking about

21   earlier.

22   Q.   And I'm showing you what has been marked as government

23   Exhibit 101, page 7.  Can you describe this document?

24   A.   Yes.  This is a similar -- it's a continuance.  This is

25   the manner these buses are parked, and when I was -- some of --

PDF created with pdfFactory trial version www.pdffactory.com

1   most of my inspections when I was taking notes I was right

2   behind these buses, but this is a very limited picture of the

3   facility.  I had a broader vision when I was doing these

4   inspections.

5   Q.   And the three pictures that we just looked at, do they

6   accurately depict the facility as it was during your

7   inspections?

8   A.   Yes, they do.

9   Q.   And are the vehicles parked in the same manner as they

10  were parked during your inspections?

11  A.   The buses might not be in the way they parked numerically,

12  but, yes, they are.

13  Q.   Are they parked in the same manner as they were parked?

14  A.   Yes, yes.

15  Q.   And do the pictures depict the sidewalk where you would

16  walk during your inspections?

17  A.   I cannot see the sidewalk from this, but if you see, if

18  you look at that picture, someone, some person, is walking on

19  the sidewalk where I used to walk back and forth.

20  Q.   Now, were these taken, these pictures taken during your

21  inspection?

22  A.   No, they did not.

23  Q.   But do they depict what the facility looked like during

24  your inspection?

25  A.   Yes, they do.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    The time of day in the pictures, is the time of day
2    different than during your inspection?
3    A.    Yes, they do differ.
4    Q.    Did the time of day or the lighting affect what you could
5    see?  Do the pictures depict anything in terms of the light
6    that you couldn't see during your inspections?
7    A.    Not really.  What happens is, when these buses turned
8    on --
9    Q.    But do the -- is there anything about the lighting in the
10   pictures that shows something you couldn't see during your
11   inspection?
12   A.    No.
13              MS. HANKEY:  I move to admit pages 1, 3 and 7, your
14   Honor.
15              MR. FRIEDMANN:  Objection, your Honor.
16              THE COURT:  Overruled.  They may be admitted.
17              MR. FRIEDMANN:  Your Honor, could we be heard on that?
18
19   (SIDEBAR CONFERENCE AS FOLLOWS):
20              MR. FRIEDMANN:  Your Honor, he did his inspections in
21   darkness.  These pictures are, obviously, not in darkness.
22   It's our position, therefore, that it's not the same conditions
23   that he observed.  These may depict the scene but not the same
24   conditions.
25              MS. HANKEY:  He just testified that he could --

```
 1            THE COURT:  They may not prove as much as they might
 2    prove if they're in the dark, but they show the facility.
 3    That's enough.
 4    (END OF SIDEBAR CONFERENCE)
 5
 6            THE COURT:  Okay.  They're admitted.
 7    (Exhibit Nos. 101-1, 101-3 and 101-7 received into evidence)
 8            MS. HANKEY:  I'd like to put up page 1 for the jury.
 9    BY MS. HANKEY:
10    Q.   Can you show us in this picture where you were walking
11    during the inspection?
12    A.   Yes.  There is -- in the picture you see a car, and there
13    is someone walking behind the fence.  The sidewalk is, if you
14    look in front of that car, that is between that curb and the
15    fence, and someone is already walking on that, along that line,
16    yes.  A little bit up.
17    Q.   My line's not quite as great as it should be.
18    A.   Yes.
19    Q.   Now, did you leave the sidewalk at any point during your
20    first inspection?
21    A.   No, I did not.
22    Q.   And we're looking at page 3 of Exhibit 101.  Can you
23    describe for the jury what's shown in this picture?
24    A.   This picture is Paul Revere vehicles parked against the
25    fence, their back on the fence.
```

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   So, does this picture depict what your view was when you

2   were walking along the sidewalk?

3   A.   Yes.

4   Q.   And, again, with picture 7?

5   A.   Yes, it depicts the same.

6   Q.   When you were walking along the sidewalk, was there

7   anything obstructing your view?

8   A.   No.

9   Q.   And approximately how many buses could you see from the

10  sidewalk?

11  A.   Depends on where I was standing, but at one time I could

12  see between 20 to 25.

13  Q.   And how did you know that the vehicles were on?

14  A.   I was very close at the back of these buses.  I could --

15  when I was walking back and forth, I could hear the engine

16  humming, I could see the -- I could smell the fumes that were

17  coming from these buses, and I could clearly see the taillights

18  that were on.

19  Q.   And how close were you to the buses when you were

20  observing them from the sidewalk?

21  A.   Very close.  If I wanted to touch these buses and extended

22  my hand through the fence, probably I could, but I didn't try.

23  Q.   You said that you could tell that a vehicle was on because

24  for -- one of the reasons was that the lights were on.  When

25  the lights were on, was the vehicle always on?

1  A.    I never came -- yes.

2  Q.    And when the lights were off on a vehicle, did you ever

3  hear the engine on on that vehicle?

4  A.    During my seven inspections I never came across any

5  vehicle where the taillights were off and the engine was on.

6  Q.    Now, I want to go back to your notes, if we could bring up

7  government Exhibit 4.   In your notes in the first column it

8  notes "Time In."  Can you tell us what does "Time In"

9  represent?

10 A.    The "Time In" means either I came, those vehicles were

11 already on when I arrived or they were turned on when I was

12 there.

13 Q.    And in the second column you've noted "Time Out."  What

14 does "Time Out" represent?

15 A.    "Time Out" represents when either the bus left or turned

16 off.

17 Q.    And when you were recording the time, what did you use to

18 tell time?

19 A.    Mostly I used my cell phone to tell the time.

20 Q.    And, so, after you arrived and you went to the sidewalk,

21 what did you do for the remainder of the inspection during this

22 first inspection?

23 A.    I stayed there until the majority of the buses I was

24 observing left.

25 Q.    Now, other than the vehicles next to the fence, were there

1    any other vehicles in the yard?

2    A.    Yes.

3    Q.    And did you record information on those vehicles?

4    A.    They were obstructed from me, and I couldn't collect

5    information, but in between the buses that were against the

6    fence, I could see other buses that were on.

7    Q.    But did you record information on those buses in your

8    notes?

9    A.    No, I did not.

10   Q.    And what time did you leave the facility on March 1st?

11   A.    About 6:30.

12   Q.    Now, did you follow the same procedures that you just

13   outlined on each of your inspections?

14   A.    No.

15   Q.    Okay.  Let's talk about the second inspection.  What day

16   was your second inspection?

17   A.    March 8th, 2006.

18   Q.    And approximately what time did you arrive on March 8th?

19   A.    A little bit before 5:31.

20   Q.    Now, did you do anything differently during your second

21   inspection than from your first inspection?

22   A.    Nothing I recall.

23   Q.    And let's take a look at your notes.  In the first column

24   it says "Time."  Can you tell me what that represents?

25   A.    That's the time I came to the facility and those vehicles

1    were on.

2    Q.    And the second column, can you tell me what that

3    represents?

4    A.    Yeah.  It represents the time each of those buses left or

5    turned off.

6    Q.    And I didn't ask you this before, but the third column,

7    what does that represent?

8    A.    The third column represents the plate, the tag of the

9    vehicle.

10   Q.    The license plate?

11   A.    Yes.

12   Q.    And, then, what is the last column?

13   A.    The last column represents -- each vehicle has an assigned

14   number, and that is the assigned number for that vehicle.

15   Q.    Now, what was the date of your third inspection?

16   A.    May I refer to my notes?  March 15th, 2006.

17   Q.    And approximately what time did you arrive for the third

18   inspection?

19   A.    A little bit before 5:26 a.m.

20   Q.    Now, did you do anything differently on this third

21   inspection, March 15th, than you had done on your last two

22   inspections?

23   A.    Yes, I did.

24   Q.    And what did you do differently?

25   A.    I had a videotape.

1    Q.    So, when you arrived on March 15th, tell us what did you

2    do when you arrived?

3    A.    I parked my car, as usual, and I collected my inspection

4    material, went out, came upon these vehicles already idling and

5    took information from the buses that were idling at the time of

6    -- before my arrival, and when I collected this information, I

7    went back to my car and I started videotaping.

8    Q.    So, where were you when you were collecting the

9    information on the vehicles?

10   A.    Right behind the buses outside the fence.

11   Q.    And the vehicles that you collected information on, were

12   those vehicles on?

13   A.    Yes, except those last two.  They came on after I was

14   already there.

15   Q.    So, you went back to your car.  What did you do then?

16   A.    I started videotaping.

17   Q.    Had you ever videotaped an inspection before?

18   A.    No, I did not.

19   Q.    Why did you videotape this inspection?

20   A.    I took this videotape to make sure that what I saw was

21   already also recorded in a tape so it could be seen by other

22   people what I saw during my inspection.

23   Q.    Now, I think you mentioned earlier, you previously

24   testified in a deposition in this matter, correct?

25   A.    Yes, I did.

1  Q.   Now, during your previous deposition testimony, did you

2  recollect taking this videotape?

3  A.   No, I did not.

4  Q.   Why didn't you recollect?

5  A.   When I was taking this videotape, it didn't seem to me it

6  worked, so if I knew it worked I would have continued using it,

7  but when I played with it and tried to use the videotape, I

8  thought it didn't work, so I stopped after a while and I never

9  gave a thought about it.  I didn't even attempt to look what is

10 in there, and I gave it to my supervisor and never remembered

11 it.

12 Q.   What did you do after you gave it to your supervisor?

13 A.   I didn't do anything else with that videotape.

14 Q.   After you came back from your inspection, did you watch

15 the videotape?

16 A.   No, I did not.

17 Q.   And when did you remember taking the video?

18 A.   One day my supervisor was cleaning her office, and she

19 came upon this videotape that I gave to her, and that was after

20 the case was already in progress.  So, she told me that she

21 came upon this videotape, that I wrote the Paul Revere name and

22 a date on it.  So, that was the time I really came to know that

23 I had a videotape.

24 Q.   And how long did you take the video for?

25 A.   About half an hour.

1   Q.   And after you stopped videotaping, what did you do?

2   A.   I went back behind -- outside the fence, right where those

3   buses were idling.

4        MS. HANKEY:  I move to admit Exhibit 119, which is the

5   video, your Honor.

6        MR. FRIEDMANN:  Objection, your Honor.

7        THE COURT:  We had a discussion.

8        MR. FRIEDMANN:  I do have a memorandum for your Honor

9   on this.

10        THE COURT:  I'll see you at the sidebar.

11

12  (SIDEBAR CONFERENCE AS FOLLOWS):

13        MR. FRIEDMANN:  I don't know if your Honor is still

14  intending to rule the same way you had previously.  If so, I'm

15  just putting this in for the record.  If you're willing to

16  reconsider your prior ruling, then I'll give you my argument.

17        THE COURT:  The basis for my prior ruling was that I

18  think there was enough time for an attempt to reopen discovery

19  and to conduct whatever discovery might have been necessary at

20  the time it was discovered and produced, and, so, the sanction

21  under Rule 37 is not warranted.

22        MR. FRIEDMANN:  I'm seeking also clarification whether

23  the entire video is being offered, a portion of it, what was

24  done with the narrative and things of that nature.

25        MS. HANKEY:  There's no narrative on this video.

1          THE COURT:  Just video, no audio?

2          MS. HANKEY:  Yeah, there's no audio.  The audio is

3    like click, click, click, click, click, click.

4          THE COURT:  Okay.  No narration?

5          MS. HANKEY:  No narration, no talking.

6          THE COURT:  Okay.  There's two questions.  One is

7    what's admitted and the other is what's shown.

8          MS. HANKEY:  I'll admit the entire video.  I think

9    it's -- I mean, I can -- my personal feeling would be, under

10   the rule of completeness, to submit the entire video as

11   evidence, and if the jury wants to watch the entire video, they

12   can ask.  Well, I don't think they will.  I'm just saying,

13   and --

14         THE COURT:  Fine.

15         MS. HANKEY:  -- my plan was, right now was to play a

16   portion of the video and fast-forward, but you can see the

17   fast-forwarding as it fast-forwards.

18         THE COURT:  Okay.  My casual recollection of seeing

19   this during the opening, or whenever it was I saw it --

20         MS. HANKEY:  That is right.

21         THE COURT:  -- is it doesn't show very much.

22         MS. HANKEY:  It shows the lights on.

23         THE COURT:  You see lights on.

24         MS. HANKEY:  Yes.

25         THE COURT:  Yes.  All right.  I mean --

```
 1              MS. HANKEY:  I mean, you saw vehicles in the video,
 2    right?
 3              THE COURT:  Yes.
 4              MR. FRIEDMANN:  My understanding is the whole thing is
 5    going to be shown but in a fast-forward --
 6              MS. HANKEY:  Fast-forward fashion.
 7              THE COURT:  How long will that take?
 8              MS. HANKEY:  I don't think it takes more than a
 9    minute.
10              MR. FRIEDMANN:  The whole thing?
11              MS. HANKEY:  Right, while it's fast-forwarding.
12              THE COURT:  That's pretty fast.
13              MR. FRIEDMANN:  So, the total elapsed time is --
14              MS. HANKEY:  You wouldn't see the elapsed time as it's
15    fast-forwarding.
16              MR. FRIEDMANN:  Okay.
17              MS. HANKEY:  I mean, we could pause it.
18              THE COURT:  Okay.
19              MR. FRIEDMANN:  When I say "okay," I just want to make
20    it clear for the record, I'm acknowledging what was said, I'm
21    not agreeing to it.
22              THE COURT:  Footnote.
23              MS. HANKEY:  If you're tired of it, you can tell me to
24    stop.
25              THE COURT:  I'll leave that to you.
```

1           MS. HANKEY:  You might want to take some Dramamine
2    first.
3    (END OF SIDEBAR CONFERENCE)
4
5           MS. HANKEY:  All right.  I move to admit government
6    Exhibit 119, your Honor.
7           THE COURT:  All right.
8    (Exhibit No. 119 received into evidence)
9           MS. HANKEY:  And permission to play the video, your
10   Honor?
11          THE COURT:  Go ahead.
12                    (Video played.)
13   BY MS. HANKEY:
14   Q.   Now, is this the videotape that we were speaking of that
15   you took during this inspection?
16   A.   Yes.
17          MS. HANKEY:  Now, I'm just going to fast-forward it
18   for the jury, so that they can see a portion of it.  I think
19   that's good.
20   BY MS. HANKEY:
21   Q.   Now, returning to your notes on March 15th, can you tell
22   me what does the second column represent?
23   A.   The time each bus left the yard or turned off.
24   Q.   And drawing your attention on the right-hand corner of
25   your notes here, it says, "I left;" is that correct?

1   A.   Yes.

2   Q.   Can you tell me, what does that mean?

3   A.   Those three vehicles were still idling from the time I

4   left.

5   Q.   And was that true on any of your other inspections?  Were

6   buses ever still idling when you left?

7   A.   Yes.

8   Q.   And did you always document that in your notes?

9   A.   No.

10  Q.   And what was the date of your fourth inspection?

11  A.   March 21st, 2006.

12  Q.   Did you do anything differently on the fourth inspection

13  than you had on the first two inspections?

14  A.   No, I don't recall.

15  Q.   So, when you arrived for your fourth inspection, what did

16  you do?

17  A.   I parked my car across the street, collected my inspection

18  materials, went behind the vehicles outside the fence, and

19  these vehicles, 5:24, all of them were idling already when I

20  arrived.  So, I collected that information.

21  Q.   And did you leave the sidewalk area during your

22  inspection?

23  A.   No.  This fourth inspection I did not.

24  Q.   And during the fourth inspection did you record

25  information on every vehicle that was idling?

1    A.    No.

2    Q.    And what vehicles did you take information on?

3    A.    Those vehicles I took the time -- when I came all the

4    vehicles that were idling I took the time I came on idling, the

5    vehicle plate number and the vehicle number and the time they

6    left, and also I took the date and the name of the company at

7    that location, Paul Revere Transportation.

8    Q.    And did you take information in your notes on every

9    vehicle that was parked along the fence?

10    A.    No, I did not.

11    Q.    And, so, if vehicles idled, did you take information on

12    every vehicle that idled while you were there?

13    A.    No, I did not.

14    Q.    And with respect to the vehicles that were parked along

15    the fence, which ones did you take information on?

16    A.    When I came and these vehicles idling and they were idling

17    prior to my arrival, I tried to concentrate those are parked

18    within a distance that I can see them, all of them at one time,

19    and when I came upon these vehicles, one vehicle between them

20    might not be turned on, but most of them, they are within close

21    proximity of each other.  So, I tried to stay with them until

22    they either turned off or left the yard, and anything that is

23    adjacent to them or close to them that comes on while I was

24    watching them, I tried to take information from that also.

25    Q.    So, you weren't running up and down the sidewalk taking

1    information on every -- all 25 of the vehicles parked along the

2    fence?

3    A.    No, I did not.

4    Q.    So, what was the date of your fifth inspection?

5    A.    March 30th, 2006.

6    Q.    And what time did you arrive on March 30th?

7    A.    Before 5:09.

8    Q.    And did you arrive earlier for this inspection than you

9    had for your previous inspections?

10    A.    Yes.

11    Q.    And why is that?

12    A.    Each time of my other inspections, each time when I

13    arrived I came on vehicles idling.  So, I was trying to come

14    earlier and earlier to see who was turning these buses on or

15    when they had been turned on.

16    Q.    And when you came on March 30th, were there vehicles on

17    when you arrived?

18    A.    Yes.

19    Q.    And is there anything in your notes that reflects which

20    vehicles were on when you arrived?

21    A.    My notes on the time I started collecting the information

22    on what buses are on, you can see all these buses, 5:09, were

23    at the same time.  What happened was, when I came upon this

24    many vehicles idling, I stood outside of the fence, I counted

25    how many were idling, and when I counted this many I started

1   writing the information from all the buses that I observed

2   idling.

3   Q.   And did you follow the same procedures on March 30th that

4   you had during your first two inspections?

5   A.   Yes.

6   Q.   So, did you leave the sidewalk at all during this

7   inspection?

8   A.   No.  No, I did not.

9   Q.   And looking at your notes, can you tell me -- the first

10  column is titled "Time."  Can you tell me what does that column

11  represent?

12  A.   Could you repeat the question, please?

13  Q.   Sure.  The first column is titled "Time."  Can you tell me

14  what that column represents?

15  A.   That column represents the time when I arrived at the

16  facility.  Prior to that time those buses were idling, and

17  that's the time I came outside the fence and started writing

18  this information.

19  Q.   And the second column, can you tell me what that second

20  column represents?

21  A.   That column represents the time each bus left or turned

22  off.

23  Q.   Down at the bottom of the page here, you've written

24  "White" next to some of the numbers.  What does that mean?

25  A.   That means Paul Revere has different sizes of vehicles.

1    They have minivans of 15 passengers or 12 passengers, and those

2    are white vans, minivans.

3    Q.    And the third column.  What does that column represent?

4    A.    The license of the vehicle.

5    Q.    And what does the fourth column represent?

6    A.    The vehicle assigned number.

7    Q.    And what was the date of your sixth inspection?

8    A.    April 4th, 2006.

9    Q.    And approximately what time did you arrive for your

10   inspection on April 4th?

11   A.    About before 4:28 a.m.

12   Q.    Sitting here today, Mr. Mohamoud, do you have any

13   recollection of the exact time that you arrived at the

14   facility?

15   A.    No, I don't.

16   Q.    And when you testify as to what time you arrived, are you

17   relying on your notes?

18   A.    That is true.

19   Q.    And you came earlier than the previous inspection; is that

20   correct?

21   A.    Yes.

22   Q.    And why did you arrive earlier?

23   A.    I was trying to see when -- if I can catch when those

24   buses are turned on.

25   Q.    Now, did you follow the same procedures on the sixth

PDF created with pdfFactory trial version www.pdffactory.com

1    inspection as you had during the previous inspections?

2    A.    No, I did not.

3    Q.    So, tell us, what did you do when you arrived on April

4    4th?

5    A.    As usual, I parked my car, collected my inspection

6    materials, went across the street where no vehicle was idling

7    at that time and went from one side of the fence to the other

8    and took information from the buses that were parked against

9    the fence.  I took their plate number and I took their vehicle

10    assigned number.

11    Q.    So, those vehicles that you were taking information on,

12    were they on?

13    A.    No, they weren't.

14    Q.    And, then, so what did you do after that?

15    A.    I went back in my car with binoculars and was watching

16    when these vehicles were going to be turned on.

17    Q.    And when you were sitting in your car, how many vehicles

18    could you see?

19    A.    I could see between 20 and 25.

20    Q.    And I'm showing you, again, exhibit -- government Exhibit

21    101, page 4.  Does this picture depict what your view from the

22    car was?

23    A.    My vision is wider than this, but this is a very -- it's a

24    portion of the facility, but my vision is wider than this.

25    Q.    And you said that you had binoculars?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    What did you use the binoculars to see?

3    A.    Binoculars bring closer to -- the number of the vehicles,

4    when I was sitting back with my bare eyes I could not see the

5    vehicle that's turned on.  Since I have the information already

6    been taken down, that brings -- when the vehicle comes on, I

7    can see the taillights on, I could see -- if I see, exactly

8    concentrate on a bus, I can see a puff of smoke coming out of

9    the tailpipe, and then I would concentrate, and that would zoom

10   in to see exact vehicle number.  The vehicle numbers easily can

11   be seen at the back of the bus if you are really looking at

12   that bus.

13   Q.    So, when you were in your car on this sixth inspection,

14   how could you tell that a vehicle was turned on?

15   A.    If I was -- I was relying on two things.  One, if I was

16   looking at a specific bus, I could see the smoke, I could see

17   the taillights come on.  Since my prior inspections, I never

18   came across any bus that was turned on.  If its taillights were

19   off, I write that the taillights came on.  Also, I saw a person

20   on the buses that were directly to me, I could see someone

21   going from bus and turning on and getting off and getting on

22   the next one and turning on in the same manner, and whenever I

23   saw that, I concentrated, focused on that person, and each bus

24   that he went on, I saw a puff of smoke coming from the

25   tailpipe.  Also, I saw the taillights on.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   And did you ever get out of your car during this

2  inspection?

3  A.   Yes, I did.

4  Q.   And when would you get out of your car?

5  A.   There are trees along the fence, and one bus might be

6  blocked from me when it came on, so I would get out of the car

7  and use my binoculars, standing outside of my car and then make

8  sure I'm getting good information from the bus that came on.

9  Q.   And I'd like to take a look at your notes again for

10  April 4th.  Can you tell us what does the first column

11  represent?

12  A.   The time each bus came on when I was there.

13  Q.   And, then, what does the second column represent?

14  A.   The time each bus either left or turned off.

15  Q.   And I'd like to direct your attention to the middle of the

16  page.  There's a little thing, and it appears to say "Off;" is

17  that correct?

18  A.   Yes.

19  Q.   And what does that represent?

20  A.   That means that bus came on 5:58 and idled until 6:25, and

21  it never left; it was turned off.

22  Q.   And if you look just above that, you've crossed out a

23  line.  Why did you cross out a line?

24  A.   As you can see, this information was taken prior to these

25  buses being started, so I took this information, and this, I

PDF created with pdfFactory trial version www.pdffactory.com

1  crossed it, because this bus, particular bus, never been turned

2  on.

3  Q.   And in terms of a bus being turned off, do you recall that

4  ever happening any other time, where a bus was turned off and

5  then later -- turned on and then later turned off?

6  A.   No, I don't recall.

7  Q.   And would you record in your notes anything unusual that

8  happened?

9  A.   I would.

10  Q.   And what was the date of your seventh inspection?

11  A.   April 12th, 2006.

12  Q.   And approximately what time did you arrive at the

13  facility?

14  A.   Before 4:48 -- 4:39.

15  Q.   And what did you do when you arrived?

16  A.   I went through the similar routine as the last one.

17  Q.   So, you went along the fence and took information and then

18  went back to your car?

19  A.   Yes.

20  Q.   Now, what happened if you didn't see a vehicle leave?

21  What would you do?

22  A.   I would never take a time out or time it left, I would

23  never record that.

24  Q.   So, I'm directing you back to the first page of your

25  notes, March 1st.  If you look at that second column, there are

1    some blank spaces.

2    A.    Yes.

3    Q.    Do you remember what happened in those instances?

4    A.    Yes.  A bunch of vehicles came on close time, very close,

5    time-wise, and some of them I -- they maybe left when I wasn't

6    paying attention or they left or I couldn't know when they

7    left, so I never took the time they left.

8    Q.    And is that true -- did you follow that same procedure on

9    all of your inspections?

10   A.    Yes.  I never took information on any car that I couldn't

11   know when it left.

12   Q.    During these inspections, did you ever see anyone?

13   A.    Yes.  I saw -- depends on when, but I saw some people,

14   yes.

15   Q.    Earlier you described you saw someone go from vehicle to

16   vehicle.  Did you see that happen more than once?

17   A.    Yes.

18   Q.    And how often did you see that?

19   A.    All my inspections I saw someone in the early times going

20   from one bus and turning on and going to the next.  I saw at

21   least three times each time this person going from one bus,

22   turning on, going to the next, to the third.  What happened,

23   since these buses are very closely parked, I could not see

24   beyond that, but you can see that when he -- if you really

25   follow, you'll see the buses being turned on in the same

1    manner.  I could not see the person who turned on, but this

2    person prior to the others being turned on I saw when he was

3    directly in front of me, the buses that were directly in front

4    of me I could see him get on one bus, and that bus taillights

5    and the smoke puff would come on, and the same manner the next

6    one until I could not see him going to the next, to the

7    successive ones.

8    Q.    Did you ever see him turn on a bus and then stay with that

9    bus?

10   A.    No.

11   Q.    You've described this as the same person.  What was this

12   person wearing?

13   A.    Dark jacket.

14   Q.    And what makes you think it was the same person?

15   A.    He had the same build.

16   Q.    And did you always see who started a vehicle?

17   A.    No.

18   Q.    And did you see anybody else during your inspections?

19   A.    Yes.  Early in the morning, after 6:00 or close to 6:00

20   you'll see more people come, and what I see when I was directly

21   watching the buses, I see someone getting on the bus and that

22   bus will leave within minutes.

23   Q.    And did you ever see anyone working on a vehicle?

24   A.    During my inspection, I did not.

25   Q.    And could you see into the bus?

1    A.    No, I could not.

2    Q.    Could you see in front of the bus?

3    A.    No, I couldn't.

4    Q.    Could you see the side of the vehicle?

5    A.    When I was walking along the side, I could see the buses

6    and the side -- the side of the buses each time when I was

7    walking around.

8    Q.    And how about from your car?  Could you see the side of a

9    bus?

10   A.    Those are in front of me, yes, but not the rest.

11   Q.    Did you ever see multiple people standing around a bus?

12   A.    No, I did not see anyone.

13   Q.    When you were on the sidewalk, could you hear people

14   talking in the yard?

15   A.    Sometimes I did.

16   Q.    And did you ever hear anyone talking about a vehicle?

17   A.    No, I did not.

18   Q.    Did you ever see anyone lift a hood on a vehicle?

19   A.    Is the hood front or the back?

20   Q.    Either.  Did you ever see either?

21   A.    No, I did not.

22   Q.    And how about on the side of a vehicle?  Did you ever see

23   anybody lift a side panel?

24   A.    No, I did not.

25   Q.    Did you ever see anyone go under a vehicle?

1   A.   No, I did not.

2   Q.   Did you ever see anyone walk around a vehicle, around the

3   back of the vehicle?

4   A.   During my inspection, I saw one person walk behind the

5   bus.  He came around and he went into the bus.

6   Q.   And did he do anything to the vehicle when he was walking

7   around it?

8   A.   I didn't see anything he did.

9   Q.   Now, during your inspections, did you ever see the vehicle

10  taillights flashing?

11  A.   When the bus is about to leave, yes.

12  Q.   When you say "the bus is about to leave," how do you know

13  it was about to leave?

14  A.   When these buses start flashing their taillights, what I

15  saw was the majority of the ones I took the information, they

16  left within minutes.

17  Q.   And during your inspection did you ever see a vehicle idle

18  where the whole time it was idling the lights were flashing?

19  A.   No, I did not.

20  Q.   Did you ever see anyone working on a taillight?

21  A.   No.

22       MS. HANKEY:  This one I'd like to bring up just for

23  the witness, your Honor.

24  BY MS. HANKEY:

25  Q.   I'm showing you what has been marked as government Exhibit

PDF created with pdfFactory trial version www.pdffactory.com

1    123.   Do you recognize this document?

2    A.    Yes.

3    Q.    What is it?

4    A.    It's a typewritten of my notes, inspection notes.

5    Q.    And what is it -- who created it?

6    A.    I did.

7    Q.    And how was it created?

8    A.    Each time when I came back from the inspection, I input

9    the data into this worksheet.

10   Q.    And why did you create it?

11   A.    It is more friendly.

12   Q.    And was this part of your regular practice, to create a

13   spreadsheet like this after your inspections?

14   A.    Yes.

15   Q.    And were there ever changes made to the spreadsheet?

16   A.    Yes.

17   Q.    And what changes were made?

18   A.    A couple of -- when I was double-checking, I came a couple

19   of entries that were mistaken time-wise, so I changed those

20   couple of times, and also I took out the information from

21   another location which was not Reading Street in Roxbury.

22         MS. HANKEY:   I would move to enter Exhibit 123, your

23   Honor.

24         MR. FRIEDMANN:   Objection, your Honor.  Could we be

25   heard?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1          THE COURT:  I'll see you at sidebar.

 2

 3   (SIDEBAR CONFERENCE AS FOLLOWS):

 4          MR. FRIEDMANN:  Your Honor, two things.  First is it's

 5   cumulative.  It's just a retyping of what was just introduced

 6   for the most part, except for there is a column that says

 7   "Violation" with a "Yes" next to each one and a column that

 8   says "Excess Minutes" or something like that.  Those are

 9   conclusions on his behalf; they're not facts.  He's entitled to

10   testify to facts.  We're entitled to see exhibits that have

11   fact in them.  It's up to the jury to decide if it's an excess

12   minute or not an excess minute or whether it's a violation or

13   not a violation.

14          So, I would say it's, number one, cumulative and

15   unnecessary, and then, because of those additional columns,

16   that it should not be entered because they already have the

17   same information in another format.

18          MS. HANKEY:  One, it's a summary chart.  It's far more

19   accessible than the notes are to the jury.  So, I would

20   disagree that it's cumulative in that sense.  And, secondly,

21   it's a business record.  I mean, he created it as part of his

22   normal practice.  With respect to the columns on "Violation"

23   and "Excess Minutes," it was -- this is part of his job.  He's

24   an inspector.  When he gets back to work, he reports his

25   findings to his supervisor, and this is part of how he reports
```

PDF created with pdfFactory trial version www.pdffactory.com

1    them to his supervisor.

2            And I guess I have a question whether Mr. Friedmann is

3    going to be on cross questioning about him -- him about his

4    thoughts on what is a violation and what's not a violation, and

5    if he's doing that, I guess I don't understand the objection to

6    something that represents his thoughts on what is a violation,

7    if he's going to be eliciting that exact testimony.

8            THE COURT:  Well, can you produce the chart without

9    the "Yes" column?

10            MS. HANKEY:  I can.

11            MR. FRIEDMANN:  And without the "Excess."

12            MS. HANKEY:  The excess minutes is just the amount of

13    time over five minutes.

14            THE COURT:  We've had no evidence yet about excess.

15    I'm sure he could --

16            MS. HANKEY:  Right.  I can have him read and explain

17    that.

18            THE COURT:  -- but it hasn't happened yet, right.  I

19    suppose if that's simply a calculation of the difference, the

20    cumulative difference of the times that he's recorded, then

21    that's what he says --

22            MS. HANKEY:  It's just minus five minutes.

23            THE COURT:  Oh, I see.

24            MR. FRIEDMANN:  I think there is a column that gives

25    the total number of minutes.

```
 1              THE COURT:  Do you have the document?  Do you have a

 2    paper copy?

 3              MR. FRIEDMANN:  I didn't bring it with me.

 4              MS. HANKEY:  I'm sorry.  I didn't bring a paper copy

 5    up with me.

 6              THE COURT:  Okay.

 7              MR. FRIEDMANN:  In fact, your Honor, it does have --

 8    I'm sorry.  It does have a column that says "Duration of Idle."

 9              MS. HANKEY:  And then the last column takes out five

10    minutes.

11              MR. FRIEDMANN:  Then there is a calculation which

12    would tend to indicate to the jury a conclusion as opposed to a

13    statement of fact.

14              THE COURT:  Let me ask you this.  What's the

15    significance of the cumulative excess?

16              MS. HANKEY:  It's just how much over five minutes.  I

17    mean, your Honor --

18              THE COURT:  No, not for any particular one.  I

19    understand that, you know, if it runs for 30 minutes it's 25

20    minutes over, but what's the significance, for the jury's,

21    purposes, of adding all the 25 minutes-es together and getting

22    some big number for all the --

23              MS. HANKEY:  I don't think it's -- well --

24              THE COURT:  Maybe we can do without that too, is all

25    I'm saying.  I mean, you have the raw data to show what they
```

PDF created with pdfFactory trial version www.pdffactory.com

1    do.  It's elementary subtraction for the jury, if they want to

2    find what the difference is.  You can even show that

3    difference, but to total up the differences of 19 different

4    observations, I'm not sure it has any significance.

5         MS. HANKEY:  The only other thing is, for example, in

6    the way the Excel was created it's not something we can -- the

7    way Excel was created by his supervisor.  It tells you the

8    average number of minutes, and it's using those calculations to

9    get there.

10        THE COURT:  Well, there might be some administrative

11   purposes to it, but the question is the jury's purpose here.

12   So, just graphically --

13        MS. HANKEY:  I will just have him cut off the last

14   column.

15        THE COURT:  He can do that with his magic machine?

16        MR. FRIEDMANN:  It's more than just the last column.

17   The last column is only excess minutes.  Then there's the

18   overall duration, there is the cumulative total, there's the

19   column that say it's a violation.

20        MS. HANKEY:  I'm sorry.  I thought you objected to the

21   "Yes" violation, and I can take that out, and you've objected

22   to the cumulative total.  I can take that out.

23        MR. FRIEDMANN:  And the excess.  And the portion that

24   says how many excess minutes.

25        MS. HANKEY:  Right.

1          THE COURT:  That's up at the top, right?  Is that the
2     little box at the top?
3          MS. HANKEY:  I don't believe that that box --
4                         (Pause)
5          THE COURT:  So, I guess you're talking mostly about
6     the last two columns.
7          MS. HANKEY:  Right.
8          THE COURT:  "Yes" and "Excess," right?
9          MR. FRIEDMANN:  I'm talking about the last either two
10    or three columns.  I'll have to go over and look again, and the
11    box at the top that says, you know, average this, average that.
12         MS. HANKEY:  I mean, what's the objection to the
13    average?  I mean, the jury can't do that math in their head?
14         THE COURT:  The question is what does it mean.
15         MS. HANKEY:  Well --
16         THE COURT:  It might mean something -- in other words,
17    it might mean this is the persistence and degree of
18    persistence.
19         MS. HANKEY:  It's not just that, your Honor.
20    Defendants argue that it was necessary and they're going to be
21    producing specific testimony and, in fact, Mr. Friedmann told
22    the jury --
23         THE COURT:  Okay.
24         MS. HANKEY:  -- at first, well, 20 minutes might be
25    necessary.

```
 1              THE COURT:  That's good enough.  You can have the box.
 2    The last two columns are out.
 3              MR. FRIEDMANN:  The first portion of the box says
 4    "Total Excess Minutes."
 5              THE COURT:  All right.  Take out the "Excess."  We can
 6    have the average and the median and all of that stuff.
 7    (END OF SIDEBAR CONFERENCE)
 8
 9              MR. FRIEDMANN:  Your Honor, could we be heard just one
10    second longer, please?
11
12    (SIDEBAR CONFERENCE AS FOLLOWS):
13              THE COURT:  Before you do that, let me just ask you,
14    is this a static document, or is this something he can
15    manipulate as we sit here?
16              MS. HANKEY:  He's manipulating it right now.
17              MR. FRIEDMANN:  Because there is a reference in the --
18              THE COURT:  Well, because you said it was an original.
19    In other words, this was prepared for his supervisor, in the
20    first instance.
21              MS. HANKEY:  Right.
22              THE COURT:  I didn't know whether that was one form
23    and then you could reproduce most of it.
24              MS. HANKEY:  He's just redacting the column.
25              THE COURT:  All right.
```

1          MS. HANKEY:  And when we give a paper copy, we'll

2     print it with the redactions.

3          THE COURT:  All right.

4          MR. FRIEDMANN:  In the box itself, the nomenclature

5     continues to refer to "excess minutes."  I think the word

6     "excess" should be excised out also in the portions that are

7     being left in, because it connotates a violation if it's just

8     average minutes.

9          THE COURT:  No.

10         MR. SANDS:  What it represents is excess over five

11    minutes.

12         THE COURT:  Yeah.  We'll just define "excess" as not

13    constituting necessarily a violation but the amount of time of

14    the idling.  So, we can leave all the excess in the box.

15         MS. HANKEY:  In the box.

16         MR. SANDS:  I have a question for clarification.  Is

17    the information on the excess idling that's shown in the last

18    column, can that be used in closing as just a summary to the

19    jury?

20         THE COURT:  Well, this isn't actually a summary

21    exhibit, but --

22         MR. SANDS:  But can it be used for summary and not,

23    necessarily, submitted to the jury?

24         THE COURT:  That's another matter.

25         MR. FRIEDMANN:  If we're going to go to --

1          THE COURT:  But I don't think it has to be, if it was

2     prepared in the regular course, as a reproduction of his notes.

3     I think it's a business record.  But let me just rethink.  If

4     the box is going to show "Excess," what's wrong with the last

5     column showing "Excess," as long as it's just defined as a

6     neutral term?

7          MR. FRIEDMANN:  We're getting rid of the cumulative

8     total, is the portion that we're getting rid of.

9          THE COURT:  Right, and then the average and the

10    median.  If you're going to do the average and the median, then

11    you might as well have total.  In other words, your objection

12    is talking about excess at all because it applies to a

13    violation, but I think there is a legitimate purpose, perhaps

14    for the median and average calculations as bearing on the

15    question of necessity or not.  So, I think, actually, the

16    excess can be used, including the column, okay?

17         MS. HANKEY:  But not the total.

18         THE COURT:  As long as it's simply defined as a

19    calculation of the number of minutes the bus was observed

20    running beyond five minutes without any implication that

21    it's -- that the word "excess" conveys judgment --

22         MR. SANDS:  Then, we are just redacting --

23         MS. HANKEY:  Just the column that says "Violation."

24         THE COURT:  Yes.

25         MS. HANKEY:  And then can we lead the witness to make

PDF created with pdfFactory trial version www.pdffactory.com

1   sure that --

2          THE COURT:  A little bit, yeah.  Yeah.

3   (END OF SIDEBAR CONFERENCE)

4

5                          (Pause)

6          MS. HANKEY:  I apologize.  It's technical

7   difficulties.

8          All right.  I move to enter government Exhibit 123,

9   your Honor.

10         THE COURT:  Okay, as it has been redacted.

11         MS. HANKEY:  As modified.

12         THE COURT:  Right.  Okay, fine.

13  BY MS. HANKEY:

14  Q.   And, Mr. Mohamoud, I'm going to ask you --

15         THE COURT:  Can we, actually, just for the record

16  purposes, can we preserve it as 123A so the original is

17  preserved as 123?

18         MS. HANKEY:  Sure.  So, this will be marked as

19  government Exhibit 123A.

20  (Exhibit No. 123A received into evidence)

21  BY MS. HANKEY:

22  Q.   And, Mr. Mohamoud, I'd like to direct your attention to

23  the last column that says "Excess Idling Minutes."  Do you see

24  that column?

25  A.   Yes, I do.

 1  Q.    Is that simply the duration of idling minus the five

 2  minutes?

 3  A.    Yes.

 4  Q.    Thank you.

 5         THE COURT:  Okay.  I'll display it to the jury now,

 6  and you may want to re-ask that question.

 7         MS. HANKEY:  Sorry.

 8  BY MS. HANKEY:

 9  Q.    And, so, can you explain to the jury, just once again,

10  briefly, what is this document?

11  A.    This document depicts the exact replica of my inspection

12  notes.

13  Q.    And what does the first column represent?

14  A.    The date I did the inspection.

15  Q.    And then the second column?

16  A.    The location of the inspection.

17  Q.    And, then, what's the third column?

18  A.    The name of the company I was inspecting.

19  Q.    And the fourth column?

20  A.    The vehicle number.

21  Q.    And the license plate number?  What's -- I'm sorry -- the

22  fifth column?

23  A.    The license plate number.

24  Q.    And the sixth column?

25  A.    When the time of idling started.

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And then what's the seventh column?

2    A.    When the idling ended.

3    Q.    And what's the eighth column?

4    A.    Duration of idling.

5    Q.    And then the ninth column is the duration minus the five

6    minutes?

7    A.    Yes.

8    Q.    And at the top in the right-hand box, what does the first

9    column say?

10   A.    Could you repeat that, please?

11   Q.    Directing your attention to the top right-hand box, what

12   does the first column say?

13   A.    The "Total Excess Idling Minutes."

14   Q.    And the second column?

15   A.    "Maximum Excess Idling Minutes By Bus."

16   Q.    And, again, when you refer to excess, it's the duration

17   minus the five minutes, correct?

18   A.    Yes.

19   Q.    And then the third column?

20   A.    "Minimum Excess Idling Minutes" --

21   Q.    And -- I'm sorry.  And then the fourth column?

22   A.    "Average Excess Idling Minutes By Bus."

23   Q.    And then the fifth column?

24   A.    "Median Excess Idling Minutes By Bus."

25   Q.    Thank you.  Now, during your inspections, did you ever

1   talk to anyone at Paul Revere?

2   A.   No, I did not.

3   Q.   And why is that?

4   A.   As an inspector, there is different inspections.  There

5   are inspections that need the inspector to be on the scene and

6   asking questions, and there are other inspections where the

7   inspector doesn't need to talk to anyone.  These inspections

8   are observation inspections.  Opacity inspections and idling

9   inspections, the inspector doesn't need to talk to anyone.

10  They are outside observation inspections, and we do that as

11  inspectors observe opacity and idling outside of the company --

12  facility.

13  Q.   And is that how you were trained to conduct an idling

14  inspection?

15  A.   Yes.

16       MS. HANKEY:  All right.  I have no further questions,

17  your Honor, at this time.

18       THE COURT:  Mr. Friedmann.

19       MR. FRIEDMANN:  Thank you, your Honor.

20                    CROSS-EXAMINATION

21  BY MR. FRIEDMANN:

22  Q.   Good morning.

23  A.   Good morning.

24  Q.   Sir, if I heard you correctly, did you state that it was

25  early 2006 when you first started doing idling inspections in

PDF created with pdfFactory trial version www.pdffactory.com

 1  Massachusetts under the Massachusetts regulation?

 2  A.   Correct.

 3  Q.   So, when you say early 2006, was that January, February,

 4  March?  What was that?

 5  A.   Early February.

 6  Q.   I'm sorry?

 7  A.   Early February.

 8  Q.   Early February.  And you started these inspections with

 9  Paul Revere in March, correct?

10  A.   Yes.

11  Q.   Okay.  How many inspections had you done at different

12  companies before you started the Paul Revere inspection?

13  A.   About 20.

14  Q.   I'm sorry?

15  A.   About 20 inspections.

16  Q.   Would that mean 20 different site visits or 20 different

17  companies?

18  A.   20 different site inspections.

19  Q.   Okay.  So, that could have been five or six or seven with

20  the same company?

21  A.   Could be.

22  Q.   Okay.  How many of those had you done exclusively by

23  yourself before you did the Paul Revere inspection?

24  A.   About 20.

25  Q.   Okay.  Now, in terms of your memory of what you saw and

1    what you didn't see on any particular day, you're relying on

2    your notes, aren't you, to refresh your memory of any

3    particular day what you saw or what you didn't see?

4    A.    According to my notes.  I'm relying on my notes.

5    Q.    Okay.  So, you have no specific memory other than through

6    your notes of the events or occurrences?

7    A.    Correct.

8    Q.    Okay.  I noticed that when you were going through your

9    notes, you never dealt with the visit to the Brookline Avenue

10   site.

11   A.    It wasn't put on the screen.

12   Q.    Okay.  That was part of one of the exhibits of your claim

13   of violations?

14   A.    Correct.

15   Q.    Do you have any memory of going to the Brookline Avenue

16   site and what you observed without looking at your notes?

17   A.    According to my notes.  I will rely on my notes.

18   Q.    But my question to you was, excluding your notes, do you

19   have a memory of what you did at the Brookline Ave?

20   A.    No.

21   Q.    Do you recall being deposed in this case about going to

22   the Brookline Avenue site?

23   A.    Yes.

24   Q.    Do you recall that you testified that you took down times

25   for buses at the Brookline Avenue site?

```
 1   A.    According to my notes.

 2   Q.    Okay.  And you took down -- well, what did you take down,

 3   if you remember?

 4   A.    May I refer to my notes?

 5   Q.    Well, if you can tell me without looking at your notes

 6   what you remember.

 7   A.    I cannot remember.

 8   Q.    Okay.  Did you go to the Brookline site and take down the

 9   time that a bus got in line until the time it left the line?

10   A.    May I refer to my notes?

11   Q.    Do your notes indicate in any way what you observed?

12   A.    My notes will depict what I saw when I was at that site.

13           MR. FRIEDMANN:  Could we have Exhibit 4 up again?

14   That's the notes, and I believe it's number 6.

15           THE COURT:  Now, this is in evidence?

16           MR. FRIEDMANN:  It was offered, yes.

17           THE COURT:  So, it will be shown to the jury.  Fine.

18           MR. FRIEDMANN:  This is April 4, 2006.  No.  That's

19   not it.  The next one is number 7, April 5th.

20   BY MR. FRIEDMANN:

21   Q.    Sir, where on your April 5th notes does it indicate what

22   process you used for writing down these numbers?

23   A.    Yes.  The time tells you when I initially saw that vehicle

24   idling.  The date and the month and the year tells you when I

25   was in that location.  The name of Paul Revere Transportation
```

PDF created with pdfFactory trial version www.pdffactory.com

1    tells you what I was observing was Paul Revere Transportation

2    buses.  The second column tells you how long that vehicle was

3    idling, the time it ended idling or left the place.

4    Q.    Sir, do you recall in your deposition testifying that you

5    took down the time from when the bus got in line until the time

6    the bus was the first bus in line?

7    A.    According to my notes, I remember these buses, the time

8    they arrived and the time they left.

9    Q.    Okay.  How many car lengths, how many vehicle lengths did

10   they move during that period of time?

11          MS. HANKEY:  Your Honor, could we have a sidebar?

12          THE COURT:  All right.  I'll see you at the sidebar.

13

14   (SIDEBAR CONFERENCE AS FOLLOWS):

15          MS. HANKEY:  With respect to the Brookline Avenue, we

16   are actually not seeking Brookline Avenue as violations, and I

17   never stated in my opening -- Mr. Friedmann has told the jury

18   that we're seeking those violations, but I haven't.

19          MR. FRIEDMANN:  They were part of the exhibits that

20   were offered, so, obviously, in our opening we assumed they

21   were part.  If they're waiving that claim --

22          MS. HANKEY:  It wasn't in the pretrial memo.

23          MR. FRIEDMANN:  Well, they're part of the exhibits

24   that are in evidence.

25          MR. SANDS:  We just had a long discussion.

```
 1              THE COURT:  Unexplained.  Is it just one notebook?  Is
 2     that what it is?
 3              MR. SANDS:  We've just had a long discussion about the
 4     burden.
 5              THE COURT:  Let me just get what the exhibit is.  We
 6     are seeing on the screen a digital image of handwritten
 7     notebook pages.
 8              MS. HANKEY:  Correct.
 9              THE COURT:  What is the exhibit?  Is it going to be
10     the original notebook, or is it going to be a paper
11     reproduction of the digital image?  What exactly is the jury
12     seeing?  I'm wondering, because this is a new date.
13              MS. HANKEY:  It's going to be a paper --
14              THE COURT:  How integral is it to the exhibit that
15     they will see?  I mean, if it's irrelevant, there's no claim on
16     it, then they don't have to see the dates that aren't claimed.
17              MR. SANDS:  It's not relevant, because there is no
18     claim on it.  His notebook contains all of his inspections, so
19     the actual notebook --
20              THE COURT:  Including other companies?
21              MR. SANDS:  Including other companies.
22              MS. HANKEY:  Exactly, which is why his original
23     notebook is not marked as an exhibit.
24              THE COURT:  Okay.
25              MR. FRIEDMANN:  It's included in different exhibits
```

1    that are going to the jury and in that excess-minute

2    calculation.

3              MS. HANKEY:  It's not included in the excess-minute

4    calculation.

5              MR. SANDS:  It isn't.

6              MS. HANKEY:  It's on the screen now because it's the

7    exact thing produced.  That's why it's on the screen now.

8              MR. FRIEDMANN:  If they are withdrawing that claim --

9              MS. HANKEY:  But it's not part of the claim.

10             MR. FRIEDMANN:  Well, he has notes.

11             THE COURT:  Well, what are you -- what will the jury

12   see apart from --

13             MS. HANKEY:  We will take out this page.

14             THE COURT:  What is it they're going to see?  A bunch

15   of pages stapled together --

16             MS. HANKEY:  Yes, yes.

17             THE COURT:  -- or a book or something?  So, you'll

18   just take out any page that is not one of the ones you are

19   relying on.

20             MR. SANDS:  Right.

21             MR. FRIEDMANN:  Could we give a curative instruction

22   to the jury that this operation, that they've seen an exhibit

23   that has it in there, that they are not proceeding then on that

24   claim, and then I'll, of course, not question him on that?

25             MS. HANKEY:  That's fine with me.

```
 1              THE COURT:  Tell me about this.  This is a different
 2    physical facility?
 3              MS. HANKEY:  It's a different location.  It's not a
 4    facility.  It's not a facility.
 5              THE COURT:  It's a stop?
 6              MS. HANKEY:  It's a bus stop.
 7              THE COURT:  What do you want me to say?
 8              MS. HANKEY:  That it's not part of the allegations,
 9    that they should disregard this page.
10              THE COURT:  Do you want me to do it by date, that the
11    inspection on April 5th is not part of the issues in the case?
12              MR. FRIEDMANN:  Yeah, and I think we also have to
13    redact it from the exhibits that have been put in by the
14    government --
15              THE COURT:  Yeah.  Well --
16              MR. FRIEDMANN:  -- and all reference to it.  I mean,
17    obviously, if I had known they were not pursuing this claim, I
18    wouldn't be going to it.
19              THE COURT:  Okay.  All right.
20    (END OF SIDEBAR CONFERENCE)
21
22              THE COURT:  Jurors, the last image that you were
23    seeing that I've now taken down was for April 5th, 2006.  It
24    related to a different location or site.  I guess there's some
25    confusion as to whether or not that was part of the claim here
```

1    as violations, and I'm told that it is not part of what the

2    plaintiff claims were violations.  So, it's irrelevant, so

3    we've taken it out and you won't see it again.

4          MR. FRIEDMANN:  Your Honor, could we have a little bit

5    more?

6          THE COURT:  Yes.

7

8    (SIDEBAR CONFERENCE AS FOLLOWS):

9          MR. FRIEDMANN:  Your Honor, I'm just concerned, since

10   we mentioned it on opening, that it's clear to the jury that

11   this entire thing is going -- that they shouldn't have an

12   inference that we mentioned it on the opening --

13         THE COURT:  I think the more you talk about it the

14   worse it gets, frankly.  I think it's okay right now.

15         MS. HANKEY:  I mean, I guess my suggestion would be

16   that there be another instruction at the end reminding the jury

17   that closings are not evidence.

18         THE COURT:  By the time the evidence is closed,

19   they'll know what they're deciding.  Okay.

20   (END OF SIDEBAR CONFERENCE)

21

22         MR. FRIEDMANN:  Okay to proceed, your Honor?

23         THE COURT:  Go ahead.

24         MR. FRIEDMANN:  Thank you.

25   BY MR. FRIEDMANN:

1    Q.   Mr. Mohamoud, you were the only person from the EPA that

2    claims to have made these observations at Paul Revere, correct?

3    A.   For the seven inspections, yes.

4    Q.   There was nobody else with you on any of those seven

5    inspections?

6    A.   Correct.

7    Q.   And the only person from the EPA on each of these days

8    that could tell us whether the operation that you observed was

9    necessary or unnecessary would be you, correct?

10         MS. HANKEY:  Objection, your Honor.

11         THE COURT:  Sustained to the form of the question, at

12   least.

13         MR. FRIEDMANN:  Okay.

14   BY MR. FRIEDMANN:

15   Q.   Is there anybody else from the EPA, other than yourself,

16   who could tell us on the days that you observed, these seven

17   days, whether there was any necessary or unnecessary idling?

18         MS. HANKEY:  Objection, your Honor.

19         THE COURT:  Overruled.  You may answer that.

20   BY MR. FRIEDMANN:

21   A.   During my inspection, I couldn't see why the idling --

22   Q.   Sir, I don't mean to interrupt you, but my question was

23   whether there was anybody else other than you.

24   A.   No.

25   Q.   Okay.  Now, you've told us also that, other than through

PDF created with pdfFactory trial version www.pdffactory.com

1    your notes, you have no independent memory of these dates and

2    of the events, correct?

3    A.    Correct.

4    Q.    And nowhere on your notes does it indicate that you saw

5    somebody turning on a bus, correct?

6    A.    No.

7    Q.    Nowhere on your notes does it indicate whether you were on

8    the sidewalk or you were in your car across the street,

9    correct?

10   A.    Correct.

11   Q.    By the way, when you went there, you didn't take pictures

12   of your observations, correct?

13   A.    Correct.

14   Q.    Because it was too dark for you to do that.

15   A.    I never used any pictures for other inspections before for

16   idling purposes.

17   Q.    Do you recall, sir, that you were deposed in this lawsuit?

18   A.    Yes.

19        MR. FRIEDMANN:  If I could approach the witness, your

20   Honor?

21        THE COURT:  All right.

22   BY MR. FRIEDMANN:

23   Q.    That's a copy of your transcript for your testimony in

24   this matter.  Do you recall that?

25   A.    According to this document, yes.

1    Q.    Okay.  Do you recall, sir, that you were represented by

2    counsel at the time of your deposition, Ms. Hankey --

3    A.    I remember.

4    Q.    -- and Mr. Dain both were there with you?

5    A.    Yes.

6    Q.    And do you recall that you were sworn in before you

7    started answering?

8    A.    Yes.

9    Q.    And you agreed to tell the truth and you took an oath to

10   tell the truth, right?

11   A.    Yes.

12   Q.    Okay.  Could you turn to page 42 of your deposition?  Tell

13   me if I read this accurately to you, okay?

14        "Question:  All right.  Why is it that you didn't take any

15   pictures of these alleged violations?"

16        "Answer:  It would be very difficult because it is --

17   number one, it was very dark at night when I was doing most of

18   the inspections, and it will be very, very -- the pictures

19   won't come out very good, and it's not our procedure to take

20   pictures when we're doing inspections."

21        Did I read that accurately?

22   A.    From the document that you gave me, yes.

23   Q.    Okay.  You had an opportunity to read this document, to

24   make changes to it if you felt it was inaccurate, right?

25   A.    Yes.

```
 1   Q.   Okay.  You didn't change your answer, did you?  I mean, in

 2   the document.

 3   A.   No.

 4   Q.   So, when you read it over, it was an accurate answer?

 5   A.   Yes.

 6   Q.   Okay.  You didn't observe the reason that the buses were

 7   running, did you?

 8   A.   My inspections --

 9   Q.   Sir, you can answer that yes or no.  Did you observe the

10   reasons the buses were running or not?

11   A.   Can I explain?

12   Q.   No.  You need to give a yes-or-no answer, sir?

13        MS. HANKEY:  Objection, your Honor.

14        THE COURT:  No.  I think that can be answered yes or

15   no.

16   A.   No.

17   BY MR. FRIEDMANN:

18   Q.   And, in fact, that's what you testified to at your

19   deposition too, at page 35, correct?

20        MS. HANKEY:  Objection, your Honor.  Improper -- I

21   mean, what is the --

22        THE COURT:  No.  Overruled.

23   BY MR. FRIEDMANN:

24   Q.   If you look at page 35, line 4, "Question:  While you were

25   there, did you observe the reason the buses were running?"
```

1        "Answer:  No."

2        Did I read that accurately?

3   A.   Yes.

4   Q.   Did you change your testimony when you read this over in

5   any way?

6   A.   No, I didn't change.

7   Q.   And this deposition was taken back in January of 2008, if

8   you look at the first page, sir.

9   A.   Yes.

10  Q.   Okay.  You also testified that you couldn't ID the person

11  that started the buses because it was too dark, right?

12          MS. HANKEY:  Objection, your Honor.  It's improper

13  impeachment, and he hasn't asked him to testify on this

14  subject.

15          THE COURT:  Yes.  Objection to the form.

16          MR. FRIEDMANN:  Okay.

17  BY MR. FRIEDMANN:

18  Q.   Sir, could you identify the person who you saw in the

19  yard?

20  A.   No, I couldn't.

21  Q.   And the reason you couldn't was because it was too dark,

22  correct?

23  A.   He had a hood and he had a dark jacket, so I couldn't

24  identify personal.

25  Q.   The whole time you were there, the seven visits, did you

PDF created with pdfFactory trial version www.pdffactory.com

1   ever go on Paul Revere's property?

2   A.    No, I did not.

3   Q.    You stayed outside the fence?

4   A.    Most of the times.

5   Q.    Mm-hmm.  Do you recall, sir, testifying at your deposition

6   that you did not take a video?

7   A.    Could you tell me what page on that?

8   Q.    I'm just asking if you recall that.

9   A.    No, I don't recall that.

10  Q.    Could you turn -- let's start at page 39, beginning at

11  line 14.

12        "Question:  Did you take any video of this?"

13        "Answer:  No."

14        Did I read that accurately?

15  A.    Yes.

16  Q.    Turn to page 43 at line 1.

17        "Question:  "Did and you like" -- I'm sorry.  Excuse me.

18  "Did -- and you, likewise, didn't take any video of this?"

19        "Answer:  That's true."

20        "Question:  And is that also not your procedure?"

21        "Answer:  That's true."

22        You said at your deposition that you didn't take videos,

23  correct?

24  A.    That's what the deposition says.

25  Q.    Did you change that deposition transcript testimony at any

PDF created with pdfFactory trial version www.pdffactory.com

```
 1  time after it was taken up till today?

 2  A.   When I was given the chance to look --

 3  Q.   Sir, you have to answer my question.  I asked you if you

 4  changed your deposition testimony at any point in time between

 5  the date it was taken and today.

 6            MS. HANKEY:  Objection, your Honor.  Can we get a

 7  sidebar?

 8            THE COURT:  All right.

 9

10  (SIDEBAR CONFERENCE AS FOLLOWS):

11            MS. HANKEY:  So, my objection is just, procedurally,

12  Mr. Mohamoud did fill out -- did an affidavit explaining that

13  he was changing the testimony, but when you ask him a question,

14  Did you change your deposition testimony, he's not going to

15  understand legally, you know, procedurally, whether the

16  affidavit was a change versus the errata sheet that he filled

17  out.

18            THE COURT:  It sounds ambiguous.

19  (END OF SIDEBAR CONFERENCE)

20

21  BY MR. FRIEDMANN:

22  Q.   Sir, could you turn to page 65 of your deposition

23  transcript, beginning at line 1.  Tell me if I read this

24  accurately.

25            "Question:  Is that standard procedure for your
```

PDF created with pdfFactory trial version www.pdffactory.com

1    investigation?"

2        "Answer:  Yes."

3        "Question:  And who taught you those standard procedures?"

4        "Answer:  I was trained to do that."

5        "Question:  To not take pictures and not take video?"

6        "Answer:  Most of the time what we do doesn't involve

7    taking pictures.  It's a normal routine for an inspector to

8    just rely on his notes."

9        Did I read that accurately?

10   A.   Yes.

11   Q.   The photographs that we have seen; you didn't take those

12   photographs, did you?

13   A.   I was part of the people who took them.

14   Q.   And those pictures, when you came back, those were not

15   taken at the time of any of your inspections, were they?

16   A.   They weren't.

17   Q.   They were taken during an inspection?

18   A.   No.

19   Q.   Okay.  They were not taken?

20   A.   They weren't.

21   Q.   Okay.  They were taken during the day?

22   A.   Correct.

23   Q.   Okay.  You were there during the darkness, correct?

24   A.   Correct.

25   Q.   Okay.  So, to the extent that those pictures show

PDF created with pdfFactory trial version www.pdffactory.com

1    conditions there, that was not what you were observing; that's

2    what you would have been observing if it had been daylight out,

3    right?

4    A.    That's not correct.  I would right behind the fence see

5    everything the picture indicates.

6    Q.    You would have the same view, but it would not be the same

7    conditions because of the darkness, correct?

8    A.    Yes.  At different times.

9    Q.    And we saw from the video from the vantage point of where

10   your car was what it looked like during darkness when you would

11   be looking across the Boulevard, correct?

12   A.    Most of my inspections were right behind the fence.

13   Q.    Sir, you have to try to answer my questions, okay?

14   A.    Okay.

15   Q.    My question was whether the condition, the darkness, okay,

16   that we saw in the video that showed what it looked like from

17   across the street from where your car was across Meinea

18   Boulevard, whether that accurately depicted how dark or how

19   light it was during the normal course of your inspections.

20   A.    It would.

21   Q.    Okay.  And, in fact, it was dark enough that you didn't

22   think the video even worked, right?

23   A.    No.  There was another reason that I thought the video

24   didn't work.

25   Q.    Okay.  Now, the logs that you gave us, those include

```
 1   every, single day that you went there, correct?
 2   A.    Could you repeat the question, please?
 3   Q.    Yes.  Your notes, the logs.
 4   A.    Yes.
 5   Q.    That includes every single day that you went?
 6   A.    Only the seven days.
 7   Q.    Only the seven, right?
 8   A.    Yes.
 9   Q.    You didn't go there during any earlier period of time,
10   that is, before, let's say, February of 2006?
11   A.    I don't recall.
12   Q.    Did you go there any time during the year 2005 and take
13   down any notes of any alleged violations?
14   A.    I wasn't an idling inspector at that time.
15   Q.    So, going back in timeframe from April 15, 2001 until
16   January of 2006, you never made any observations of any claim
17   of idling at the location in question, did you?
18   A.    I couldn't, because I was not an idling inspector.
19   Q.    So, is the answer yes?
20   A.    Yes.
21   Q.    Okay.  You didn't do that.
22   A.    How could I do it?
23   Q.    I don't know, sir.  That's why I'm asking you.
24   A.    Yeah, I have to be -- as an inspector -- if I can explain,
25   sir.
```

1    Q.    No.  I'll ask you some questions; that's okay.  Do you

2    know of anybody else from the EPA that ever went and looked at

3    the premises from April 15, 2001 until January 1, 2006 to note

4    any alleged violation?

5    A.    No.

6    Q.    By the way, sir, from where you are looking into the

7    property, from whether you were in your car or whether you were

8    on the sidewalk, can you tell what the air pressure is in that

9    bus?

10   A.    No.

11   Q.    Can you tell if any of the lines on the bus are frozen?

12   A.    No.

13   Q.    Can you tell if any of the lines on the bus are partially

14   obstructed?

15   A.    No.

16   Q.    Can you tell if the bus will perform the kneeling function

17   that's needed as part of its daily operations?

18   A.    If someone was --

19   Q.    Just yes or no, sir.  Could you, from where were you,

20   could you see that?

21   A.    Could you clarify the question, please?

22   Q.    Sure.  From where you were standing, could you see if the

23   bus had built up enough air pressure so that the bus could

24   kneel to access somebody that has, perhaps, a handicap or a

25   wheelchair?

1  A.    If I were walking along the side, if anyone was doing --

2  or any bus was moving, I could see easily --

3  Q.    That's not what I asked you, sir.  I asked you if you

4  could tell if the air pressure in the bus had built up to a

5  sufficient level for the bus to perform that function.

6  A.    No, I couldn't.

7  Q.    Okay.  Did you keep track of the weather on the days you

8  inspected?

9  A.    I did not.

10  Q.    Okay.  Did you keep track of the humidity on the days you

11  inspected?

12  A.    The Massachusetts regulation doesn't --

13  Q.    Sir, that isn't what I asked you.  You have to try to

14  answer the questions that I asked you.

15  A.    I don't mind answering that, I would love to answer it,

16  but some questions need a little bit of explanation, if you

17  don't mind.

18  Q.    No, sir.  You need to answer either yes or no.  I know you

19  can do this, you can tell me if you checked the humidity on the

20  days of your observation.  It's yes or no, sir.

21  A.    No.

22  Q.    Why -- strike that.  Which were the days that you used the

23  binoculars?

24  A.    Repeat the question, please?

25  Q.    Yes.  Which were the dates that you did observations that

1   you used the binoculars?

2   A.    Can I refer to my notes?

3   Q.    Do your notes indicate someplace that you used binoculars

4   on that date?

5   A.    No, but I know during -- if I look at my notes I can tell

6   the dates that I used the binoculars.

7   Q.    What on your notes tells you what dates you used the

8   binoculars?

9   A.    The dates that I used the binoculars were the days that my

10  taking the time, the starting time of the idling buses who were

11  not sequentially arranged.

12  Q.    So, looking at your notes, which days did you use

13  binoculars and which days did you not use binoculars?

14  A.    May I refer to my notes?

15  Q.    Yes.

16  A.    According to my notes, April 4th, 2006.

17  Q.    I'm sorry?

18  A.    April 4th, 2006 --

19  Q.    April.

20  A.    -- and April 12th, 2006.

21  Q.    Sir, while you were using your binoculars on April 4th and

22  on April 12th of 2006, were you able to see whether the buses

23  that were running had built up sufficient air pressure?

24  A.    No.

25  Q.    You understand that these buses have a brake system that

1    is air operated, and until they get to a certain level of the

2    air pressure they can't move, right?

3    A.    I don't understand.

4    Q.    You don't understand how the buses work?

5    A.    That's not my expertise.

6    Q.    Okay.  So, you're unaware that there's an air pressure

7    that has to build up before the brakes will release so a bus

8    can be moved?

9    A.    I don't know.

10   Q.    When you came to Paul Revere's facilities on any of these

11   days, did you ever come in and ask anybody why the buses were

12   running?

13   A.    As I said before, these are observations and this --

14   Q.    That's not what I asked you, sir.  I asked you if you ever

15   went in on any of these seven days and asked any person at Paul

16   Revere why the buses were running.

17   A.    I'm not required to do that.

18   Q.    Sir, I didn't ask you if you were required by any training

19   you might have; I'm asking you what you did.  Did you go in --

20   A.    No.

21   Q.    -- and ever inquire whether the air pressure was

22   sufficient, whether it was being charged or any other reason

23   why the buses were running on any of those seven days?

24   A.    No, I did not.

25   Q.    You never once did that?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    I never did in any other inspection before Paul Revere

2    either.

3    Q.    Sir, Paul Revere is all we're interested in here.    I

4    understand you want to tell us about other things you've done,

5    but you never did on this inspection any of the dates you

6    inspected --

7              MS. HANKEY:    Objection.    Asked and answered.

8              THE COURT:    Well, no.    Go ahead.

9    BY MR. FRIEDMANN:

10   Q.    Any of the dates you inspected, you never came in and

11   asked anybody why the buses were running, correct?

12   A.    Correct.

13             MR. FRIEDMANN:    Thank you.    I have no further

14   questions, your Honor.

15                  REDIRECT EXAMINATION

16   BY MS. HANKEY:

17   Q.    Mr. Mohamoud, you were asked a couple of questions about

18   what your recollection is versus what you're relying on for

19   your notes.    Sitting here today, do you remember visiting the

20   Roxbury facility?

21   A.    No.

22   Q.    You don't have any recollection that you went to the

23   Roxbury facility?

24   A.    No.

25   Q.    And sitting here today, do you remember walking along the

PDF created with pdfFactory trial version www.pdffactory.com

1  sidewalk at the Roxbury facility?

2  A.    If I rely on my notes, I can remember it, yeah.

3  Q.    And what about your notes refreshes your recollection that

4  you were walking the sidewalk?

5  A.    These are my notes, and I know where I took them when I

6  look at them.

7  Q.    When you say you know where you took them when you look at

8  them, explain.  How do you know where you were, looking at your

9  notes, where you took them?

10  A.    It is the information I gathered during my inspection that

11  tells me what time and what day where I was.

12  Q.    Okay.  So, let me ask you again.  Sitting here today, do

13  you have any memory of the exact dates that you went to the

14  Roxbury facility?

15  A.    No.

16  Q.    No?

17  A.    No.

18  Q.    But sitting here today, do you remember that you went to

19  the Roxbury facility?

20  A.    According to my notes, yes.

21  Q.    Do you have a recollection -- sitting here today, do you

22  remember visiting the Roxbury facility but not, necessarily,

23  what day it was?

24  A.    I remember being at that facility and inspecting but not

25  exact date.

1    Q.    And sitting here today, do you remember not necessarily

2    the exact date, but do you remember arriving and finding

3    vehicles on?

4    A.    Yes.

5    Q.    And sitting here today, do you remember not the exact

6    date, but do you remember walking that sidewalk and taking

7    information on each of the vehicles?

8    A.    I do.

9    Q.    And sitting here today, do you remember sitting in your

10   car for some of the inspections but just not the specific

11   dates?

12   A.    Correct.

13   Q.    So, when you were testifying earlier on direct, you were

14   testifying based on your memory of what happens on those dates.

15   It's simply the specific dates that you do not remember sitting

16   here today?

17   A.    Correct.

18           MR. FRIEDMANN:  Objection.

19           THE COURT:  Sustained.  The answer is stricken.

20   BY MS. HANKEY:

21   Q.    And when you were discussing when you saw a person at the

22   Roxbury facility, sitting here today, do you have a

23   recollection of seeing a person at the Roxbury facility?

24   A.    No, I don't have a recollection.

25   Q.    Sitting here today, not necessarily the specific date, but

1  sitting here today, do you remember seeing someone at the

2  Roxbury facility?

3  A.   Yes, I do.

4       MR. FRIEDMANN:  Objection, your Honor.

5       THE COURT:  Overruled.

6  BY MS. HANKEY:

7  Q.   And sitting here today, not the specific date, do you have

8  a recollection of whether you saw people working on the

9  vehicles?

10 A.   I do.

11 Q.   And Mr. Friedmann or defense counsel asked you did you

12 observe a reason why the buses were running.  Do you remember

13 that?

14 A.   Yes.

15 Q.   Did you observe anything that would explain why those

16 buses were running?

17       MR. FRIEDMANN:  Objection.

18       THE COURT:  Overruled.

19 A.   No, I did not.

20 BY MS. HANKEY:

21 Q.   And when you saw that the buses were running, could you

22 see that they often were running unattended?

23 A.   Yes.

24 Q.   And Mr. Friedmann asked you if you could see whether the

25 air pressure in a vehicle was trying -- whether the air

PDF created with pdfFactory trial version www.pdffactory.com

 1    pressure had built sufficiently to kneel.  Did you ever see a
 2    vehicle kneel?
 3    A.    No, I did not.
 4    Q.    Mr. Friedmann asked you if you noted the weather.  Why
 5    didn't you note the weather?
 6    A.    Because there is a -- the Massachusetts regulation does
 7    not require the weather to be recorded.
 8    Q.    So, there's nothing in the regulation that refers to the
 9    weather?
10    A.    Not at all.
11    Q.    Mr. Friedmann asked you if you ever spoke to anyone at
12    Paul Revere about why the vehicles were idling.  Did you ever
13    speak to anyone at Paul Revere about why the vehicles were
14    idling?
15    A.    The only time I spoke -- we spoke, as in EPA, to people
16    from Paul Revere was when the Paul Revere representatives came
17    for the Notice of Violation conference.
18    Q.    So, after a Notice of Violation was sent to Paul Revere,
19    Paul Revere was invited in to EPA to speak; is that correct?
20    A.    Yes.
21            MR. FRIEDMANN:  Objection.
22            THE COURT:  Wait a minute, wait a minute.  The
23    objection is sustained.
24            MS. HANKEY:  May we approach, your Honor?
25            THE COURT:  It's leading, if nothing else.

```
 1   BY MS. HANKEY:

 2   Q.   And at that meeting, did anyone at Paul Revere tell you

 3   why the vehicles were idling?

 4            MR. FRIEDMANN:  Objection.

 5            THE COURT:  The question was -- the answer was

 6   stricken, so there was no evidence of a meeting.  I don't know.

 7   But I don't want to be too -- is there a different objection?

 8            MR. FRIEDMANN:  Well, I think you're getting it, your

 9   Honor.  I'm not meaning to be flip.

10            THE COURT:  No.  All right.

11   BY MS. HANKEY:

12   Q.   So, was there a meeting with Paul Revere representatives?

13            MR. FRIEDMANN:  Objection.

14            THE COURT:  Let me just see you at the sidebar.

15

16   (SIDEBAR CONFERENCE AS FOLLOWS):

17            MR. FRIEDMANN:  Your Honor, it's certainly well beyond

18   the scope of what I crossed on.  I mean --

19            THE COURT:  It is.

20            MS. HANKEY:  I'm sorry, but he asked him multiple

21   times, Did you ever ask anyone at Paul Revere why these

22   vehicles were idling.

23            THE COURT:  I think on the inspection dates.

24            MR. FRIEDMANN:  On the inspection dates, correct.

25            MR. SANDS:  But he opened the door, your Honor.
```

 1          THE COURT:  No, no, not a meeting.  Just inform us.
 2   Tell me about the meeting.
 3          MR. SANDS:  Well, your Honor, this is an opportunity
 4   that each company is given after a Notice of Violation is
 5   issued to come in and give any explanations.  What he asked was
 6   whether or not he had talked to anyone about why it was
 7   necessary.  He did not, but they had an opportunity to come in.
 8   He opened the door.
 9          MR. FRIEDMANN:  I asked him about the days of
10   observation.
11          THE COURT:  Yeah.  I think it can be limited to the
12   days of observation.
13          MS. HANKEY:  The argument to the jury is that Paul
14   Revere was never given the opportunity to explain that that's
15   why the government --
16          THE COURT:  Well, I assume there's going to be other
17   evidence.  You're going to have Paul Revere representatives on
18   the stand.  You'll have, I'm sure, another opportunity to get
19   into all of this.
20          MR. FRIEDMANN:  I'm not sure, your Honor, that if
21   somebody comes in in response to an NOV that those aren't
22   settlement discussions.
23          THE COURT:  I don't know.  We'll consider that when
24   the occasion is appropriate.  For now, the objection is
25   sustained.

1           Do you have a little more?  I'd like to finish the

2      guy.

3           MS. HANKEY:  We're done.

4           THE COURT:  As long as you're here, what's next

5      tomorrow, so I know?

6           MR. SANDS:  Ms. Christine Sansevero from the EPA, your

7      Honor.

8           THE COURT:  She is a supervisor, as I recall?

9           MR. SANDS:  Yes.

10          THE COURT:  Then what else?

11          MS. HANKEY:  Just moving everything into evidence.

12          THE COURT:  Documents?

13          MS. HANKEY:  Yeah.

14          MR. FRIEDMANN:  What about the transcripts?

15          MS. HANKEY:  We need to resolve the issue of the

16     deposition designations.

17          THE COURT:  Okay.  We'll have to do that in the

18     morning.  So, there will be some depositions.  Are you going to

19     read them?

20          MS. HANKEY:  If you admit them.

21          THE COURT:  That's what I mean.

22          MS. HANKEY:  We need to hear that from you.

23          THE COURT:  I expect there will be some admitted.

24     Assuming that there is some, are you going to read them to the

25     jury?

```
 1            MS. HANKEY:  We'll have to hear what your rulings are.

 2            THE COURT:  So, that will take some time too.  This is

 3     all scheduling questions, really.

 4            MS. HANKEY:  I think they have an issue with a witness

 5     who has to testify tomorrow.

 6            MR. FRIEDMANN:  Yes.  Although, it may be dependent on

 7     some motions that we'll be presenting tomorrow, obviously, when

 8     the plaintiff concludes their side of the case.  Depending upon

 9     how your Honor rules on them, this person may not be necessary.

10     If he is necessary, then we would sort of take him out of order

11     of what our preferred order is, but it doesn't really matter.

12     It's not like we're taking him off sides or anything.

13            MS. HANKEY:  Is he going to be available next week?

14            MR. FRIEDMANN:  Mr. Carney, who would not be available

15     again until Monday, he's going to be out of town, he was

16     subpoenaed in.

17            THE COURT:  Who is he?

18            MR. FRIEDMANN:  He is the former General Manager of

19     Paul Revere Transportation.

20            THE COURT:  We should do him tomorrow, even if we have

21     to adjust across the cases, even.

22            MR. FRIEDMANN:  Yeah.  I mean --

23            THE COURT:  Because I think at this rate we may be

24     closed by Monday.

25            MR. FRIEDMANN:  I believe you're right, so that's why
```

PDF created with pdfFactory trial version www.pdffactory.com

1    I have him coming in for tomorrow.

2         THE COURT:  Right.  Okay.  Do you have some more?  I

3    don't mean to -- in other words, we can go a little bit over,

4    if you want to finish up whatever needs to be done, and I don't

5    know whether you have any more, but I want to get him out of

6    here today.

7         MR. FRIEDMANN:  If they're done with him, I think I'm

8    done with him also.

9         MR. SANDS:  If we can just check, your Honor.

10        THE COURT:  Yes.

11   (END OF SIDEBAR CONFERENCE)

12

13        MS. HANKEY:  I'm done, your Honor.

14        THE COURT:  Okay.

15        MR. FRIEDMANN:  No further questions, your Honor.

16        THE COURT:  Okay.  Mr. Mohamoud, thank you.  You may

17   step down.

18        THE WITNESS:  Thank you.

19             (Witness stepped down)

20        THE COURT:  And we'll finish for the day on that note.

21   Again, I remind you of my caution to avoid any discussion of

22   the evidence outside the courthouse, and, otherwise, enjoy the

23   rest of the day and we'll see you tomorrow morning and continue

24   on.

25        THE CLERK:  All rise for the jury.  Court is in

PDF created with pdfFactory trial version www.pdffactory.com

1    recess.

2    (The Honorable Court and the Jury exited the courtroom at 1:08

3    p.m.)

4    (Proceedings adjourned for the day at 1:08 p.m.)

5

6                    C E R T I F I C A T E

7

8            I, Marcia G. Patrisso, RMR, CRR, and Brenda K.

9    Hancock, RMR, CRR, Official Court Reporters of the United

10   States District Court, do hereby certify that the foregoing

11   transcript, from Page 2-1 to Page 2-154, constitutes, to the

12   best of my skill and ability, a true and accurate transcription

13   of my stenotype notes taken in the matter of *United States of*

14   *America v. Paul Revere Transportation, LLC*, No.

15   1:06-cv-12297-GAO.

16

17                    /s/ *Marcia G. Patrisso*

18                    Marcia G. Patrisso, RMR, CRR

19                    Official Court Reporter

20

21

22                    /s/ *Brenda K. Hancock*

23                    Brenda K. Hancock, RMR, CRR

24                    Official Court Reporter

25