UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,            )
                                     )
        Plaintiff,                   )
                                     )    Civil Action
v.                                   )    No. 06-12297-GAO
                                     )
PAUL REVERE TRANSPORTATION, LLC,     )
                                     )
        Defendant.                   )
                                     )



BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


DAY THREE
JURY TRIAL



John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Wednesday, June 3, 2009
9:10 a.m.


Marcia G. Patrisso, RMR, CRR
Brenda K. Hancock, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    APPEARANCES:

 2         UNITED STATES DEPARTMENT OF JUSTICE
           ENVIRONMENTAL ENFORCEMENT SECTION
 3         By: Rachel A. Hankey, Esq.
           P.O. Box 7611
 4         Ben Franklin Station
           Washington, D.C. 20044-7611
 5         - and -
           U.S. AIR FORCE DEPARTMENT OF LAW
 6         By: Jeffrey K. Sands, Esq.
           HQ USAFA/DFL Suite 8J100
 7         USAFA, Colorado 80840
           On Behalf of the Government
 8
           RUDOLPH FRIEDMANN, LLP
 9         By: Jonathon D. Friedmann, Esq.
               Zachary J. Tuck, Esq.
10         92 State Street
           Boston, Massachusetts 02109
11         On Behalf of the Defendant

12
      IN ATTENDANCE:
13
           Gregory Dain, Senior Enforcement Counsel
14         Environmental Protection Agency

15

16

17

18

19

20

21

22

23

24

25
```



I N D E X

| WITNESSES FOR THE PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| CHRISTINE SANSEVERO | | | | |
| By Mr. Sands | 15 | | 43 | |
| By Mr. Friedmann | | 39 | | |
| JAMES VIOLA | | | | |
| (Through deposition) | 71 | | | |
| FREDERICK JONES | | | | |
| (Through deposition) | 79 | | | |

PDF created with pdfFactory trial version www.pdffactory.com

```
 1              (The following proceedings were held in open court

 2     before the Honorable George A. O'Toole, Jr., United States

 3     District Judge, United States District Court, District of

 4     Massachusetts, at the John J. Moakley United States Courthouse,

 5     One Courthouse Way, Boston, Massachusetts, on June 3, 2009.)

 6              THE CLERK:  All rise.

 7              The United States District Court for the District of

 8     Massachusetts.  Court is now in session.

 9              Please be seated.

10              For a continuation of the trial in USA versus Paul

11     Revere Transportation.

12              THE COURT:  Good morning.

13              MR. SANDS:  Good morning, your Honor.

14              MR. FRIEDMANN:  Good morning, your Honor.

15              MS. HANKEY:  Good morning.

16              THE COURT:  Mr. Friedmann, you had something?

17              MR. FRIEDMANN:  Yes, your Honor.  The next witness

18     that I understand the government is calling, a live witness, we

19     understand is going to testify to this alleged routine and

20     habit, et cetera.  And from her deposition we understand that

21     her intent is to testify that what she did was she checked the

22     calendar to see how many days during the statute of limitations

23     period --

24              MR. SANDS:  That won't be the scope of her testimony,

25     your Honor.
```

```
 1          MR. FRIEDMANN:  If that will not be the scope of her

 2     testimony, then I will sit down at this point.  But I was

 3     concerned we were getting into the habit-and-routine issue

 4     again, and I wanted to let your Honor know we obviously have a

 5     dispute about that.  And rather than interrupting their

 6     deposition, I wanted to have a standing objection on that

 7     subject.

 8          THE COURT:  But you're not?

 9          MR. SANDS:  That's not what Ms. Sansevero is going to

10     be testifying to, your Honor.

11          THE COURT:  Okay.

12          MR. SANDS:  One issue regarding Ms. Sansevero, your

13     Honor, is that we will be seeking to move into evidence the

14     notice of violation that was issued in this case.  The notice

15     of violation covers the alleged violations at the Roxbury

16     facility.  It also makes reference to the Brookline facility

17     which we discussed yesterday.

18          What we would propose, your Honor, is that we

19     authenticate the document, or lay the foundation for the

20     complete document with Ms. Sansevero, but only move in a

21     redacted version that removes the references to Roxbury.

22          THE COURT:  You mean to Brookline Ave.?

23          MR. SANDS:  Excuse me.  Brookline, yes.

24          MR. FRIEDMANN:  Your Honor, I have no problem with

25     them redacting that portion, but the issue is beyond just the
```

1   redaction.  The notice of violation is a document that they

2   created that is their testimony of what they think happened.

3   It contains allegations and questions.  It's not evidence, it's

4   not testimony, it's not under oath, and we can't cross-examine

5   it.  It's classic hearsay that they're trying to introduce for

6   some purpose, perhaps the truth of the document.  I've not been

7   told what the purpose of introducing it is.  If it is just to

8   say that on a particular date a notice of violation was issued

9   to us, we don't dispute that fact.

10          THE COURT:  What's the purpose of the offer?

11          MR. SANDS:  The purpose is, your Honor, it establishes

12   that this is a regularly conducted activity by the agency; that

13   when they do have violations, they do issue these notices; that

14   Paul Revere did receive a notice; that Paul Revere had an

15   opportunity to come in and address these violations.

16          This is a regularly conducted business record --

17          THE COURT:  Can't you get those facts without the

18   contents of the document?  In other words, that they were given

19   notice and an opportunity to discuss whatever -- I'm not --

20          MR. FRIEDMANN:  We don't dispute, your Honor, that we

21   were given notice and that we filed a response to the notice.

22   We don't dispute those facts.  We dispute, though, the

23   content --

24          THE COURT:  Maybe it will actually help if I look at

25   the notice.

```
 1              MR. SANDS:  The highlighted portions, your Honor, are

 2     just what will be redacted.

 3              THE COURT:  I see.

 4              (Pause.)

 5              THE COURT:  Well, looking at it very quickly, there do

 6     seem to be some assertions of propositions which could be

 7     understood as factual propositions which would be classic

 8     hearsay.  There are other things that are not.  I mean, there

 9     are instructions, "Please submit a response" and so on.  So

10     it's conceivable that with further redaction of statements of

11     fact that would not be admissible under the hearsay rules, that

12     the non-hearsay parts of it could be offered, I suppose, if the

13     question is simply the fact of notification.

14              There is some of this that is notification and not

15     fact statements, but you would have to go through and -- I

16     mean, even just on the first page of the letter, for example,

17     it says, "Idling diesel engines emit pollutants which can cause

18     or aggravate a variety of health problems," and so on.  That

19     may not be a very controversial fact, but it's a statement of

20     fact, and there are others like that throughout, so...

21              MR. SANDS:  We can remove the letter, your Honor,

22     keeping --

23              THE COURT:  I haven't gone through it line by line.  I

24     think probably the statements about what the law is and how it

25     applies, that may be taken as fact statements and even law
```

PDF created with pdfFactory trial version www.pdffactory.com

1    statements which maybe shouldn't be admitted.  I don't say

2    there's nothing that could be saved from it, but it doesn't

3    look like the whole thing, without some saving, would escape

4    the hearsay rule.

5         MR. SANDS:  The notice is just that:  a notice of

6    violation from a governmental enforcement agency.  It's no

7    different than a speeding ticket from a police officer.

8         THE COURT:  Right.  But the precise question is:  If

9    there's a stipulation to the fact of notice, what does the

10   contents of the notice add that is properly considered by the

11   jury?  Your point is that they should know there was a notice

12   sent.  If that's all, if it's just that fact, there are other

13   ways of getting to it.  If there's something about the content

14   that the jury should know, that's the question, and then is it

15   admissible under hearsay rules and other things.

16        MR. SANDS:  There are provisions in the notice, your

17   Honor, that invites the party to whom the notice is sent to

18   come in and to provide additional evidence to the agency.

19        THE COURT:  Right.

20        MR. SANDS:  That is a fact that we believe the jury

21   should be made aware of as well.

22        THE COURT:  Maybe the way to deal with it is through

23   the witness -- without putting the document in, is to highlight

24   those proper portions and ask the witness whether the letter

25   invited them to come in and give their explanation, for

1    example.  I don't know whether --

2          MR. FRIEDMANN:  I think we would still be objecting to

3    that because the fact that the letter gives us an opportunity

4    to come in and talk with them doesn't prove or disprove any of

5    the allegations in the case; it doesn't tend to prove or

6    disprove that we idled in excess of five minutes.

7          THE COURT:  Well, that's a logic question -- that is

8    relevance -- but it's different from the hearsay objection.

9          MR. FRIEDMANN:  Granted.

10          THE COURT:  I thought you were conceding relevance

11    when you said you would stipulate to the fact of notice and

12    that you responded and so on and so forth.

13          MR. FRIEDMANN:  For the purpose of notice, I said it

14    in my opening that we got the notice and that we responded.  We

15    don't dispute that those occurrences happened.  What we do

16    dispute is that it's relevant that we had an opportunity to

17    come in and attempt to prove to the government that we hadn't

18    done something wrong and that they got to be the judge and say,

19    "No, you still did something wrong, so we're going ahead with

20    trial," and that tends to indicate that we've done something

21    wrong.

22          THE COURT:  Again, this is one of those issues that

23    sounds like it may be perfectly appropriate on a penalty phase

24    when you decide what to do about the evaluation because of the

25    state of mind or whatever of the company.

```
1              MR. SANDS:  If I may, your Honor --

2              THE COURT:  Then why does it go to the existence of a

3      violation?

4              MR. SANDS:  If I may, your Honor, counsel has argued

5      in open court that in response to receipt of notice of

6      violation, that the company took certain and direct actions in

7      response to this notice of violation.  If he's allowed to argue

8      that these were actually taken in response to this notice of

9      violation, I believe the government should be allowed to put

10     into evidence the actual notice of violation to lay the

11     foundation, the context that, in fact, this was issued, that

12     this is what was cited, that they came in, that they had

13     discussions with the agency, that they had an opportunity to

14     respond at that time.

15             THE COURT:  Is that your intention, to try to put that

16     stuff in?

17             MR. FRIEDMANN:  We're not going to put in anything

18     about going in and meeting with the agency and having an

19     opportunity to respond.  The government has raised an issue --

20     they have raised an issue about a reprimand letter -- two

21     reprimand letters that were issued in response to this letter,

22     to the notice of violation, to two employees.

23             And the only context that we're using it in is that we

24     got the notice of violation, and in the letter to our employee

25     it says that there was an allegation made that this occurred
```

```
 1  and so we're sending you a discipline letter.  And we're
 2  certainly going to explain that we sent a discipline letter,
 3  which the government has tried to say is an admission that
 4  we -- that we've admitted that we did these things, that
 5  discipline letter is evidence that we agree with their
 6  position.  So we're only explaining that we got the notice
 7  letter and in response to it --
 8          THE COURT:  Well, who's going to put in the reprimand
 9  letters?
10          MR. FRIEDMANN:  I believe those are being offered
11  today by the government.
12          THE COURT:  When did they come?  What date?
13          MR. FRIEDMANN:  May 16th and April 26th, your Honor.
14  May 16th to Michael Swartz, April 26th to Jim Powers.
15          THE COURT:  Of '06?
16          MR. FRIEDMANN:  Of '06.  Yes.  I'm sorry.
17          THE COURT:  So is Mr. Friedmann correct that the
18  government's view is that those are evidence of acknowledgment
19  of violation and, therefore, that's why they're offered?
20          MR. SANDS:  We do contend that this is -- that those
21  letters are admissions by the company, your Honor, an
22  acknowledgment of the violation.
23          THE COURT:  Okay.  And so in response?  They're
24  already in now.  I mean, hypothetically that puts them in so --
25          MR. FRIEDMANN:  Yeah.  And we're saying, "Why did you
```

1    send the letter?"  We sent the letter because we got this

2    notice from the government that said you've done this.

3            THE COURT:  Okay.

4            MR. FRIEDMANN:  So we've reprimanded two individuals,

5    the individuals that the government cited as allegedly doing

6    these things.

7            THE COURT:  Is that disputed, by the way, that that's

8    why they sent the letters?

9            MR. SANDS:  That appears to be the reason, your Honor.

10   Mr. Daley conducted a three-week investigation after receipt of

11   this notice of violation.  And in order to put that -- the

12   reason why that investigation was done and the reason they took

13   whatever action they took was in response to this notice of

14   violation.

15           THE COURT:  Okay.  So maybe that answers the relevancy

16   question, then.  I guess I see the point there.  So let's go

17   back to the hearsay one.  I guess I'd just leave it.  Some of

18   it might be admissible; some of it isn't.  And if you want to

19   go through it, we can decide whether a proffer of a redacted

20   one sufficiently meets the hearsay problem and that the rest of

21   the non-hearsay that is relevant to this issue that you've just

22   identified can be admitted.

23           MR. FRIEDMANN:  Thank you, your Honor.

24           THE COURT:  But I'd suggest an alternate way of doing

25   that is not using the -- not putting the letter actually in

PDF created with pdfFactory trial version www.pdffactory.com

1    evidence but walking the witness through the parts that are

2    non-hearsay, if she's able to do that.

3               MR. SANDS:  For the letter?

4               THE COURT:  Well, the letter, the notice, whatever.

5               MR. SANDS:  The notice, your Honor, we believe is an

6    exception to the hearsay rule.

7               THE COURT:  The whole thing?

8               MR. SANDS:  The whole thing.

9               THE COURT:  Why?

10              MR. SANDS:  It's a business record.

11              THE COURT:  No.  You mean 803?

12              MS. HANKEY:  803.

13              THE COURT:  803(6).  From memory?  No.

14              MR. SANDS:  It is, in fact, a regularly conducted

15   activity.  It's a routine business document that's maintained

16   by the agency, it was created at the time and by a person with

17   knowledge of the contents of the letter, your Honor.

18              MR. FRIEDMANN:  Certainly in anticipation of

19   litigation.

20              THE COURT:  I don't think it qualifies.

21              MR. SANDS:  There was nothing -- there was nothing in

22   anticipation of litigation, your Honor.

23              THE COURT:  You lose on that one.  So whatever.  I

24   mean, I've given you the scope you can get it in -- or some of

25   it in, anyway.

```
1            MR. FRIEDMANN:  Thank you, your Honor.
2            MR. SANDS:  Just for clarification, I can still ask
3    about the notice?
4            THE COURT:  Yeah, I guess so.  It seems that both
5    parties regard it as relevant to some degree.  Just stay away
6    from the hearsay parts, that's all.
7            (Pause.)
8            THE CLERK:  All rise for the jury.
9            (Jury in at 9:25 a.m.)
10           THE COURT:  Good morning, jurors.
11           THE JURORS:  Good morning.
12           THE COURT:  Again, we appreciate your patience.  There
13   were a couple of things for the lawyers and me to iron out.
14   We've done that, and we're ready to continue with the evidence.
15           Mr. Sands?
16           MS. HANKEY:  The United States calls Christine
17   Sansevero.
18                    CHRISTINE SANSEVERO, sworn.
19           THE CLERK:  Please be seated.  State your name, spell
20   your last name for the record, keep your voice up and speak
21   into the mic so everyone can hear you.
22           THE WITNESS:  Okay.  My name is Christine Sansevero.
23   My last name is spelled S-A-N-S-E-V-E-R-O.
24
25
```

```
 1                        DIRECT EXAMINATION

 2   BY MR. SANDS:

 3   Q.    Good morning, Ms. Sansevero.

 4   A.    Good morning.

 5   Q.    Would you tell us where you are currently employed?

 6   A.    Yes.  I work for the United States Environmental

 7   Protection Agency in the regional office in Boston.

 8   Q.    And what is your current position with the EPA?

 9   A.    I'm currently the acting chief of the Air Technical Unit.

10   Q.    Before we get too far into your work background, I'd like

11   to ask you a little bit about your educational background.  Can

12   you let us know a little bit about your educational background?

13   A.    Sure.  I attended the University of Connecticut, and I

14   received a bachelor's of science in civil and environmental

15   engineering.

16   Q.    Did you receive any academic honors?

17   A.    I did.  I graduated magna cum laude.

18   Q.    In what year did you graduate?

19   A.    In 1995.

20   Q.    And what did you do after graduating from college?

21   A.    I was hired by the United States Environmental Protection

22   Agency in Research Triangle Park, North Carolina, and I worked

23   for the Office of Air Quality Planning and Standards in a small

24   group that analyzes trends in air quality.

25   Q.    And what specifically were your job responsibilities in
```

1    that office?

2    A.   Well, the major responsibility of the group is to take

3    data that's collected from air quality monitoring stations

4    across the country and to analyze that data over time.  The

5    data collects information about pollution levels in the air.

6    And it's useful for us to know how those pollution levels are

7    changing, whether they're improving or declining.  So the group

8    produces an annual report, and that's the primary

9    responsibility, is to analyze that data and summarize it in the

10   report.

11   Q.   And how long were you in that position?

12   A.   I was in that position for a year and a half.

13   Q.   And what was your next -- excuse me.  Why did you leave

14   that position?

15   A.   Well, I was actually given an opportunity to serve in the

16   front office of the Office of Air Quality Planning and

17   Standards doing communication materials.  The office produces

18   quite a number of regulations, regulations designed to reduce

19   air pollution.  And in order to summarize those regulations, it

20   was useful to have someone who had a technical background who

21   could talk to the engineers and take something that was very

22   lengthy and summarize it into a page or two.  And those

23   documents were shared with the public so that, you know, the

24   general public could understand what we were doing, but also

25   with -- excuse me -- with the regulated community.  So I worked

PDF created with pdfFactory trial version www.pdffactory.com

1    on writing those materials.

2    Q.    And how long were you in that position?

3    A.    For approximately a year and a half.

4    Q.    And why did you leave the position as a policy and

5    communications specialist?

6    A.    Well, I was given another opportunity, this time in

7    Washington, D.C., to serve as a special assistant to the

8    assistant administrator for the Office of Air and Radiation.

9    This is the primary office of air issues in the Environmental

10   Protection Agency.  So I moved to Washington, D.C., and became

11   a special assistant.

12   Q.    And what were your job responsibilities as special

13   assistant?

14   A.    Well, there were quite a few, actually, but the primary

15   responsibility is to take the regulatory documents that the

16   assistant administrator would sign.  So these would be, again,

17   regulations designed to reduce air pollution.  They can be of a

18   variety of different sorts.  But the assistant administrator

19   would sign them before they would become effective, and it was

20   my responsibility to review those materials prior to his

21   signature.

22   Q.    And how long were you in that position?

23   A.    I was in that position for six months, which is very

24   typical for a special assistant.  They usually rotate people in

25   every six months or so.

1  Q.   And after you left the assistant administrator's office,

2  what did you do after that?

3  A.   Well, after that I stayed in Washington, D.C.  I was hired

4  permanently there -- again, this is all with the Environmental

5  Protection Agency -- and I started working on -- again, on

6  communication materials in the communications office.  But this

7  time I was certainly more intimately involved in the regulatory

8  development.  At the time the agency was setting new standards

9  for cars and trucks, and I was working with the team of people

10  across the country who were developing those standards.

11  Q.   And how long were you in that position?

12  A.   I was in that position for about two and a half years.

13  Q.   And after leaving that position, is that when you moved to

14  Boston?

15  A.   No.  Actually, one more stop along the way.  I applied for

16  a congressional fellowship, and I was given the opportunity to

17  work in the U.S. Senate for Senator Hillary Rodham Clinton.  At

18  the time she served on the Environment and Public Works

19  Committee, and so I supported her work on that committee.

20  Q.   And what year was that?

21  A.   That was in 2001.

22  Q.   And specifically, what kind of work -- you said you

23  supported her work on the committee.  What kind of work did you

24  do for Senator Clinton's office?

25  A.   Well, it was kind of twofold.  I was doing environmental

1    work.  There were a lot of EPA issues, actually, before the

2    Environment and Public Works Committee.  And so I was familiar

3    with a lot of those issues and provided a lot of background

4    material for the senator so she could be prepared for hearings.

5         But also I was working on energy issues, both

6    transportation and power plants.  There were a lot of issues at

7    the time nationwide, including blackouts in California, that

8    were very relevant for the State of New York.  And I was

9    working on a lot of those issues.

10   Q.   So after you finished your fellowship, is that when you

11   then moved to Boston?

12   A.   Yes.  Then I moved up to Boston, and I was fortunate

13   enough to be hired by the regional office here in Boston.

14   Q.   And so how long have you been here in this regional

15   office?

16   A.   I've been in the regional office about seven years.

17   Q.   And when you first came to the regional office, in what

18   position were you hired?

19   A.   I was hired in a group that is called the Office of

20   Ecosystem Protection, and I was working exclusively on air

21   issues.  In particular, at the time we were developing a

22   voluntary program to reduce pollution from diesel engines.  And

23   I was intimately involved in that work.  It really had two

24   components:  One was retrofitting diesel engines with

25   pollution-control devices to reduce the harmful exhaust from

1    the vehicles, and the second component was to educate,

2    particularly schools and school bus operators, about the need

3    to not idle vehicles.

4    Q.    And how long were you in environmental -- excuse me, an

5    environmental engineer?

6    A.    Well, I was in that position, in the Office of Ecosystem

7    Protection, for four years.

8    Q.    What did you do after that?

9    A.    And then after that I was promoted to become the senior

10   enforcement coordinator for the Air Technical Unit, which is

11   the unit in the region that oversees all of the air enforcement

12   activity in New England.

13   Q.    And as a senior enforcement coordinator, what are your

14   responsibilities?  What were your responsibilities?  Excuse me.

15   A.    Well, again, there's many, but the primary responsibility

16   is to oversee the work of the air inspectors.  We have about

17   six who conduct field work.  They go out to facilities, and

18   they evaluate whether these facilities are complying with the

19   regulations.  If they're not, then we would develop an

20   enforcement action and very likely collect penalties.

21   Q.    And do you have supervisory responsibilities as a senior

22   enforcement coordinator?

23   A.    Yes.  The individuals in the group don't report directly

24   to me as the senior enforcement coordinator; they report to my

25   supervisor, who's the chief of the unit.  But I oversee their

1    work and really decide in large part where they're going to go

2    and what they're going to do in terms of the inspection

3    activity.

4    Q.    And how long did you serve in the position as a senior

5    enforcement coordinator?

6    A.    I was in that position for about four years.

7    Q.    And then what did you do after that?

8    A.    Well, recently, in February, I was promoted to become the

9    acting chief of the unit.  And that's the current position that

10   I'm serving in.

11   Q.    And your job responsibilities as acting chief of the unit?

12   A.    Well, they're actually very similar.  As it turns out, the

13   position of the senior enforcement coordinator -- because of

14   lack of resources, we haven't been able to fill that position,

15   so I'm actually serving as both the senior enforcement

16   coordinator and the unit chief currently.

17   Q.    Do you get paid for both positions?

18   A.    Unfortunately, no.

19   Q.    Do you still have direct supervisory -- you have direct

20   supervisory responsibilities for the environmental engineers

21   and the inspectors?

22   A.    Yes, now I do.  I would write their performance reviews,

23   and they would report directly to me on all issues related to

24   inspections or enforcement.

25   Q.    So in total how many years have you worked for EPA?

1    A.    Fourteen years.

2    Q.    And during that entire tenure have you always worked with

3    the Clean Air Act?

4    A.    Yes.

5    Q.    Can you provide, for the benefit of the jury, just a brief

6    overview of what the Clean Air Act provides?

7    A.    Sure.  It's actually very simple.  It's a very complex

8    document, but it's a very -- it has a very simple purpose,

9    which is to protect public health and the environment by

10    reducing pollution from the air that we breathe.

11    Q.    And how does the act do that?

12    A.    Well, there's -- again, it's a complex document.  It's --

13    one of its primary purposes is to set national ambient

14    air-quality standards for six pollutants for which the agency

15    has established that there are health effects associated with

16    exposure to these pollutants.  And so the act directs the

17    agency to set limits that would protect public health and the

18    environment, and then directs both the federal government and

19    the state governments to implement regulations to meet those

20    limits.

21    Q.    When you say "directs state and local governments to meet

22    those limits," do the states have any role in enforcement of

23    the Clean Air Act?

24    A.    Yes.  In fact, they play a very key role.  We work in

25    close partnership with the state and the local agencies.  The

1    Clean Air Act directs states -- all states -- to develop what's

2    called a State Implementation Plan and submit that plan to EPA

3    for approval.  And in that plan the state effectively outlines

4    all the ways in which they're going to reduce pollution from

5    the sources in their state to meet those national standards.

6    Q.   And does the Commonwealth of Massachusetts have one of

7    those state implementation plans?

8    A.   Yes, indeed.

9    Q.   And you say that they develop these, but are these plans

10   submitted to EPA?  Are they approved by EPA?

11   A.   Yes.  The act requires the states to develop the plans,

12   and then it requires the EPA review all of the components of

13   those plans.  So if -- and the reason is that if a state were

14   to put a regulation in the plan that we, EPA, didn't think was

15   going to be effective or didn't think was actually going to

16   reduce pollution in the way the state thought it would, then

17   EPA would comment on that regulation and perhaps the state

18   would revise the regulation so that it then could be approved

19   into the plan.

20   Q.   And the Commonwealth of Massachusetts, their state

21   implementation has been approved by the EPA; is that correct?

22   A.   Yes.  And it's a living, breathing document.  There are

23   changes that are made to it all the time in terms of the

24   state's -- as EPA revises the national ambient quality air

25   standards, which it's also directed to do under the act, there

1   may be a need to appropriate new regulations.  And the state

2   would then submit those to the EPA for approval, and we would

3   go through that whole process.

4   Q.   And is the Massachusetts idling regulation a part of the

5   Massachusetts State Implementation Plan?

6   A.   Yes, it is.

7   Q.   This is a state regulation, correct?

8   A.   Yes, it's a state regulation, but because it has been

9   approved by EPA into the State Implementation Plan, both EPA

10  and the state can enforce this regulation.

11  Q.   And if EPA decides to enforce the regulation, do they

12  provide notice to the state?

13  A.   Yes.  Actually, the Clean Air Act, I think, envisioned

14  that, and it requires the -- it requires EPA to issue what's

15  called a notice of violation.  And it really -- that document

16  really serves three purposes:  One is to notify the state that

17  EPA is enforcing a regulation contained in the SIP -- the State

18  Implementation Plan -- excuse me; the second is to notify the

19  facility that we've identified violations at their location;

20  and the third is really to give the facility an opportunity to

21  meet with us if they so choose.

22  Q.   So the Massachusetts idling regulation.  Have you ever had

23  occasion to conduct an inspection under the Massachusetts

24  idling regulation?

25  A.   Yes, I have.

1    Q.    And approximately how many have you conducted?

2    A.    About half a dozen.

3    Q.    And was that in your capacity as the -- as an

4    environmental engineer or acting chief?

5    A.    Actually, in my capacity as senior enforcement

6    coordinator, one of the additional roles is -- we're a small

7    group, so I conduct a number of inspections myself in addition

8    to overseeing the work of the inspectors in the group.  So in

9    addition to idling inspections, I conduct other inspections as

10   well.

11   Q.    And you said that you also work with other inspectors in

12   the group.  Have you been involved in other idling inspections

13   other than the six that you personally conducted?

14   A.    Yes, I have.  I've been involved in some way in all of

15   them.

16   Q.    And can you give us an estimate, or can you give us a

17   number, of how many idling inspections your unit conducts each

18   year?

19   A.    It varies from year to year.  I wouldn't know an exact

20   number that we've conducted every year.  I do know that since

21   2005, which is when I began my tenure as senior enforcement

22   coordinator, up to the present time we've conducted about 250.

23   Q.    And of those 250 idling inspections, how many of those

24   have been in the Commonwealth of Massachusetts?

25   A.    I think it's about 175.

1  Q.    And of those 175, how many have you been involved in,

2  either conducted or been involved in in some supervisory

3  capacity?

4  A.    All of them.

5  Q.    Is there a standard procedure for how an idling inspection

6  is conducted in the state of Massachusetts?

7  A.    Yes.   Idling inspections are very straightforward.

8  Essentially, what we do is, once we decide where we're going to

9  go, we would arrive at the location -- each location is going

10  to be a little bit different, but we'd find a safe place to

11  park our vehicle -- we would observe the circumstances.  If

12  there are vehicles idling we would note the time, and then we

13  would continue to observe until either the vehicles are turned

14  off or they depart from the lot.

15      And they may not -- that may not all happen at the same

16  time, but, you know, we would note each individual vehicle as

17  we were taking the observation.

18  Q.    When you say "observe," would you go up to the facility

19  and physically look in or --

20  A.    Well, it depends.   Each situation is unique.   We do

21  these -- we do these inspections unannounced; in fact, we do

22  most all of our inspections unannounced, but idling inspections

23  are a little bit different in the sense that we don't actually

24  approach the facility.   And the reason that is, is that it

25  would necessarily change their behavior.

1    Q.    Can you explain that a little for me?

2              MR. FRIEDMANN:  Objection, your Honor.  Speculation as

3    to what third parties would do.

4              THE COURT:  Overruled.

5              THE WITNESS:  So we would arrive at the facility.  And

6    if we were to go up to the facility and say "We're here to

7    conduct an idling inspection," it's very likely they would just

8    turn off their vehicles.  And while that may have a short-term

9    environmental benefit, it would impede our ability to determine

10   whether there's actually a -- you know, a repetitive behavior

11   that's happening at this location.  You know, we want to try to

12   evaluate really what's happening.  Is this a one-time

13   occurrence?  Is there perhaps a reason?  And, you know, we want

14   to sort of collect that information before we would consult

15   with the facility.

16   BY MR. SANDS:

17   Q.    And is it standard procedure to go to a facility one time

18   or do you go multiple times?

19   A.    We would go multiple times.  And it really depends, you

20   know, on the circumstances.  But, you know, in order to collect

21   information that's accurate and is representative of what we

22   think the behavior is, the more observations we have, the

23   better.  So we would conduct multiple observations at a

24   particular location.  Sometimes we would go to more than one

25   location owned by the same facility to see if the behavior is

1    happening, perhaps, in more than one place.

2    Q.   And generally how does EPA determine which facilities it

3    chooses to inspect under the idling regulation?

4    A.   Well, it's an important effort in our office, and it is a

5    big part of what we do in the air program.  We're very

6    concerned about the health effects associated with exposure to

7    diesel exhaust, and so we've made this a priority for our

8    office to try to reduce pollution from idling diesel vehicles.

9    And as a result, we begin our focus at the beginning of each

10   fiscal year by looking at various types of vehicles or even

11   particular locations.

12        So, for example, we had an initiative for a number of

13   years to focus on shuttle busses and tour busses and transit

14   busses.  More recently, we've had an initiative to focus on

15   trash haulers.  So we would decide at the beginning of the year

16   what facilities we're going to inspect, and then we would plan

17   that out over the course of the year and assign the

18   inspections.

19   Q.   Are there any other ways in which EPA becomes aware or

20   decides on which facilities to inspect?

21   A.   Yes.  In fact, we receive a number of tips and complaints.

22   Not just diesel idling complaints but, you know, oftentimes

23   there's a number of diesel idling complaints.  And we would --

24   depending on the nature of the complaint, we might actually go

25   and do an inspection.  It would depend on the information we

PDF created with pdfFactory trial version www.pdffactory.com

1  receive.

2  Q.    You mentioned earlier that you've been involved in, in

3  some capacity, all 170-plus inspections in the state of

4  Massachusetts since 2005; is that right?

5  A.    Correct.

6  Q.    Have any of those inspections involved bus companies other

7  than Paul Revere?

8  A.    Yes, many of them have involved bus companies.  As I

9  mentioned, we had an initiative to focus on bus companies, so

10 we did issue a number of enforcement-related documents to other

11 facilities as well.

12 Q.    And do any of those -- did any of those inspections

13 involve facilities with older busses, say busses manufactured

14 before 1998?

15 A.    Yes.

16 Q.    And is it your understanding, based upon your experience,

17 that these older busses are generally unable to comply with the

18 idling regulation?

19 A.    No, not at all.  The regulation doesn't specify the age of

20 the vehicle; in fact, it doesn't even specify the type of the

21 vehicle.  All vehicles, whether they're gasoline-powered or

22 diesel-powered, have to comply.  So regardless of the age of

23 the vehicle, they're required to comply with the Massachusetts

24 idling reg.

25 Q.    Do you know whether older vehicles have more difficulty

PDF created with pdfFactory trial version www.pdffactory.com

1  complying with the law?

2  A.   My experience has been that as long as the vehicles are

3  properly maintained, they really shouldn't have a problem

4  complying.

5  Q.   Were you -- were you senior enforcement counsel *[sic]* at

6  the time the inspections at the Paul Revere facility took place

7  in 2006?

8  A.   Yes, I was the senior enforcement coordinator.

9  Q.   And you worked with Mr. Mohamoud?

10  A.   Yes, I did.

11  Q.   And can you tell us how this inspection came about, why

12  you inspected this facility at that time?

13  A.   Sure.  It was actually a little bit different than some of

14  our other idling inspections.  At the time we did have an

15  initiative to focus on busses, and Mr. Mohamoud had been

16  conducting a number of those inspections.  And he was driving

17  by the Paul Revere facility one day -- he actually lives

18  nearby -- and he noticed that the busses were idling.  So when

19  he returned to the office, he asked me if it would be okay to

20  go back and to further investigate.  And I encouraged him to do

21  so.

22  Q.   And did you consult with Mr. Mohamoud during the course of

23  that inspection?

24  A.   Yes, I did.

25  Q.   And how long did that inspection take?

1   A.   We were at the facility for seven consecutive weeks.

2   Q.   As part of that inspection, was Mr. Mohamoud required to

3   record the temperature on the days that he inspected the

4   facility?

5   A.   No.

6   Q.   And why not?

7   A.   Well, the Massachusetts idling regulation does not contain

8   a temperature limit.

9   Q.   Was this the first time that Paul Revere facilities had

10  been alleged to violate the Massachusetts idling regulation?

11  A.   No.

12  Q.   Can you describe the other instances?

13          MR. FRIEDMANN:  Objection.

14          THE COURT:  Sustained.

15  BY MR. SANDS:

16  Q.   Was there another -- was there a particular instance when

17  the facility was accused of -- was alleged to have violated the

18  idling regulation?

19          MR. FRIEDMANN:  Objection.

20          THE COURT:  Sustained.

21  BY MR. SANDS:

22  Q.   Has the agency ever had an administrative settlement with

23  Paul Revere on -- regarding a violation to the Massachusetts

24  idling regulation before?

25  A.   Yes.

1    Q.    And when was that?

2    A.    It was in 2002.

3    Q.    And can you describe what happened in that case?

4            MR. FRIEDMANN:  Objection.

5            THE COURT:  Let me see you at the side, please.

6            (Discussion at sidebar and out of the hearing of the

7    jury:)

8            MR. FRIEDMANN:  She has no personal knowledge.  In her

9    deposition she told us she has no personal knowledge.  She

10   wasn't in the region at the time the enforcement action even

11   took place.

12           MR. SANDS:  She was in the region.

13           MR. FRIEDMANN:  She was in the region, but she didn't

14   have any personal knowledge of what the events were or weren't,

15   so she has no personal knowledge on this subject.

16           MR. SANDS:  She was a supervisor at the time in 2006,

17   so in that capacity she would be aware that an administrative

18   action was taken against the company in 2002.

19           MR. FRIEDMANN:  But you asked --

20           THE COURT:  You're asking about the contents of the

21   settlement, right, the details?

22           MR. SANDS:  Right.  So what happened in the case.

23           MR. FRIEDMANN:  What happened is different than there

24   was a settlement.  For her to say what happened, she would have

25   to --

```
 1              THE COURT:  What did happen?  Just so I know.
 2              MR. FRIEDMANN:  They had one bus over at the airport,
 3     that as part of an enforcement action --
 4              MR. SANDS:  More than one bus.
 5              MR. FRIEDMANN:  There was one Paul Revere bus that you
 6     guys cited.
 7              MS. HANKEY:  No, there was more than one bus.
 8              MR. FRIEDMANN:  Obviously, I wasn't there.  So
 9     Ms. Sansevero -- I don't have personal knowledge of it.
10              THE COURT:  And?
11              MR. FRIEDMANN:  And we entered into a consent decree
12     with a fine, I believe, of $20,000, or somewhere in that
13     neighborhood.
14              THE COURT:  What's the point here?
15              MR. SANDS:  Mr. Friedmann raised during his opening
16     that there, in fact, was an administrative settlement with the
17     agency in 2002, and in response to that the company instituted
18     all these procedures for how to deal with this.  This is
19     establishing --
20              THE COURT:  Okay.  But do we need -- so what would she
21     say?  Let me ask that.
22              MR. SANDS:  She would say there was an allegation that
23     they were idling at Logan Airport and there was an
24     administrative settlement and they paid a penalty.
25              MR. FRIEDMANN:  We don't dispute that piece of it, if
```

1    that's all it is, but for her to say --

2          THE COURT:  If that's all she's going to say, fine.

3          MR. FRIEDMANN:  If it's limited to that.

4          THE COURT:  I just don't want to try another case.

5    That's my concern, okay?  All right.

6          (In open court:)

7    BY MR. SANDS:

8    Q.    Ms. Sansevero, again, we were talking about the

9    administrative settlement in 2002 with Paul Revere.  What was

10   the result of that?

11   A.    Well, there was an administrative settlement, and Paul

12   Revere paid a penalty for the violations that we identified.

13   They were at Logan Airport -- the busses -- their busses that

14   they owned were idling at Logan Airport.

15   Q.    So it was for violations for the same Massachusetts idling

16   regulation, correct?

17   A.    Yes.

18   Q.    Earlier you mentioned that the agency is required to issue

19   a notice of violation when it alleges that a facility or a

20   company has violated the Clean Air Act, correct?

21   A.    Correct.

22   Q.    And you explained a little bit about what the purpose of

23   the NOV is.  Can you reiterate, I'm sorry, what's the purpose

24   of the NOV?

25   A.    Sure.  It really serves three purposes:  One is to notify

1    the state that EPA is enforcing one of the regulations

2    contained in their State Implementation Plan; the second

3    purpose is to notify the facility that we've identified

4    violations at their location; and the third is to give the

5    facility an opportunity, if they so choose, to come in and meet

6    with us.

7    Q.   And you also testified earlier that it's the standard

8    procedure not to approach personnel at the facility while

9    you're conducting the investigation; is that correct?  The

10   inspection, excuse me.

11   A.   Right.  For idling inspections we would not approach the

12   facility until after we have completed all of the inspections.

13   Q.   But the company is afforded the opportunity to come in and

14   talk to EPA at some point after the NOV is issued, correct?

15   A.   Absolutely.

16   Q.   And is the information that is gathered during these

17   meetings, if the company chooses to take advantage of it,

18   considered by the agency when it's deciding whether or not to

19   pursue an enforcement action?

20   A.   Absolutely.

21   Q.   And in this particular instance after the 2006 inspection

22   of Paul Revere, was an NOV issued to Paul Revere in connection

23   with the 2006 inspection?

24   A.   Yes.  In fact, we concluded our investigation on April

25   12th and we issued the notice of violation on April 13th.  So

1   it was issued right away after we concluded the investigation.

2   Q.   And part of that NOV was giving them an opportunity to

3   come in and talk to the agency, correct?

4   A.   Correct.

5   Q.   Did they take advantage of that opportunity?

6   A.   Yes, they did.

7   Q.   And were you part of that discussion?

8   A.   Yes, I was.

9   Q.   And did Paul Revere offer any explanations of why the

10  idling of the busses was necessary?

11          MR. FRIEDMANN:  Objection, your Honor.

12          THE WITNESS:  No.

13          THE COURT:  No, you may have it, but you'll have to

14  identify who it was on behalf of the company rather than just

15  general.

16  BY MR. SANDS:

17  Q.   Who on behalf of the company met with you on that

18  occasion?

19  A.   Richard Daley and Richard Brown, the principal.

20  Q.   Anyone else?

21  A.   No.

22  Q.   And, again, at that conference did Paul Revere -- let me

23  ask you this:  Did Paul Revere ever deny during that conference

24  that the idling was occurring?

25          MR. FRIEDMANN:  Objection, your Honor.

1          THE COURT:  Overruled.

2          THE WITNESS:  No, they did not.

3    BY MR. SANDS:

4    Q.    And did they offer you any explanation as to why the

5    idling was, in fact, necessary?

6    A.    No, they did not.

7          MR. FRIEDMANN:  Objection.

8          THE COURT:  Overruled.

9    BY MR. SANDS:

10   Q.    Did they give you any explanation for the idling at all?

11   A.    They did.  What they explained to us was that there was an

12   individual at the facility who, as it turns out, was actually

13   the same individual who was making announcements every day

14   about the five-minute anti-idling limit, but he didn't -- I

15   think they said didn't connect the dots.  And as a result, he

16   had directed people at Paul Revere to go around and start the

17   busses and let them run each morning.

18   Q.    And did you consider the information that Paul Revere

19   provided during that meeting when deciding whether or not to

20   pursue this enforcement action?

21   A.    Yes, we did.

22   Q.    And how many NOVs for idling violations would you estimate

23   that the agency has issued?

24   A.    We've issued about two dozen.

25   Q.    And in each of those instances does EPA always initiate an

1    enforcement action whenever an NOV is issued?

2            MR. FRIEDMANN:  Objection, your Honor.

3            THE WITNESS:  No.

4            THE COURT:  Sustained.

5            MR. FRIEDMANN:  The answer --

6            THE COURT:  The answer will be stricken.  The jury

7    will disregard the answer.

8    BY MR. SANDS:

9    Q.   Let me ask it more generally.  Does EPA initiate an

10   enforcement action in every instance when an NOV is issued?

11           MR. FRIEDMANN:  Objection.

12           THE COURT:  Sustained.

13   BY MR. SANDS:

14   Q.   In your experience has EPA always issued -- excuse me --

15   pursued an enforcement action whenever an NOV has been issued?

16           THE COURT:  The objection is sustained.

17           MR. FRIEDMANN:  Thank you, your Honor.

18   BY MR. SANDS:

19   Q.   Let me ask an even broader question.  Does EPA enforce

20   every instance where a vehicle in the Commonwealth of

21   Massachusetts has been idling for more than five minutes?

22           MR. FRIEDMANN:  Objection.

23           THE COURT:  Sustained.

24   BY MR. SANDS:

25   Q.   In your experience, your personal experience with the

```
 1    agency, has EPA always initiated an enforcement action whenever
 2    an allegation of a vehicle idling for more than five minutes
 3    has been brought?
 4              MR. FRIEDMANN:  Objection.
 5              THE COURT:  The objection is sustained.
 6              Move to a different line of inquiry.
 7    BY MR. SANDS:
 8    Q.   Let me ask you, Ms. Sansevero, have there been any
 9    subsequent inspections of the Paul Revere facilities?
10    A.   Yes.
11    Q.   When was that?
12    A.   There have been several, actually.  There were a few after
13    we issued the notice of violation.  And we conducted one
14    recently, actually, this year, and I believe we conducted one
15    in 2007 as well.
16    Q.   And were any violations found during those inspections?
17              MR. FRIEDMANN:  Objection, your Honor.
18              THE COURT:  Overruled.
19              THE WITNESS:  No.
20              MR. SANDS:  No further questions at this time, your
21    Honor.
22                         CROSS-EXAMINATION
23    BY MR. FRIEDMANN:
24    Q.   Good morning.
25    A.   Good morning.
```

```
1    Q.   There are seven instances in this case that Mr. Mohamoud

2    made observations of that the EPA is claiming are violations,

3    correct?

4    A.   Yes.

5    Q.   Okay.  Were you present with him on any of those seven

6    occasions?

7    A.   No.

8    Q.   So you have no personal knowledge of what took place on

9    any of those seven days?

10   A.   No.

11   Q.   You have no personal knowledge of where he stood or what

12   actions he took, do you?

13   A.   No.

14   Q.   You have no personal knowledge of what the necessity or

15   lack of necessity was for any of the busses that were running

16   that day, do you?

17   A.   I wouldn't agree with that.  I have personal knowledge

18   from the meeting that I attended with Paul Revere in which they

19   didn't provide any explanation for why the idling might be

20   necessary.

21   Q.   Isn't it true that Paul Revere told you that Mr. Powers

22   was starting the vehicles to make sure that they would operate

23   properly and so that they would build up heat and they would be

24   able to meet their runs for the service that day?

25   A.   That's not my recollection.
```

1    Q.    Okay.  You would agree with me, wouldn't you, though, that

2    on those seven days that are the charged seven days from

3    Mr. Mohamoud's observations, that you have no personal

4    knowledge of anything that occurred at the site?

5    A.    Yes.

6    Q.    Okay.  And there are some additional dates that the

7    government is claiming that Paul Revere had violations on,

8    correct?

9    A.    Well, yes.  There's a past violation from 2002.

10   Q.    Do you have any personal knowledge on any of those

11   occasions as to any operation of any Paul Revere vehicle in

12   excess of five minutes?

13   A.    I didn't personally conduct the inspections; no.

14   Q.    So you don't have any personal knowledge one way or

15   another?

16   A.    No.

17   Q.    Now, were you the person that trained Mr. Mohamoud how to

18   do the inspections or was that somebody else?

19   A.    Well, all of our inspectors receive training before they

20   conduct any field work.  At a minimum, they receive basic

21   inspector training and health and safety training.

22   Q.    So was that you or was that someone else?

23   A.    Well, it's not me personally.

24   Q.    Okay.  That's what I was asking.  So you're not familiar

25   with the training that he got?

```
 1   A.    Well --
 2   Q.    I'll strike that.
 3   A.    No, I'm very familiar with the training.  I've taken it
 4   myself, so I'm very familiar with the training.
 5   Q.    One of the things that you said is that each location is
 6   different, right?
 7   A.    Correct.
 8   Q.    Okay.  And that you go there and you observe, right?
 9   A.    Correct.
10   Q.    And then you collect the reason, right?
11   A.    We collect the data; correct.
12   Q.    Well, I thought you said the word "reason."  You collect
13   the reason.
14   A.    I don't believe I said that.
15   Q.    Do you collect any knowledge about the operation -- strike
16   that.
17         Do you know what knowledge of Paul Revere's operation
18   Mr. Mohamoud collected?
19   A.    Well, I meet with my inspectors upon their return to the
20   office.  I met with Mr. Mohamoud upon his return to the office
21   after conducting these inspections, and we discussed what it
22   was that he observed and how it is that he conducted the
23   inspection.
24   Q.    Did he receive any training on how a bus functions before
25   he went out and did these inspections?
```

1  A.    No.

2         MR. FRIEDMANN:  Those are all the questions I have at

3  this time, your Honor.

4         THE COURT:  All right.  Mr. Sands, anything?

5                     REDIRECT EXAMINATION

6  BY MR. SANDS:

7  Q.   Ms. Sansevero, you just stated there were seven instances

8  when Mr. Mohamoud went out and inspected the facility; is that

9  correct?

10 A.   Correct.  There were actually more than seven, the seven

11 prior to issuing the notice of violation.  We conducted a few

12 inspections after that.

13 Q.   And were those on seven consecutive days?

14 A.   No.

15 Q.   How were the seven inspections spaced out?

16 A.   It was one inspection a week for seven weeks.  It wasn't

17 the same day every week.  Quite frankly, it was when it was --

18 it would fit into the inspector's schedule.  But we had

19 discussed the overall approach, that he would conduct a number

20 of inspections and that it would make sense to go multiple

21 times in consecutive weeks.

22 Q.   And you also mentioned you did have regular discussions

23 with Mr. Mohamoud during the course of these inspections?

24 A.   Yes.  I always try to talk to all of my inspectors upon

25 their return to the office.  It's not always possible, but it's

1  very helpful for me as -- either in my role as senior

2  enforcement coordinator or as the manager of the unit to know

3  whether the inspectors have encountered any issues that --

4  health and safety issues or, you know, issues specific to the

5  case that may be relevant.  So I do try to have those

6  discussions as much as possible.

7  Q.    And you also talked about the fact there was a prior

8  action in 2002; is that correct?

9  A.    Yes.

10  Q.    And that was -- what was the result of that, again?

11  A.    That was an administrative settlement in which Paul Revere

12  paid a penalty for idling vehicles at Logan Airport.

13  Q.    And as part of the inspection training, do you receive

14  training on how every single facility that you inspect

15  operates?

16  A.    No, we don't.  And, again, as I mentioned, idling

17  inspections are very straightforward.  The Clean Air Act is a

18  very complex document, and our inspectors are trained in a

19  variety of different aspects of the act and the regulations

20  associated with it, some of which are incredibly complex.  But

21  idling inspections are about as straightforward as it can get

22  in terms of an inspection.

23  Q.    And, again, when Paul Revere came in and talked to you

24  after the issuance of the NOV, did they explain how the

25  functions of their operations necessitated the idling?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.    No, that's not the explanation --
 2              MR. FRIEDMANN:  Objection.
 3              THE COURT:  Overruled.
 4              THE WITNESS:  That's not the explanation that they
 5   offered.
 6              MR. SANDS:  Thank you.
 7              No further questions, your Honor.
 8              MR. FRIEDMANN:  No further questions, your Honor.
 9              THE COURT:  All right.  Thank you, ma'am.  You may
10   step down.
11              (The witness is excused.)
12              MS. HANKEY:  Can we go to sidebar, your Honor?
13              (Discussion at sidebar and out of the hearing of the
14   jury:)
15              THE COURT:  I'll give you back your document.
16              MS. HANKEY:  Thank you.
17              THE COURT:  You --
18              MS. HANKEY:  I think we talked about this yesterday.
19   What we have left is the deposition designations after you rule
20   on --
21              THE COURT:  I haven't had time to look at them.  So I
22   guess if you're going to get there I'm going to have to look at
23   them, so we'll have to take a break.
24              MS. HANKEY:  And then moving documents into evidence.
25              THE COURT:  Let me ask you this:  Do you have an
```

```
 1    estimate, if you got all of the reading that you wanted to do

 2    in, how long it would take?

 3            MS. HANKEY:  No.

 4            MR. FRIEDMANN:  And I'd ask you also whether you're

 5    including the counter-designations also in your time just so --

 6    there's some designations and counter-designations, just so

 7    your Honor is aware of that.

 8            THE COURT:  Yeah.  I've looked very cursorily at what

 9    you've given me, but I haven't gone through it to rule on any

10    objections.  We'll also have to discuss the broad -- there's a

11    group of them, as to which there's a more general objection.

12    Am I right about that?

13            MR. FRIEDMANN:  Right.  There's two general

14    objections, and then more specific within --

15            THE COURT:  Why don't we excuse the jury and deal with

16    that question, and then -- it may take a while to go through

17    this because I don't know the volume of it.

18            MR. FRIEDMANN:  It's about -- I can show your Honor

19    the list of it.

20            THE COURT:  We'll just do that.

21            MR. FRIEDMANN:  I think the reading would probably be

22    about an hour or so.

23            THE COURT:  Do you have an estimate of how many pages

24    or anything like that?

25            MS. HANKEY:  I can't remember.
```

1           MR. SANDS:  It's about this thick, double-sided.

2           MR. FRIEDMANN:  We think it's an hour to an hour and a

3    half, if everything is going to be --

4           MS. HANKEY:  If you include the counter-designations,

5    it probably is, like, 200 pages.

6           THE COURT:  That will take a while.

7           MR. FRIEDMANN:  I'm the eternal optimist.

8           THE COURT:  All right.  We'll excuse the jury and

9    we'll talk about the general objection, the collective one, and

10   then I'll deal with the other ones one by one.

11          (In open court:)

12          THE COURT:  Jurors, I'm going to excuse you for a

13   little bit while we resolve something.

14          So we'll do that.  Mr. Clerk?

15          THE CLERK:  All rise for the jury.

16          (Jury out at 10:12 a.m.)

17          THE COURT:  Okay.  Mr. Friedmann, I think you should

18   start off since it's your objection to the --

19          MR. FRIEDMANN:  Your Honor, we had raised two general

20   objections, and then there were also certain specific

21   evidentiary issues with regard to certain components.  In

22   addition, we have done counter-designations, some of which the

23   government has objected to.

24          So I guess to work through the various levels of it,

25   we had raised a general objection under Rule 32(a) to the use

1    of deposition testimony.  And at the time we believed, because

2    certain witnesses had been subpoenaed, that they would be

3    testifying live.  To the extent that these witnesses are not

4    now being called live by the government, we're reserving on the

5    issue of whether the 30(b)(6) designees could or could not

6    testify through their depositions only.  I know the First

7    Circuit has expressed a preference that witnesses, even

8    30(b)(6) witnesses that are -- that you want to use their

9    transcripts of, that they testify live and not come in two

10   times.

11        But it appears that the government, if I understand

12   from them correctly, are not going to be calling these people.

13   So if the government is telling me today that these people are

14   not being called live, then I'll withdraw that argument, but if

15   they're still intending to bring them live, then it's still a

16   live issue.

17        THE COURT:  All right.  I think we have the answer,

18   but would you confirm it?

19        MS. HANKEY:  Yeah.  I think the way that you have set

20   up the burden-shifting scenario, the only way that they would

21   be called is as rebuttal witnesses.  And I guess

22   additionally -- I guess the question is we can't call a

23   30(b)(6) witness at trial.  There's no procedure under which --

24   we can call a person who testified under Rule 30(b)(6), but

25   they would not be coming into court and testifying as someone

1    who is a designated agent of Paul Revere.

2         MR. FRIEDMANN:  I'm not sure I agree with that legally

3    conceptually.

4         THE COURT:  I'm not sure it matters legally.

5         (Laughter.)

6         MR. FRIEDMANN:  My point is, your Honor, the

7    government's designation consisted of two components:  It

8    consisted of 30(b)(6) designees, which was the first group of

9    individuals, and then you got to a second group of individuals

10   who were not 30(b)(6) designees.  I would note that there is an

11   exception in our mind to that that we would say that Richard

12   Daley, who also goes by Doc Daley, who was deposed twice

13   because of his position with the company -- we would say even

14   though he wasn't a 30(b)(6) designee, he falls into the first

15   category.  We don't dispute that.

16        THE COURT:  So you would concede that he's a Rule 32

17   witness?

18        MR. FRIEDMANN:  Correct.  Correct.

19        However, what we then get to under Rule 32 is the

20   issue on these other witnesses like Garvin Andrews or people

21   like this who -- individuals who were part-time employees --

22   bus drivers, mechanics, things of that nature -- which we would

23   say would not fall under the Rule 32(a)(3) components for

24   admissibility.

25        By example, if we have somebody who is a bus driver

1    and works only on weekends for us, that's a far stretch to say

2    he's in part of the control group and that his statements would

3    be ascribed to us and then would be admissions against interest

4    on it.  So that's the second group.

5        What we did, your Honor, was we designated on the

6    materials themselves an objection, which was the general

7    objection beginning with Designee No. 9.  What we did is, we

8    gave you -- the government gave us their designations, we put

9    it onto a spreadsheet that listed them by number along with

10   their name, and then listed the designation, our objection, the

11   counter-designation, and then the government gave us their

12   objection to our counter-designation.  So you would have

13   different fields across each page.  But the witnesses were

14   numbered so that it would just make it a little easier.

15       So the first eight would be the ones that we would

16   consider the 30(b)(6).  Beginning at Number 9 are the ones that

17   we have the 30(a)(3) objections to.  Some of these are former

18   employees of ours, some of them are current employees, but also

19   are of a position that are not in management, for the most

20   part.  Mr. Swartz is perhaps the differential there.

21   Mr. Swartz is considered management.  He's an assistant manager

22   of the Roxbury facility.

23       But with regard to the rest of them, if you go to

24   Mr. Powers, he's a part-time employee, paid on an hourly basis,

25   works four hours a day; Greg Roland is a former mechanic, does

1    not work for the company anymore.

2            THE COURT:  Let me just ask:  Is there any controversy

3    as to whether the deponents from 9 on, if that's the way to

4    classify them, would not meet 30(a)(3)?

5            MS. HANKEY:  We are not seeking to admit them as

6    deposition witnesses.

7            THE COURT:  So there's no question they're outside of

8    32(a)(3)?

9            MS. HANKEY:  Right.  The statements are all being

10   sought to be admitted as statements of a party -- admissions of

11   a party opponent, and under 801 --

12           THE COURT:  Right.  I understand that.  I just wanted

13   to cut short the one-by-one exclusion, if there's no argument

14   that they should be included under 32(a)(3).

15           MR. FRIEDMANN:  I would suggest, your Honor, that 801

16   doesn't necessarily make the deposition transcript --

17           THE COURT:  That's the next question.  There's no

18   question about whether it's admissible -- these are admissible

19   under 32.  They're not offered under 32.  So the next question,

20   then, is whether they're otherwise admissible.

21           MR. FRIEDMANN:  Right.  And that's my point, is

22   they're seeking to admit them under 32.

23           THE COURT:  Right.  I understand.

24           MR. FRIEDMANN:  Even though they're saying it

25   qualifies under 801 -- 801, it could qualify as live testimony.

1    It could be a letter; it could be almost any form.  But when an

2    801 is brought in through a deposition transcript, then you use

3    Rule 32 and its constraints which provide for completeness, et

4    cetera.  And that's my point --

5         My point on it is even if they're right -- which I'm

6    not conceding the 801 position, but even if they were right on

7    that, that's just the qualifying event.  But when you go to try

8    to admit it through a deposition transcript, unlike having the

9    person admit it on the stand or from a letter or some other

10   mechanism that they may have, you have to qualify it still

11   through Rule 32.  And 32 says if they put it in, we get to

12   designate for completeness and we get -- in fact, 32 goes a

13   little farther, in subdivision 6, (a)(6), saying that "and any

14   party may itself introduce any other parts."

15        And so even if the government disputes our

16   counter-designations as completeness, we still get to introduce

17   the other parts anyway.  So I think it -- unless, of course,

18   there's some other evidentiary objection that they have that

19   they've preserved.

20        MS. HANKEY:  I guess I don't agree that that's the

21   interpretation of 30(a)(2).  In fact, I did research it and

22   couldn't find a single case or treatise that said that was the

23   proper interpretation of (a)(2), and that (a)(2) was simply a

24   rule of completeness.

25        I believe that that last phrase is simply referring to

1   the fact that a party can seek to admit it under some other

2   form of evidence that is admissible.  I mean, the defendant's

3   seeking to introduce testimony of itself in a deposition is

4   clearly hearsay.  And while the rule specifically states that

5   the opposing party can use the 30(b)(6) deposition, it does not

6   say that a party can use its own 30(b)(6) deposition as

7   evidence at trial.

8        And with respect to 801(d)(2), your Honor, all of the

9   employees at the time that they were deposed were current

10  employees, and all of them were testifying about subjects which

11  were within the scope of their employment.  For example, the

12  drivers -- the testimony that we have designated is about what

13  they did as drivers.  We didn't ask them, for example, you

14  know, about what their supervisors were doing.  The testimony

15  is not about something that's outside -- even if he only worked

16  on weekends, he still is testifying about the process of

17  starting his bus on weekends, and I don't think there's any

18  evidence that it would be different on the weekends as opposed

19  to the weekdays.

20       And to be honest, we've researched this subject with

21  respect to whether you can use transcripts as under

22  801(d)(2) -- (2)(d) -- (d)(2) -- and we couldn't find anything

23  directly on point, but we did find some cases that basically

24  suggested that, in fact, statements made during a deposition

25  are, in fact, admissions under 801(d)(2) and that they're

1    admissible as such.

2         THE COURT:  Without addressing the mechanism by which

3    they are admitted?

4         MS. HANKEY:  I can give you an example.  In *City*

5    *Builder Supply Company v. National Gymnasium Company* which was

6    a case here in the District of Massachusetts, a party admitted

7    during summary judgment proceedings a declaration from someone

8    about what someone else had said during a deposition.  And the

9    court found that that was admissible under 801(d)(2), that, in

10   fact, you can --

11        THE COURT:  I don't think Mr. Friedmann disputes -- at

12   least for the time being doesn't dispute that.

13        MS. HANKEY:  The suggestion that we could put somebody

14   up who was at the deposition to say what they said but not read

15   the transcript in -- what about the federal rules would

16   preclude you from reading the actual statement into evidence?

17   I mean, the transcript -- the jury's not going to see the

18   transcript; they are simply going to be read the statement.

19        THE COURT:  Okay.  I agree with Mr. Friedmann.  I

20   think it cannot be offered under Rule 32.  If there is an

21   admission that qualifies under 801, it might be admitted

22   through testimony or some other matter, but not through the

23   mechanism of reading the deposition.  For example, I don't

24   think Rule 801 would necessarily admit the questions.  So it

25   would be -- but, anyway, I would agree.

1          So I would sustain the objection to the offer of the

2    depositions of those witnesses, 9, 10, 11, 12, 13, 14, whatever

3    they are.

4          MR. FRIEDMANN:  I think they are, your Honor, Numbers

5    9, 10, 11, 12, 13 and 14.  Yes, those are the numbers.

6          THE COURT:  So having resolved that, we'll take a

7    break now and I'll start looking at the specific objections and

8    see how fast we can do this.

9          MR. FRIEDMANN:  Are you just going to do that, then,

10    for 1 through 8?  Is that what the Court is saying?

11          THE COURT:  Yeah.

12          MR. FRIEDMANN:  And, your Honor, I had also raised the

13    fact that on the counter-designations and under my reading of

14    32(a)(6), it's not just counter-designations, but we can put in

15    other parts also.

16          THE COURT:  Completeness.

17          MR. FRIEDMANN:  Well, complete- -- it says, "If a

18    party" -- I'm sorry, this is subdivision 6 of 32(a).  "If a

19    party offers in evidence only" --

20          THE COURT:  I'm sorry.  I see what you're saying.

21          MR. FRIEDMANN:  The very last clause of it is --

22          THE COURT:  I'm not sure -- I'll look at that.

23          MS. HANKEY:  We don't disagree that you can add for

24    completeness; we just disagree that that's what they've done.

25          THE COURT:  Okay.  I understand that.

```
 1              MR. FRIEDMANN:  Your Honor --
 2              MS. HANKEY:  On the 801 -- on the 801 issue, I guess
 3    just a point of clarification.  So can I put someone on the
 4    stand who was present at the deposition and have them read in
 5    the transcript?
 6              THE COURT:  No.  You can't use the transcript.
 7              MS. HANKEY:  He can just testify about what his memory
 8    was?
 9              THE COURT:  Right.
10              MR. FRIEDMANN:  Your Honor, just going back to the
11    Section 6, I would just draw the Court's attention to the last
12    clause which says, "and any party may itself introduce any
13    other parts."
14              When you're considering completeness, my general
15    practice in the past has been to offer all of it at the same
16    time in addition to the completeness.  And that's part of what
17    our counter-designations are, just so you're aware of that.
18              THE COURT:  I understand.  All right.  We'll take a
19    recess.
20              MR. FRIEDMANN:  Thank you, your Honor.
21              MR. SANDS:  Thank you.
22              MS. HANKEY:  Thank you, your Honor.
23              THE CLERK:  All rise.
24              Court will take a recess.
25              (There is a recess in the proceedings at 10:26 a.m.)
```

PDF created with pdfFactory trial version www.pdffactory.com

1             THE CLERK:  All rise.

2    (The Honorable Court entered the courtroom at 11:55 a.m.)

3             THE CLERK:  Court is in session.  You may be seated.

4    *U.S. v. Paul Revere Transportation*.

5             THE COURT:  Okay.  I've been through all the

6    transcripts, and I think the easiest thing is for me to tell

7    you what objections have been sustained; all others will have

8    been overruled.

9             All right.  So, let's start with number one, Kenneth

10   Wood.  There was only one objection.  It's overruled.  Now,

11   this is a short one, so it's easy to ask the question, I guess.

12   And the counter-designation is in, unless I say otherwise.  I

13   guess, maybe that's the other ruling.  So, now that you know

14   that, let's just take this one.

15           What are you going to do?  Are you ready to go ahead

16   with the reading?  I mean, or will you need some preparation

17   time to integrate the rulings?

18           MS. HANKEY:  Yes.

19           MR. SANDS:  A few minutes, your Honor, yes.

20           THE COURT:  All right.  So, that's one.  Let's see.

21           Number two is Carney.  As I understand the grid you

22   gave me, there were some counter-designations on pages 27 and

23   30 as to which there are objections, and then, I gather, that

24   if it was the plaintiff's view that if the objection was

25   overruled, there was an additional portion to be

```
 1    counter-counter-designated.
 2            MS. HANKEY:  Correct.
 3            THE COURT:  Okay.  And with that understanding, the
 4    objection is overruled, but the counter-designations can be
 5    made so that, with respect to page 27, the portion from 28 --
 6    I'm sorry -- 26, 19 to 28, 6 is okay, and, similarly, for page
 7    30, 15 to 25 is okay.
 8            MR. FRIEDMANN:  Could I just ask a question, your
 9    Honor?  I'm on the assumption that when we're doing these now,
10    that we will start the beginning of each transcript and the
11    portions --
12            THE COURT:  Go right through.
13            MR. FRIEDMANN:  Go right through.
14            THE COURT:  Correct.
15            MR. FRIEDMANN:  So, with the
16    counter-counter-designations, those will be read --
17            THE COURT:  Just in order.  Everything will be read in
18    the order it appears in the transcript --
19            MR. FRIEDMANN:  Okay.  I just wanted to make sure I
20    was understanding.
21            THE COURT:  -- whatever its source.
22            MR. FRIEDMANN:  Got you.
23            THE COURT:  Okay.  The next matter is at page 43, line
24    8 through page 44, line 43 -- I mean line 3, page 44, line 3.
25    There was an objection.  That objection is sustained.  That
```

PDF created with pdfFactory trial version www.pdffactory.com

1    portion will be excluded.  At page 45, there are two objections

2    on lines 5 through 12 and on 15, page 46, line 1, and the

3    objection stated is "Not employee at time.  Assumed facts."  I

4    can't tell whether he was an employee at the time or not.

5            MR. FRIEDMANN:  He was only -- I believe in the

6    initial portion of the designation they indicate that he was

7    only employed till 2004, and this is questions about things

8    that occurred in 2006.

9            MS. HANKEY:  We're talking about 45, 5 through 12?

10           THE COURT:  5 through 12, and then 15 through line 1

11    on the next page.

12           MS. HANKEY:  With respect to lines 5 through 12, Mr.

13    Powers testified that it was his practice to instruct employees

14    to start cold buses in cold weather the whole time that he was

15    a dispatcher at Paul Revere, which has been since at least

16    2002.  So, in fact, it was happening.

17           THE COURT:  But not in 2006, right?

18           MS. HANKEY:  No, I'm sorry.  He was doing it in 2000

19    -- Mr. Powers testified that it was his practice.

20           THE COURT:  Oh, Powers, I'm sorry.  Not the deponent.

21           MS. HANKEY:  Right.  Mr. Powers testified that it

22    was --

23           THE COURT:  No.  The question is about the deponent.

24           MS. HANKEY:  Right, and, so, the question was, Did you

25    know that Mr. Powers was doing this practice, and Mr. Powers

1    testified that he was doing it during the time that Mr. Carney

2    worked at Paul Revere, because he testified it had been his

3    practice the whole time he was dispatcher, and that has been

4    since at least 2002, and Mr. Carney was there until 2004.

5        MR. FRIEDMANN:  Your Honor, if we can break it into

6    the two segments, which is --

7        THE COURT:  Right.

8        MR. FRIEDMANN:  -- the first segment, I agree with my

9    sister, is a more general question, but what she's doing is she

10   is reciting what she believes Mr. Powers' testimony to be to

11   ask a question of the witness.  It's not that --

12       THE COURT:  Yeah.  Objection sustained to both

13   portions.

14       MR. FRIEDMANN:  Thank you, your Honor.

15       THE COURT:  And I think that's it.  All the other

16   objections on that one are sustained -- I mean, are overruled,

17   overruled.

18       Number three, Viola.  I understand the last objection

19   to be -- well, the last statement to being an objection beyond

20   line 14.  This is from the plaintiff.  In other words, the

21   counter-designation -- maybe I didn't give you the page.  Page

22   34, lines 5 through 25.  And there's an objection.  It says,

23   "Would agree to 5 to 14."

24       MS. HANKEY:  Correct.

25       THE COURT:  So, I guess the objection is to lines 15

PDF created with pdfFactory trial version www.pdffactory.com

1   through 25?  That's overruled.  It can be in.  15 through 25

2   can be in.

3          I don't think there are any objections regarding

4   Patricia Cargill.  The designations are in.

5          MS. HANKEY:  I'm sorry, your Honor?

6          THE COURT:  When I say "objection," I'm thinking of an

7   evidentiary objection, rather than objection to the

8   designation.  In general, the designations, unless I note

9   otherwise, are all permitted.

10          MS. HANKEY:  Right.  There are no objections to

11   Cargill.

12          THE COURT:  And the same with Frederick Jones.

13   There's one objection, I guess.  It's overruled.

14          MR. FRIEDMANN:  That was number six, your Honor, Fred

15   Jones?

16          THE COURT:  Yes.  I skipped five, because I'm going to

17   do five and eight together.

18          MR. FRIEDMANN:  I see.

19          THE COURT:  Seven, the objection to page 18 lines 8

20   through 25 is sustained; those will be excluded.  The

21   objections to page 32, line 18 through 33, line 10, and to 33,

22   11 through 16 are both sustained.  So, from 32, 18 through 33,

23   15 or 16 -- I can't tell from -- are excluded.

24          MR. FRIEDMANN:  I'm sorry, your Honor.  I didn't

25   follow that.  If you could just --

```
 1              THE COURT:  32, 18 through 33, 10 and 33, 11 through
 2    16 --
 3              MR. FRIEDMANN:  Oh.
 4              THE COURT:  -- are excluded.
 5              MR. FRIEDMANN:  The original in the counter?
 6              THE COURT:  Right.  That's it on that one.  Now,
 7    Daley, number five.  The objection to 24, lines 6 through 11, a
 8    counter-designation, is sustained.
 9              The objection to page 23, lines 2 through 9 is
10    sustained.  Page 30, lines 2 through 22, the objection is
11    sustained.  And page 37, line 1 through page 40, line 25, the
12    objection is sustained.
13              MR. FRIEDMANN:  I'm sorry, your Honor.  I didn't hear
14    that.
15              THE COURT:  Sustained.
16              MR. FRIEDMANN:  No.  I didn't hear the page number.
17              THE COURT:  37, 1 through 40, 25.  That's testimony
18    about the contents of the manual.  And that's it on that.  The
19    others are overruled.
20              On number eight, I'm not clear on -- there's an
21    objection by the defendant to 42, line 20 through 43, line 12,
22    but what it says is "Errata sheet testimony."  Is the objection
23    only that the errata sheet should amend the transcript?
24              MR. FRIEDMANN:  I just wanted to make sure that it was
25    their errata sheet that was being read in.  I didn't mean that
```

1    as an objection, and I think we're in agreement --

2            THE COURT:  You just want the corrections to conform

3    to the errata sheet; is that your objection?

4            MR. FRIEDMANN:  Correct.

5            MS. HANKEY:  We actually have an objection, because

6    the errata sheet is actually changing the testimony

7    substantively.

8            THE COURT:  Not much.  It seems to make it clearer,

9    doesn't it?

10           MR. FRIEDMANN:  That was my belief, your Honor.

11           MS. HANKEY:  Which line are we talking about?

12           THE COURT:  Well, 42, line -- well, the last line, I

13   guess.  In answer to the question on page 24.  And then --

14           MS. HANKEY:  Right.  It is changing the testimony

15   substantively.  At the time he didn't say anything about the

16   complaint being about noise, and the question was actually,

17   "Has Paul Revere ever received any complaints about the buses

18   smelling like smoke or fumes?"  And the answer was, "Yes," and

19   the errata sheet is trying to change the answer to, really, No,

20   we only received complaints about noise.  It is substantively

21   changing the answer.

22           MR. FRIEDMANN:  Your Honor, that was because the

23   witness was confused what was being asked of him in that series

24   of questions about whether it was noise versus -- there is a

25   whole series of questions there about the difference, noise,

```
 1   smoke, and complaints, and he was, quite frankly, confused when
 2   he answered.  He thought he was answering one question; in
 3   reading it, realized that he was answering a different
 4   question.
 5        MS. HANKEY:  There's nothing in the preceding
 6   testimony where he's being questioned about noise.  And I
 7   think, if the witness takes the stand, he can clarify that, but
 8   I don't see how it's an appropriate errata sheet change to
 9   testimony.
10        THE COURT:  Well, I'm looking at Rule 30(e)(1)(B),
11   which provides for a review by the witness and changes, and it
12   says "if there are changes in form or substance, to sign a
13   statement listing" them.  It seems to contemplate that
14   substantive changes can be made by errata sheet.
15        MS. HANKEY:  I think there's, actually, quite a bit of
16   case law that says that that's not correct.
17        THE COURT:  Well, I'll allow it.
18        There's also an objection on page 43.  The objection
19   is said to be to lines 13 to 15.  Well, the objection is that
20   -- the designation is 13 to 15, and it's only a question and
21   there's no answer.  It seems appropriate to -- I don't know
22   whether the designation was wrong.
23        MR. FRIEDMANN:  I believe so, your Honor.  If I could
24   just have one second.  I believe -- actually, your Honor, I'll
25   just withdraw that one.  I'm sorry.  I didn't realize it was
```

1    just the question.

2         THE COURT:  All right.  I'll take it out.  The

3    objections, the last two on the page 50, lines 5 through 10,

4    and 50, line 22 through 51, line 8, those objections are

5    sustained.  That portion will be excluded.

6         Okay.  That's it.

7         MS. HANKEY:  Your Honor, if I could just object.  Mr.

8    Powers' statement is an admission.  Mr. Powers --

9         THE COURT:  Well, the problem is it's garbled.  I

10   agree that there's a -- where are you?

11        MS. HANKEY:  I'm at page 50, lines 2 through 10 --

12   lines 5 through 10.  I mean, Mr. Friedmann the entire -- their

13   entire description of the case is that Mr. Powers was only

14   idling these vehicles for safety and mechanical reasons, and

15   this was an admission by Mr. Powers that, in fact, he was

16   idling the vehicles because of the temperature in the

17   morning -- the temperature -- that passengers were complaining

18   about the cabin temperature.  It's an admission that he was

19   idling for what is an unnecessary reason.

20        MR. FRIEDMANN:  I wouldn't agree, first off, that it's

21   an unnecessary reason.

22        MS. HANKEY:  Well, I can --

23        MR. FRIEDMANN:  I would also suggest, your Honor, that

24   it's totem-pole hearsay, because it's not Mr. Powers' admission

25   against interest, but it's Mr. Daley's attempt to recollect

PDF created with pdfFactory trial version www.pdffactory.com

1    what Mr. Powers told him, and he clarifies it in a number -- a

2    number of times in his deposition -- excuse me -- in his

3    testimony.

4         MS. HANKEY:  Actually, he's always confirmed that

5    Mr. Powers said that in his deposition testimony, and while

6    it's true it's double hearsay, it's also true that it is a

7    double admission.  Both parties are agents of the company, and

8    Mr. Daley is the General Manager of Paul Revere, and he

9    admitted during his deposition that his employee told him he

10   was turning on the buses for reasons that weren't necessary,

11   and every, single witness at Paul Revere has testified that

12   passenger comfort --

13        THE COURT:  You can have it.

14        MR. FRIEDMANN:  5 through 10?

15        THE COURT:  Let me just find my place again.  Yes,

16   that's 5 through 10.  But 22 through 51, 8 is -- well, I guess

17   you could have lines 4 through 8.  So, 50, line 22 through 51,

18   line 3 would be out.

19        Okay.  So, now you need a little time to organize this

20   and, obviously -- I think, obviously, we're not going to finish

21   today, but we'll continue with it in the morning with whatever

22   doesn't get read.  We'll do as much as we can now.

23        MS. HANKEY:  Well, I think we're going to go through

24   your rulings, your Honor, and decide which testimony we'll

25   admit based on your rulings, and we're hopeful --

1          THE COURT:  Oh, you may not offer it all.  All right.
2     Is 10 minutes going to be enough?
3          MS. HANKEY:  I think so.  There was one other thing,
4     which is we gave -- I have a list of exhibits that we would
5     like to admit today, move for admission today, and I've
6     provided the list to opposing counsel, and I was just
7     wondering, if he had any objections, that now might be a good
8     time to raise them.
9          MR. FRIEDMANN:  I agree my sister gave me the list
10    this morning, and I think we went through them, and I did have
11    objections to some of them.
12         THE COURT:  I think this is going to have to be
13    something we have do after.  Let's get this part done and we'll
14    get to the exhibits.  Okay.
15         MR. FRIEDMANN:  Your Honor, if I understand now, the
16    government may not offer certain portions that they had
17    previously designated, but we have counter-designations, and we
18    still have the right, under the rule, to add in additional
19    parts.  Is it the Court's position that, if they withdraw a
20    designation, that our counter-designation is likewise withdrawn
21    for us, or do we still get to have our counter-designations?
22         THE COURT:  I don't know.
23         MS. HANKEY:  And if we withdraw --
24         THE COURT:  This could be an endless process.  I think
25    the -- a practical way of solving it is to make the decision

1    whether to offer or not witness by witness rather than by

2    pieces of the witnesses' testimony.

3            MS. HANKEY:  That's exactly what we're going to do,

4    your Honor.

5            THE COURT:  So, either the witness is in or out.

6    You'll then have your chance, if you want -- well, I guess you

7    don't have the chance, if it's a Rule 32 offer.

8            MR. FRIEDMANN:  I thought they were meaning that they

9    may decide not to do line 18 and instead --

10           MS. HANKEY:  We may do that for some of the testimony.

11           THE COURT:  Well, I think it's too late for that,

12   because it's just going to obstruct the process.  So, witness

13   by witness.  You want the witness, you've done the designating

14   and counter-designating, you get that.  If you don't want the

15   witness, you get zero.  Fine.  And no opportunity to designate

16   for a witness who isn't called -- counter-designate.  Okay?

17           MR. FRIEDMANN:  Yes.  Thank you, your Honor.

18           THE COURT:  Okay.  We'll take a short break.

19           THE CLERK:  All rise.  Court is in recess.

20   (The Honorable Court exited the courtroom at 12:23 p.m.)

21   (Recess taken from 12:23 p.m. to 12:40 p.m.)

22           THE CLERK:  All rise for the jury.

23   (The Honorable Court and the Jury entered the courtroom at

24   12:40 p.m.)

25           THE CLERK:  Please be seated.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE COURT:  Jurors, once again we appreciate your

2     patience.  We've been working on things here, and let me tell

3     you what we've been working on.  Under the Rules -- well, in

4     the course of a case like this, the parties have the

5     opportunity before trial to learn about each other's positions

6     in the case and information about the case in a process that's

7     called "discovery," you discover facts about the case and so

8     on.

9          One of the techniques is the ability to ask questions

10    under oath of witnesses.  It's called a deposition.  It's

11    recorded by a court reporter and certified as an official

12    transcript.  There are some occasions permitted --- well, I'll

13    start that sentence again.

14         Under the Rules of Procedure, under certain

15    conditions, transcripts or portions of transcripts of

16    depositions may be admitted as evidence in trial in

17    substitution for the appearance of the witness, the witness

18    having been examined under oath by both sides and the testimony

19    having been recorded in the same way.  So, there are some

20    limited circumstances.  And then the parties may, under certain

21    conditions, offer those transcripts.

22         We've been working a little bit with the transcript,

23    because I understand the plaintiff intends to offer some

24    transcripts of the deposition testimony taken during the

25    preparation phase of the case, okay?  This is evidence just

```
 1    like any other evidence.  The difference is you don't actually

 2    see the witness testifying.  What you will see is somebody

 3    playing the part of the witness reading the transcript, and,

 4    so, we'll go through it as if there is a witness, but it's not

 5    the actual person, obviously, but you'll hear it.

 6            But other than that, it is testimony.  Give it the

 7    same consideration, evaluation and so on that you would give

 8    live-witness testimony if the witness were here.  All right?

 9            So, Ms. Hankey, or, Mr. Sands.  Whoever is doing it.

10            MR. SANDS:  Yes, your Honor.  Your Honor, we will be

11    re-calling Ms. Sansevero as our --

12            THE COURT:  To do the reading?

13            MR. SANDS:  To do the reading.

14            THE COURT:  Okay.  I gather, you've discussed with

15    Ms. Sansevero the methods and how we do it?

16            MR. SANDS:  Yes, your Honor.

17            THE COURT:  Okay.

18            MR. SANDS:  Your Honor, we need to have access to the

19    monitors.

20            THE COURT:  Is that how she's going to see the

21    transcript?

22            MR. SANDS:  (Nodding).

23            THE COURT:  Okay.  So, the jury needn't see it.

24            MR. FRIEDMANN:  Your Honor, if she needs an extra

25    copy, we have extra copies of the transcript, if that makes it
```

```
 1   easier.
 2            THE COURT:  I think it will be all right on the
 3   monitor.  That's fine, as long as it's legible to you.
 4            MS. SANSEVERO:  Actually, a paper copy would probably
 5   be better.  Oh, actually, no.  That's fine.  That's much bigger
 6   now.
 7            THE COURT:  Well, does the digital image contain the
 8   markings of what's being offered and what's not being offered,
 9   or will you direct her by oral direction?
10            MR. SANDS:  By oral direction, your Honor.
11            THE COURT:  Is it being highlighted?
12            MR. BYRDSONG:  I'm going to zoom in, your Honor, on
13   the parts that are.
14            THE COURT:  Can you highlight it?
15            MR. BYRDSONG:  Yeah, I will try to highlight it as we
16   go along.
17            THE COURT:  All right.
18            MR. FRIEDMANN:  I'm sorry.  And this is only being
19   projected to the witness?
20            THE COURT:  All without jury.
21            MR. FRIEDMANN:  Okay.  Thank you.  I just wasn't sure.
22            THE COURT:  And this is Viola?
23            MR. SANDS:  Yes, your Honor.
24            "Deposition of James Viola.  James J. Viola of 71
25   Preservation Lane, Tewksbury, Massachusetts, having been sworn
```

```
 1   by a notary public to tell the truth, the whole truth and
 2   nothing but the truth, testified upon his oath as follows:"
 3   (Whereupon, the following portions of the deposition transcript
 4   of JAMES VIOLA were read into the record.  Atty. Sands read the
 5   questions and Christine Sansevero read the answers -
 6   Transcribed as read by Atty. Sands and Ms. Sansevero)
 7   Q.    Could you please state your name for the record.
 8   A.    James Viola.
 9   Q.    Are you currently employed by Paul Revere?
10   A.    Yes.
11   Q.    In what position?
12   A.    Director of Maintenance.
13   Q.    What location of Paul Revere do you work at?
14   A.    Chelsea.
15   Q.    When were you the Director of Safety and Training?  What
16   position, what location of Paul Revere did you work at?
17   A.    Chelsea.
18   Q.    How often do you visit the Roxbury facility?
19   A.    Multiple times during the week.
20   Q.    What are the hours that you would visit -- sorry.  What
21   are the hours that you would visit the Roxbury facility?
22   A.    During business hours, usually.
23   Q.    And how many times have you been to the facility between
24   4:30 and 6:00 a.m?
25   A.    Maybe twice.
```

1  Q.    How many mechanics are at the Roxbury facility at any one

2  time?

3  A.    Three at a time is the maximum.

4  Q.    Okay.  And how many mechanics are on site during the 10:00

5  p.m. to 6:00 a.m. shift?

6  A.    Two.

7  Q.    And how many are on site between 6:00 a.m. and 2:00 p.m?

8  A.    Three.

9  Q.    Does that ever vary?

10  A.    No.

11  Q.    In the three years that you've been Director of

12  Maintenance, has that ever varied?

13  A.    Not to my knowledge.

14  Q.    Are any -- are the drivers given any training regarding

15  how to diagnose mechanical issues?

16  A.    Not by me.

17  Q.    To your knowledge, are they given that kind of training by

18  anyone?

19  A.    No.

20  Q.    And do the vehicles have any kind of equipment or anything

21  to assist in dealing with cold starts?

22  A.    Yes.

23  Q.    And what would that be?

24  A.    Some have auxiliary heaters.

25  Q.    Anything else?

1    A.    Some have electrical heaters that are from -- you know,

2    land power.

3    Q.    They plug in?

4    A.    They plug in.

5    Q.    Is there anything else?

6    A.    No.

7    Q.    Are -- are the drivers trained on how to use either the

8    plug-ins or the auxiliary heaters?

9    A.    No, not to my knowledge.

10   Q.    Is there anyone who is specific who would have been

11   trained on how to use either the electric heaters or the

12   auxiliary heaters?

13   A.    The mechanics maintain them.

14   Q.    So, is it your assumption that the mechanics would be

15   trained on them?  Or do you know whether the mechanics --

16   A.    The mechanics maintain the heaters and also plug the

17   electric heaters in as well.

18   Q.    So, did they receive training on how to use those heaters?

19   A.    Yes.  They repaired them and use them.  They are

20   automatic.

21   Q.    I'm sorry.  Which are automatic?

22   A.    The auxiliary heaters.

23   Q.    Are automatic?

24   A.    Yes.

25   Q.    The electric heaters, are those automatic?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    They are manual plug-ins.

2    Q.    Were you aware that Mr. Powers had instructed Paul Revere

3    employees to start vehicles to check to see if they were

4    working in cold weather?

5    A.    I was not.

6    Q.    When you say that you were not aware, were you aware --

7    today, are you aware of that fact?

8    A.    Yes.

9    Q.    Do you know specifically who Mr. Powers gave instructions

10   to?

11   A.    I do not.

12   Q.    In preparation for today, did you speak to Mr. Powers?

13   A.    I did not.

14   Q.    In preparation for today, did you attempt to locate any

15   employees who Mr. Powers had instructed to start the vehicles?

16   A.    I did not.

17   Q.    In March and April of 2006, EPA visited the Roxbury

18   facility and witnessed numerous instances in which Paul Revere

19   vehicles were idling for more than the five minutes.  Do you

20   have any understanding of why those vehicles were being idled?

21   A.    No.  No specific reason, no.

22   Q.    Do you have any understanding of who directed the vehicles

23   to be idled?

24   A.    No.

25   Q.    Yes?

1          THE COURT:  Line 25.

2          MS. SANSEVERO:  No -- I'm sorry.

3     A.    Yes.

4     Q.    And who was that?

5     A.    Jim Powers.

6     Q.    Do you have any understanding of why Mr. Powers asked that

7     the vehicles be started?

8     A.    I believe he -- to meet the service requirements.

9     Q.    When you say "meet the service requirements," can you be

10    more specific?

11    A.    Just to assure that the vehicles all went out on time and

12    that everything was capable of going out when it was supposed

13    to.

14    Q.    Was there any procedure, to your knowledge, that was used

15    when Mr. Powers was instructing that the vehicles be started?

16    A.    Not to my knowledge.

17    Q.    To your knowledge, did Mr. Powers or anyone else check the

18    vehicle manuals before they had the vehicles started?

19    A.    I don't -- I don't know.

20    Q.    To your knowledge, did anyone check with the manufacturer

21    regarding whether the vehicles needed to be idled or started?

22    A.    Not to my knowledge.

23    Q.    Was anyone at management, to your knowledge, aware that

24    Mr. Powers was instructing people to start the vehicles?

25    A.    Not to my knowledge.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Do you have any understanding of why 12 vehicles would be

2  idling for more than half an hour at one time?

3  A.   I do not.

4  Q.   Is passenger warmth a reason to idle under the policy?

5  A.   No.

6  Q.    Is driver warmth a reason to -- I'm sorry.   Is driver

7  warmth a reason to idle under the policy?

8  A.   No.

9  Q.   Do you have any equipment that you use to deal with frozen

10 lines?

11 A.   Yes.

12 Q.   And what equipment is that?

13 A.   It would be a torch or a heat gun.

14 Q.   Now, Ms. Hankey asked you some questions about the written

15 idling policies of Paul Revere Transportation.   Do you remember

16 that?

17 A.   Yes.

18 Q.   And you mentioned that there was a memo that you've seen

19 that contains the written idling policy?

20 A.   Correct, yes.

21 Q.   Was that a memo that you saw when you were first hired by

22 Paul Revere?

23 A.   Yes.

24 Q.   And, to the best of your knowledge, has Paul Revere

25 Transportation had a written policy since the time that you

1   were hired?

2   A.    Yes.

3   Q.    In addition to the written-memo-style policy, have you

4   received notices from the company as reminders about the idling

5   policy?

6   A.    Yes.

7   Q.    What types of notices have you gotten?

8   A.    We've gotten notices on the paychecks.  We've gotten

9   verbal notices.  We've discussed it in meetings.  I have passed

10  it on to people that work for me as well, giving them constant

11  updates as to what we were supposed to be doing.

12  Q.    Do you know how the drivers are kept updated on that?

13  A.    I believe, from the memos on the checks and also from the

14  supervisors, and also announcements are made over the radio to

15  inform the drivers -- to remind the drivers that no idling or

16  five-minute idling, whatever the procedure calls for -- they

17  are reminded of that during the course of their shift.

18  Q.    Are there any signs that have been placed up to remind

19  drivers or employees?

20  A.    There are signs that have been placed at both facilities.

21  Q.    You referred to thawing out a line.  What does thawing out

22  a line entail?

23  A.    It could be heating it with a torch or a heat gun.

24  Q.    Does the bus need to be on in order for you to heat the

25  line with the torch?

PDF created with pdfFactory trial version www.pdffactory.com

```
1    A.    Yes, it does.
2    Q.    And how long does it take for the torch to un-thaw the
3    line generally?
4    A.    I mean, what -- it would depend on how frozen it was and
5    how long it took to thaw it out.
6    Q.    If a bus was jump-started, would it need to idle more than
7    five minutes?
8    A.    Yes.
9    Q.    How long would it need to idle?
10   A.    It would depend on how dead it was and what the procedure
11   was going to be, whether the bus was going in service or going
12   in for repair.
13   Q.    If it was going in for repair, why would it need to
14   continue to be idled?
15   A.    If you shut it off, it would not start again.
16   (Conclusion of reading of deposition transcript of James Viola)
17         MR. SANDS:  That concludes the testimony of Mr. Viola,
18   your Honor.
19         THE COURT:  All right.  It's about 5 of.  Do you have
20   a short one you can do?  Or should we just --
21         MR. SANDS:  Frederick Jones, your Honor.  This will be
22   short.
23         THE COURT:  Okay.
24         MR. SANDS:  "Frederick Jones, of 20 Montclair Avenue,
25   Pembroke, Massachusetts, having been sworn by a notary public
```

PDF created with pdfFactory trial version www.pdffactory.com

1    to tell the truth, the whole truth and nothing but the truth,

2    testified upon his oath as follows:"

3    (Whereupon, the following portions of the deposition transcript

4    of FREDERICK JONES were read into the record.  Atty. Sands read

5    the questions and Christine Sansevero read the answers -

6    Transcribed as read by Atty. Sands and Ms. Sansevero):

7    Q.    Could you please state your name for the record?

8    A.    Frederick Philip Jones.

9    Q.    And can you spell your last name?

10   A.    J-O-N-E-S.

11   Q.    Are you here to testify on behalf of Paul Revere

12   Transportation?

13   A.    Yes.

14   Q.    And do you understand that you are here as a

15   representative of Paul Revere Transportation?

16   A.    Say it again.

17   Q.    Do you understand that you are here as a representative of

18   Paul Revere Transportation?

19   A.    Yes.

20   Q.    Are you currently employed by Paul Revere Transportation?

21   A.    I am.

22   Q.    And in what position?

23   A.    I'm the manager of the Boston division, also known as the

24   Roxbury division.

25   Q.    And what do your job responsibilities entail?

1    A.    I'm responsible for the management of the facility, the

2    operators and the various contractors that operate out of the

3    facility, specifically, MASCO, Blue Cross and several smaller

4    contracts regarding the public bus service.

5    Q.    And what are your hours?

6    A.    9:00 to 5:00, Monday and Friday.

7    Q.    Do those vary at all?

8    A.    Occasionally.

9    Q.    And do they vary in a specific way?

10   A.    Maybe an hour one way or the other, an hour or two hours.

11   Q.    And when did you become the manager of the Boston

12   division?

13   A.    November 7th, '06, 2006.

14   Q.    So, were you at Paul Revere prior to November 7th, 2006?

15   A.    No.

16   Q.    Is your testimony today limited to the time period at

17   which you worked for Paul Revere, or are you here to testify

18   with respect to a larger time period than that?

19   A.    No.  Just specifically to my employment here.

20   Q.    Since you've been at Paul Revere, how many routes are

21   operated out of the Roxbury facility?

22   A.    Well, there's two majors, the MASCO contract, the Blue

23   Cross contract, there's a contract -- the CDM, I think.  It's

24   Camp, Dresser McGee is the firm.  Museum Towers, Harvard School

25   of Public Medicine.  I think it is HSPC, something like that.

PDF created with pdfFactory trial version www.pdffactory.com

1    New England Baptist.

2    Q.    And do these routes operate daily?

3    A.    Yes.

4    Q.    And when I say "daily," does that include weekends?

5    A.    I'm sorry?

6    Q.    Does that include weekends?

7    A.    The only one that operates on the weekend is the national

8    contract, and the only thing that runs on that is our MS

9    shuttle.  It's just one vehicle on Saturday.

10   Q.    How about on holidays?

11   A.    It depends on the holiday, but most holidays, no.  Most

12   major holidays they don't operate.

13   Q.    So, currently, do vehicles idle for more than five minutes

14   in the Roxbury yard?

15   A.    As a rule, they -- they adhere to the five-minute limit.

16   They have a ten-minute circle check, and it may take that long

17   to build up.  But, generally, it shouldn't be any more than 10

18   minutes.

19   Q.    Starting the buses and doing the circle check, currently,

20   you said it takes approximately 10 minutes; is that correct?

21   A.    Well, we allocate 10 minutes for pullout and for the

22   circle check, and then we allow 20 minutes for travel time to

23   their designation to arrive on time for the first trip.  So,

24   there's generally a half-hour period, the first ten being the

25   circle check, and then the pullout -- excuse me -- the circle

PDF created with pdfFactory trial version www.pdffactory.com

1    check, and then the 20 minutes to get to the job site.

2    Q.    In cold weather, do you ask the drivers to ever arrive

3    more than 10 minutes early?

4    A.    No.

5    (Conclusion of reading of deposition transcript of Frederick

6    Jones)

7         MR. SANDS:    That concludes the testimony of Frederick

8    Jones, your Honor.

9         THE COURT:    Okay.  I think that's as far as we can go

10   today.  There are a few more of these.  We'll pick them up

11   tomorrow.  Okay.  I know you didn't see as much of the progress

12   as we saw, but we've made some progress today, and we'll

13   continue.  So, we'll recess now.  Enjoy the rest of the day,

14   and we'll see you tomorrow morning.

15        THE CLERK:    All rise for the jury.

16   (Jury exited the courtroom at 1:03 p.m.)

17        MR. SANDS:    May we release Ms. Sansevero?

18        THE COURT:    Yes.

19        Just a couple of things.  One is, I want to get a

20   sense beyond this.  I know there was a mention of some exhibits

21   and what you intend to do about that and what I might have to

22   do about it.  So, fill me in on -- after we finish the

23   depositions, what's next?

24        MS. HANKEY:    I had a question just in terms of what

25   exhibits we enter.  We had one question, which is, whether your

1    Honor would allow the government to introduce exhibits either

2    during the defense case or in rebuttal.  The concern is there

3    are exhibits, for example, that were stipulated to or ones that

4    we think, you know, will be admitted by the Court.  So, you

5    know, if they're being used with a witness, we would like them

6    to be shown to the jury, but they're not, necessarily -- they

7    don't need to be entered now until we get to that testimony.

8    So, it's a procedural question.

9            THE COURT:  I'm not sure I understand the question.

10           MS. HANKEY:  The question is would you allow us to

11   admit exhibits into evidence during the defense case or --

12           THE COURT:  It depends.  I mean, you can do anything

13   you're allowed to do, I guess.  I mean --

14           MS. HANKEY:  It's just a procedural question.  Some

15   courts are different on that rule.  I mean, presuming they are

16   admissible.

17           THE COURT:  If the conditions are right for admission,

18   you can get it admitted.

19           MS. HANKEY:  I just wanted to make sure.

20           THE COURT:  If the question is, once you've left your

21   case in chief, have you given up the opportunity to get in any

22   exhibits that were identified in the case in chief but not

23   used?

24           MS. HANKEY:  Correct.

25           THE COURT:  Not necessarily, is the answer, I guess.

1   And if some people would say "necessarily," then I would take a

2   different view.

3          MS. HANKEY:  So, we've given them a list of eight

4   exhibits.  The question was whether counsel had any objections

5   to them, and if they did, that they could raise them now.

6          THE COURT:  My objective is, I just don't want to have

7   a big hole in the morning again, that's all.

8          MR. FRIEDMANN:  Perhaps we can talk some more before

9   the end of the day, I mean, before we leave, because, quite

10  frankly, I was focused on other things rather than focused on

11  the list that counsel gave me.

12         THE COURT:  Fine.  I don't, necessarily, have to have

13  an answer.  I just don't want, as I said, a big hole in the

14  middle of the morning again.

15         MS. HANKEY:  A couple of them are ones that you

16  actually ruled on during openings, so you will have heard the

17  issues.

18         THE COURT:  Okay.  Then what?

19         MS. HANKEY:  Then we rest.

20         THE COURT:  Okay.  Then what?

21         MR. FRIEDMANN:  Then we have a couple of motions.

22         THE COURT:  Right.  Then what?

23         MR. FRIEDMANN:  Then we have a few witnesses.

24         THE COURT:  Who do you have in mind?

25         MR. FRIEDMANN:  Richard Brown will most likely be our

1    first.  It's going to depend in large part, your Honor, on how

2    you rule on some of the motions that we're going to be

3    presenting.  So, we've given the government --

4        THE COURT:  Give me the worst-case scenario.

5        MR. FRIEDMANN:  The worst-case scenario is Richard

6    Brown, James Powers, Mike Swartz, Greg Roland, Mr. Kiernan --

7    and, I'm sorry, I forget his first name right now -- Paul

8    Kiernan, and we had mentioned to your Honor the issue that we

9    had with Mr. Carney.  We have jettisoned him today, because we

10   didn't reach him, and we may not be able to.  He may come back.

11   If we're still going on Monday or Tuesday, he would be

12   available.  So, he may be a potential --

13       THE COURT:  Okay.

14       MR. FRIEDMANN:  And Richard Daley, Doc Daley would be

15   the other one.  Those would be the universe that we're looking

16   at, again, subject to how you rule on certain motions.

17       THE COURT:  Okay.  All right.  That's fine.  Thank

18   you.  All right.  We'll see you tomorrow.

19       MR. FRIEDMANN:  Thank you, your Honor.

20       MS. HANKEY:  Thank you.

21       THE CLERK:  All rise.  Court is in recess.

22   (Whereupon, proceedings adjourned for the day at 1:05 p.m.)

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com

1                    C E R T I F I C A T E

2

3

4         I, Marcia G. Patrisso, RMR, CRR, and Brenda K.

5    Hancock, RMR, CRR, Official Court Reporters of the United

6    States District Court, do hereby certify that the foregoing

7    transcript, from Page 3-1 to Page 3-87, constitutes, to the

8    best of my skill and ability, a true and accurate transcription

9    of my stenotype notes taken in the matter of *United States of*

10   *America v. Paul Revere Transportation, LLC*, No.

11   1:06-cv-12297-GAO.

12

13              /s/ *Marcia G. Patrisso*

14              Marcia G. Patrisso, RMR, CRR

15              Official Court Reporter

16

17

18              /s/ *Brenda K. Hancock*

19              Brenda K. Hancock, RMR, CRR

20              Official Court Reporter

21

22

23

24

25

PDF created with pdfFactory trial version www.pdffactory.com