UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action |
| v. ) | No. 06-12297-GAO |
| ) | |
| PAUL REVERE TRANSPORTATION, LLC, ) | |
| ) | |
| Defendant. ) | |
| ) | |

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**DAY FOUR**
**JURY TRIAL**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Thursday, June 4, 2009
9:05 a.m.

Marcia G. Patrisso, RMR, CRR
Brenda K. Hancock, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

PDF created with pdfFactory trial version www.pdffactory.com

```
1   APPEARANCES:

2        UNITED STATES DEPARTMENT OF JUSTICE
         ENVIRONMENTAL ENFORCEMENT SECTION
3        By: Rachel A. Hankey, Esq.
         P.O. Box 7611
4        Ben Franklin Station
         Washington, D.C. 20044-7611
5        - and -
         U.S. AIR FORCE DEPARTMENT OF LAW
6        By: Jeffrey K. Sands, Esq.
         HQ USAFA/DFL Suite 8J100
7        USAFA, Colorado 80840
         On Behalf of the Government
8
         RUDOLPH FRIEDMANN, LLP
9        By: Jonathon D. Friedmann, Esq.
             Zachary J. Tuck, Esq.
10       92 State Street
         Boston, Massachusetts 02109
11       On Behalf of the Defendant

12
    IN ATTENDANCE:
13
         Gregory Dain, Senior Enforcement Counsel
14       Environmental Protection Agency

15

16

17

18

19

20

21

22

23

24

25
```

<u>I N D E X</u>

|                              | DIRECT | CROSS | REDIRECT | RECROSS |
|------------------------------|--------|-------|----------|---------|
| **WITNESSES FOR THE PLAINTIFF:** |        |       |          |         |
| RICHARD J. DALEY, JR.        |        |       |          |         |
|   (Through deposition)       | 4      |       |          |         |
| **WITNESSES FOR THE DEFENDANT:** |        |       |          |         |
| RICHARD BROWN                |        |       |          |         |
|   By Mr. Friedmann           | 60     |       | 83       |         |
|   By Mr. Sands               |        | 77    |          | 85      |
| JAMES E. POWERS, JR.         |        |       |          |         |
|   By Mr. Friedmann           | 88     |       | 135      |         |
|   By Ms. Hankey              |        | 116   |          | 142     |
| RICHARD J. DALEY, JR.        |        |       |          |         |
|   By Mr. Friedmann           | 145    |       | 160      |         |
|   By Ms. Hankey              |        | 155   |          | 164     |

<u>E X H I B I T S</u>

GOVERNMENT'S

| EXHIBIT NO. | DESCRIPTION | RECEIVED |
|-------------|-------------|----------|
| No. 6   | Disciplinary letter to Mr. Swartz | 34 |
| No. 7   | Disciplinary letter to Mr. Powers | 34 |
| No. 8   | National Climatic Data Center certified records for 4/01 - 4/06 (pages 1 and 63-65) | 34 |
| No. 11  | Pages 6 and 7 | 34 |
| No. 33  | Weather data | 39 |
| No. 47  | Certified weather data | 106 |
| No. 100 | Pages 8 and 9 | 34 |
| No. 103 | 2006 calendar | 40 |
| No. 115 | Letter to Mr. Carney from Mr. Busch | 41 |
| No. 122 | Summary charts of inspection and affidavit of John White | 41 |

```
 1              (The following proceedings were held in open court

 2   before the Honorable George A. O'Toole, Jr., United States

 3   District Judge, United States District Court, District of

 4   Massachusetts, at the John J. Moakley United States Courthouse,

 5   One Courthouse Way, Boston, Massachusetts, on June 4, 2009.)

 6              THE CLERK:  All rise for the jury.

 7              (The Honorable Court and the jury entered the

 8   courtroom at 9:05 a.m.)

 9              THE CLERK:  Please be seated.

10              THE COURT:  Good morning, jurors.

11              THE JURORS:  Good morning.

12              MR. FRIEDMANN:  Good morning, your Honor.

13              THE COURT:  Counsel.

14              MS. HANKEY:  Good morning.

15              THE COURT:  Mr. Sands?

16              MR. SANDS:  The United States would like to re-call

17   Ms. Sansevero for the reading of depositions.

18              THE COURT:  Okay.

19              MR. SANDS:  From the deposition of Richard J. Daley,

20   Jr., on January 23, 2008.

21              "Richard J. Daley, Jr., of 94 Pritchard Avenue,

22   Somerville, Massachusetts, having been sworn by a notary public

23   to tell the truth, the whole truth, and nothing but the truth

24   testified upon hs oath as follows:"

25              (Whereupon, the following portions of the deposition
```

1    transcript of RICHARD J. DALEY, JR., were read into the record.

2    Attorney Sands read the questions and Christine Sansevero read

3    the answers.  Transcribed as read by Attorney Sands and Ms.

4    Sansevero.)

5    Q.    Can you please state your name for the record.

6    A.    Richard Joseph Daley, Jr.

7    Q.    And can you spell your last name?

8    A.    D-A-L-E-Y.

9    Q.    Thank you, Mr. Daley.

10        Are you here to testify as a witness on behalf of Paul

11   Revere Transportation?  Is that correct?

12   A.    Yes, ma'am.

13   Q.    And do you understand that this means that your testimony

14   is not limited to personal knowledge but to all matters

15   reasonably available to the corporation?

16   A.    Yes, ma'am.

17   Q.    And the time period -- do you have an understanding as to

18   what time period you are here to testify to?

19   A.    I do.  I do.

20   Q.    And what time period is that?

21   A.    From -- actually, from 2002, since I started.  I know it

22   goes to 2001, but I had no knowledge prior to when I started at

23   the -- Paul Revere.

24   Q.    So 2002 until the present?

25   A.    Yes, ma'am.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.    And what are your hours?

2  A.    I work usually at 6:30 in the morning until sometimes 6:30

3  at night; about 12 hours a day.

4  Q.    And how many times have you visited the Roxbury facility

5  between the hours of 4:30 a.m. -- excuse me -- the hours of

6  4:30 and 6 a.m.?

7  A.    Probably a dozen times since -- since I started here that

8  early.

9  Q.    Are busses ever late for their routes?

10  A.    They're -- at times busses are late, yes.

11  Q.    And is there anywhere where it's documented when a bus is

12  late?

13  A.    No.

14  Q.    And is there anywhere that it's recorded at all when a

15  vehicle is late for its service on a particular day?

16  A.    If the vehicle didn't go out it wasn't assigned to

17  anybody.

18  Q.    But if -- if a bus was an hour late for its route, is

19  there anywhere that that would be documented?

20  A.    No.  Let me just elaborate on that.  Because we have cover

21  people, so a bus really wouldn't be late because of -- the

22  driver could be late, but if the driver was going to be late,

23  we would put a cover person on that bus to cover the route.  So

24  we hardly ever drop any trips.

25  Q.    Let's say if a bus was having mechanical problems so the

1   bus was late for a route, would that be documented anywhere?

2   A.   Late on a pullout from the garage.  Is that -- is that

3   what you're talking about?

4   Q.   Yes.

5   A.   It would probably be listed in -- we have a diary at the

6   garage location.

7   Q.   What's in the diary?

8   A.   The day-to-day.  It's a daily logbook.

9   Q.   Since 2002, to your knowledge, how many runs go out of the

10  Roxbury facility on weekends?

11  A.   We have one bus on the 2 Route, from Harvard Square to the

12  hospital area.

13  Q.   Anything else?

14  A.   And charters.  No designated everyday trips.

15  Q.   How about holidays?

16  A.   It's the same.  It depends on the holiday.  If it's -- if

17  it's a Sunday schedule, we don't have any service.  There are

18  some holidays that are designated as Saturday's schedule, and

19  the M2s would run.  Again, they don't run in the summer.  When

20  the colleges are out, that, of course, didn't run.

21  Q.   The M2?

22  A.   Yes, ma'am.

23  Q.   So it's only on weekends during the school year?

24  A.   Correct.

25  Q.   What did you do to prepare for today's deposition?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Just went through the records again.

2    Q.    What is your understanding of how many mechanics are at

3    the Roxbury facility at any one time?

4    A.    Three on the day shift.

5    Q.    And what are their shifts?  I'm sorry.

6    A.    That's okay.  Okay.  Again, I believe two of them come in

7    six o'clock to two o'clock, and one of them comes in at ten

8    o'clock a.m. and he works till six o'clock at night on the day

9    shift.  We have a midnight shift also.

10   Q.    And what's the midnight shift?

11   A.    They come in at midnight and work until seven in the

12   morning.

13   Q.    And how many people are there at that shift?

14   A.    Two.

15   Q.    Two?  So let me see if I've gotten this correctly.  From

16   six to two there are two mechanics on-site?

17   A.    Correct.

18   Q.    Are any -- are the drivers given any training regarding

19   how to diagnose mechanical issues?

20   A.    No.

21   Q.    Did you speak to any mechanics?

22   A.    No.

23   Q.    What efforts were made prior to responding to these

24   interrogatories to locate any employees who Mr. Powers had

25   given instructions to start the busses?

1   A.   Prior to the interrogatories we'd asked Mr. Powers who had

2   started -- who he asked to start the busses, and he said

3   whoever the cover person was, the answer to us.  He didn't

4   specifically give us a name.  Whoever was there.

5   Q.   Did you make any efforts to identify who was the cover

6   person?

7   A.   I didn't interview any cover people, no.

8   Q.   Did you try to identify who the cover people were for the

9   dates on which EPA had visited Paul Revere's facility?

10  A.   No, I did not.

11  Q.   In preparation for today's deposition, were any efforts

12  made to identify who the cover person was on the days which the

13  EPA visited the Paul Revere facilities?

14  A.   I didn't do that myself personally.

15  Q.   Are you aware of anyone at Paul Revere doing that?

16  A.   No.

17  Q.   What is your understanding of the reason that Mr. Powers

18  had the vehicle idling?

19  A.   The reason he gave me was that he just wanted to make sure

20  the vehicles were able to start and they were ready for

21  service.

22  Q.   You previously testified in this matter; is that correct?

23  A.   Yes, ma'am.

24  Q.   In your previous deposition you stated that Mr. Powers

25  had -- that the reason that Mr. Powers had given you was that

1  people were complaining that the busses were cold in the early

2  a.m.

3  A.    I did say that, that he did get a complaint from a

4  customer and he did get complaints from some of the drivers

5  that the busses were cold.

6  Q.    When did he tell you that he got complaints from customers

7  and drivers about the temperature of the busses?

8  A.    After we got the complaint and I went over and asked if

9  they were starting the busses in the morning.

10  Q.    So was that -- did he tell you that one of the reasons

11  that he was idling the busses was because of complaints by

12  customers and drivers about the warmth -- the temperature of

13  the busses?

14  A.    Yes, ma'am.

15  Q.    You said that he told you he was having the busses started

16  to make sure they would start and that they were ready for

17  service.  Have I stated that correctly?

18  A.    Yes.

19  Q.    Do you have any understanding of what was checked when

20  whoever he instructed to start the vehicle went and started it?

21  A.    Not personal knowledge, no.

22  Q.    You're not testifying personally today, so do you have any

23  understanding of what whoever checked the vehicle was checking?

24  A.    Again, it's an assumption.  They started the bus, got to

25  make sure the bus would start, to make sure that they had

PDF created with pdfFactory trial version www.pdffactory.com

1  proper air pressure and that the bus was ready to go in

2  service.

3  Q.   Have you spoken to anyone who actually went and started

4  one of the vehicles, went under Mr. Powers' instructions?

5  A.   I have not.

6  Q.   Do you have any knowledge of how many vehicles Mr. Powers

7  instructed someone to turn on at one time?

8  A.   I do not.

9  Q.   Do you have any other understanding of what their

10  procedure was that was followed once Mr. Powers had given this

11  instruction?

12  A.   No.

13  Q.   Do you know if there was any written procedure regarding

14  what should be done once Mr. Powers had given this instruction?

15  A.   No, there is no written procedure.

16  Q.   Do you know if there was any oral procedure that was

17  developed about what should happen once Mr. Powers had given

18  that instruction?

19  A.   No, ma'am.

20  Q.   Some of the vehicles had these Proheat heaters in them; is

21  that correct?

22  A.   Yes, ma'am.

23  Q.   Do you have any knowledge of whether those heaters were

24  being used at the time that Mr. Powers was giving these

25  instructions?

1   A.   I don't.  It's an assumption that they were activated

2   because we activate them by November 14th every year.

3   Q.   Are they deactivated at any time?

4   A.   After the winter.

5   Q.   Do you know, is there any date specific on which they are

6   deactivated?

7   A.   No.

8   Q.   Who makes the decision as to when to deactivate them?

9   A.   It would be the maintenance people after it warms up.

10  Q.   Do you know -- do you know who specifically would activate

11  them?

12  A.   The mechanics.

13  Q.   Was Mr. Powers ever given training on the use of the

14  auxiliary engine -- excuse me -- of the auxiliary or engine

15  block heaters?

16  A.   I don't know that for a fact.

17  Q.   Do you know if drivers are trained to use the fast idle

18  setting on vehicles?

19  A.   They are.

20          MR. FRIEDMANN:  Objection, your Honor.  Could we be

21  seen at sidebar?

22          (Discussion at sidebar and out of the hearing of the

23  jury:)

24          MR. FRIEDMANN:  The last question and answer, your

25  Honor, I move to have stricken.

```
1              THE COURT:  I don't have that on my notes.  The next
2    portion on page 23, 2 through 9.
3              MR. FRIEDMANN:  I'm sorry.  I thought you said 22
4    to 19 to 21.
5              THE COURT:  Wait.
6              MR. SANDS:  That was taken out.
7              MR. FRIEDMANN:  That's one you had taken out?
8              MR. SANDS:  Right.
9              THE COURT:  Twenty-three, 2 through 9.
10             MR. FRIEDMANN:  No, they voluntarily withdrew that.
11             MR. TUCK:  They said they were voluntarily withdrawing
12   that.
13             THE COURT:  Oh, I guess you are right.
14             MR. SANDS:  There were certain portions, your Honor,
15   that had been admitted by the Court, then after further review
16   we told you that we would voluntarily strike that.
17             THE COURT:  This was one of them?
18             MR. FRIEDMANN:  This was one of them.
19             MS. HANKEY:  It was accidentally included.
20             MR. FRIEDMANN:  I would like to move to strike it
21   because they told us they were withdrawing it.
22             THE COURT:  Nineteen through 21?
23             MR. FRIEDMANN:  Correct.  The last question and
24   answer.
25             THE COURT:  How do you do it?
```

```
 1              MR. TUCK:  Is it possible for you to instruct the jury
 2    to disregard the last question and answer?
 3              THE COURT:  I can do that.  I don't know how effective
 4    it will be.
 5              MS. HANKEY:  What's the basis for the motion to
 6    strike?
 7              THE COURT:  There was a change in the designation.
 8    I'm detecting other changes here from this chart.
 9              MR. FRIEDMANN:  I am, too.  I was trying not to --
10              THE COURT:  We may have different interests in this.
11    My interest is that what is read will not match with the
12    schematic, so if somebody reconstructing wanted to look at the
13    schematic and say all of that stuff is put in --
14              Are you taking this stuff down?
15              THE REPORTER:  (Nods in the affirmative.)
16              THE COURT:  I guess we're okay with that, because the
17    actual transcript of this will --
18              MR. FRIEDMANN:  I had raised this with my brother
19    earlier today, because they did come to us after they had
20    indicated they wanted to delete certain portions and I had
21    suggested we would, number one, put it on the record so your
22    Honor would know, but I didn't want to interrupt; and, number
23    two, they would provide a list of those portions that were
24    withdrawn that we could then just mark and have it as part of
25    the transcript.
```

1          THE COURT:  I want to make sure that the transcript is

2     clear at the end.  As I say, we have a verbatim transcript of

3     what is going on here, so that will be --

4          MR. FRIEDMANN:  But you wouldn't necessarily -- what's

5     going in won't necessarily comport with your rulings, and

6     that's why I felt we should have a check on it.

7          THE COURT:  Correct.

8          MS. HANKEY:  Maybe we could take a five-minute break

9     so we could ensure that doesn't happen again?  I just don't

10    want to --

11         THE COURT:  I'd rather not.

12         MS. HANKEY:  -- have him accidentally read in --

13         THE COURT:  How much variance is there likely to be

14    going forward?

15         MR. FRIEDMANN:  I don't think much.

16         MR. TUCK:  Not much.

17         THE COURT:  Let's just do it.

18         (In open court:)

19         THE COURT:  Jurors, the last question and its answer

20    is stricken, so you are to disregard it.  So if you made a note

21    about it, cross it out.

22         MR. SANDS:  We're on page 23.

23         (Continuation of reading by Attorney Sands and Ms.

24    Sansevero:)

25    Q.   Was anyone in management aware that Mr. Powers was giving

1   this instruction to employees?

2   A.   I believe not.

3   Q.   And let me just clarify.  To your knowledge, was

4   Mr. Swartz aware that Mr. Powers was giving this instruction?

5   A.   He knew that some of the busses were being started.

6   Mr. Swartz knew that, yes.

7   Q.   And is Mr. Swartz considered management at Paul Revere?

8   A.   Yes, ma'am.  Yes.

9   Q.   Is Mr. Powers considered management at Paul Revere?

10  A.   He's an hourly employee; he's a supervisor, dispatcher.

11  Q.   A dispatcher?

12  A.   It -- it's a dispatcher supervisor.  There's really no --

13  Q.   Is he considered a manager?

14  A.   He's not a manager; he's an hourly employee.  Mike Swartz

15  is manager.

16          (Pause.)

17          MR. SANDS:  Page 26.

18  Q.   And what time does the first bus driver arrive?

19  A.   It depends on their pullouts.  This bus pulls out at five

20  o'clock in the morning, 5:05.

21  Q.   So he would arrive at approximately --

22  A.   He -- he had to be there at 5:05 o'clock in the morning.

23  Q.   He has to be there at 5:05 in the morning?

24  A.   Right.  He is --

25  Q.   So the time on his sheet represents the report time?

1   A.   It's the beginning of his shift.  This is his pay.  So if

2   the bus -- if he has to be there at 5:05, he's got to pull out

3   by 5:10 -- I'm sorry -- 5:15, because they give them ten

4   minutes to perform a circle check.  And then depending on how

5   far he's going, they usually give him 20 minutes to get to his

6   starting destination.

7   Q.   You testified that Mr. Powers told you that one of the

8   reasons he started the busses was in order to see if the bus --

9   make sure the bus would start?

10  A.   Correct.

11  Q.   Why would he not want to know that at the outset of the

12  morning, whether -- what busses were not going to start?

13  A.   He -- he wants to know that, that's why -- looking at

14  those other sheets, when the inspector came out and the shifter

15  in the morning would start the busses.

16          MR. SANDS:  May I approach the witness, your Honor?

17          THE COURT:  All right.

18          (Pause.)

19          THE COURT:  Just for the jury's benefit, I think we

20  skipped a page.  There was a page missing.  So you have to

21  start that question and answer again.

22          MR. SANDS:  Starting the question again on page 27.

23  Q.   Why would he not want to know that at the outset of the

24  morning, whether what busses were not going to start?

25  A.   He -- he wants to know that.  That's why, looking at those

1    other sheets, when the inspector came out and looked at it, he

2    would start, the way that's set out, four or five busses.

3    Those were the first four or five busses that were pulling out

4    that morning.

5    Q.    Okay.  But is there any reason that he wouldn't want to

6    know for the rest of the morning busses whether those busses

7    were going to have any problem starting?

8    A.    No.  They all pulled out between five o'clock and

9    seven-thirty.  And the way the sheets were done, he did six in

10   a row, and then at -- 20 minutes later he did six more.  And if

11   you have probably watched that, you will see that on the

12   specific day it would coincide with these sheets here.

13   Q.    Okay.  On March 15, 2006, an EPA inspector visited the

14   Roxbury facility and he found 12 vehicles idling.  Do you have

15   any understanding why these vehicles were idling?

16   A.    My understanding is -- after talking to Mr. Powers, is he

17   would send the person out to make sure they did start.

18   Q.    Does Paul Revere deny that this idling occurred?

19   A.    No.

20   Q.    Do you know who started them --

21   A.    The busses?  I don't.

22   Q.    -- other than it was a cover person?

23   A.    And I know that sometimes one of the mechanics -- the

24   shifter in the morning would start the busses.

25   Q.    When you refer to a shifter --

 1   A.    Someone who works in the yard who pulls busses out.

 2   Q.    Do you have any understanding of why 12 vehicles would

 3   idle for 35 minutes --

 4   A.    No.

 5   Q.    -- all at the same time?

 6   A.    No.  Well, actually, let me rephrase that because there

 7   could be an issue -- a time when you had 12 people pulling out

 8   at the same time, or within ten minutes, if they did a circle

 9   check.  So in reality, you could have 12 busses running.

10   Q.    All at one time?

11   A.    All at one time.

12   Q.    Do you have any understanding why 12 vehicles would run --

13   would all run for over half an hour at one time?

14   A.    No.

15   Q.    Between the hours of 4:30 and 6 a.m., there were only two

16   mechanics on-site; is that correct?

17   A.    Between 4:30 --

18   Q.    And 6 a.m.

19   A.    Yes, ma'am.

20   Q.    Were they given ten minutes to do the circle check?  Is

21   that correct?

22   A.    They were allotted ten minutes; yes, ma'am.

23   Q.    They're allotted ten minutes.  Is it your understanding

24   that it takes more than ten minutes?

25   A.    At times it could be, depending on the weather.

1    Q.    When the weather changes, does Paul Revere change the

2    allotted time?

3    A.    We do not.

4    Q.    What's your understanding of how long it takes to do a

5    circle check in cold weather?

6    A.    If we had frozen air, it depends on how long it took for

7    that to thaw out.

8    Q.    If you had frozen air, would you reassign the bus?

9    A.    Yes.

10   Q.    Is there any policy regarding when idling is permitted

11   that's not written?

12   A.    No, not a policy.  If there was a mechanical issue, you

13   could have a bus idling for more than five minutes.

14   Q.    Let me ask:  For example, is there any policy regarding

15   when you need to consult a supervisor regarding whether you

16   should idle?

17   A.    No.

18   Q.    Is there any policy that would outline what -- what

19   mechanical issues would allow idling to occur?

20   A.    No, not a written policy.  No.

21   Q.    Or a verbal/oral policy?

22   A.    No.  Again, the only time a bus would be idling more than

23   five minutes would be a mechanical issue where a bus wasn't

24   building up air pressure or the alternator wasn't functioning

25   properly.  And if you shut the bus off you wouldn't be able to

1    get it started again until they get it back to the facility.

2    You know, those mechanical issues, that's all.

3    Q.    Is there anything that would specifically outline what

4    mechanical -- what mechanical issues would permit idling?

5    A.    No.  No, ma'am.  No.

6    Q.    Under this policy can a vehicle be idled when no one is

7    present at the vehicle?

8    A.    Again, it depends on the situation.  If you had a bus in

9    the yard that wouldn't start and the mechanic started the bus

10   and you knew that the alternator was bad and it would shut off,

11   and he walked away to jump-start another bus in the morning,

12   that bus might run until he got it into the garage.

13   Q.    Could he allow the bus to run for an hour until he brought

14   it into the garage?

15   A.    No.

16   Q.    Could he allow the bus to run for half an hour until he

17   brought it into the garage?

18   A.    No, that's -- we'd jump the bus.

19   Q.    Okay.  Is there any time outlined for the mechanics as to

20   when they can --

21   A.    No.

22   Q.    -- how long a period they can leave the vehicle?

23   A.    No, not unattended.  Again, you know, a mechanic may work

24   on the bus for an hour if we're trying to find a charging

25   problem or something to that effect.  And, you know, you're not

1  going to find it if -- if the bus is shut off.

2  Q.   Would you agree with me that two mechanics couldn't

3  possibly be working on 12 busses at once?

4  A.   It would be highly unlikely.

5  Q.   Under the policy is passenger warmth a reason to idle

6  under the policy?

7  A.   Passenger comfort is an issue once you have somebody on

8  the vehicle.

9  Q.   So if a passenger is on the vehicle, is the driver

10  committed to idle the vehicle for passenger comfort?

11  A.   Yes.

12  Q.   If a passenger is not on the vehicle, is a driver

13  permitted to idle a vehicle?

14  A.   Not longer than five minutes.

15  Q.   How about driver warmth, if there are no passengers and

16  there's just a driver on the vehicle?

17  A.   No.

18  Q.   Does Paul Revere follow manufacturer recommendations for

19  operating in cold weather?

20  A.   Yes.

21  Q.   Other than giving the written policy and the memo, is

22  there any other training that employees are given regarding

23  idling?

24  A.   Well, no, just stubs.  The check stubs, the announcements,

25  the policies.  Besides hitting them with a baseball bat, I'm

```
 1   not really sure what else we can do, to be honest with you.
 2   Q.   Exhibit No. 8, that letter to Mr. Powers, is that
 3   considered a disciplinary action?
 4   A.   Yes.
 5   Q.   And is that in Mr. Powers' file?
 6   A.   Yes, ma'am, it is.
 7   Q.   And was that similar letter written to Mr. Swartz?
 8   A.   Yes, ma'am.
 9   Q.   And is that letter in his file?
10   A.   Yes, it is.
11   Q.   And is that considered a disciplinary action?
12   A.   It is.
13   Q.   I'm showing what has been marked as Exhibit 10.  Just for
14   the record, is that the letter that you were just referring to
15   to Mr. Swartz?
16   A.   Yes, ma'am, it is.
17   Q.   Is that letter dated May 16th, 2006?
18   A.   Yes, ma'am.
19   Q.   And it's from yourself?
20   A.   It's from me, yes, ma'am.
21   Q.   Prior to writing these letters, did you meet with
22   Mr. Powers?
23   A.   Yes.
24   Q.   Did you meet with Mr. Swartz?
25   A.   Yes.
```

1   Q.   Did you meet with anybody else?

2   A.   I did not.

3   Q.   Other than what you've already told me about the meeting

4   with Mr. Powers, was there anything else that was discussed at

5   those meetings?

6   A.   No.  I went there specifically to the issue that we had

7   the violation that the busses were idling in the morning, and

8   that's what I went there for.  And I asked him, "Are you

9   running the busses in the morning?"  And he said he started the

10  busses, and that's why he was disciplined.

11       MR. SANDS:  That's the deposition of Mr. Daley from

12  January 23, 2008.

13       The deposition of Richard Daley taken on August 29,

14  2007.  "Richard J. Daley, Jr., having been sworn to tell the

15  truth, testified as follows:"

16       (Whereupon, the following portions of the deposition

17  transcript of RICHARD J. DALEY, JR., were read into the record.

18  Attorney Sands read the questions and Christine Sansevero read

19  the answers.  Transcribed as read by Attorney Sands and Ms.

20  Sansevero.)

21  Q.   I don't think you've been asked.  Can you state your full

22  and complete name for the record.

23  A.   Yes.  My name is Richard Joseph Daley, Jr.

24  Q.   Can you please describe your current employment?

25       MS. SANSEVERO:  I'm missing a page.

```
 1              MR. SANDS:  Put it up for her.
 2   A.    Yes.  Right now I'm the general manager of Paul Revere
 3   Transportation.
 4   Q.    And what do your duties include?
 5   A.    The duties include overall responsibility for all aspects
 6   of the business.
 7   Q.    And where's your office located?
 8   A.    My office is at 100 Eastern Ave., Everett -- Chelsea.
 9   Chelsea.
10   Q.    Do you have any offices anywhere else?
11   A.    No, ma'am.
12   Q.    And how long have you had this position?
13   A.    August of 2002 until present.
14   Q.    And before you held this position, were you also at Paul
15   Revere?
16   A.    Yes, ma'am.
17   Q.    When did you come to Paul Revere?
18   A.    January of 2002.
19   Q.    So between January and August, what was your position?
20   A.    I was the director of safety and training.
21   Q.    Could you draw me a diagram of what the facility looks
22   like?  I'm going to ask, if there's a building, can you
23   represent the building and show how the vehicles --
24              MR. FRIEDMANN:  That's not part of it.
25              MR. SANDS:  I'm sorry.  Withdraw that, your Honor.
```

1  Q.   How many employees would be on-site for 24 hours?

2  A.   Depending on the shift, most of the -- the early shift,

3  seven o'clock to three o'clock, you have supervisors and

4  managers there.  From three o'clock to eleven o'clock you would

5  have two supervisors and, of course, all the drivers that were

6  there.

7  Q.   Is that three o'clock a.m. or three o'clock p.m.?

8  A.   Three o'clock p.m.

9  Q.   Three o'clock p.m. to 11 p.m. --

10  A.   Yes.

11  Q.   -- there would be two supervisors?

12  A.   Yes.  And eleven o'clock to seven o'clock.

13  Q.   Eleven o'clock p.m.?

14  A.   Eleven o'clock p.m. to 7 a.m. we have two mechanics and

15  car cleaners and fuelers.  But the car-cleaner shifts are a

16  little different; they come in around eight o'clock.

17  Q.   Eight o'clock p.m.?

18  A.   Eight o'clock p.m., and leave around four o'clock in the

19  morning.

20  Q.   Just to clarify, when you say "car cleaners" --

21  A.   They clean the vehicles and fuel the vehicles.

22  Q.   And how often do you visit the Roxbury facility?

23  A.   Two or three times a week.

24  Q.   And during what hours?

25  A.   Could be any time.  I go there on Saturdays; I go there on

PDF created with pdfFactory trial version www.pdffactory.com

1    Sundays; I go there in the morning.

2    Q.    Could you just approximate for me?

3    A.    I go there in the morning -- I'm out on the street at six

4    o'clock every morning, six-thirty.  But I usually am over in

5    Harvard Square, and then a couple of days a week I'll end up

6    over at the garage.

7    Q.    I guess I didn't ask you what your hours are, so maybe you

8    can --

9    A.    I'm out six-thirty in the morning -- I'm out in the

10   street -- and I don't get home until six-thirty at night on a

11   normal day.

12   Q.    So basically your visits to the facility would be sometime

13   between 6:30 a.m. to 6:30 p.m.?

14   A.    Sometimes I go there on Saturday night at eight o'clock.

15   You know, 24 hours a day, seven days a week.

16   Q.    Has Paul Revere ever received any complaints about the

17   busses smelling like smoke or fumes?

18   A.    Yes.

19   Q.    How often?

20   A.    I'm not sure, but we had a complaint about noise.

21   Q.    Do you recall when that was?

22   A.    I don't.  It was years ago.

23   Q.    And do you recall who that was from?

24   A.    I don't.  I don't know her name.  I know who the woman was

25   who complained about the noise.

PDF created with pdfFactory trial version www.pdffactory.com

```
1   Q.    Okay.
2   A.    She's the woman that lived right behind the garage.
3   Q.    So you're referring to a neighbor that complained about
4   the smell?
5   A.    Yes, ma'am.
6            MR. FRIEDMANN:  Objection, your Honor.
7            THE COURT:  Yeah, that was altered by the errata
8   sheet.
9            MR. FRIEDMANN:  May that answer be stricken?
10           THE COURT:  That answer will be stricken.
11           There's an answer from the errata sheet, I believe.
12  Q.    Do you have any manuals --
13           MR. FRIEDMANN:  May I have the correct question and
14  answer read back?
15           THE COURT:  Why don't you just give him your copy, if
16  they don't have it.
17           MR. FRIEDMANN:  May I take it over to the witness if
18  the errata sheet is missing?
19           THE COURT:  Fine.
20  Q.    So you're referring to a neighbor that complained about
21  smells?
22  A.    No, noise.
23           MR. SANDS:  If I may beg the Court's indulgence for a
24  moment, I don't want to go into something --
25           THE COURT:  All right.
```

```
 1              MR. FRIEDMANN:  If I can get my transcript back.
 2              THE COURT:  Yes.
 3              (Pause.)
 4    Q.    Do you have any manuals for the vehicles at the Roxbury
 5    lot?
 6    A.    Yes, ma'am.
 7    Q.    Do you know where those are?
 8    A.    They're in the lot in the garage.
 9    Q.    Do you know if you have them for all the vehicles?
10    A.    I don't believe we have them for all the vehicles, no.
11    Q.    How about the Thomas and Neoplans?
12    A.    We have books for those also.
13    Q.    The complaint that we talked about earlier from the
14    neighbor, do you know who received that complaint?
15    A.    I do.  John Carney.
16    Q.    How do you know it was John Carney?
17    A.    Because he told me.
18    Q.    Do you know when he told you?
19    A.    I don't remember.
20    Q.    Was it approximately around the time period --
21    A.    I think -- to be honest with you, I think it was before I
22    got there that the complaint came in.
23    Q.    It was before 2002?
24    A.    Yes.
25    Q.    So then do you recall the conversation that you had with
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Mr. Carney?

2    A.    The conversation I had basically was the fact that the

3    woman was complaining that the people were running the busses.

4    Q.    Do you remember why he was telling you this?

5    A.    Because he had a complaint, that's all.

6    Q.    Do you know around the time period that he told you?  Was

7    it approximately 2002 or sometime later?

8    A.    It was right after I got there.

9    Q.    So probably around 2002?

10   A.    That's a guesstimation, though.

11   Q.    Do you know what was done in response to this complaint?

12   A.    I do.  John Carney gave the woman his telephone number,

13   and told her if she had any more problems, to call him

14   immediately.

15   Q.    Do you know if there was anything else that was done in

16   response to the complaint?

17   A.    The operators and mechanics were told make sure they don't

18   idle the busses longer than have [sic] to.

19   Q.    Are there any other complaints that you're aware of?

20   A.    No.

21   Q.    There has been idling at the Roxbury facility.  Are you

22   aware of this?

23   A.    Yes, ma'am.

24   Q.    And what's your understanding of who was idling vehicles

25   at that time?

1    A.    To my knowledge, Mr. Powers had started some of the busses

2    on cold mornings.

3    Q.    And I'm just going to ask, how did you come to be aware

4    that Mr. Powers was starting busses -- or what is your

5    understanding based on?

6    A.    Based on the fact that we got a violation and I went over

7    there and asked him -- I'm sorry.  I went over there and asked

8    them what they were doing.

9    Q.    Did you ever witness any idling?

10   A.    I did not.

11   Q.    And what is your understanding for the reasons that the

12   busses were being idled?

13   A.    Mr. Powers stated to me because the people were

14   complaining that the busses were cold in the early a.m.

15   Q.    Who else, to your knowledge, has knowledge of this idling?

16   A.    Mike Swartz.

17   Q.    Anyone else?

18   A.    No.

19         MR. SANDS:  That concludes the reading of the

20   deposition of Mr. Daley from August of 2007.

21         We have no other deposition designations to read into

22   the record, your Honor.

23         THE COURT:  Okay.

24         What's next?

25         MR. SANDS:  There are a number of facts that have been

1  stipulated to by the parties.

2      THE COURT:  Okay.  I'll just tell the jurors that

3  occasionally in cases like this the parties agree that certain

4  facts are true, and they enter what's called a stipulation, or

5  an agreement; that you may take these facts as established in

6  the case.

7      Go ahead, sir.

8      MR. SANDS:  The EPA sent a notice of violation to Paul

9  Revere on April 13, 2006, regarding the violations.  Mr. Powers

10  told Mr. Daley that he would instruct the cover person to start

11  the vehicles.  Drivers do not service the vehicles.  Paul

12  Revere operates a number of busses, but most are either Thomas

13  busses or Neoplans.  Paul Revere's pre-trip inspection does not

14  include a temperature requirement for operating.  Most of Paul

15  Revere's morning runs left the Roxbury facility before six

16  o'clock a.m.

17      MS. HANKEY:  Your Honor, the United States would like

18  to move into evidence a number of exhibits.

19      THE COURT:  All right.

20      MS. HANKEY:  The first is Exhibit -- Government

21  Exhibit 6, which is the May 16, 2006 --

22      THE COURT:  Are these agreed exhibits or is it going

23  to be a mix of agreed and unagreed?  I just want to know what

24  to expect, that's all.

25      MR. FRIEDMANN:  Your Honor, there are a whole series

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   of exhibits that they are seeking to introduce.  Most of those
 2   we agree with, and I'll let -- if you want --
 3           THE COURT:  Let's do those.  And then if there are
 4   some that there are issues, let's come to those afterwards.
 5   Let's do first the ones that can just be admitted because
 6   there's no dispute.
 7           Go ahead.
 8           MS. HANKEY:  The first is Government Exhibit 6.
 9           THE COURT:  Now, do you want these agreed -- they
10   could be shown to the jury as you're enumerating them or not?
11   I have it on the screen; that's why I'm asking.
12           MS. HANKEY:  I don't think it's necessary.
13           THE COURT:  No?  Okay.
14           MS. HANKEY:  The next is Government Exhibit 7; the
15   next, Government Exhibit 8, page 1 and pages 63 to 65; the next
16   is Government Exhibit 11, pages 6 and 7; Government Exhibit
17   33 --
18           MR. FRIEDMANN:  Excuse me, your Honor.  I think this
19   is one that we have to come back and talk about a little bit at
20   sidebar.  But perhaps we should hold that till -- when we have
21   to discuss any other ones.
22           THE COURT:  All right.  Put it to the side and we'll
23   come back to it.
24           MS. HANKEY:  All right.
25           Government No. 100, page 8 and 9; and then Government
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Exhibit 103.

2            (Government Exhibit Nos. 6; 7; 8, pages 1 and 63

3    through 65; 11, pages 6 and 7; and 100, pages 8 and 9, received

4    into evidence.)

5            MR. FRIEDMANN:  That's one, also, your Honor, that we

6    have to have some discussion with you at sidebar.

7            MS. HANKEY:  The remainder of them are --

8            MR. FRIEDMANN:  Actually -- yes, I think you're right.

9    I think you skipped Number 2.

10            MS. HANKEY:  I skipped Number 2.

11            The remainder is Government Exhibit 115 --

12            MR. FRIEDMANN:  We have a dispute over that, your

13    Honor.

14            MS. HANKEY:  -- and Government Exhibit 122.

15            MR. FRIEDMANN:  We also have a dispute over that.

16            THE COURT:  Okay.  Perhaps the best thing is to excuse

17    the jury just for a few minutes as we resolve those, and then

18    we'll have you back.  So we'll excuse you just for a few

19    minutes.  We'll try to be expeditious about this.

20            THE CLERK:  All rise for the jury.

21            (Jury out at 9:49 a.m.)

22            THE COURT:  Okay.

23            MS. HANKEY:  Should we start with Government Exhibit

24    103?

25            MR. FRIEDMANN:  Well, 33 may be the easiest.  First

1    off, you had told me you were going to admit 2, which I had no

2    objection to.  I didn't know if you were meaning to still admit

3    that.

4            MS. HANKEY:  We're not meaning to still admit that.

5            MR. FRIEDMANN:  Okay.  I didn't want you to think I

6    was objecting to it.

7            On Exhibit 33, your Honor, I'm not sure -- we each

8    seem to have a different idea of what is agreed to and isn't

9    agreed to on our stipulated list.  I would just draw the

10   Court's attention to the unobjected-to exhibits for liability

11   in the pretrial memorandum.  And in that, on Exhibit 33 -- and

12   this was a document we were proposing, was that the government

13   would only agree to it being admitted if Mr. Wong or Mr. Lyons

14   testifies.  Mr. Lyons is obviously testifying in the penalty

15   phase; Dr. Wong is not.

16           I think there may be some confusion between my sister

17   and I which exhibit this is.  I think 32 is the one, which is

18   right before it, that has the information; she thinks 33.  I

19   just want to make sure we're getting the right document in and

20   there's not confusion over the document, because this is one

21   that they said they objected to us introducing unless these

22   other people testified.

23           So I just wanted to make sure we're talking about the

24   same exhibit to make sure that we're introducing -- what we're

25   introducing, we both believe is being introduced.

```
 1              THE COURT:  All I have is the list that was in the
 2    pretrial, which lists a 32 and a 33.
 3              MR. FRIEDMANN:  Correct.
 4              THE COURT:  And if those are the two you're talking
 5    about, then --
 6              MR. FRIEDMANN:  Yes.
 7              MS. HANKEY:  Yes.
 8              THE COURT:  -- the question is:  Which do you really
 9    mean?
10              MR. FRIEDMANN:  Correct.  Because my -- 33 I have is
11    the same as --
12              MS. HANKEY:  He just turned the page.
13              MR. FRIEDMANN:  Yeah.  If you could go back to the
14    first page of 33, I agree that that's 33 and that they had
15    said -- they were objecting to it unless certain people
16    testified.  And so I just wanted to make sure that we were
17    clear that we were putting in the right exhibit.
18              So I withdraw my objection --
19              THE COURT:  You're happy to have it in; you just want
20    to make sure there's no problem later?
21              MR. FRIEDMANN:  Absolutely.  That's correct.
22              MS. HANKEY:  The actual -- same document is on there.
23              MR. FRIEDMANN:  Right.  It was something we had
24    proposed, but I just wanted to make sure we were talking about
25    the same document because they had objected to it partially
```

1    before for some reason, so...

2         MS. HANKEY:  The exhibit list was mislabeled, and

3    Exhibit 32 should have had the objection instead of Exhibit 33.

4         THE COURT:  I see.

5         MS. HANKEY:  There's several different exhibits that

6    is all weather data.  One is weather data that was provided to

7    the experts, and that was Exhibit 32.

8         MR. FRIEDMANN:  That is important to us because we're

9    intending to use Exhibit 32 and -- which is different than what

10   you just saw.  We were, from the pretrial memo, led to believe

11   that they were objecting to 33, not to 32.

12        THE COURT:  Right.

13        MR. FRIEDMANN:  And so we're going to be offering 32

14   as an unobjected-to exhibit later on.

15        THE COURT:  In this phase?

16        MR. FRIEDMANN:  In this phase; yes.

17        MS. HANKEY:  And it was in error, your Honor.  And I

18   guess I would object because -- you'll see when he introduces

19   the weather data, that while Exhibit 33 is certified weather

20   data from the National Climatic Data Center, Exhibit 32 is

21   weather data that was downloaded from the Internet by defendant

22   and provided to their experts.  And so Exhibit 32 is on the --

23        THE COURT:  Right.  I understand.

24        MR. FRIEDMANN:  It has the same data for the same

25   dates -- these are discrete dates; these are the seven days --

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   it's just in a different format, and I just find it easier to
 2   read, quite frankly, than 33 or 44, which has the same --
 3             THE COURT:  How are you going to introduce it?
 4             MR. FRIEDMANN:  I was just going to offer it as an
 5   agreed-upon exhibit.
 6             THE COURT:  It's not agreed, apparently.
 7             MS. HANKEY:  It's not agreed.
 8             MR. FRIEDMANN:  That's the problem.  When we were at
 9   the pretrial --
10             THE COURT:  Oh, I see.  It was then agreed?
11             MR. FRIEDMANN:  -- we were told it was agreed, and now
12   we're being told it's not agreed.
13             MS. HANKEY:  I guess I would point out the same is
14   true with Ms. Mary Jayne Fay's notes.  The defendant had
15   stipulated through that --
16             THE COURT:  We're talking about this right now.
17             MR. FRIEDMANN:  Weather data is weather data.  Again,
18   it's easier for me to read in one format versus another format.
19             MS. HANKEY:  I guess my objection is it's not the same
20   weather data.  It's from the WeatherUnderground.com.  It's not
21   certified.
22             THE COURT:  Does it show different temperatures?
23             MS. HANKEY:  I believe it does.
24             MR. FRIEDMANN:  I don't believe it does.  I think it
25   shows -- one shows it by hour; one shows highest and lowest.
```

 1   So it's just easier to get to highest and lowest.  But it's

 2   also in Exhibit 44, so I guess we'll deal with it at that

 3   point.

 4           THE COURT:  All right.  At any rate, the government is

 5   offering 33, and there's no objection?

 6           MS. HANKEY:  Correct.

 7           MR. FRIEDMANN:  No.

 8           THE COURT:  Done.

 9           (Government Exhibit No. 33 received into evidence.)

10           MS. HANKEY:  And then the next exhibit is Exhibit 103.

11           MR. FRIEDMANN:  Yes.

12           MS. HANKEY:  This, your Honor --

13           THE COURT:  Now you've exceeded my list.

14           MR. FRIEDMANN:  There should be a separate plaintiff's

15   contested list that it would be a separate schedule, your

16   Honor.  I think it might be Attachment G to the pretrial

17   memorandum.

18           THE COURT:  Yeah, but it's not numbered.

19           MS. HANKEY:  Right.  It's not -- the pretrial list

20   does not have the trial exhibit numbers.  Would your Honor like

21   me to approach with it?

22           THE COURT:  If it will help.

23           MR. FRIEDMANN:  Your Honor, I have another copy.

24           MS. HANKEY:  This just has the trial exhibit numbers.

25           MR. FRIEDMANN:  That's what I was going to...

1          THE COURT:  Okay.

2          MS. HANKEY:  It's just a calendar for the year 2006,

3    your Honor, which you have up on the screen, so I don't know

4    what the objection is.

5          MR. FRIEDMANN:  I don't know what the relevance is of

6    the calendar.  We have certain very discrete dates that are in

7    dispute; we have the records from those discrete dates.

8          MS. HANKEY:  There's a disagreement with respect to

9    the number and dates at issue.  But, your Honor, all that the

10   calendar does is shows the dates -- it allows the jury to see

11   the dates on which the inspector went to visit.

12         THE COURT:  It can be admitted.

13         (Government Exhibit No. 103 received into evidence.)

14         MS. HANKEY:  And then the next is Exhibit 115.  This

15   is the letter, your Honor, that was used in opening from the

16   city, the purpose of which is simply notice.

17         MR. FRIEDMANN:  Our objection is the same one we made

18   before, that they had tried to introduce it as a business

19   record, and your Honor said you would not permit it to be

20   entered as a business record.

21         MS. HANKEY:  Right.  You ruled it could be admitted as

22   notice.

23         THE COURT:  No dispute about the foundational facts

24   that it was sent and received?

25         MR. FRIEDMANN:  Correct.

1              THE COURT:  It can be admitted.

2              MR. FRIEDMANN:  For notice purposes?

3              THE COURT:  Yes.

4              MR. FRIEDMANN:  Yes.  That was our --

5              (Government Exhibit No. 115 received into evidence.)

6              MS. HANKEY:  And then the next is Exhibit 122.  These

7    were also some of the documents used in opening, your Honor.

8    And these are the ones which have been marked with -- where

9    "violations" has been changed to "vehicles."

10             MR. FRIEDMANN:  I just wanted to make sure the changes

11   had been made -- that was my concern -- before it got admitted.

12             THE COURT:  The change was, as I recall, "total number

13   of violations" on some of them was changed to "total number of

14   vehicles"?

15             MS. HANKEY:  Correct.

16             MR. FRIEDMANN:  Correct.  That was my only concern,

17   was to make sure that had been changed before it went to the

18   jury.

19             THE COURT:  And that has been done?

20             MS. HANKEY:  Correct, your Honor.

21             THE COURT:  Then I guess there's no objection to it as

22   revised.

23             (Government Exhibit No. 122 received into evidence.)

24             MS. HANKEY:  That's it.

25             MR. FRIEDMANN:  I wasn't sure, just whether you were

1    going to consider that a different number, the 123A versus what

2    was originally there, if that was something you were doing on

3    the record also.

4              MS. HANKEY:  We will change them within the binders

5    that are submitted and -- I don't -- there hasn't ever been --

6              THE COURT:  I think the record is clear enough on it.

7    It's a simple-enough change that I don't think we need to mark

8    a separate set.

9              MR. FRIEDMANN:  Okay.

10             THE COURT:  All right.  So we can bring the jury back

11   in and you'll move the rest of those?

12             MS. HANKEY:  Yes, your Honor.

13             THE COURT:  And then?

14             MS. HANKEY:  And then rest.

15             THE COURT:  Okay.

16             MR. FRIEDMANN:  And then I'm going to have a couple of

17   motions, your Honor.

18             THE COURT:  I'm just concerned about in and out.  Do

19   you need to have the jury in to put those in?

20             MS. HANKEY:  No.  If the Court doesn't feel it's

21   necessary.

22             THE COURT:  It's a pure matter of inconvenience.  If

23   you feel it has any implication to your case, do it your way,

24   but I don't think it does.

25             MS. HANKEY:  We're not going to be displaying them to

1    the jury at this point, so...

2         THE COURT:  All right.  So we'll consider those

3    admitted, then, the ones we just discussed.  And the government

4    rests.  I'll let you say "rest" later as well so they can see

5    that.  But, now, just so we can get to the motions.

6         MR. FRIEDMANN:  I actually have three different

7    motions, your Honor.

8         If I could, your Honor -- and it may make it

9    convenient for your Honor to understand where we're going with

10   this, our motions -- there are three different motions.  They

11   relate to different segments of the case, different proofs in

12   the case.  I think the easiest one to deal with first is the

13   one that we've entitled -- the one that says in its title "With

14   respect to Brookline Avenue idling."

15        This one is purely procedural.  I know the government

16   has indicated partway through the case that they've withdrawn

17   this claim and they weren't bringing it, but it was part of

18   what was in the complaint; it was part of what was in the NOV.

19   And so, of record, this claim is still there.  I think for Rule

20   54(b) purposes we need to have something on the record to enter

21   for judgment for the defendant on that claim so that we don't

22   have a Rule 54(b) problem later on.

23        MS. HANKEY:  I actually don't think the complaint

24   makes any specific reference to the Brookline -- he's correct

25   that it's in the NOV, but I don't believe that there's any

PDF created with pdfFactory trial version www.pdffactory.com

```
1    reference in the complaint, so I don't think it's necessary.

2            MR. FRIEDMANN:  My memory is the complaint says not

3    only specific dates but also says "and other events" or "other

4    dates," and this would be one of them.

5            THE COURT:  This is more general.

6            MR. FRIEDMANN:  And, again, it's just to make sure on

7    the record that it's clear that the case is not proceeding on

8    that claim.  Although the jury was instructed to some extent,

9    I'm just concerned that we later on have an issue of we don't

10   have all claims having been decided under Rule 54(b), and this

11   takes care of that issue.

12           THE COURT:  Well, I understand the interest.  It seems

13   to me it's not a separate claim, at least as framed.  It's a

14   separate --

15           MR. FRIEDMANN:  Subset, perhaps.

16           THE COURT:  -- subset of evidence that supports the

17   claim that is made.  I don't know if that's appropriate for a

18   Rule 50 motion or not.

19           MR. FRIEDMANN:  I'm sorry?

20           THE COURT:  I'm not sure whether it's either necessary

21   or appropriate under Rule 50 to simply say that some of the

22   evidence that might have supported the general claim doesn't.

23           MR. FRIEDMANN:  Well, as long as we're clear on the

24   record --

25           MS. HANKEY:  Or isn't being offered.
```

```
1              THE COURT:  Yeah, or isn't --
2              MR. FRIEDMANN:  -- that date that was in the NOV, and
3    those claims are not claims going to jury.  As long as that's
4    clear that's not being submitted and the jury will be
5    instructed on that --
6              MS. HANKEY:  We're perfectly willing to relate that
7    any alleged instances of idling at the Brookline facility are
8    not going to be submitted to the jury.
9              THE COURT:  Well, they're not in evidence.  There's no
10   way a jury could rely on them in coming to a conclusion.
11             MR. FRIEDMANN:  There were some dates that were in the
12   notes and in the NOV -- well, in some of the --
13             MR. SANDS:  The NOV wasn't submitted.
14             MR. FRIEDMANN:  There were some in the notes that were
15   submitted.  And that was my concern, was just to be extra safe
16   to make sure this claim is not going to the jury -- or this
17   piece of the claim.
18             THE COURT:  I thought we took --
19             MS. HANKEY:  We've redacted.
20             THE COURT:  Mr. Mohamoud's notes, I thought we took
21   out the Brookline --
22             MS. HANKEY:  That's correct.
23             MR. FRIEDMANN:  I wasn't sure that had been done, your
24   Honor.
25             MS. HANKEY:  That's correct, your Honor.
```

1         MR. FRIEDMANN:  So --

2         THE COURT:  So it's a potential theory that hasn't

3    been present that could have supported the --

4         MR. FRIEDMANN:  As long as it's clear that's not going

5    to the jury, that's all I wanted to make sure.

6         THE COURT:  All right.

7         MR. FRIEDMANN:  That was the easy one.

8         The next component, your Honor, is what we have been

9    referring to as the habit-and-routine claims, the supposed 500

10   additional violations.  If your Honor recalled that the

11   government had said that the habit was allegedly supported by

12   admissions from Mr. Swartz and Mr. Carney, which such

13   admissions have never been tendered to the Court.  The

14   statement was made to the Court that Mr. Swartz -- that there

15   was going to be testimony that Mr. Swartz and Mr. Carney said

16   that the busses were started every time it was below 35

17   degrees.  In fact, that testimony was never adduced; there has

18   been no testimony of habit here.

19        They put in no evidence of any of the prior dates

20   between the statute of limitations date of April 16, 2001,

21   running through the complaint.  And I would suggest, therefore,

22   your Honor, that only observed instances are what are left in

23   the case and that the unobserved claimed habit violations had

24   not met the burden of proof either under Rule 406 or under the

25   burden-shifting paradigm that your Honor had suggested, and

PDF created with pdfFactory trial version www.pdffactory.com

1    those claims should not go to the jury.

2           MS. HANKEY:  If I could, your Honor, I think that --

3    first off, we need to segregate in terms of exactly when we're

4    talking about.  There's two different time periods involved,

5    right?  There's the entire five years, and then there's the

6    seven weeks that the inspector went to the facility.

7           With respect to the five years, it's correct, the

8    United States did not put in any evidence regarding -- well,

9    and we didn't -- we aren't going to be seeking any allegations

10   with respect to the days over the last five years where it was

11   under 35 degrees with -- and I'm not counting Mary Jayne Fay's

12   testimony with respect to her specific observations during that

13   time period.

14          MR. FRIEDMANN:  I was not meaning to indicate that

15   either, your Honor.  I was meaning to exclude.

16          THE COURT:  I don't understand.  I don't understand

17   that last reservation.

18          MR. SANDS:  With respect to Dr. --

19          THE COURT:  You're not counting on which side of the

20   ledger? is what my question is.

21          MR. SANDS:  With respect to Dr. Fay, your Honor, we

22   still believe that her testimony establishes that there were

23   instances that she observed the violations that were before the

24   seven-week period that was observed by the inspector.

25          MR. FRIEDMANN:  Your Honor, I wasn't --

```
 1              THE COURT:  I understand.  We'll come to that issue.
 2    I just wanted to be clear whether you were including in what
 3    you were talking about in terms of the --
 4              MR. FRIEDMANN:  I was not.
 5              THE COURT:  -- more general habit evidence or not.
 6              MR. FRIEDMANN:  I was not meaning to include Ms. Fay,
 7    any of her testimony, in the portion I was just addressing, but
 8    I will address --
 9              THE COURT:  The motion isn't addressed to her --
10    separately.
11              MR. FRIEDMANN:  -- separately.
12              MS. HANKEY:  But I would like to address, your Honor,
13    the seven-week period in which the inspector made observations.
14    Essentially, what defendant is suggesting to the Court is that
15    the Court should preclude the United States from arguing that
16    circumstantial evidence supports findings of violations, and I
17    would suggest there's nothing in the statute and there's
18    nothing in the rules that would suggest that a party cannot use
19    circumstantial evidence to support a claim.
20              And in this case, frankly, your Honor, the evidence is
21    pretty overwhelming.  If I could -- and I just sort of -- as
22    background, I think it's -- this notion is actually extremely
23    problematic.  I mean, you're talking about an agency that's
24    regulating activity, and the standard that defendant is
25    suggesting the Court has to adopt is that the agency has to be
```

PDF created with pdfFactory trial version www.pdffactory.com

1    there to observe the violations in order to ever allege that a

2    violation occurred.  And that's --

3              Not that calendar.

4              Sorry.  You're setting a standard that essentially

5    means the agency would almost have a very limited ability to

6    enforce the law if the standard is such that they could only

7    ever enforce it if an inspector was there observing the

8    violations as opposed to presenting circumstantial evidence

9    that the violation occurred.

10             Your Honor, in our pretrial memorandum we noted for

11   the Court that the First Circuit has noted that circumstantial

12   evidence may be given the same weight as direct evidence, and

13   there's two different kinds of circumstantial -- circumstantial

14   evidence.  And also, there's direct evidence that violations

15   occurred not only the days that the inspector went to visit but

16   during all of the days during that period of seven weeks.

17             The first days --

18             THE COURT:  Let me just ask you how you define the

19   period:  from the beginning date and the last date of

20   Mr. Mohamoud.

21             MS. HANKEY:  Correct.

22             THE COURT:  So it would be March 1st to April 12th?

23             MS. HANKEY:  Correct.

24             THE COURT:  And I would presume it would be business

25   days?  We just had testimony they don't run on weekends.

1           MS. HANKEY:  Yes, your Honor.  Only on business days.

2           The inspector went once a week for seven weeks.  And

3    every single time he went to the facility he witnessed large

4    numbers of violations.  And, in fact, if you look at the time

5    of day that he went, based on the time of day that he showed

6    up, he witnessed almost the exact number of violations.

7           So when he showed up at 5:26 or 5:30 in the morning,

8    he witnessed almost the same number of violations as when he

9    went on previous days.  And when he went earlier in the

10   morning, at 4:30 or a little before five o'clock, he witnessed

11   almost the same number of violations, which we have a chart

12   that illustrates that, if we could find it.

13          And in addition to that, if you look at the letter

14   that was sent to Mr. Swartz, the admission that was made --

15          Could you highlight the first paragraph?

16          Remember, the context of this letter is that Paul

17   Revere had gone and met with EPA and discussed what the

18   allegations were.  And in response they sent this letter to

19   Mr. Swartz, and also a letter to Mr. Powers, disciplining them

20   for violating the rule.  And in that letter it says, "As you

21   are aware, on April 17, 2006, Paul Revere Transportation

22   received a notice of violation from the Environmental

23   Protection Agency pertaining to busses at the Roxbury garage

24   violating the five-minute idling rule.  The allegations are

25   that for a period of seven weeks, one of their inspectors

PDF created with pdfFactory trial version www.pdffactory.com

1    monitored the garage and reported that every morning at 5 a.m.

2    someone at the Paul Revere Transportation started every bus at

3    the location and allowed them to run until the busses pulled

4    out for customer service."

5         "And when I questioned you regarding the busses

6    running in the yard on cold mornings, you stated that you were

7    aware that the busses were running.  You also stated that you

8    were aware that Mr. Powers told the shifters, 'Start the busses

9    at 5 a.m. on cold mornings.'"

10        And if you remember earlier in the letter Mr. Daley

11   states that these acts were, in fact, a violation of the EPA

12   five-minute idling rule.

13        Now, the dispute in this case is with respect to

14   whether, when Mr. Powers sent the shifter out in the morning,

15   that was necessary.  There's no evidence that the behavior on

16   the part of the defendant differed from day to day.  And, in

17   fact, Mr. Friedmann told the jury in his opening that, in fact,

18   this was Paul Revere's regular practice, that as part of their

19   routine they would send someone out in the morning to start the

20   busses.

21        And if on Tuesday that was a violation, there's no

22   evidence to suggest that on Wednesday, on Thursday, on Friday

23   that it wasn't also a violation.  The dispute -- there's no

24   dispute here that there was a practice of starting busses; the

25   dispute is with respect to the necessity.  And if the jury

PDF created with pdfFactory trial version www.pdffactory.com

1    makes a finding that on Tuesday that practice was not

2    necessary, the standard here is preponderance of the evidence.

3    Is it more likely than not that Paul Revere violated this

4    idling rule on Thursday, on Friday, on Wednesday?

5         And given this evidence, I think it's almost -- I

6    think it's, you know, very reasonable to say that it was more

7    likely than not that if you had a violation on Tuesday, and

8    then on Wednesday the following week, and then on Tuesday the

9    following week, and then on Thursday the following week, and

10   then on Monday the following week, that, in fact, you also had

11   violations on the other days of the week.

12        MR. FRIEDMANN:  Your Honor, my sister did read in the

13   first two sentences of that letter, and it says in the second

14   sentence "The allegations are," and there's a colon, and the

15   letter states what the allegations are.  The fact that those

16   are allegations made against us doesn't mean that we agree with

17   them.  It doesn't mean that we were doing the things that were

18   alleged by the government to be our practice.

19        What we are stuck with here, whether it's a burden to

20   the government or not, just like in every case where there is a

21   burden of proof and sometimes you don't have evidence to prove

22   it, doesn't mean you change the burden of proof because it's

23   inconvenient or you don't have the proof; it means that you

24   didn't have the proof to establish the predicate facts

25   necessary to get the case to the jury.  It doesn't matter

PDF created with pdfFactory trial version www.pdffactory.com

1    whether it's a government agency, a plaintiff in a tort case or

2    any other type of case.

3          The fact that busses were being idled on certain days

4    does not establish a pattern.  In fact, their own witness,

5    Ms. Sansevero, got on the stand yesterday and told you that she

6    had gone to the facility and that there had been inspections on

7    other days where they found no violations.  So what is the

8    pattern or habit if sometimes they go and there's a violation

9    claimed and other times they go and there's not a violation

10   claimed?

11         Under the standard of 406(b), for them to establish a

12   pattern they have to have numerous violations showing that it

13   is a reflexive action in response to the stimulus.  They have

14   not established that.  They've said on seven days they went --

15   and, quite frankly, if they thought there were violations on

16   other days, they had it well within their control to go there

17   every single day, or every other day, or continued going, had

18   they chosen to.  That's, however, their burden of establishing

19   enough occurrences with specificity to even start down the road

20   of 406(b).

21         Then you have the second level of this, which is even

22   if you find that there was some habit -- and by the way, your

23   Honor, 406(b) says you need specific instances, you need

24   numerosity, and then you can use that to prove a specific

25   instance.  Most notably is they're not looking to do that:

1    They're looking to say, "Well, because we saw it on seven

2    occasions, therefore it must have happened on all these other

3    occasions."  They've not cited a single case that supports the

4    supposition that you can use the rule on its head like that.

5    The rule doesn't apply that way.  It's numerous instances,

6    which the First Circuit has even said that 75 to 100 cases --

7    examples -- is not sufficient numerosity to prove habit.

8            But here you also have a second piece of it because

9    it's not just operation.  As your Honor knows, the standard for

10   them is operation plus.  They have to be able to say there was

11   no driver there, there was no this there or there was no that

12   there.  All of these supposed dates, these in-between dates,

13   they have absolutely no evidence of the plus on.

14           So you have a situation where they have no plus, they

15   have their own people testifying that this was not what they

16   observed every single time, and they're trying to use 406(b) on

17   its head in a way that does not prove a specific instance, but

18   they're trying to prove general instances.  The standard under

19   406 for them to do it is that they have to prove it with

20   specificity.

21           So I would suggest, your Honor, not only haven't they

22   made out their 406(b) requirements, but in addition, with the

23   standard of proof, the shifting burden of proof that they have,

24   they haven't made out that either, the first element, to put

25   the onus on us.  Although they want to say it's up to us to

1   have to disprove it, they have to first show operation in

2   excess of five minutes and something additional before it

3   shifts to us.

4       And on these other dates where they chose not to have

5   their inspector there, they don't have any proof of it.  And so

6   it would be inappropriate to say, "Well, because we chose not

7   to go out there on a particular date, we're still going to

8   imply liability on you."  That's not the standard.

9       THE COURT:  We're going to confine ourselves to the

10  time March 1 to April 12, because the government's not offering

11  anything beyond that.

12      MS. HANKEY:  That's correct.

13      THE COURT:  As to that, I think that the government's

14  evidence is sufficient to satisfy the first step of the burden

15  shifting, which supports an inference, prima facie, of

16  unnecessary operation in excess of five minutes.  It does not

17  mean at this stage we've considered whether the government's

18  carried its burden of proof as to the entire claim as to those

19  days, and that may be a matter for review at the end of all the

20  evidence in the case.  But at this stage, given the allocation

21  of the burden as to that period, this motion is denied.

22      MR. FRIEDMANN:  So you're letting them put in

23  unobserved occurrences?

24      THE COURT:  No.

25      MS. HANKEY:  The evidence is --

PDF created with pdfFactory trial version www.pdffactory.com

1    THE COURT:  The evidence would support an inference

2    that it's more likely than not that similar observations would

3    have been made on the intervening days.

4    MR. FRIEDMANN:  Had they chosen to do that.

5    THE COURT:  As a prima facie matter, right.

6    MR. FRIEDMANN:  We would also like to address on

7    Ms. Fay's testimony, not her observed days, but the same issue

8    where she says that, you know, sometimes she saw busses out

9    there --

10    THE COURT:  Because there may have been some

11    adjustment in the course of the trial, let me hear what the

12    government's intention is with respect to the Fay testimony.

13    MR. FRIEDMANN:  Sure.

14    MR. SANDS:  With respect to Dr. Fay's testimony, your

15    Honor, we believe that we presented evidence through Dr. Fay

16    that she observed violations on numerous occasions.  I believe

17    she testified at least ten times each year.  We would only be

18    limiting that to the period that's within the statute of

19    limitations, but we believe that the jury's allowed to make the

20    inference and draw the conclusion from her testimony that she,

21    in fact -- if they believe her testimony that on those dates

22    that are noted in her notes -- and she testified that she

23    didn't make notes on each of those occasions that she witnessed

24    it but that she did, in fact, witness it on at least ten

25    occasions per year -- that the jury's allowed to make that

1    inference that -- and draw their own conclusion as to whether

2    or not it's reasonable for them to find that during that period

3    of time Ms. Fay was there, between 2002 and 2006 -- I guess

4    we'll whittle it to 2006 again, April 12th -- that the jury --

5    I mean, that she observed violations on numerous occasions up

6    to ten times per year.

7              MR. FRIEDMANN:  Your Honor, her testimony was very

8    equivocal on what she observed.  She said sometimes she wrote

9    it down, sometimes she didn't.  She couldn't say that on any

10   specific date that she hadn't -- I'm only dealing with dates

11   that she has not written down.  I'm not suggesting that the

12   dates that she has written notes on, that those go out.  This

13   is only on the dates that she had no notes for where she said,

14   "Yeah, you know, in some years I saw it ten times."  "I can't

15   tell you how many busses; I can't tell you how long; I can't

16   tell you if it was necessary."  "I saw people out there working

17   on them sometimes.  I saw their hoods open other times.  I saw

18   them being charged other times."

19             It's, at best, equivocal evidence where she can't give

20   any specifics of the number of vehicles, whether they were over

21   five minutes, the dates they occurred on, whether they were

22   being serviced or not being serviced.  And she admitted that

23   since February of '05 she didn't make any notes, for '05, '06,

24   '07 and '08.  And I would suggest that that's just not enough

25   to make us have to bear a burden of disproving.  Again, I'm not

PDF created with pdfFactory trial version www.pdffactory.com

1    addressing the ones with her notes.

2         THE COURT:  I understand the objection is not to the

3    six identified dates that she testified to --

4         MR. FRIEDMANN:  Correct.

5         THE COURT:  -- but to whether her evidence would

6    support an inference similar to the inference that I just said

7    was sufficient with respect to the March-April '06 period.  And

8    I think that the inference is not as strong.  And, in fact, I

9    don't think it's strong enough.  So that we'll leave in the

10   specific dates, but this is not a tight period as the other

11   period is where -- and with observations clearly on a sort of

12   linear time frame where you can -- with connecting the dots in

13   between.

14        MR. SANDS:  If I might, your Honor?

15        THE COURT:  It's just more plausible on the evidence

16   than the Fay testimony.

17        MR. SANDS:  If I may respond quickly, your Honor?

18        THE COURT:  Well, you've just lost, but go ahead.

19        MR. SANDS:  What Ms. Fay testified to is that she

20   never contacted the company unless she saw multiple busses

21   running for at least half an hour.  That is her testimony.

22        THE COURT:  And she had notes as to when she did that.

23        MR. SANDS:  But she didn't always have them --

24        THE COURT:  The other testimony is just too general.

25   I don't think a rational jury would be justified in relying on

1    that to draw -- to draw the lines between the dots the way I

2    think it's possible on the March to April '06 period.

3          MR. SANDS:  But, again, that's a question for arguing

4    to the jury, your Honor.

5          THE COURT:  Well, the question is, is it enough to get

6    to that stage, and I don't think it is.

7          MR. FRIEDMANN:  Your Honor, we also had a third

8    motion, which was a general motion --

9          THE COURT:  Reserved.

10          MR. FRIEDMANN:  -- on all claims.

11          Thank you, your Honor.

12          THE COURT:  Under the rule.

13          All right.  So we'll call the jurors back; the

14    government will rest; we'll turn to you.

15          MR. FRIEDMANN:  Richard Brown will be our first

16    witness.

17          THE COURT:  All right.  Are you ready to go with that?

18          MR. FRIEDMANN:  Yes.

19          Your Honor, could we just have a minute so I could

20    talk to my client while the jury is --

21          THE COURT:  Go ahead.

22          (Pause.)

23          THE CLERK:  All rise for the jury.

24          (Jury in at 10:24 a.m.)

25          THE CLERK:  Please be seated.

```
 1              THE COURT:  Okay.  Thank you.  You were offering
 2      exhibits?
 3              MS. HANKEY:  The United States rests, your Honor.
 4              THE COURT:  Okay.  Just for the jury's benefit, some
 5      additional exhibits were admitted as a result of our
 6      discussion, and I guess that will be provided at some point.
 7              And, with that, the plaintiff rests.  We turn to the
 8      defendant now.
 9              Mr. Friedmann?
10              MR. FRIEDMANN:  Your Honor, Richard Brown.
11              THE COURT:  Okay.
12                          RICHARD BROWN, sworn.
13              THE CLERK:  Please be seated.  State your name, spell
14      your last name for the record, keep your voice up and speak
15      into the mic, please.
16              THE WITNESS:  Richard Brown, B-R-O-W-N.
17                          DIRECT EXAMINATION
18      BY MR. FRIEDMANN:
19      Q.   All set?
20      A.   All set.
21      Q.   Thank you.
22              MR. FRIEDMANN:  Okay to proceed, your Honor?
23              THE COURT:  Please.
24              MR. FRIEDMANN:  Thank you.
25      BY MR. FRIEDMANN:
```

1    Q.    Mr. Brown, where do you live?

2    A.    In Boston.

3    Q.    And what's your educational background?

4    A.    From Northeastern University, B.S. in business

5    administration in 1964.

6    Q.    Did you serve in the military services?

7    A.    Yes, I did.  I served during the Vietnam War as a captain

8    in the Army.

9    Q.    And what years were that?

10   A.    1964 through late '67.

11   Q.    How long have you been employed in the transportation

12   industry?

13   A.    Plus or minus 30 years.

14   Q.    What is your involvement with Paul Revere Transportation?

15   A.    I am one of the three directors.  The other two directors

16   are my business partners, Mr. James O'Leary, who's sitting in

17   court today, and Jane Daly, who could not be in court today.

18   Q.    Who is Paul Daley -- I'm sorry -- Richard Daley?

19   A.    Richard Daley is no relationship whatsoever to Jane Daly.

20   It just so happens that they both have the name "Daley."  But

21   Richard -- Doc Daley is spelled E-Y at the end, and Ms. Daly's

22   is D-A-L-Y.

23   Q.    And Richard Daley is referred to as Doc, or Doc Daley?

24   A.    Doc Daley.

25   Q.    Okay.  What is his position with Paul Revere

1 Transportation?

2 A.    Mr. Daley is the general manager of Paul Revere

3 Transportation.

4 Q.    Was he the general manager of Paul Revere Transportation

5 in 2006?

6 A.    Yes, he was.

7 Q.    Can you describe for us, if you would, the chain of

8 command in Paul Revere Transportation?

9 A.    Mr. Daley has reporting to him a director of

10 administration, a director of safety and training, a director

11 of maintenance, a chief accountant.  And then directly he has

12 lead supervisors who run the different divisions of Paul

13 Revere, and under those lead supervisors are approximately 35

14 other supervisors and dispatchers, and under those

15 supervisors -- those 35 supervisors and dispatchers are bus

16 operators reporting to the maintenance director, but also

17 during the day to the on-duty supervisor at each location would

18 be maintenance personnel and cleaners.

19 Q.    In 2006 approximately how many employees did Paul Revere

20 Transportation have?

21 A.    Approximately 400 employees.

22 Q.    And in 2006 approximately how many vehicles did Paul

23 Revere Transportation have?

24 A.    Approximately 170, 175 vehicles.

25 Q.    And can you tell us what different types of vehicles, by

PDF created with pdfFactory trial version www.pdffactory.com

1  categories, they had?

2  A.   The vehicles are broken down by different locations.

3  Chelsea, which is our largest location -- it has 45,000 square

4  feet of maintenance space and also washing space -- has the

5  largest number of vehicles.  And that fleet is comprised of

6  compressed natural gas busses which run throughout the

7  airports.  You'll see them at the terminal.  They're

8  clean-burning diesel -- I mean, clean-burning natural gas --

9          MR. SANDS:  Objection, your Honor.  Relevance?

10          THE COURT:  Overruled.

11          THE WITNESS:  -- clean-burning natural gas busses;

12  there are busses, natural gas burning, in Cambridge out of the

13  Chelsea facility.  The whole Chelsea facility was retrofitted

14  for natural gas.  It's the only one by any private bus company

15  in the northeast.

16          We also have some seven diesel busses that provide

17  commuter services in the town of Winthrop.  We also provide for

18  the Massport Authority under contract service from Woburn that

19  shuttles people into Boston from parking areas out in Woburn

20  and also from Braintree, Mass.  And am I forgetting any?  We

21  may have some other small contracts there out of Chelsea.

22  BY MR. FRIEDMANN:

23  Q.   And what about the Roxbury facility?

24  A.   The Roxbury is the smaller of the facilities, and it's

25  supported by Chelsea.  Chelsea does all of the heavy

1    maintenance, all of the engine rework.  Any of the big-problem

2    busses taken from Roxbury are moved over to Chelsea.

3          And Roxbury is about 27,000 square feet of space.  It has

4    60-plus vehicles out of Roxbury.  And it's comprised of clean

5    low-sulphur diesel-fueled busses.  We could not use compressed

6    natural gas over there because of the -- it's just too small

7    and the infrastructure was not close by to fuel the busses.

8          So they're all diesel busses, and they range from 40-foot

9    Neoplan busses -- which are used for Harvard University, mostly

10   running between the main medical complex and Harvard

11   University -- to 35-foot and 30-foot busses which service

12   parking lots which are established by the medical community

13   around the perimeter of the main medical complex.  And those

14   30-, 35-foot busses have to go in and out of parking lots and

15   narrow streets.

16         And then we have probably at Roxbury 27-plus -- you'll

17   hear the word "vans" -- but there's a combination of cut van

18   that will take 20, 25 passengers; and then we have an Econoline

19   type that will take about ten passengers.  And, again, those

20   are used in small locations.

21   Q.    Now, sticking with just the Roxbury location, in 2006 how

22   many employees did Paul Revere have there?

23   A.    Probably between 115 and 120 employees at Roxbury.

24   Q.    And what was the makeup of those, meaning what were the

25   types of positions that the employees held?

```
 1   A.    Eleven of those, including the lead supervisor, are what
 2   you would call a supervisor that was -- first you have your
 3   lead supervisor; then you have direct shift supervisors that
 4   were responsible for an eight-hour shift or some portion of an
 5   eight-hour shift or they might be out on the street supervising
 6   busses on the street; then you have dispatchers working the
 7   radios that would be in constant contact with a bus if we had
 8   any problems or if there were instructions to be given to the
 9   bus driver; and then you have your cleaners and your mechanics.
10   Q.    Now, in terms of the people who were the bus drivers and
11   the mechanics, et cetera, are they -- are you a union shop or a
12   nonunion shop?
13   A.    All of our operators belong to Teamsters Local 25.
14   They're all Teamsters.
15   Q.    Now, who are the customers or routes that run out of the
16   Roxbury facility?
17   A.    We have New England Baptist Hospital; we have the main
18   medical complex itself, which is called MASCO, which is the
19   Medical Academic Scientific Community, where the big hospitals
20   in that area join together and have one private company -- a
21   nonprofit company that takes care of their telephone system,
22   their travel and all of their transportation services.  And we
23   contract with them.  We also have Blue Cross Blue Shield where
24   we provide shuttle services for them from North Station and
25   South Station over to their headquarters.  And we have a couple
```

PDF created with pdfFactory trial version www.pdffactory.com

1    of other smaller contracts that work out of that facility.

2    Q.    Sticking again with the Roxbury facility and for these

3    specific routes, are there specific types of vehicles that are

4    assigned to specific routes?

5    A.    Yes.  Because, again, the size of the vehicle and where

6    the vehicle can fit.  You can't get a 40-foot vehicle into some

7    of the parking lots and down some of the streets; you can't

8    drive a 30- -- or any type of a bus on the parkways, so you

9    have to use a van, less than 20-passenger, something like that.

10        And New England Baptist Hospital is an example all by

11   itself.  That sits on top of a hill, and we've only found one

12   type of vehicle that can make that hill reliably -- it's a

13   heavy-duty vehicle -- because of the height and the concern

14   about the braking.  For example, a fire engine came down the

15   hill, lost its brakes and went across.  We have real

16   heavy-duty...

17   Q.    As a result of having specific busses on specific routes,

18   does that provide unique challenges to Paul Revere

19   Transportation on a daily basis?

20   A.    It would.

21   Q.    And can you describe what that challenge would be?

22   A.    The challenge is to have enough equipment of the right

23   size to run on the right surface.  And you can't, as I just

24   described, substitute a 40-foot bus for something like a 30- or

25   35- is going to do, because it's not going to make the turns.

PDF created with pdfFactory trial version www.pdffactory.com

1   Q.   You're not the person that's there on the street each day

2   deciding which bus goes out or doesn't go out, correct?

3   A.   I am a little old for being out there doing that.  That's

4   not my capacity.

5   Q.   Now, there's been some mention about a violation that

6   occurred at the airport in 2002; do you recall that?

7   A.   I do.

8   Q.   Can you tell me what you remember of that?

9   A.   We received a violation for some of our bus drivers idling

10  the busses on a very, very hot summer day, as well as other

11  companies, in the limo pool, which is a staging area prior to

12  moving into the terminals to pick up passengers.  The bus

13  drivers decide to sit on the bus and idle their busses.

14  Q.   And as a result of that notice of violation, did the

15  company take some steps?

16  A.   Yes, we did.

17  Q.   What steps?

18  A.   First of all, because we are a union company, Teamsters,

19  that's something you have to negotiate.  We wanted to

20  discipline, but to discipline for a particular infraction,

21  you've got to negotiate that.  It's not like a driver runs a

22  red light and gets a traffic violation; that's by law.  But

23  under this particular law we have to negotiate with our union

24  that there would be a step to the discipline process that the

25  driver would go through if they were found idling over five

1    minutes.

2         We have a good union; they're very good people.  And most

3    of our drivers, they're very professional.  They're very, very

4    good people.  And we were able to get from the union the

5    agreement that they would allow the discipline process.

6    Q.   In addition to that, can you tell me any other steps that

7    the company took -- just briefly tell me -- in order to be

8    compliant with the five-minute idling rule?

9    A.   Well, after that incident --

10             MR. SANDS:  Objection, your Honor.

11             THE COURT:  Overruled.

12             MR. SANDS:  Can we have sidebar, your Honor?

13             THE COURT:  All right.

14             (Discussion at sidebar and out of the hearing of the

15    jury:)

16             MR. SANDS:  Your Honor, the United States would like

17    to renew its motion to limit the testimony regarding efforts to

18    comply.  It's not relevant to the question of whether or not on

19    the occasions that are being testified about, that are at issue

20    today -- whether or not, in fact, they did violate the law and

21    whether or not it was, in fact, necessary -- what they were

22    told what the policies were regarding would necessarily go to

23    whether or not that was done on these occasions.

24             MR. FRIEDMANN:  Your Honor, the government has raised

25    the issue of these discipline letters.  I'm just leading into

1    the discipline letters he'll be testifying as to.  Because of

2    the policies that were in place, he issued that discipline

3    letter, which the government has tried to characterize as an

4    admission against interest, even though it says "These are the

5    allegations."

6          So I'm getting to the reason why the company --

7    through this witness why the company reacted the way it did to

8    the notice of violation in 2006.  And I think it's a very quick

9    answer.  We'll be done in a minute or two.

10          THE COURT:  Okay.  The objection is overruled.

11          (In open court:)

12   BY MR. FRIEDMANN:

13   Q.   Sir, I believe before we went to visit with the judge I

14   had asked you the additional steps that the company took in

15   response to the 2002 violation.

16   A.   Certainly.  We augmented our training of all the bus

17   drivers.  We brought in all of our supervisors and made sure

18   that they all understood that the rule was no idling of any bus

19   more than five minutes unless there was a mechanical or safety

20   reason for it, and to stick to it.  We sent letters out in all

21   of the paychecks.  We started to make announcements every hour

22   on the hour and was required to have a logbook that the

23   announcements were made that there was no idling of busses

24   for -- for more than five minutes.  We put extra spot checks by

25   supervisors out on the roads where we could reach our busses.

1   We can't put supervisors out in western Massachusetts, when we

2   send a charter bus operator; we have to depend on that we

3   trained them right and they're listening to us.

4       Like I said, we have very good people and most of them

5   would comply.  But that's basically -- on the paychecks, we put

6   right across the top of the paychecks you would not idle a bus

7   more than five minutes.

8   Q.   And would this be on everybody's paycheck?

9   A.   Everybody's paycheck got that.

10  Q.   Now, in November -- excuse me.  In April of 2006 the

11  company received a notice of violation which is what is the

12  subject matter now of this lawsuit, correct?

13  A.   Correct.

14  Q.   And when you received -- do you recall specifically when

15  you received that notice of violation?

16  A.    I don't remember the day, but I certainly remember

17  receiving it.

18  Q.   Okay.  It's dated at or about April 13th, somewhere in

19  that date?

20  A.   Yes.

21  Q.   Okay.  And of 2006?

22  A.   Yes.

23  Q.   And you say you remember receiving it?

24  A.   Yes.

25  Q.   What do you remember?

1    A.    I remember being, "Oh, no."  I just went berserk.  "We

2    can't be going through this again."

3    Q.    Why did you go berserk?

4    A.    Because of everything that I just described, the steps

5    that we had been taking, that how could we possibly be cited

6    for this?

7    Q.    What did you do?

8    A.    I immediately picked up the telephone, called the EPA and

9    said, "I want to come over and see you."

10   Q.    And did you meet with people at the EPA?

11   A.    It took them a couple of days to get a meeting, but, yes,

12   they did have us come over.

13   Q.    Were you here yesterday while the EPA representative was

14   testifying?

15   A.    Yes.  Yes, I was.

16   Q.    You recall she mentioned the meeting that she had with

17   you?

18   A.    Yes, she did.

19   Q.    Do you recall who was present at that meeting?

20   A.    She was present; Mr. Dain was present.  There were one or

21   two other people that I cannot remember.

22   Q.    That is from the EPA?

23   A.    With the EPA, yes.

24   Q.    And do you recall who from Paul Revere Transportation was

25   present?

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    It was just myself and Mr. Daley.

2    Q.    And do you remember with any specificity what was

3    discussed?

4    A.    Oh, I remember the general gist, that it became evident

5    very quickly.  We walked in and we did not know the specifics,

6    which they provided to us, and they asked why we were doing the

7    idling.  And we said, "Well, since we got your announcement,

8    we're doing an investigation of it, but here are some of the

9    reasons why that idling could have been taking place:  that 80

10   percent of the busses are air-driven, and if you don't have

11   your air pressure built up, you're not going to drive that bus.

12   And if you did try to drive that bus on the road, you'd kill

13   somebody if it went out of the facility without the air being

14   built up properly.  Or it could have been the windshield --

15   that the defrosters weren't working."  There were a number of

16   reasons that we had to look at as to why those busses would

17   have been idling for more than five minutes.

18   Q.    Did you state that to the representative --

19   A.    I stated that to the representatives.  We talked about the

20   plug-in heaters that we have in Roxbury and the heaters that

21   are built into the engines.  But that does nothing for what I

22   just told you about the air pressure; that's only heating up

23   the engine that makes it easier for you to start a bus, but it

24   does nothing in terms of the safety aspect of a bus.  You have

25   to have air pressure; you have to have a clean windshield; you

PDF created with pdfFactory trial version www.pdffactory.com

1    have to be able to rely on that bus is going to maintain itself

2    on the road, if you shut it off it's going to start again.

3        That was -- those aspects they cared nothing about.  It

4    was more, "You are guilty.  You're five minutes over.  And now

5    we're going to talk about penalties and what's going to

6    happen."  And one of the things that they brought up, and they

7    seemed to be very excited about, was they were going to put out

8    a press announcement that Paul Revere was going to be severely

9    penalized for idling busses for more than five minutes.

10   Q.   And did you respond to that?

11   A.   I did.  I said, "You put out that notice, and I'll put out

12   a notice that says Paul Revere is closing their facility in

13   Roxbury because of the EPA, and 120 local residents of Roxbury

14   who work there are not going to have a job."  So we decided

15   both, between us and the EPA, no press announcements.

16   Q.   Did Paul Revere at that meeting ever admit that it had

17   wrongfully idled busses in excess of five minutes?

18   A.   No.  We admitted that busses were started.  But never,

19   never did we mention that that was violation of the law.  To

20   the knowledge we had at that point, it was idling that we would

21   investigate and find out the reason for.

22   Q.   Now, you mentioned that busses are 80 percent air.  For

23   those of us who aren't familiar with busses and drive cars, can

24   you tell me the difference?

25   A.   Well, you can't operate doors, you can't lean the bus to

PDF created with pdfFactory trial version www.pdffactory.com

1    pick up people, and you can't safely stop unless you have full

2    air pressure.

3    Q.    What systems on a bus are run by air pressure?

4    A.    The doors are run by air pressure; the bellows are run by

5    air pressure, which is the lift on the bus to hold it steady.

6    You're going to -- I'm not a mechanic, so I can't give you all

7    the other systems that operate, but --

8    Q.    Are the brakes?

9    A.    The brakes, most certainly, yes.  Yes.  You don't want one

10   of those busses without air pressure rolling up behind you.

11   Q.    The busses have to actually build up a certain amount of

12   air pressure before can they move, correct?

13   A.    That is what I'm told by my mechanics, yes.

14   Q.    Okay.  So it's much different than a car in its suspension

15   and how it operates?

16   A.    Correct.

17   Q.    Okay.  Now, after you met with the EPA and had this

18   discussion with them about what they said had happened, did you

19   have some disciplinary steps that were taken internally?

20   A.    After that meeting I walked back with Mr. Daley.  And I

21   said -- I was furious.  I was absolutely furious, one, at going

22   to the meeting and being treated the way we were, we were

23   guilty; two, I was furious thinking about was there any

24   credibility to those allegations after everything we had done.

25   Was there any credibility whatsoever.

1          I was thinking also about our customers.  If the EPA went

2    public, you know, what are our customers going to think?  What

3    are we going to do for additional business?  That kept popping

4    up.  And there were several other things running through my

5    mind.

6          So I told Mr. Daley, "You go back, you find out the facts.

7    But I don't really care.  Just discipline the people that were

8    on duty at that time.  Discipline them.  Write them letters,

9    discipline them."  Was -- in retrospect, was that fair?  No, it

10   wasn't fair to Mr. Swartz and Mr. Powers.  It wasn't fair at

11   all.  But it certainly passed the message to 400 employees that

12   Paul Revere -- that management was not going to stand by if

13   they violated the five-minute idling rule without a reason --

14   for a mechanical reason or safety reason for violating that

15   rule.

16         And it did send a shockwave through the company.  Here

17   were one management person and one hourly dispatcher who were

18   disciplined.  And that went right through the whole company.

19   Q.   Sir, you mentioned two people that were sent discipline

20   letters.  Do you recall mentioning two names?

21   A.   Mr. Powers and Mr. Swartz.

22   Q.   Mr. Powers was one of your first employees?

23   A.   Mr. Powers I have known personally for well over 25 years,

24   and he was one of our first employees at the company.

25   Excellent person.  He's a wonderful man.

1    Q.    And notwithstanding that, you sent him a disciplinary

2    letter?

3    A.    Absolutely.

4    Q.    And Mr. Swartz?

5    A.    Mr. Swartz I've known for 13 years only because he came

6    with us when we picked up a contract.  But, again, good person,

7    good family man.

8    Q.    Do you recall --

9    A.    They never had any discipline, neither one of them.

10    Q.    Have you or the company ever admitted or acknowledged that

11    there was any wrongful idling in excess of five minutes with

12    regard to the dates that are in question?

13    A.    No.  The company itself has not, no.

14    Q.    And have you?

15    A.    No.

16    Q.    Did you ever tell anybody, "Yes, we idled more than five

17    minutes"?

18    A.    Yes.

19    Q.    But there was a reason for that idling?

20    A.    Mechanical or safety.

21    Q.    Okay.  Is it Paul Revere's policy to only permit idling in

22    excess of five minutes if there are mechanical or safety

23    issues?

24    A.    Absolutely; that is our policy.

25    Q.    Are there any exceptions to that policy?

1   A.   There are no exceptions to that policy.

2   Q.   And is that why those discipline letters were sent out?

3   A.   That's absolutely the reason.

4   Q.   You wanted to make sure everybody knew that, right?

5   A.   They all knew it.

6   Q.   And you saw the reaction from your employees?

7   A.   Yes, we saw the reaction, and we hurt those two

8   individuals.  I'm sorry, but that's what it is.

9        MR. FRIEDMANN:  I have no further questions at this

10  time, your Honor.

11                   CROSS-EXAMINATION

12  BY MR. SANDS:

13  Q.   Good morning, Mr. Brown.

14  A.   Good morning.

15  Q.   You stated that you were one of three directors of Paul

16  Revere, but you're actually employed by a company called

17  Alternate Concepts, Incorporated; isn't that correct?

18  A.   Correct.

19  Q.   And Alternate Concepts, Incorporated, is one of the

20  companies that owns Paul Revere Transportation; isn't that

21  correct?

22  A.   Correct.

23  Q.   And the other company that owns Paul Revere Transportation

24  is a company called Modern Continental Construction; is that

25  not correct?

1  A.   That's one, yes.

2  Q.   And the other company is called Nolan; is that correct?

3  A.   That is correct.  Nolan Associates.

4  Q.   You have no personal knowledge of why the busses were

5  idling on the dates that the inspector was at the Paul Revere

6  facility, do you?

7  A.   No.

8  Q.   In fact, you're not involved in day-to-day operations of

9  Paul Revere Transportation, are you?

10  A.   Define "day-to-day operations," because -- is finance part

11  of day-to-day?  Is going over morning reports and finding out

12  what was wrong if you see breakdowns on morning reports -- is

13  that part of day-to-day?

14  Q.   You're not involved in any operational activity of the

15  facility on a day-to-day basis, are you?

16  A.   Again, I'm not trying to be silly here, but what is your

17  definition of "operational"?  Because I do get reports every

18  morning that shows every breakdown, every accident that

19  happens.  I do regular financing --

20  Q.   Thank you, sir.  I'll refine my question for you, then.

21       You're not part of -- excuse me.  You are not there to

22  witness the busses when they are being prepared for service,

23  are you?

24  A.   No.

25  Q.   You stated during your testimony that the busses at the

1    Paul Revere facility are low-sulphur vehicles.  But isn't it

2    true that that's a requirement under your contract with MASCO,

3    that you use low-sulphur vehicles?  Is that not correct?

4    A.    That's correct.

5    Q.    And you're not a mechanic, are you, sir?

6    A.    No, I'm not a mechanic.

7    Q.    And so you have no personal knowledge of what is

8    mechanically necessary for operation of the vehicles, do you?

9    A.    Would you define "personal" for me?  Because as I

10   stated --

11   Q.    Based upon your personal knowledge, your personal

12   experience, you have no knowledge of what is mechanically

13   necessary for these vehicles, do you?

14   A.    Let me ask you this:  Is personal knowledge --

15   Q.    Sir, if you didn't understand the question, say "I don't

16   understand the question."

17   A.    Okay.  I don't understand the question you're trying to

18   ask me.

19   Q.    Okay.  You previously stated you are not a mechanic?

20   A.    Correct.

21   Q.    And so when you say that -- what is mechanically

22   necessary, you have no basis, personal knowledge, for defining

23   what that is; is that not correct?

24   A.    Not exactly.

25   Q.    But, sir, if I can refer you -- you were deposed in this

PDF created with pdfFactory trial version www.pdffactory.com

1  matter, were you not?

2  A.    Yes.

3  Q.    On March 3rd of 2008?

4  A.    Yes.

5  Q.    Do you recall that deposition?

6  A.    I do.

7  Q.    And during that deposition you were sworn in under oath as

8  you are today?

9  A.    Correct.  Correct.

10  Q.    And you promised to tell the truth during that deposition;

11  is that not correct?

12  A.    Correct.

13  Q.    And do you recall being asked whether or not you -- what

14  you had learned about the idling at the Paul Revere facility by

15  Ms. Hankey?

16  A.    I don't remember, but you could refresh me.

17          MR. SANDS:  Permission to approach the witness, your

18  Honor?

19          THE COURT:  Yes.

20  BY MR. SANDS:

21  Q.    This is your deposition?

22  A.    Yes, it is.

23  Q.    Now, I'd like to refer you to page 21 of your deposition,

24  sir.

25  A.    Yes.

1    Q.    In the middle of the page, page -- around line 13,

2    Ms. Hankey asked you a question:  "And after EPA's NOV, what

3    have you learned about what Mr. Powers was doing, if anything,

4    with respect to idling at the Paul Revere facility?"  And your

5    response was, "That is a question that gets to the issue of

6    what is the definition of mechanical and safety, and that is

7    beyond my expertise."

8        Do you recall saying that, sir?

9    A.    It's right here.  I did say that, yes.

10   Q.    Thank you.

11       And Paul Revere has not denied the idling of these busses

12   on the occasions that were cited by the EPA in their notice of

13   violation; is that correct?

14   A.    That is correct.

15   Q.    And you talked about a disciplinary letter that was sent

16   by Doc Daley to Mr. Powers and Mr. Swartz.  Showing you what

17   has been marked as Government Exhibit No. 6 --

18           THE COURT:  Mr. Sands, do you want this displayed to

19   the jury as well as the witness?

20           MR. SANDS:  Yes, your Honor.

21           THE COURT:  It's in evidence.

22           THE WITNESS:  Can you make it one size bigger?  Oh,

23   thank you.

24   BY MR. SANDS:

25   Q.    Do you recognize this letter, sir?

1    A.    Yes, I do.

2    Q.    And this is the letter that was sent from Doc Daley to

3    Mr. Swartz in 2006, correct?

4    A.    That is correct.

5    Q.    And you read through the letter and approved the letter

6    before it went out; isn't that correct?

7    A.    Yes.

8    Q.    And in the letter you state -- it states that "Over the

9    past three weeks I have investigated the complaint, and during

10   the investigation it was determined that Jim Powers, the a.m.

11   dispatcher, ordered the busses to be started on cold days to

12   allow the busses to build up air pressure and warm up.  This

13   act is, in fact, a violation of the EPA's five-minute idling

14   rule."

15        Is that not what it states, sir?

16   A.    Yes.

17   Q.    Paul Revere doesn't idle its busses in excess of five

18   minutes anymore, does it, sir?

19   A.    Yes.

20   Q.    As a policy, you said that Paul Revere does not idle its

21   busses in excess of five minutes?

22   A.    May I rephrase?  Can I go back to what I did say, that I

23   believe I said we do not idle busses for more than five minutes

24   except for mechanical or safety reasons.

25   Q.    Paul Revere has not been cited for any further violations

PDF created with pdfFactory trial version www.pdffactory.com

1    by EPA, have they, sir --

2              MR. FRIEDMANN:  Objection.

3    BY MR. SANDS:

4    Q.   -- since 2006?

5              THE COURT:  Overruled.

6              You may answer.

7              THE WITNESS:  No.

8              MR. SANDS:  No further questions, your Honor.

9                       REDIRECT EXAMINATION

10   BY MR. FRIEDMANN:

11   Q.   Mr. Brown, is Exhibit 6 still in front of you?

12   A.   Yes.

13   Q.   Okay.  The first paragraph --

14             MR. FRIEDMANN:  Can you make that a little larger?

15   A.   I can read it.

16   BY MR. FRIEDMANN:

17   Q.   I think we must have the same optometrist.

18        This is a letter to Mr. Swartz, correct?

19   A.   Now you have to lower it.

20        Yes, it is a letter to Mr. Swartz.  Yes.

21   Q.   And it was a couple of weeks after the NOV, the alleged

22   violations, were issued?

23   A.   Correct.

24   Q.   Could you read the second sentence -- I'm sorry.  Could

25   you read the first sentence for me first?

PDF created with pdfFactory trial version www.pdffactory.com

1  A.   "As you are aware, on April 17, 2006, Paul Revere

2  Transportation received a notice of violation from the

3  Environmental Protection Agency pertaining to busses at the

4  Roxbury garage violating the five-minute idling rule."

5  Q.   All right.  Let me just stop you there.  Does that refresh

6  your memory about when you actually got the notice, that being

7  April 17, 2006?

8  A.   To be honest, I can't remember the exact date.

9  Q.   Okay.  Okay.  Would you read the next sentence?

10  A.   "The allegations are that for a period of seven weeks one

11  of their inspectors monitored the garage and reported that

12  every morning at 5 a.m. someone at Paul Revere Transportation

13  started every bus at the location and allowed them to run until

14  the busses pulled out for customer service."

15  Q.   So your letter was restating what the government's

16  allegations were, correct?

17  A.   Correct.

18  Q.   Were you agreeing with those?

19  A.   No.  No.

20  Q.   And you say that -- there was a portion that my brother

21  had you read, and it said that Mr. Powers had said that he ran

22  the busses on cold days to allow them to build up air pressure

23  and warm up.  Do you remember having that read to you just a

24  minute ago?

25  A.   Oh, yes.  Yes.

1    Q.   And that was why the busses were operated in excess of

2    five minutes, was to build up air pressure --

3             MR. SANDS:  Objection, your Honor.  This witness has

4    no personal knowledge.  He testified that he has no personal

5    knowledge of why they were idling.

6             THE COURT:  Overruled.

7             Go ahead.

8             THE WITNESS:  That is correct.

9    BY MR. FRIEDMANN:

10   Q.   And when you say "for maintenance and safety reasons," is

11   that what you mean?

12   A.   That is one of the reasons that it would be.

13   Q.   Because until the air pressure is built up, the busses

14   can't even move, can they?

15   A.   That is what my mechanic told me.

16            MR. FRIEDMANN:  Thank you.  No further questions.

17            THE COURT:  Mr. Sands, anything else?

18            MS. HANKEY:  Just a few more questions, your Honor.

19            THE COURT:  Okay.

20                         RECROSS-EXAMINATION

21   BY MR. SANDS:

22   Q.   Mr. Brown, you testified that after leaving the NOV

23   conference with Doc Daley, you said, "Go back and do an

24   investigation"; is that not correct?

25            MR. FRIEDMANN:  Objection.  Beyond cross.

1          THE COURT:  Overruled.

2          THE WITNESS:  He had started that investigation, I

3    believe, prior to.  He made telephone calls.  But, yes, I did.

4    BY MR. SANDS:

5    Q.    And this letter to Mr. Swartz was dated May 16, 2006,

6    correct?

7    A.    Correct.

8    Q.    Approximately -- according to the letter, approximately

9    one month after receipt of the notice of violation; is that not

10   correct?

11   A.    Correct.

12   Q.    And after Doc Daley had conducted his three-week

13   investigation; is that not correct?

14   A.    It wasn't completed.

15   Q.    So you sent a disciplinary letter to your employees a

16   month later, and Doc Daley states in this letter that he

17   conducted a three-week investigation and found that -- but

18   you're saying that you sent this letter out -- you approved

19   this letter, but you sent it out before the investigation was

20   ever completed.  That is not what's stated in this letter, is

21   it?

22          MR. FRIEDMANN:  Objection, your Honor.

23          THE COURT:  Overruled.

24          You may answer it if --

25          THE WITNESS:  No.

1    BY MR. SANDS:

2    Q.    Mr. Brown, I'm showing you what's been marked as

3    Government Exhibit 122, which is a timeline chart of the

4    inspector's observations from March 1st of 2006.  Can you tell

5    us today why Bus No. 100 was idling for one hour and two

6    minutes?

7    A.    No.

8              MR. FRIEDMANN:  Objection, your Honor.  Beyond the

9    scope.

10             THE COURT:  That is beyond the scope.

11             Sustained.

12             MR. FRIEDMANN:  May we have the answer stricken also?

13             THE COURT:  I didn't hear an answer.  But if there was

14    an answer, the jury will disregard it; it will be stricken.

15             MR. SANDS:  Your Honor, may we be heard on this?

16             THE COURT:  No.  It's clearly beyond the scope of

17    direct.

18             MR. SANDS:  No further questions, your Honor.

19             THE COURT:  All right, Mr. Brown.  You may step down.

20             We'll take the midmorning recess at this time.

21             THE CLERK:  All rise.  We'll take the midmorning

22    recess.

23             (The Honorable Court and the jury out at 11:02 a.m.)

24             (There is a recess in the proceedings at 11:02 a.m.)

25

1              THE CLERK:  All rise for the jury.

2    (The Honorable Court and the Jury entered the courtroom at

3    11:20 a.m.)

4              THE CLERK:  Please be seated.

5              MR. FRIEDMANN:  We call James Daley, Jr. -- James

6    Powers, Jr.

7              THE COURT:  Okay.

8              THE CLERK:  Step up to the box, sir.  Remain standing.

9    Raise your right hand.

10                  JAMES E. POWERS, JR., SWORN

11             THE CLERK:  Please be seated.  State your name, spell

12   your last name for the record.  Keep your voice up and speak

13   into the mic so everyone can hear you.

14             THE WITNESS:  My name is James E. Powers, Jr.  I live

15   at 4 Cabot Road, Arlington, Massachusetts.

16                    DIRECT EXAMINATION

17   BY MR. FRIEDMANN:

18   Q.   Mr. Powers, if you are unable to hear me, I know you have

19   a little bit of a problem with hearing.  If you are unable to

20   hear me, please let me know.  Okay?

21   A.   Uh-huh.

22   Q.   Could you tell me, sir, what your educational background

23   is?

24   A.   I graduated from Medford High School in 1954, went in the

25   service, came out, went to work.

1    Q.    What service did you go into?

2    A.    I was in the Marine Corps.

3    Q.    At what age did you go into the Marine Corps?

4    A.    I was 18.

5    Q.    And what age did you come out of the Marine Corps?

6    A.    A year later.  I was 19.

7    Q.    During the past 40-plus years, have you worked in the bus

8    industry?

9    A.    All my life.

10   Q.    How many years have you worked in the bus industry?

11   A.    Forty-nine, six.

12   Q.    Forty-nine, six?

13   A.    Forty-nine and six months.

14   Q.    Okay.  When did you first go to work for Paul Revere

15   Transportation?

16   A.    1990.

17   Q.    Do you know when Paul Revere Transportation first started?

18   A.    I think they incorporated, I'm not sure if it was '90 or

19   if it was '89.

20   Q.    You were there right from the start?

21   A.    Yes.

22   Q.    Drawing your attention to the March or April, 2006

23   timeframe, I'm going to ask you a number of questions about

24   that timeframe.  So, when I'm asking you questions, will you

25   assume that that's the timeframe that I'm dealing with?

1   A.    Yes.

2   Q.    Okay.  Just so we're clear when we're talking about.  In

3   the March/April 2006 timeframe, how were you employed by Paul

4   Revere?

5   A.    I was a dispatcher.

6   Q.    And what is the duty of a dispatcher?

7   A.    I came in at 4:30 in the morning, set up the schedule to

8   go out, starting at 5:00 in the morning.

9   Q.    When you say "set up the schedule," what does that mean?

10  A.    The runs that were going to go out during the morning.

11  Q.    For those of us --

12  A.    Scheduled trips.

13  Q.    Specific buses to go out on specific --

14  A.    Specific buses for specific drivers.

15  Q.    Okay.  In terms of the buses that were at Paul Revere

16  Transportation -- I'm sorry -- where did you work for Paul

17  Revere Transportation in March and April of 2006?

18  A.    59 Reading Street, Roxbury.

19  Q.    That's what's known as the Roxbury location?

20  A.    Yes, sir.

21  Q.    Okay.  How many hours per day did you work there?

22  A.    Five and a half.

23  Q.    And how many hours per week?

24  A.    Twenty-seven, five.

25  Q.    Okay.  And you said you were the dispatcher; is that

1  correct?

2  A.    Correct.

3  Q.    And you would come in at what time?

4  A.    I would come in at 4:30 in the morning.

5  Q.    Would there be other people already there at work at 4:30

6  in the morning when you arrived?

7  A.    There would be a couple of mechanics working in the

8  garage.

9  Q.    Any other people?

10  A.    And one cleaner.

11  Q.    A cleaner?  Were shifters working at that point in time?

12  A.    Not at that point.

13  Q.    Okay.  What is a shifter?

14  A.    A shifter is what we call a cover person.  We bring in

15  three people to help us out if drivers don't show up, and we

16  use the cover people to fill the shifts, and if I don't use --

17  I can use them to do other things, if I need it.

18  Q.    What types of other things do you have them do?

19  A.    I have them go out there when they come in, to check the

20  buses to see if they're going to start, number one, for me.

21  Q.    So, in terms of the people in the March/April 2006

22  timeframe that you would send out to start buses for you, what

23  are the names of the positions, the types of persons that you

24  would send out?

25  A.    Basically, bus drivers and cover people, which are bus

1  drivers.

2  Q.    Okay.  How many people would that be that would be

3  available to you?

4  A.    Three to five, three to six, could be.  It depends on what

5  time they come in.

6  Q.    Do the bus drivers come in before their --

7  A.    Some do.

8  Q.    Okay.  What do they do?

9  A.    Have a cup of coffee, chit-chat.

10  Q.    And if you --

11  A.    Set up what they're going to do.

12  Q.    And if you ask them to go out and start the buses, to

13  check out the buses for you, do they get paid for that?

14  A.    They get paid from their time that they come in, but some

15  of them will go out on their own and do it, if I ask them.

16  Q.    So, sometimes they get paid for it, sometimes they don't?

17  A.    Right.  If it's something special and they're real early,

18  then I'll make sure they get paid.

19  Q.    Okay.

20  A.    They don't have to do it unless -- you know, some people

21  will refuse to do it, because they didn't get paid.

22  Q.    Now, in March and April of 2006, did you, on occasion,

23  give people instructions to go out and start vehicles?

24  A.    Yes.

25  Q.    Why did you give them instructions to go out and start

PDF created with pdfFactory trial version www.pdffactory.com

1    vehicles?

2    A.    I wanted, number one, is the vehicle going to start for me

3    so it can make my trip.

4    Q.    When you say is the vehicle going to start for you, what

5    are you referring to?

6    A.    The bus.

7    Q.    Well, what type of problem would you have that you'd be

8    checking for?

9    A.    I could have, number one, electrical problem, it won't

10   start.  Number two, I could have an air problem, it won't build

11   air.  If it doesn't build air, then I can't move the bus.

12   Q.    Other than for mechanical and safety reasons during the

13   time --

14          MS. HANKEY:  Objection, your Honor.  I don't believe

15   that the witness just testified to that.

16          THE COURT:  Overruled.  Go ahead.

17   BY MR. FRIEDMANN:

18   Q.    Other than for mechanical and safety reasons, did you,

19   during this March and April 2006 timeframe, ever instruct

20   anybody to start a vehicle and run it for more than five

21   minutes for any other purpose?

22   A.    No.

23          MS. HANKEY:  Objection.  Leading, your Honor.

24          THE COURT:  Overruled.

25   BY MR. FRIEDMANN:

1    Q.    I'm sorry.  I didn't hear your answer.

2    A.    No.  I send them out to make sure they'll start.  They'll

3    come back and report to me if it doesn't start.  Then, I can go

4    from there.

5    Q.    Now, it wasn't just mechanics that you sent out to start

6    vehicles, was it?

7    A.    No.

8    Q.    What were the positions that you would use?

9    A.    I had what they call cover people, which are bus drivers.

10   They're extras.  We hire three extra people in the morning to

11   cover sickness, people that bang in for some unknown reason.

12   Q.    Now, I used the terminology "mechanical and safety

13   reasons" a moment ago.  Do you recall that?

14   A.    Correct.

15   Q.    When I said that to you, what did you understand

16   "mechanical" to mean?

17   A.    Mechanical is starting.  Safety is, is the vehicle going

18   to perform correctly, is the air going to build up, the brake

19   system going to work, the doors going to work, and are the

20   wipers going to work.

21   Q.    Now, when you would send these people out to start the

22   vehicles, did you send them out to start every vehicle, or did

23   you only send them out to start some vehicles?

24   A.    I ask them to start the ones that are going to go out

25   first; that could be five or six buses.

1    Q.    And then what would you do?

2    A.    Then I'll make sure that I'll assign them -- I'll have

3    them, once they come back and they say everything is fine, then

4    I'll make sure -- I'll have them do some more.

5    Q.    Now, you mentioned a couple of times that buses have to

6    build up air pressure.  Can you explain to us what you mean by

7    that?

8    A.    In order for a bus to work correctly, the bus has to go

9    to -- technically, it has to go to 120 pounds.  If it goes to

10   90 pounds, the air brake will work.  You have a hand brake, air

11   brake that you push -- it's down.  It comes up.  When you've

12   got maximum air, you bring it up, it locks.  When you push it

13   down, it releases it, and what will happen is if the air isn't

14   correct and you push it down, it will pop back up.  So, the air

15   has got to reach 90 pounds.

16       When the safety valve goes off underneath the bus, it

17   usually reaches 120 pounds.  Once it hits 120 pounds, then the

18   bus, basically, is safe to work.  You can work it from 90 to

19   120, still be safe, but it's better when it's 110 and 120.  So,

20   that's why you have to take time to build the air.

21       When you start the bus, you have an air compressor.  From

22   the air compressor, you have four rear airbags, like valves,

23   and then you have two in the front.  You have four to six

24   levelling valves; depends on the system of the bus.  You have

25   wipers that operate on air, you have doors that operate on air,

1    and you have -- the bus is 90 percent air -- and you have a

2    driver's seat that operates on air.  So, it takes time to build

3    in a bus.

4    Q.    So, you have wipers that work on air, doors that work on

5    air, brakes that work on air, suspension that works on air?

6    A.    And brake --

7            MS. HANKEY:  Objection, your Honor.  Mr. Friedmann is

8    testifying.

9            THE COURT:  No.  It's a summary.  Go ahead.

10   BY MR. FRIEDMANN:

11   Q.    Suspension that works on air, and I think you said

12   something about kneeling.

13   A.    Kneeling is your suspension.

14   Q.    Suspension, okay.  That's one in the same.  Now, you

15   mentioned that the bus has to build up a certain amount of air

16   pressure.  I think you said 90 pounds.

17   A.    It has to go 90 pounds in order for the hand brake to work

18   correctly.

19   Q.    So, if the bus is parked overnight, when you first start

20   it, is it accurate that it has to build up to 90 pounds before

21   the bus can move?

22   A.    Definitely.

23   Q.    And then you were saying that there was this 120-pound

24   threshold?

25   A.    120 pounds is the maximum.

1  Q.   What's the difference between those two?  I mean, I know

2  it's 30 pounds, but, I mean, what's --

3  A.   Pounds per square inch.

4  Q.   Right, but in terms of the operation of the bus, what's

5  the difference -- what's the effect on the bus?

6  A.   The manuals say at 115 to 120 it's perfect.

7  Q.   So, that's when the brakes are then safe to use?

8  A.   In other words, when you go in the street, the bus is

9  moving at 30 miles an hour, you hit the brake, it will react,

10  it will stand.

11  Q.   So, when you're saying for mechanical and safety reasons,

12  these are the reasons that you --

13  A.   Right.  This is where you run a bus.  The bus is 90

14  percent, and if you do not have maximum air pressure, your bus

15  is not going to function.  You've got front doors, you've got

16  rear doors, you've got wipers.  You've got multiple things with

17  a bus.  The bus is 90 percent air, and air, it takes times for

18  it to build.

19  Q.   Are there weather conditions that affect how long it takes

20  for the air to build up on a bus?

21  A.   Yes, because you've got condensation in your lines.

22  Q.   I'm sorry.  Go ahead.

23  A.   If you've got condensation in your lines, especially in

24  colder weather, you could have ice.  Ice builds up.  It takes a

25  while.  Sometimes it will go like that, other times it won't.

1    I've seen buses, you can run them quite a while before they hit

2    their air pressure.

3    Q.    What are the weather components that affect how fast a bus

4    will build up the air?

5    A.    Below 32.  32 and below you have major problems with

6    diesel.

7    Q.    Temperature?

8    A.    Temperature.

9    Q.    How about humidity?

10    A.    Humidity.

11    Q.    How about wind?

12    A.    Definitely with wind.

13    Q.    Why is wind a factor?

14    A.    It just blows the cold air underneath the bus.  You've got

15    -- most of them also have four air tanks, they have an air

16    dryer.  The air dryer -- the purpose of the air dryer is to

17    clean the system.  It drains.  It's supposed to drain any

18    moisture that's in your lines, and that has to work correctly.

19    In order for that to work correctly, your air has to -- you

20    have to have maximum air.

21    Q.    So, are there different weather conditions that would

22    require you to start the buses --

23    A.    Definitely.

24    Q.    -- and other weather conditions that wouldn't require you?

25    A.    Always, always.

1    Q.    Some weather you would?

2    A.    Weather is the major factor in a bus.

3    Q.    Okay.  If it's hot and dry, do you need to start the bus

4    and run it for as long?

5    A.    No.

6    Q.    If it's cold and damp?

7    A.    Definitely.

8    Q.    If it's cold and windy and damp?

9    A.    (Witness nodding).  If it's cold and windy and damp,

10   you've got to -- you have to run it.  Number one, in the cold

11   weather, a bus takes a long time to heat up.  In order for the

12   windshield, for the driver to be able to drive it, he has to

13   have the defroster working, hot air needs to come up.  Well,

14   hot air doesn't come up right away.  It takes a while to build

15   that system.

16   Q.    Some of these buses have things called Proheat heaters.

17   Are you familiar with that?

18   A.    The new ones do.

19   Q.    Some of them have some plug-in heaters?

20   A.    Yes.

21   Q.    Do they in any way affect how long it takes to build up

22   the air pressure?

23   A.    No, not for the air.  Not for the air.

24   Q.    Do you know there are seven days that are in contention

25   here, where --

PDF created with pdfFactory trial version www.pdffactory.com

1    A.    Yes.

2    Q.    -- where the EPA says --

3    A.    Yes, yes.

4    Q.    Okay.  Do you have a specific memory of any one of those

5    seven days?

6    A.    No.

7    Q.    Do you have a specific memory on any one of those days of

8    who it was you sent out to start the buses?

9    A.    Every day.  I have different people every day.

10   Q.    Okay.  Now, if the buses were running and somebody had

11   come in and asked you why it was running, you would have been

12   able to tell them that, wouldn't you?

13   A.    Correct.

14   Q.    And you would know, then, on that specific day who had

15   started the bus for you and the reason for that?

16   A.    Yes.  If someone had come and told me, yes.

17   Q.    Did anybody from the EPA during these seven days in

18   question ever come in and ask you why any of these buses were

19   running?

20   A.    Nobody has ever questioned me.

21   Q.    Okay.  If they had asked you, you could have explained to

22   them why it was running?

23   A.    Definitely.

24   Q.    You could have told them if a bus was having a problem

25   charging?

1   A.   I would have.  If something was wrong, tell me.

2   Q.   Okay.  But nobody did that?

3   A.   No, sir.

4   Q.   By the way, sir, with regard to this air system with some

5   of the buses, if you turn them on and it hasn't built up air

6   pressure, can you even turn the engine off?

7   A.   On the RTS you cannot.

8   Q.   I'm sorry.  You cannot?

9   A.   It has to go to 80 pounds, at least 80.  Some will shut

10  off at 80.  At 90 they will shut off.

11  Q.   So, if in the morning you sent somebody out to start one

12  of the buses and it wasn't building up air pressure, you had no

13  way to shut it off; is that correct?

14  A.   You could shut it off if you knew you have to pick up the

15  back door and you have to throw a safety valve.

16  Q.   Other than building up air pressure, would there be a

17  reason on cold or damp or wet weather why a bus would not start

18  in the morning?

19  A.   Say that again, sir.

20  Q.   Other than just air pressure, would there be reasons why a

21  bus wouldn't start in the morning?

22  A.   Yeah.  It could be electrical.

23  Q.   When you say --

24  A.   The starter could be gone, the battery could be dead,

25  someone could have left the lights on, and then, if that

1    happens, then you have to jump it.  In a bus, it's like if you

2    own a car, if you have an alternator and your car goes, if you

3    jump it and then you take it for a short ride, say, a couple of

4    miles, that system will build up.

5         Well, the alternator in the bus is the same way.  It's a

6    300-amp alternator.  You have to charge that system, and you

7    have to run it for a period of time to build the system.

8    Q.   Well, if a driver is there and they're doing their circle

9    check and they have 10 minutes to do their circle check and 20

10   minutes to get to their first stop, is that sufficient time to

11   charge it?

12   A.   It needs to run a half hour to fully charge the system;

13   and if the alternator is still in shape and the battery is not

14   completely dead, the system will recharge itself after a while.

15   Q.   If you have a bus that's been jumped, will you let it

16   leave the yard before it's gotten that full charge?

17   A.   We'll jump it, and once it's got its maximum air, we'll

18   run it, because we figure it's on a run that's picking up

19   people, it's not stopping.  If it stops for five minutes, you

20   know, it stops for the five-minute idle rule, yes, you have to

21   shut it down.

22   Q.   Right.  My question is about the electrical system, sir.

23   If we could focus on that for a minute, okay?

24   A.   Go ahead.

25   Q.   If you had a bus that had a dead battery overnight, before

PDF created with pdfFactory trial version www.pdffactory.com

1    you would let it out of the yard, would you make sure it had a

2    full charge?

3    A.    Yeah.  Once we jumped it, the alternator would charge the

4    battery.  The alternator is like a charger.  It's not like a

5    generator that you had in the car years ago.  If you have an

6    alternator, an alternator is a built-in charger.

7    Q.    Why would you make it run for at least 30 minutes in the

8    yard before you let it out of the yard?

9    A.    So everything functions.  It charges the system, you heat

10   the water, so the defroster and heat comes into the bus.

11   Q.    Would you be concerned if the bus was out on route and had

12   to be turned off and then turned back on whether it would

13   start?

14   A.    You could -- we do that to see if it's going to restart

15   it, yes.

16   Q.    So, before you would let it go out, you'd have to make

17   sure that it would restart again --

18   A.    Correct.

19   Q.    -- if it was a charging situation?

20   A.    Yes.

21   Q.    Okay.

22   A.    But you can also tell the charging system -- there's a

23   light that will tell you yes or no.

24   Q.    Okay.  Now, if you were standing at the back of the bus,

25   behind the bus, would you be able to tell if the bus had built

1    up air pressure?

2    A.    No.

3    Q.    Would you be able to tell if the bus had built up enough

4    charge to operate properly?

5    A.    No.

6    Q.    Would you be able to tell if the windshield was defrosted

7    or the side windows beside the driver were clear so the driver

8    could see out?

9    A.    No.

10    Q.    Would you be able to tell if the driver could see his

11    mirrors to tell, you know, if he's going around a turn if he's

12    going to hit something or anything like that?

13    A.    Say that one again.

14    Q.    Would you be able to see from behind the bus whether the

15    mirrors were defrosted so that the driver could safely operate?

16    A.    No, absolutely not.

17    Q.    Are these all the reasons that you would have somebody

18    start a bus early in the morning to make sure all of that

19    functioned?

20    A.    Yes.

21    Q.    Did you ever start buses for any reason other than for

22    these mechanical and safety reasons and idle them for more than

23    five minutes?

24    A.    No.  No reason to.

25    Q.    So, you didn't just start them for the sake of running

1    them?

2    A.    Run them -- start them for the sake of running them?  No.

3    Q.    Now, we talked a little bit about how weather conditions

4    affect the ability to build up air pressure and the bus to then

5    go on its route.  Do you recall that?  Do you recall doing

6    that --

7    A.    Say that again.

8    Q.    -- just a minute ago.

9    A.    Go ahead.  Say that again.

10   Q.    Remember, we talked about weather conditions, cold,

11   humidity, wind, how it affects the ability of the vehicle to

12   build up air pressure?

13   A.    Yes.

14   Q.    Okay.  I'm going to read to you from an exhibit some

15   weather information, okay, and ask you if, under those

16   conditions, you believe you will need to start a bus for it to

17   build up pressure.  Okay?

18        Now, you wouldn't build up air pressure and do this every

19   day of the week, did you?

20   A.    No.

21   Q.    Just when the weather required it?

22   A.    Yes, sir.

23   Q.    Just when it was cold, humid and windy?

24   A.    Right.  When it gets warmer, we don't need to do it.

25            MR. FRIEDMANN:  Your Honor, we have an agreed-upon

PDF created with pdfFactory trial version www.pdffactory.com

1    exhibit, which is Exhibit 44.  I'd like to move it into

2    evidence at this point in time.  It's certified weather data

3    from the U.S. Department of Commerce.  I don't believe there's

4    a dispute over it.

5            MS. HANKEY:  No objection.

6            THE COURT:  No objection?

7            MS. HANKEY:  No.

8            THE COURT:  Okay.

9            MR. FRIEDMANN:  I apologize.  We renumbered, and it's

10   actually 33.

11           THE COURT:  Okay.  That was admitted earlier.

12           MR. FRIEDMANN:  You know what, these are actually

13   different.

14           I'm sorry.  It's 47.  I would then move to have 47

15   entered as an exhibit, your Honor, instead of 44.

16           MS. HANKEY:  Is this document any different than

17   Exhibit 33?

18           MR. FRIEDMANN:  It's in a different format, yeah.

19   It's still a certified medical (sic) --

20           MS. HANKEY:  No objection, your Honor.

21           THE COURT:  All right.  47 is admitted without

22   objection.

23   (Exhibit No. 47 received into evidence)

24   BY MR. FRIEDMANN:

25   Q.   This is for the date of --

```
 1              THE COURT:  I'm displaying it to the jury now as well.
 2              MR. FRIEDMANN:  Okay.
 3    BY MR. FRIEDMANN:
 4    Q.   Can you see down, it says that this is for the date of
 5    March 1, 2006?  That's one of the claimed violation dates?
 6    A.   Can I see it?
 7    Q.   Yeah.  Can you see it?  Let me just read you some data
 8    from that, okay?  March 1, 2006.  19 degrees, 57 percent
 9    humidity and maximum wind speed 24 miles per hour.
10         Is that the type of conditions that would require you to
11    start buses for mechanical reasons?
12    A.   Yes.
13    Q.   Sir, if you -- I'm going to move to the next date, which
14    is about four pages up.  This will be for March 8, 2006.
15    Temperature is 28 degrees, 79 percent humidity, wind speed 14
16    miles per hour.
17         Is that the type of conditions that would require buses to
18    be started for building up air pressure?
19    A.   Yes.
20    Q.   Going next, sir, a few more pages back to the March 15,
21    2006.
22    A.   Okay.
23    Q.   Minimum temperature that day 32 degrees, 70 percent
24    humidity, wind gusts up to 41 miles per hour.  Is that the type
25    of conditions that would require you to start buses for
```

1  mechanical reasons?

2  A.   Yes.

3  Q.   The next claimed violation date, sir, March 21, 2006.

4  Minimum temperature 23 degrees, relative humidity 52 percent,

5  wind gusts up to 25 miles per hour.  Is that the type of

6  weather that would require you to start buses for mechanical

7  reasons?

8  A.   Yes.

9       MS. HANKEY:  I'm sorry, your Honor.  Could

10  Mr. Friedmann identify from where on the document he's reading?

11       MR. FRIEDMANN:  From each day.

12       MS. HANKEY:  I'm sorry.  But where, precisely, on the

13  document?

14       THE COURT:  Yeah.  It's not clear what values you're

15  selecting in your questions.

16       MR. FRIEDMANN:  I was using the minimum temperature of

17  the day.

18       THE COURT:  The lowest point?

19       MR. FRIEDMANN:  The lowest point.  I was using the

20  high humidity and the wind gust reading for the day for each of

21  the days.

22       MS. HANKEY:  I still don't -- are you reading from the

23  document that's on the screen right now?

24       MR. FRIEDMANN:  Well, I was just going to March 30th.

25  You still have March 21st on the screen.

1          MS. HANKEY:  I'm sorry.  I don't see on the document

2     where it says what the minimum temperature of the day is.

3          MR. FRIEDMANN:  I'm just taking the lowest temperature

4     of the day, which, in this case, was at 3:54 a.m.

5          MS. HANKEY:  So, I think that that wasn't clear, your

6     Honor, that Mr. Friedmann is actually picking and choosing out

7     of the entire line the lowest in each column, and some of them

8     are for different times; is that correct?

9          MR. FRIEDMANN:  Absolutely.

10         THE COURT:  Okay.

11    BY MR. FRIEDMANN:

12    Q.   Let's go back, if we would.  We still have the 21st in

13    front of us.  At 3:54 p.m. -- excuse me -- a.m.  That would be

14    just before you came in in the morning?

15    A.   You said 2:00 a.m., right?

16    Q.   3:54 a.m.

17    A.   Oh, 3:54.  I wasn't there at that hour.

18    Q.   23 degrees?

19    A.   That would affect the vehicle.

20    Q.   And at the same time 50 percent relative humidity and wind

21    gusts somewhere between 21 and 25 miles per hour.

22    A.   It would affect the system.

23    Q.   Okay.  Earlier that day it shows wind gusts of, between

24    1:00 a.m. and 3:00 a.m., it shows wind gusts of 23 and 21 miles

25    per hour.

1    A.    It would affect the bus because it was cold and windy all

2    night.

3    Q.    Okay.  And in that condition you would need to start the

4    buses and have them run, correct?

5    A.    Correct.

6    Q.    Okay.  Moving next to March 30th, 5:54 a.m., just before

7    6:00.  46 degrees --

8    A.    Okay.

9    Q.    -- relative humidity 36 percent, wind gusts up to 21 miles

10   per hour that day.  Would you need to start buses in those

11   conditions?

12   A.    Start them for condensation, but not --

13   Q.    Okay.  Moving on to April 4, starting off at, essentially,

14   1:00 a.m. at 054 in the morning, 42 degrees, 86 percent

15   relative humidity and wind gusts that day up to 34 miles per

16   hour.

17   A.    Again, you could have a condensation problem.

18   Q.    Okay.  Would you need to start buses that day for

19   mechanical reasons?

20   A.    Yes.  You need to start them mechanically to see if the

21   air system is going to build.

22   Q.    Going on to the April 12th date, let's use the 5:00 in the

23   morning.  42 degrees, 76 percent relative humidity and wind

24   gusts that day up to 29 miles per hour.

25   A.    We're still talking condensation.

1  Q.    Still have to start buses?

2  A.    Yes, because the air, if there's water in that system, we

3  have to clear it.

4  Q.    When you say "water in that system," are you talking about

5  the --

6  A.    Condensation settling in the line.

7  Q.    Okay.

8  A.    The line has got to be clear for air to build the air

9  system.  Like, again, go back to what the bus is.  The bus is

10  90 percent air; it operates on air.

11  Q.    If there's condensation in the system, how do you get rid

12  of the condensation?

13  A.    You run the system, and if the air dryer is working, it

14  will clear it eventually; it will clear the system.

15  Q.    Let's move on to April 27th, 5:00 in the morning, again.

16  I'm sorry.  Let's skip April 27.

17       Sir, I think I've taken you through the days of the

18  violations that are claimed in this instance, those seven days.

19  Now, there were weather conditions for each of them that you

20  indicated would require the buses to be started to build up air

21  pressure and to operate properly, correct?

22  A.    Correct.

23  Q.    Now, if the day before or the day after those weather

24  conditions didn't exist, would you still start the buses?

25  A.    You watch the weather.  If the weather is correct, you

PDF created with pdfFactory trial version www.pdffactory.com

1   don't have to touch them.

2   Q.    So, the weather would determine for you?

3   A.    Weather determines everything with a bus.

4   Q.    Okay.

5   A.    In order for me to meet my schedule, weather was a big

6   factor.

7   Q.    Did you ever start the buses and idle them during that

8   seven-week period when it wasn't required because of the

9   weather?

10  A.    Did I start them?

11  Q.    I'm sorry.  It was a poor question.  It was a very poor

12  question.

13        During the seven weeks that we have been talking about, if

14  there were not weather conditions that indicated to you that

15  the buses needed to be started, would you still start them in

16  the morning?

17  A.    No.  I wouldn't be worried about it.  I worried about the

18  weather.  If the weather is okay, then I can live with it.

19  Q.    Okay.  Now, you got a discipline letter --

20  A.    Yes, I did.

21  Q.    -- from Paul Revere Transportation on April 26th, 2006,

22  right?

23  A.    Yes.

24  Q.    It's Exhibit 7, and that was about ten days after the

25  Notice of Violation in this case, correct?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.    Correct.

 2   Q.    Okay.  You got a discipline letter, didn't you?

 3   A.    Oh, I did.

 4   Q.    What was your reaction to the discipline letter?

 5   A.    I didn't like it.

 6   Q.    Why didn't you like it?

 7   A.    Because I felt I was doing my job to the best of my

 8   ability.  I didn't feel I was doing anything radically wrong.

 9   Q.    Well, when you say you don't believe you did anything

10   wrong, what do you mean by that?

11   A.    That I broke any rules.

12   Q.    Five-minute idling rule?

13   A.    Pardon?

14   Q.    The five-minute idling rule?

15   A.    Yes.

16   Q.    On any of those days that were cited in your discipline

17   letter, do you believe that you started the vehicles except for

18   mechanical reasons?

19   A.    For mechanical and safety reasons only.

20         MS. HANKEY:  Objection, your Honor.  I mean, just a

21   point of clarification.  I don't think Mr. Powers testified he

22   ever started a vehicle himself.

23         THE COURT:  Rephrase the question.

24   BY MR. FRIEDMANN:

25   Q.    On any of seven days, when you sent a busman, a shifter, a
```

PDF created with pdfFactory trial version www.pdffactory.com

1    mechanic or any of the other people that were available to you

2    out to test, to see if the buses would build up pressure, on

3    any of those seven days in March or April, do you believe that

4    the starting of those vehicles was anything other than

5    mechanically necessary?

6    A.    No.  It was strictly for mechanical and safety reasons.

7    Q.    When you sent the people out to start the buses, did they

8    report back to you?

9    A.    They report back that it started and it was correct.

10   Q.    If it was working fine --

11   A.    If it was working fine.

12   Q.    -- what did you have them do?

13   A.    If it's working fine, we can shut it down -- shut it down,

14   and then when the driver goes out, he'll take the bus then.

15   Q.    If it wasn't working fine, then what did you do?

16   A.    Then we would call a mechanic and look and see what's

17   wrong.

18   Q.    Why would a bus run for 30 or 40 minutes?

19   A.    You're running it to see if the door systems are going to

20   work.  You're going to see if the suspension is going to come

21   up.  This is the reason you run a bus.  Again, I emphasize air.

22   Air is this whole -- everything in the bus is air.  If you do

23   not have proper air, you do not have a proper operation; your

24   doors won't work, your wiper won't work, the bus just won't

25   rise.

PDF created with pdfFactory trial version www.pdffactory.com

1  Q.   Would you ever run a bus for an hour or more if it wasn't

2  necessary?

3  A.   No.  Not -- I might run it if it's mechanically -- there's

4  something radically wrong.

5  Q.   Would you be running more than one bus at a time?

6  A.   It could be.  It depends on what our problems are.  We

7  wouldn't run a bus just to run a bus.

8  Q.   Could a person go out, one of the people that you have

9  start the buses, could they go out and start more than one bus

10 at a time?

11 A.   Yeah, anybody.

12 Q.   And why would they be starting more than one bus at a

13 time?

14 A.   To see which ones are going to start.

15 Q.   So they could sit there and monitor?

16 A.   Pardon?

17 Q.   They could sit there and monitor more than one bus at a

18 time?

19 A.   Correct.  You can start two or three, go back and see if

20 the air is building in number one, is the door working on this

21 one.  There's multiple things you can do.

22 Q.   It wasn't just mechanics that could check that, right?

23 A.   Right.  Drivers can do it, because drivers drive a bus.

24 They have to operate the door, they have to operate the wiper,

25 they have to operate the driver's seat.  I mean, you don't need

PDF created with pdfFactory trial version www.pdffactory.com

1    a mechanic to do that.  You need a mechanic to fix it, but the

2    operator can do all those things.

3         MR. FRIEDMANN:  I have no further questions at this

4    time, your Honor.

5         THE COURT:  Ms. Hankey.

6                   CROSS-EXAMINATION

7    BY MS. HANKEY:

8    Q.   Mr. Powers, I don't think I heard you testify.  At what

9    point in the morning would you send someone out to start the

10   vehicles?

11   A.   When the first person would come in that was available to

12   me.

13   Q.   And when you were -- when you came in in the morning and

14   you were assigning the vehicles, you knew which buses you were

15   going to assign to which routes, for the most part; isn't that

16   correct?

17   A.   Yeah, I would know what driver -- I try to keep a

18   standard -- keep everything in order.

19   Q.   So, how far in advance of the scheduled departure of the

20   vehicle would you send someone out to start the vehicle?

21   A.   When the first couple of drivers come in, I have them go

22   out and start these vehicles to see if the air is -- if, number

23   one, they're going to start, number one; number two, see if the

24   air is going to come up.

25   Q.   So, did you ask that person to start all of the vehicles

PDF created with pdfFactory trial version www.pdffactory.com

1  in the yard at one point in time?

2  A.   I'd ask him to start a couple.

3  Q.   Which couple would you ask him to start?

4  A.   The ones that are going to be going out.

5  Q.   And at what point before they were going out did you ask

6  this person to start the bus?

7  A.   I'd ask them when they came in to start it, come back to

8  me and see if it starts, see if it operates correctly, and if

9  it does, we'll shut it down and --

10 Q.   So, Mr. Powers, what time does the first bus depart the

11 lot?

12 A.   What time does the first one go out?  Let's see.  The

13 first one is -- the girl leaves about 12 after.

14 Q.   12 after 5:00?

15 A.   Yes.

16 Q.   What time does the second bus depart the lot?

17 A.   The second bus -- well, there's about four buses that go

18 out between 5:12 and 5:25.

19 Q.   And at what point did you -- at what point in the morning

20 would you ask someone to go start those vehicles?

21 A.   I'd start it -- the first time they'd come in, I would

22 start at 5:00 and have them go up the line and start different

23 ones.

24 Q.   So, at 5:00 in the morning --

25 A.   Five, ten after; it depends.  There's one fellow comes in

PDF created with pdfFactory trial version www.pdffactory.com

1  exactly at 5:00; another guy comes in a few minutes after.

2  Q.   So, when the guy comes in at 5:00, how many vehicles do

3  you ask him to start?

4  A.   Start the first five or six or seven vehicles that are

5  going to go out, and then keep going up the line and,

6  eventually, try to start all of them to see if you're going to

7  have problems later, because, if I've got problems now, then

8  I've got to make adjustments in my schedule.  Like, I've got to

9  change -- I've to got change buses.  I had it the other

10  morning; I had four buses that didn't start.  Four buses were

11  assigned at quarter of 6:00 to 6:05.

12  Q.   And when you have a number of buses that don't start, you

13  document that in a daily log; isn't that correct?

14  A.   Not all the time.

15  Q.   If you had a number of problems in a morning, where you

16  had a number of vehicles that wouldn't start or were having

17  problems building air pressure --

18  A.   I'll just send a mechanic out -- I would send a mechanic

19  to jump them.  I wouldn't make -- the only time I would make a

20  notation is if I had to work on it and I had a major problem.

21  I mean, the bus could have been dead because someone left the

22  lights on.  So, you're not going to document something like

23  that.  You're going to document it if you do it every day.

24  Q.   I'm sorry.  But if you had a number of runs --

25  A.   Pardon?

1  Q.   If you had a number of vehicles that didn't make their

2  runs because they were having problems starting or because they

3  weren't building air pressure, you would note that in your

4  daily log book; isn't that correct?

5  A.   I would know it if I had a problem every day, yes.  If I

6  had it every day.

7  Q.   If buses were late because they didn't -- because they had

8  problems starting, you would note that in your daily log book;

9  isn't that correct?

10  A.   I don't know what you mean by that.

11  Q.   Well, did you keep a daily log book, Mr. Powers?

12  A.   No.

13  Q.   No, you didn't --

14  A.   I keep a log.

15  Q.   -- you didn't keep a diary?

16  A.   I keep a log on things that I have a problem.  If a bus is

17  turned in every day for some reason, then I make a notation.  I

18  have a board and I keep a personal thing on it.  I'm a stickler

19  for maintenance; and I pay attention to it, but if a bus

20  doesn't start on a given day I don't make -- I don't pay

21  attention to it.  I watch it and see if it does it the next two

22  days.

23  Q.   I'm showing you --

24       MS. HANKEY:  Just for the witness, your Honor.

25       THE COURT:  Yes.

1    BY MS. HANKEY:

2    Q.   -- what has been marked as Exhibit 121.  Mr. Powers, is

3    this the diary that we were referring to that you would keep

4    information on the vehicles in?  Looking at your screen,

5    Mr. Powers.

6    A.   Okay.  Those buses are tied up.  Those buses are out of

7    service.

8    Q.   And would you note in this log book if you had multiple

9    problems with multiple vehicles?  I'm sorry.  You said that you

10   would note somewhere, Mr. Powers, if you had many problems with

11   a vehicle.  Where would you note that?

12   A.   You asked me a question earlier, if I jumped the vehicle,

13   would I correct it right then and there.

14   Q.   I'm sorry, Mr. Powers.  I think -- I asked you a specific

15   question.  You testified that if you -- that you were very

16   careful in keeping notes, and that if you had multiple problems

17   with a vehicle, you would note that somewhere.  Where would you

18   note that?

19   A.   I would note it in my head and then I'd pick it up --

20            THE COURT:  Mr. Powers, excuse me just a minute.  Just

21   one ground rule here.  You can't both talk at the same time.

22   Make sure she's finished the question before you begin your

23   answer.

24            THE WITNESS:  Sorry.

25            THE COURT:  Why don't you ask the question again.

1    BY MS. HANKEY:

2    Q.    So, you would simply note it in your head?

3    A.    Pardon?

4    Q.    You would simply note it in your head?

5    A.    Yes.  I have a very good memory.

6    Q.    And there wasn't anywhere where, for your management, you

7    would tell them when you had multiple problems with vehicles

8    starting?  You simply never kept your management apprised of

9    what was going on at the Roxbury facility in terms of problems

10   starting?

11              MR. FRIEDMANN:  Objection, your Honor.

12              THE COURT:  You may answer it.

13   A.    Yeah, we would keep a record.  I would tell the mechanic,

14   This is what you need to address.  If this problem arises

15   again, we need to address it.

16   Q.    So, there would be a record somewhere, if vehicles were

17   having problems starting?

18   A.    Well, they would have a work record if they worked on it.

19   You work on something that --

20   Q.    Mr. Powers, I'm sorry, let me -- I get to ask the

21   questions here.

22   A.    Okay.

23   Q.    Now, Mr. Powers, isn't it true that you were never outside

24   during these mornings?

25   A.    Was I outside?

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.   Yes.  Isn't it true that you were never outside during
2    these mornings?
3    A.   I sent someone out.  I'm usually at a desk.
4    Q.   I'm sorry.  So, my question was, isn't it true that you
5    were never outside during these mornings?
6    A.   I was never outside?
7    Q.   Yes.  Isn't that correct?
8    A.   Very rarely am I outside.
9    Q.   So, after you asked someone to start the vehicles, you
10   never watched what they did with those vehicles; isn't that
11   correct?
12   A.   Well, I couldn't see them, that's for sure.
13   Q.   And you couldn't hear them, either; isn't that correct?
14   A.   True.
15   Q.   So, you don't know how long after you gave the instruction
16   these vehicles were left idling?
17   A.   Well, they would idle, and they'd come back and let me
18   know, number one, did it start, number two, is the air up.
19   Once the air is up, then I can have them shut it down and so we
20   can operate.
21   Q.   Now, Mr. Powers, when you're building air, in order to
22   build the air, don't you put your foot on the accelerator;
23   isn't that correct?
24   A.   No.
25   Q.   No?  I'm sorry, but isn't the air compressor controlled by

1    the accelerator?

2    A.    The bus?

3    Q.    I'm sorry.  My question is --

4    A.    The acceleration on a bus, you cannot accelerate until the

5    air hits a certain pound.  It has to hit -- it has to go over

6    60 pounds for that accelerator.

7    Q.    I'm showing you what has been marked as government

8    Exhibit 1.

9    A.    It idles --

10   Q.    Can you please look at the document, Mr. Powers?

11        THE COURT:  Is this in evidence?

12        MS. HANKEY:  No.

13   BY MS. HANKEY:

14   Q.    Mr. Powers, can you please look at this document.  What is

15   the document on the screen?

16   A.    Like, the --

17   Q.    I'm sorry, Mr. Powers.  You need to answer my questions.

18   What is the document on the screen?

19   A.    Pre-Trip Inspection, CDL.  Commercial Driver's License.

20   Q.    And is this document a document used by Paul Revere?

21   A.    It just says -- I got the "CDL."

22   Q.    Is this a document used by Paul Revere?

23   A.    Is it what?

24   Q.    Is this a document used by Paul Revere?

25   A.    Is it by Paul Revere?

1    Q.    Is this a document used by Paul Revere?

2    A.    I don't use it.

3    Q.    So, you don't have any responsibility over what happens

4    during the circle check?

5    A.    The driver does the circle check and --

6    Q.    I'm sorry.  And you have no responsibility for what

7    happens?

8    A.    I don't have any responsibility to that, no.

9    Q.    Okay.  So, you don't know that during the pre-trip

10   inspection you are to hit the accelerator to build the

11   pressure?

12   A.    No.  Just so you understand --

13   Q.    I'm sorry, Mr. Powers.  Paul Revere only schedules the

14   drivers to arrive ten minutes before their shift; isn't that

15   correct?

16   A.    Right.

17   Q.    And they don't change that time in cold weather; isn't

18   that correct?

19   A.    No.

20   Q.    And that's true today, isn't it, Mr. Powers?  Today, Paul

21   Revere still only schedules the drivers to arrive ten minutes

22   before their shift.

23   A.    Ten minutes -- a ten-minute circle check.

24   Q.    And Mr. Friedmann asked you a number of questions about

25   whether someone from standing behind the bus could tell whether

PDF created with pdfFactory trial version www.pdffactory.com

1    the air pressure could build.  Someone who's not on the bus

2    couldn't tell whether the air pressure could build; isn't that

3    correct?

4    A.    You have to be on the bus to see it.

5    Q.    So, if someone were to leave the bus, they couldn't know

6    whether the air pressure was building; isn't that correct?

7    A.    No.

8    Q.    No, it's not correct?  They couldn't know whether the

9    pressure would build if they weren't on the bus, correct?

10   A.    You have to see it.

11   Q.    And they couldn't know whether the windshields were

12   defrosting if they weren't on the bus; isn't that correct?

13   A.    If the what?

14   Q.    If the windshields were defrosting if they weren't on the

15   bus; isn't that correct?

16   A.    No.

17   Q.    No?  So, someone from outside could tell whether the

18   windshields were defrosting?

19   A.    (No response).

20   Q.    How about if you're on another bus?  If you're on another

21   bus, can you tell whether the windshields are defrosting?

22   A.    Not if you're on another bus, no.

23   Q.    And you talked about condensation in the lines and how you

24   might have to start the buses because of condensation in the

25   lines.  You can have condensation in the lines in any

PDF created with pdfFactory trial version www.pdffactory.com

1    temperature; isn't that correct?

2    A.    In colder weather you have a problem, because it can ice

3    up on you.  Yes, you can have --

4    Q.    So, if it's under 32 degrees?

5    A.    You can have water in your system when it's warm, yes.

6    Q.    But your testimony is you don't start these vehicles to

7    run them in warm weather; isn't that correct?

8    A.    In warm weather, the dryer will kick in right away and

9    suck all that water out.

10   Q.    And the dryer won't kick in --

11   A.    Not in cold weather, because there's blockage, there's

12   ice.  There's ice somewhere down that line.

13   Q.    If it's 42 degrees, there's no ice on the air dryer; isn't

14   that correct?

15   A.    There's no ice on it, but there can be condensation in

16   your lines.

17   Q.    There can be condensation, just like in warm weather?

18   A.    Again, we're talking the bus, which is 90 percent air.

19   You've got water with all your lines.

20   Q.    And in warm weather, you do not start the vehicles and run

21   them ahead of time; isn't that correct?

22   A.    In warm weather?

23   Q.    Yes.  That was your testimony, wasn't it?

24   A.    In warm weather, you just go out, you start the bus in the

25   morning to see if it starts.

1    Q.    And that's true, even though you can have condensation in

2    warm weather?

3    A.    You can have water.

4    Q.    And, Mr. Powers, during the pre-trip inspection, the

5    drivers, they check the air pressure, don't they?

6    A.    Do they check it?

7    Q.    Yes.   As part of the pre-trip inspection?

8    A.    Yes.

9    Q.    And they check that the bus will start, don't they, as

10   part of the pre-trip inspection?

11   A.    They check the air pressure and see if the hand brake will

12   work, see if the hand brake will release.   The hand brake won't

13   release until that air builds up to a certain --

14   Q.    Now, you testified that some of these vehicles have block

15   heaters, is that correct, what you referred to as the Proheat

16   heater?

17   A.    The Proheat is for the heating system.

18   Q.    That heater also heats the interior compartment of the

19   bus; isn't that correct?

20   A.    That heats the water.

21   Q.    I'm sorry.   The Proheat heater?

22   A.    (No response).

23   Q.    But when you were -- in 2006, when you were instructing

24   employees to go start these buses, you didn't know that they

25   had this block heater, did you?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.   I'm not aware of it -- as a dispatcher, I wasn't aware.

 2   Q.   But you know that now, today?

 3   A.   Yes.

 4   Q.   Now, you testified that you would send someone out to

 5   start it, and if they were having problems, they would come

 6   back and tell you, and if the bus had problems, you would ask a

 7   mechanic to go address the problem; isn't that correct?

 8   A.   Correct.

 9   Q.   And there were only two mechanics on site; isn't that

10   correct?

11   A.   As a rule.

12   Q.   And drivers aren't trained to repair the vehicles; isn't

13   that correct?

14   A.   No.

15   Q.   I'm going to show you what's been marked as government

16   Exhibit 122.  Now, that is a chart showing the inspector's

17   observations on March 30th.  Can you tell me -- bus 540 idled

18   for 53 minutes.  Why was that bus idled?

19          THE COURT:  Can I see you at the sidebar about these?

20

21   (SIDEBAR CONFERENCE AS FOLLOWS):

22          THE COURT:  Before we get too far into this, I want to

23   be sure everybody's on the same page.  So, has this been

24   offered and admitted?

25          MS. HANKEY:  Yes.
```

```
 1              MR. FRIEDMANN:  No, it hasn't.

 2              THE CLERK:  Yes, it was.

 3              MR. TUCK:  In the opening.

 4              THE COURT:  It was just admitted.

 5              MR. FREIDMANN:  Right.

 6              THE COURT:  So, I guess maybe that answered my

 7     question, because you want it displayed to the jury?

 8              MS. HANKEY:  Yes.

 9              THE COURT:  All right.  Okay.  I think that's all.

10     (END OF SIDEBAR CONFERENCE)

11

12              THE COURT:  All right.  This is an admitted exhibit,

13     so it will be displayed to the jury.

14     BY MS. HANKEY:

15     Q.    Now, Mr. Powers, bus 540 idled for 53 minutes.

16     A.    Correct.

17     Q.    Sitting here today, do you know why that bus was idled?

18     A.    Major door problem.  We don't have the bus anymore.

19     Q.    You don't have bus 540 anymore?  And how about bus 541?

20     And, I'm sorry.  If the bus was having a problem with a door, a

21     mechanic would be working on it to repair it, correct?

22     A.    Okay.

23     Q.    So, there may have been one mechanic working on that bus?

24     A.    I'll answer your question the best I can.  540, 541, 4, 6,

25     7 -- is 8 there?
```

1  Q.   So, bus 541, that idled for an hour and three minutes.

2  A.   We have major door problems with all those Thomas buses

3  from 540 to 549, 550 and 51.

4  Q.   So, bus 541, you're saying a mechanic might have been

5  addressing the issue with the door problem on bus 541?

6  A.   He could have been addressing it or we were running it.

7  The longer the bus runs and builds the air, the doors -- these

8  doors were not working.  When you see all this, all these

9  minutes on each vehicle, on those particular buses we have door

10 problems.

11 Q.   You're telling me that on all of your vehicles --

12 A.   Yes.

13 Q.    -- on March 30, you had door problems?

14 A.   We've had constant door problems with these vehicles.

15 Q.   Yet, do you still have bus 550?

16 A.   550 is a Thomas.  Same thing 51.

17 Q.   I'm sorry?  So, how about bus 547?  Do you still have bus

18 547?

19 A.   Which one?

20 Q.   Bus 547.

21 A.   Like I said, all --

22 Q.   I'm sorry.  Do you still have bus 547?

23 A.   547 --

24 Q.   My question was, Mr. Powers, do you still have bus 547?

25 A.   Do I have it?

```
1   Q.    Does Paul Revere still own bus 547?

2   A.    Yes, ma'am.

3   Q.    And it still operates from the Roxbury lot?

4   A.    Yes.

5   Q.    And yesterday did bus 547 idle for 45 minutes?

6   A.    Yesterday?

7   Q.    Yesterday.

8   A.    It could have been.  They've got a problem with it.  It's

9   tied up.

10  Q.    I'm sorry?  You were there yesterday; isn't that correct?

11  A.    I was there yesterday?

12  Q.    Were you at the Roxbury facility yesterday?

13  A.    In the morning.

14  Q.    And did bus 547 idle for 45 minutes yesterday?

15  A.    That I couldn't tell you, because maintenance has got it.

16  It's tied up for a -- it's tied up.  It's under maintenance.

17  Q.    Are you saying that all of these 540 numbers are under

18  maintenance and are not being operated currently at the Roxbury

19  facility?

20  A.    547 is sitting in the yard, broke down right now, and

21  maintenance has been working on it.

22  Q.    And how about bus 546?

23  A.    546 is broke down with a major problem.

24  Q.    And bus 544?

25  A.    544 was in the street.
```

1   Q.    Is in the street?  And bus 541?

2   A.    541 is not there.

3   Q.    How about bus 554?  It idled for almost two hours.  Do you

4   know why that bus was idling on March 30th?

5   A.    Like I said, these buses here --

6   Q.    I'm sorry.  This, you testified, was a Thomas bus; is that

7   correct?

8   A.    They're Thomases.  540 is not there anymore, okay?  541 is

9   not there.  544 is, 546, 545, 547 --

10  Q.    These are all still there?

11  A.    -- and 48 and 49.

12  Q.    They're all still there?

13  A.    And we have constant -- every day or every other day we

14  have a problem with either a rear door or a front door.

15  Q.    Now, you would have that problem in warm weather, wouldn't

16  you?

17  A.    We've had it in warm weather.

18  Q.    But you testified in warm weather you don't send someone

19  out to start the vehicles ahead of time, correct?

20  A.    Correct.

21  Q.    And, Mr. Powers, currently do you still send a cover

22  person out in the early mornings to start the vehicles ahead of

23  service?

24  A.    Say that one again.

25  Q.    Currently, do you still send a cover person or someone out

1    ahead of time to start the vehicles?

2    A.    I send them out to start them, to see if they will start.

3    Q.    And do they currently idle the vehicles for more than an

4    hour?

5           MR. FRIEDMANN:    Objection.

6    A.    The vehicle isn't in the yard an hour.

7    Q.    I'm sorry.  No.  The vehicles are not in the yard -- when

8    you send them out to start the bus -- yesterday did you send

9    someone out ahead of schedule to start the bus?

10   A.    I sent them out to start them to see if they'll start,

11   yes.

12   Q.    And then they shut it down?

13   A.    Yes.

14   Q.    And how long did they idle that vehicle?

15   A.    To make sure the air's up.

16   Q.    And how long did they idle that vehicle?

17   A.    That, I'm not out there.  I mean, some of these buses take

18   quite a while to build.

19   Q.    I'm sorry, if you're not out there, how do you know how

20   long they take to build?

21   A.    Because I know the bus.

22   Q.    Did you see any of these vehicles idle for the time

23   periods on these days?

24   A.    I did not see them, no.

25   Q.    Did you know that any of these vehicles were idling for

PDF created with pdfFactory trial version www.pdffactory.com

1    these lengths of time on these days?

2    A.    You're talking March 30th, now.

3    Q.    Yes.  When Mr. Daley -- after the NOV was sent, when

4    Mr. Daley came and asked you about the allegations, did you

5    tell Mr. Daley that you were running the buses for hours?

6    A.    If we were running the bus an hour, we were running it for

7    mechanical reasons; we weren't running it for -- just to let it

8    idle.

9    Q.    If it was running for an hour -- but the buses were

10   scheduled to go out at 5:25, correct?  I mean, you said the

11   first set of vehicles was scheduled to go out at 5:25; isn't

12   that correct?

13   A.    All right.

14   Q.    But you only sent someone out to start the vehicles after

15   5:00, correct?  So, you didn't anticipate that the vehicles

16   would take an hour?

17   A.    I would hope not.

18   Q.    And did you send people out regularly an hour ahead of

19   schedule to start the vehicles and idle them?

20   A.    Again, I sent them out to start them, not to idle them,

21   just to run.  I --

22   Q.    I'm sorry.  If they're running the vehicle, they're idling

23   the vehicle; isn't that correct?

24   A.    (No response).

25   Q.    It was never your intention, when you sent someone out to

PDF created with pdfFactory trial version www.pdffactory.com

1  start the vehicle, that they would then idle the vehicle for an

2  hour?

3  A.   Not if it was running correctly.

4  Q.   And if you sent them out 25 minutes ahead of time but it

5  idled for an hour, that bus would have been 30 minutes late for

6  its schedule, correct?

7  A.   I don't follow you.

8  Q.   If you sent someone out to start the vehicle 30 minutes

9  ahead of time but the vehicle idled for an hour, it would have

10  been late for its run; isn't that correct?

11  A.   Yeah.

12  Q.   And you didn't document that anywhere when you missed

13  runs?  You didn't document that anywhere?

14  A.   It would have been given to maintenance to try to correct

15  the problem.

16  Q.   And there were only two mechanics on site, correct,

17  Mr. Powers?

18  A.   Right, but I make a list and then, through the day, we'll

19  try to correct them.

20       MS. HANKEY:  I have no further questions, your Honor.

21       MR. FRIEDMANN:  I have a few, your Honor.

22                REDIRECT EXAMINATION

23  BY MR. FRIEDMANN:

24  Q.   Mr. Powers, if you sent somebody out to start a bus and it

25  wouldn't build up air pressure, would you then substitute

PDF created with pdfFactory trial version www.pdffactory.com

1    another bus of that type until that -- the first bus built up

2    its air pressure?

3    A.    Yes.  I do it every day.

4    Q.    Sort of like triage?

5    A.    Right.

6    Q.    You get the first ones out.  If you had six buses that had

7    to go out, one, two, three, four, five, six, and the first one

8    went out okay, but the second one wasn't okay, you'd then use

9    the third one in the second one's spot and the fourth one in

10   the third one's spot until you --

11   A.    I would circumvent them all right down the line.  I make

12   those adjustments every day.  In the bus industry, the bus

13   doesn't run correct -- it's not perfect every morning.

14   Q.    So, you have to substitute something until you get --

15   A.    You have to.  You have to make adjustments.

16   Q.    And not every repair -- now, Ms. Hankey asked you about

17   repairs to vehicles being done by mechanics.  If a bus isn't

18   building up air pressure, it doesn't always require a repair,

19   does it?

20   A.    No.

21   Q.    So, a bus could run and have somebody other than a

22   mechanic checking on it to make sure that it would then

23   properly operate, correct?

24   A.    Again, I would get a mechanic, if the doors didn't operate

25   correctly, which I have a major problem with the Thomas.  It's

PDF created with pdfFactory trial version www.pdffactory.com

1    just the way the bus was manufactured.  We have an air problem

2    with them, and we have to let them run, or we have to try to do

3    something with them, we have to change different things in

4    them.

5           MR. FRIEDMANN:  Could we see Exhibit 125 again?

6           MS. HANKEY:  122?

7           MR. FRIEDMANN:  I'm sorry.  Was it 122?  Okay.

8    BY MR. FRIEDMANN:

9    Q.   These buses that you were asked about, on the date that

10   these events occurred, you knew what the problem was with each

11   of these buses, didn't you?

12   A.   On most of them I did.

13   Q.   You sent somebody out to see what problems you had, and

14   they would report back to you, right?

15   A.   Correct.

16   Q.   Okay.  That's how you would find out what the status of

17   each bus was, right?  Is that a yes?

18   A.   Yes, yes.  I'm shaking my head.

19   Q.   You have to say it for the record.

20        If the EPA inspector on that date had come and asked you

21   why this bus was running, you would have been able to tell him,

22   right?

23   A.   Yes.

24   Q.   But he didn't?

25   A.   Nobody came in to see me.

 1          MS. HANKEY:  Objection.  This is outside the scope of

 2    cross-examination, your Honor, and asked and answered.

 3          THE COURT:  It is beyond the scope.  Sustained.

 4    BY MR. FRIEDMANN:

 5    Q.   With regard to the scheduling of the drivers when they

 6    arrive --

 7    A.   Yes.

 8    Q.    -- there is a minimum requirement that they be there ten

 9    minutes before their route starts, right?

10    A.   Yes.

11    Q.   That's the minimum?

12    A.   (Witness nodding).  Correct.

13    Q.   Drivers show up a whole lot earlier than that, don't they?

14    A.   Some do.

15    Q.   You have a whole driver's lounge set up for the drivers,

16    right?

17    A.   A what?

18    Q.   A lounge set up for the drivers.

19    A.   Correct.

20    Q.   They can get coffee, they can read the paper, they can

21    talk with their friends?

22    A.   Correct.

23    Q.   And they do come in early?

24    A.   Some come in early.

25    Q.   And in bad weather a lot of them come in early, don't

PDF created with pdfFactory trial version www.pdffactory.com

1   they?

2   A.    Because they want a parking space.

3   Q.    And they also know that you're going to need help on bad

4   weather?

5            MS. HANKEY:  Objection.  Leading, your Honor.

6            THE COURT:  It is leading.

7            MR. FRIEDMANN:  Okay.

8   BY MR. FRIEDMANN:

9   Q.   Have you observed bus drivers coming in early in bad

10  weather so that they could prepare for their trip?

11           MS. HANKEY:  Objection, your Honor.

12           THE COURT:  Sustained.

13  BY MR. FRIEDMANN:

14  Q.    That's a minimum requirement, is the ten minutes?

15  A.    Ten minutes.

16  Q.    But they, periodically, come in earlier than that?

17  A.    Some --

18           MS. HANKEY:  Objection, your Honor.

19  A.    Some fellows do.

20           THE COURT:  We've been over this.

21  BY MR. FRIEDMANN:

22  Q.    You were shown Exhibit No. 1.  Do you recall that?  That

23  was the CDL circle check for buses.

24  A.    Correct.

25  Q.    I don't think that's been entered yet, but do you remember

PDF created with pdfFactory trial version www.pdffactory.com

1   you were questioned on that?

2   A.   That's a safe -- that's safety and training.

3   Q.   The circle check; is that check separate and apart from

4   what you've been describing when you send people out to check

5   on the vehicles?

6   A.   The people I send out don't do a circle check; they go out

7   to see if it starts mechanically and for safety reasons.

8   Q.   Completely different check?

9   A.   Right.  The driver does what she was referring to, the CDL

10  Pre-Trip Inspection.

11  Q.   And the CDL says that this is a bus fueled by compressed

12  natural gas.

13          MS. HANKEY:  Objection, your Honor.

14          THE COURT:  Sustained.

15  MR. FRIEDMANN:

16  Q.   Do you know if the CDL that you were shown --

17          MS. HANKEY:  Objection, your Honor.

18          THE COURT:  Yeah.  It's not in.  He didn't identify

19  it.  I don't think there's any examination necessary.

20  BY MR. FRIEDMANN:

21  Q.   You were also shown Exhibit 121, which was not offered.

22  Do you recall being shown a log?

23  A.   The log?

24  Q.   Yeah.

25  A.   I keep a log every day with stuff that's tied up.

1    Q.    Okay.

2    A.    That log you see there, those vehicles are out of service.

3            MS. HANKEY:  Objection, your Honor.

4            THE COURT:  Well, the answer may stand, but the

5    exhibit is not displayed to the jury.

6    BY MR. FRIEDMANN:

7    Q.   When you say "out of service," what do you mean by "out of

8    service"?

9    A.    Can't use it; it's in for repair.

10   Q.    Is there a difference between a bus that has been, let's

11   say, sent out to the manufacturer to have its brakes redone or

12   sent over to Chelsea to have its brakes redone and something

13   that just won't build up air pressure one morning, in terms of

14   the recordkeeping that you do?

15   A.    If I'm going to tie the bus up in the morning, say, I have

16   an air pressure problem, you'll see it in that log book.

17   Q.    If a bus is not able to make routes on a permanent basis

18   and needs a repair, is it put in this --

19            MS. HANKEY:  Objection, your Honor.

20   A.    No, it won't be in the book.

21            THE COURT:  Overruled.

22   A.    We'll work on them.  I'll have them work on it; I'll have

23   the mechanics fix it.

24   BY MR. FRIEDMANN:

25   Q.    But if it's something like the brakes needed to be

PDF created with pdfFactory trial version www.pdffactory.com

1   replaced and the bus was out of service, is that what would go

2   in this type of a log?

3   A.    That would be in this log, because it's out of service.

4   Q.    That's different -- the out-of-service log is different

5   than the log you kept in your mind?

6           MS. HANKEY:  Objection, your Honor.  Leading.

7           THE COURT:  Sustained.

8   A.    You have an out-of-service --

9           THE COURT:  Mr. Powers, wait for the next question,

10  please.

11  BY MR. FREIDMANN:

12  Q.    I think you testified before that you had a good memory.

13  Do you recall saying that, and that you would keep track of

14  buses that you were having problems with?

15  A.    Yes.

16  Q.    Is that different than the types of events that you were

17  putting in these types of logs?

18  A.    Yes.

19  Q.    Okay.

20          MR. FRIEDMANN:  I have no further questions, your

21  Honor.

22          THE COURT:  All right.

23                     RECROSS-EXAMINATION

24  BY MS. HANKEY:

25  Q.    Mr. Powers, how many buses are at the Roxbury facility?

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   A.    At this time?
 2   Q.    In March of 2006 how many vehicles were there at the
 3   Roxbury facility?
 4   A.    You had ten Thomases, eight Neoplans and ten RTSs, and you
 5   had cut vans and --
 6   Q.    And how many routes did you have?
 7   A.    Pardon?
 8   Q.    And how many routes did you have at the Roxbury facility?
 9   A.    How many routes?
10   Q.    Yes.
11   A.    Let's see.
12   Q.    Let me ask the question another way.  I'll withdraw the
13   question.
14         How many extra vehicles did you have sitting around the
15   Roxbury facility that weren't assigned to routes?
16   A.    Possibly, one or two.  It depends on what the breakdown
17   rate was.
18   Q.    So, you had one or two vehicles that were --
19   A.    Possibly.
20   Q.    -- that were available to you to substitute into service?
21   A.    No.  I really don't have anything to play with, basically.
22   I have enough vehicles so long as everything is up.  Right now
23   I'm short vehicles.  So I've got, in the yard, there are three
24   vehicles tied up in the yard.
25            MS. HANKEY:  I have no further questions, your Honor.
```

1           THE COURT:  Okay.  Thank you, Mr. Powers.  You may

2    step down.

3           THE WITNESS:  Thank you.

4              (Witness stepped down)

5        MR. FRIEDMANN:  Your Honor, our next witness will be

6    Doc Daley.

7        MR. FRIEDMANN:  I'm sorry, your Honor.  He's coming up

8    from downstairs.

9           THE COURT:  Let me just use the time by seeing

10   counsel.

11

12   (SIDEBAR CONFERENCE AS FOLLOWS):

13        THE COURT:  First of all, you're sure he's coming up?

14        MR. FRIEDMANN:  Yeah.  He was sequestered so --

15        MR. TUCK:  He's in the cafeteria.

16        THE COURT:  Just a progress report.

17        MR. FRIEDMANN:  He's our last witness.

18        THE COURT:  Things are moving along very well.

19        MR. FRIEDMANN:  He's our last witness.

20        THE COURT:  Go over tomorrow, finish today?

21        MR. FRIEDMANN:  I have very little with him.

22        THE COURT:  Okay.  And that will be yours.  And then

23   what might be next?

24        MS. HANKEY:  I think we may have one or two witnesses,

25   your Honor.

1        THE COURT:  Tomorrow?

2        MS. HANKEY:  (Nodding).

3        THE COURT:  So, we might finish the evidence tomorrow?

4        MS. HANKEY:  Yes.

5        THE COURT:  Okay.

6  (END OF SIDEBAR CONFERENCE)

7

8        THE CLERK:  Sir, step up to the box, please.

9              RICHARD J. DALEY, JR. SWORN

10       THE CLERK:  Please be seated.  State your name, spell

11  your last name, for the record, keep your voice up and speak

12  into the mic, so everyone can hear you.

13       THE WITNESS:  Okay.  My name is Richard J. Daley,

14  D-A-L-E-Y, Jr.

15              DIRECT EXAMINATION

16  BY MR. FRIEDMANN:

17  Q.    Good afternoon.

18  A.    Good afternoon, sir.

19  Q.    You sometimes go by the name "Doc"?

20  A.    Yes, sir.

21  Q.    Can you tell me your educational background, sir?

22  A.    Yes.  I graduated from Somerville High School, I went to

23  Bunker Hill College for a couple of years, and that's as far as

24  I went with school.

25  Q.    Did you serve in the military?

1  A.    I did.  I was in the Air Force from 1969 to 1972.

2  Q.    How many years have you been in the bus industry?

3  A.    Thirty-two years.

4  Q.    What types of companies have you worked at?

5  A.    I worked -- in the bus business I worked with the MBTA.  I

6  started in the MBTA in 1977.  I retired in 2001, and I started

7  working for Paul Revere Transportation in 2002.

8  Q.    What positions have you held with Paul Revere

9  Transportation?

10  A.    I began as the Director of Safety and Training in January

11  of 2002, and in August of 2002 I became the General Manager.

12  Q.    Sir, if you need some water, there's a --

13                         (Pause)

14  A.    Thank you.

15  Q.    When you say you were the General Manager, did you oversee

16  the Roxbury location?

17  A.    Yes, sir.  As part of my duties, I do.

18  Q.    Do you oversee other locations also?

19  A.    Yes.  The Charlestown -- the garage in Chelsea and the

20  operation we have at the Grand Canyon.

21  Q.    Can you tell me, sir, the position you held before General

22  Manager, what was that position?

23  A.    At Paul Revere?

24  Q.    At Paul Revere.  I'm sorry.  Yes.

25  A.    I was the Director of Safety and Training.

1  Q.   And what did your duties involve there?

2  A.   The duties were to train all the new drivers that came on,

3  retrain any operators that had any incidents with either

4  accidents or customer-service-related incidents.

5  Q.   Was part of your job to train employees regarding the

6  five-minute idling rule?

7  A.   Yes, sir.

8  Q.   And you began doing this in what year?

9  A.   January of 2002.

10  Q.   And have you been involved in the training of Paul Revere

11  employees regarding the five-minute idling rule since then?

12  A.   Yes, sir.

13  Q.   Do you recall at some point in time going over to the EPA

14  offices here in Boston with Richard Brown in response to the

15  Notice of Violation?

16  A.   Yes, sir.

17  Q.   And do you recall meeting with anybody from the EPA at

18  that time?

19  A.   Yes, sir, I do.

20  Q.   Do you recall any of your discussions with the

21  representatives of the EPA at that point in time?

22  A.   Yes.  It was a brief discussion, yes, sir.

23  Q.   What do you recall of that?

24  A.   Myself and Richard went over there right after the Notice

25  of Violation.  I know that we called to make an appointment.

PDF created with pdfFactory trial version www.pdffactory.com

1    It was two or three days after the violation.  We went in and

2    we met Mr. Greg Daniels, one of the individuals, and I know

3    there was a couple of women that were involved in the meeting

4    also.  And, you know, we asked about the violation, you know,

5    what were the circumstances behind the violation.

6    Q.   Did you try to explain to the representatives of the EPA

7    what the idling was that was being done by Paul Revere at that

8    time?

9    A.   Part of the discussions were exactly that, you know, what

10   was the nature of the violation, you know, where it was,

11   different dates, whenever, you know, the violation occurred.

12   Q.   Did you try to explain to them why the buses were being

13   idled?

14   A.   I believe we did.  I think, you know, part of the problems

15   were the buses were idling in the morning, and we tried to

16   explain to them that the buses do idle, the operators have ten

17   minutes to do a safety circle check, and, you know, it doesn't

18   really violate the five-minute idling rule, because it gives

19   them that ten minutes to do that check.

20   Q.   Did you also explain to them that the idling that was

21   going on for more than five minutes was for mechanical and

22   safety reasons or what you believe to be mechanical and safety

23   reasons?

24            MS. HANKEY:  Objection.  Leading, your Honor.

25            THE COURT:  Sustained.

PDF created with pdfFactory trial version www.pdffactory.com

 1  BY MR. FRIEDMANN:

 2  Q.   Did you indicate -- how did you indicate to them what the

 3  idling was that was being done in excess of five minutes?

 4        MS. HANKEY:  Objection, your Honor.

 5        THE COURT:  Yes.  Sustained.

 6  BY MR. FRIEDMANN:

 7  Q.   Who was it that you explained this to?

 8  A.   I know Mr. Dain was at the meeting.  There were a couple

 9  of other people, a couple of other women that were in the room.

10  I know the woman that testified the other day was there.  I

11  don't remember her name, but she was there also.

12  Q.   Okay.  Did you at any point in time state that it was your

13  belief that Paul Revere had violated the five-minute idling

14  rule?

15  A.   No, sir.

16  Q.   Did you state the opposite?

17  A.   Again, we were there to find out exactly why we were there

18  and it was -- no.  We just said that, you know, we start the

19  buses in the morning to make sure the buses build up enough air

20  pressure and that the buses are ready to go.

21  Q.   Do you recall anything else about that meeting?

22  A.   There was some discussions about a fine that was going to

23  be levied against the company, and that's what, you know,

24  Mr. Brown was concerned about, and we were wondering what the

25  cost of that fine would be, and then said there was going to

1    be --

2         MS. HANKEY:  Objection, your Honor.

3         THE COURT:  Well, no.  He may complete the answer.  If

4    you hadn't finished, you may finish.

5    A.    You know, that we thought it might be up in the

6    seven-figure digits.

7    MR. FRIEDMANN:

8    Q.    Did you agree to a fine that day?

9    A.    No.

10   Q.    Okay.  After you left the EPA, did you receive any

11   assignments from your superiors on what they wanted you to do

12   relative to the NOV?

13   A.    Yes, sir.  Again, Mr. Brown is the owner of the company.

14   He was very upset, wanted me to go back and find out what was

15   going on over at the Roxbury garage, if, in fact, they were

16   violating the idling rule, and, you know, if I found that that

17   was the case, to discipline or fire anybody that was idling

18   more than five minutes.

19   Q.    Did Mr. Brown tell you to issue a disciplinary letter to

20   people?

21   A.    Yes, sir, he did.

22   Q.    Did he tell you why he wanted a disciplinary letter issued

23   to people?

24   A.    He wanted to reiterate that there is a five-minute idling

25   rule that people are aware of -- I mean, we've been training

PDF created with pdfFactory trial version www.pdffactory.com

1    people for that for a long time -- and that if anybody violated

2    that rule, that they would be subsequently disciplined and

3    terminated, if that be the case.

4    Q.   Now, were you involved in the issuing of the disciplinary

5    letters?

6    A.   Yes, sir, I did.

7    Q.   And why did you issue them?

8    A.   I started to do an investigation to find out what was

9    transpiring over at the garage.  I talked to Mr. Powers, who

10   was the dispatcher, the a.m. dispatcher, asked him if they were

11   starting buses and running them past the 5-minute idling time,

12   and he claimed that they were starting buses on cold days and

13   they were running the buses to build up the air pressure, and I

14   told him, Look it, that's unacceptable, you have to stay with

15   the five-minute idling rule, everybody is aware of this, and

16   that I was going to give him a letter of reprimand.

17   Q.   So, you told him you were going to reprimand him, right?

18   A.   Yes, sir, I did.

19   Q.   What was his response?

20   A.   He was very upset.

21   Q.   Did he express to you why he was upset?

22   A.   Not at that time.

23   Q.   Did he at some later time?

24   A.   Yes, sir.

25   Q.   And what did he tell you?

1    A.    He told me that --

2              MS. HANKEY:  Objection, your Honor.

3              THE COURT:  Sustained.

4    BY MR. FRIEDMANN:

5    Q.    You issued the disciplinary letter to Mr. Powers, didn't

6    you?

7    A.    I did.

8    Q.    You issued one to Mr. Swartz too, correct?

9    A.    Yes, sir, I did.

10   Q.    Why did you issue it to those two people?

11   A.    I talked to Mr. Powers first, and he said he was idling

12   the buses beyond the five-minute idling rule.  I issued that

13   letter either the next day or the day after that.  I continued

14   my investigation to find out who was starting the buses,

15   whether it be mechanics or shifters, or Jimmy told me --

16   Mr. Powers told me that whoever he had available in the morning

17   on cold mornings would go out and start the buses.  So, I

18   wanted to find out who those people were.

19        Mike Swartz is the manager, the a.m. manager, at the

20   location, and, you know, I asked Mike if he realized that the

21   buses were being started.  He doesn't get in until 6:00.  The

22   buses were being started after that.  But I told him it's his

23   responsibility, as a manager, to oversee the supervisors and

24   the drivers, the day-to-day operations of the garage, and if,

25   in fact, there was any violations, that they would be

PDF created with pdfFactory trial version www.pdffactory.com

```
 1   disciplined also.
 2   Q.   And then you issued disciplinary letters to both of them?
 3   A.   Yes, sir.  Mike Swartz was probably a week or two after.
 4   Q.   And what was the purpose of that?  What was the message
 5   you were trying to get out?
 6   A.   The message was to reinforce the policies and procedures
 7   of Paul Revere and the five-minute idling rule, the law.
 8   Q.   We've had some discussion in this case about Proheat
 9   heaters.
10   A.   Correct.
11   Q.   Are you familiar with them?
12   A.   Yes, sir.
13   Q.   Are you familiar with plug-ins?
14   A.   We have different types of Proheats or different types of
15   heaters for different buses.
16   Q.   Do plug-ins or the Proheat heaters in any way assist a bus
17   in building up its air pressure?
18   A.   Air pressure?
19   Q.   Yes.
20   A.   No, sir.
21   Q.   I understand that out of the Roxbury location you run
22   particular buses for particular routes, correct?
23   A.   We have assigned vehicles for different contracts, yes.
24   Q.   One of those is Harvard, correct?
25   A.   Yes, sir.
```

1    Q.   Do you recall going back to the March/April 2006

2    timeframe, were you having problems with buses that were on the

3    Harvard --

4              MS. HANKEY:  Objection.  Leading, your Honor.

5              THE COURT:  No.  Overruled.

6    BY MR. FRIEDMANN:

7    Q.   Were you having trouble with buses that were on the

8    Harvard route?

9    A.   In 2006?

10   Q.   Correct.

11   A.   We had some issues where Harvard changed the fare

12   structure.  Prior to 2006, there was no cost for the bus.  They

13   went to, like, a Charlie-Card-type of a card that they -- it's

14   called a Crimson Cash card that the employees and students of

15   Harvard -- it's a swipe card for coke machines or their meals.

16        They put the same card reader on the buses.  When they

17   installed the card readers on the buses, we had some electrical

18   problems that were killing the batteries at the very beginning,

19   when they put them in.  Well, it was about our four or five

20   months before they rectified that.

21   Q.   Was this back in the March/April 2006 timeframe?

22   A.   I believe it was.  I believe they first installed those in

23   January of '06, I think, when they first installed them.

24   Q.   And what kind of problem did it generate in terms of the

25   buses and their operation?

1    A.    The problem we had with them is that the -- they installed

2    them, apparently, directly to the battery, because if the bus

3    sat for four or five or six or seven hours, it actually drew on

4    the battery and the bus wouldn't start.

5    Q.    Now, you were in the courtroom the other day, when opening

6    statements were done, correct?

7    A.    Correct.

8    Q.    And you saw a video or a piece of a video that was put up

9    on the screen.  Do you recall that?

10   A.    Yes, sir.

11   Q.    When did you remember about this problem with the card

12   readers?

13   A.    Actually, when I saw that video, because it was some of

14   the newer vehicles in the corner of the yard that were alleged

15   to be running, and I was trying to figure out, you know, why

16   would those buses be running, because they were some of the

17   newer vehicles we had at the time.  And when I saw that, I

18   thought about the problems that we did have with that.

19   Q.    And then it hit you at that point in time?

20   A.    Yes, sir.

21         MR. FRIEDMANN:  I have no further questions, your

22   Honor.

23                      CROSS-EXAMINATION

24   BY MS. HANKEY:

25   Q.    I'm sorry, Mr. Daley.  You were referring to the Harvard

PDF created with pdfFactory trial version www.pdffactory.com

1  shuttles.  Are those MASCO shuttles?

2  A.   Yes, ma'am.  That's part of the MASCO route.

3  Q.   You testified that you instructed Mr. Powers that he could

4  not idle for more than the five minutes; is that correct?

5  A.   Yes, ma'am.

6  Q.   And you testified that in your discussions with EPA, you

7  explained to EPA that you guys had to do a ten-minute circle

8  check; is that correct?

9  A.   Yes, ma'am.

10 Q.   It's not your testimony today that you explained to EPA

11 that the circle check took an hour, is it?

12 A.   No, ma'am.

13 Q.   So, you didn't explain to EPA that the vehicles had to

14 idle for an hour to build up air pressure; is that correct?

15 A.   I don't remember -- no.  The circle check itself, they're

16 allowed ten minutes.

17 Q.   I'm sorry.  My question specifically is that you did not

18 explain to EPA that the buses required an hour to build up air

19 pressure in order to operate; is that correct?

20 A.   No, they do not, unless there was a problem with the

21 vehicle.

22 Q.   And if there was a problem with the vehicle, a mechanic

23 would have to address it, correct?

24 A.   Yes, ma'am.

25 Q.   And currently at the Roxbury facility do you allow them to

PDF created with pdfFactory trial version www.pdffactory.com

1   idle the vehicles for more than the ten-minute circle check?

2   A.    Who would that be, the operator?

3   Q.    Yes.

4   A.    No.  They're only allowed ten minutes, unless there is a

5   problem with the bus.

6   Q.    And is anyone other than a mechanic allowed to operate the

7   vehicle for more than ten minutes at the Roxbury facility

8   currently?

9   A.    I'm not following your question.

10  Q.    If a vehicle is idling for more than ten minutes at the

11  Roxbury facility currently, is that because it's having

12  mechanical issues?

13  A.    No, not necessarily.  We could idle a bus for half an hour

14  on a cold, cold morning to build up the air pressure.

15  Q.    What is a cold, cold morning to you, Mr. Daley?

16  A.    A cold morning would be -- there's a combination of

17  factors to that.

18  Q.    Well, let me ask you a question.  Is 40 degrees a cold

19  morning?

20  A.    No.

21  Q.    And is it a regular occurrence for a vehicle to take as

22  much as half an hour for the air pressure to build?

23  A.    Depends on the day.

24  Q.    Only on rare occasions; is that correct?

25  A.    Yes, ma'am.  Cold, cold mornings.

1  Q.   And cold, cold mornings, that's going to be well below

2  freezing, isn't it, Mr. Daley?

3  A.   Again, it depends on the humidity, it depends on the wind

4  --

5  Q.   Well, let me ask this:  If the air pressure isn't

6  building, that's because there's blockage in the line; is that

7  correct?

8  A.   That's correct.

9  Q.   And if you have blockage in the line, you have to have a

10  mechanic address that issue; isn't that correct?

11  A.   It depends on the issue, depends on what the blockage is.

12  Sometimes it could just be water.

13  Q.   And if it's water, do you then have a mechanic unfreeze

14  the line?

15  A.   It depends on how fast the air pressure builds up.

16  There's a gauge on the air tanks.  When the air pressure builds

17  up over 120 pounds, it blows out any condensation that's in the

18  tanks.

19  Q.   You wouldn't wait half an hour, though, would you, before

20  you made that determination?

21  A.   You could.

22  Q.   You would wait as much as half an hour before deciding to

23  have a mechanic address the issue?

24  A.   No, no.  We would have a mechanic look at, but it may not

25  be fixed.  It may take that much time to build the air pressure

```
 1   up high enough for the bus to evaporate the air off.
 2   Q.   When you issued the disciplinary to Mr. Swartz and
 3   Mr. Powers, you had already met with them; is that correct?
 4   A.   Yes, ma'am.
 5   Q.   And Mr. Powers explained to you why he was idling the
 6   buses; is that correct?
 7   A.   Not at the very first he did not, no.
 8   Q.   Did Mr. Powers tell you that one of the reasons he was
 9   idling the buses was because he had received complaints from
10   passengers and drivers about the temperature in the cabin?
11   A.   He did say that he had a complaint from one of the
12   passengers that the buses were cold.  Yes, ma'am.
13   Q.   In your letter you stated that you spent three weeks
14   investigating the allegations; is that correct?
15   A.   Yes, ma'am.
16   Q.   And after those investigations, you issued the
17   disciplinary letter -- you decided to issue the disciplinary
18   letter to Mr. Powers and to Mr. Swartz; is that correct?
19   A.   I did them at different times.
20   Q.   But after your investigation, you decided to issue the
21   disciplinary letters, correct?
22   A.   Well --
23   Q.   Yes or no?
24   A.   Well, I'm trying to think, because I think the second day
25   I gave the letter to Jim, and it was --
```

PDF created with pdfFactory trial version www.pdffactory.com

1    Q.    And then it was almost a month later that you gave the

2    letter to Mr. Swartz; is that correct?

3    A.    It was a while.

4            MS. HANKEY:  I have no further questions, your Honor.

5            MR. FRIEDMANN:  I just have a couple, your Honor.

6                    REDIRECT EXAMINATION

7    BY MR. FRIEDMANN:

8    Q.    Sir, on the discipline letters, you were told to issue

9    those, weren't you?

10   A.    Yes, sir.

11   Q.    You didn't decide to do that.

12   A.    No, sir.

13   Q.    And you were told to make a point in those letters to the

14   employees, correct?

15   A.    Yes, sir.

16   Q.    You were asked a question a minute ago about when you

17   spoke to Mr. Powers and he told you the reasons the buses were

18   being idled.  Do you recall being questioned about that subject

19   matter?

20   A.    Yes, sir.

21   Q.    And Ms. Hankey asked you if one of the reasons that he

22   told you was because of a customer complaint.  Do you recall

23   that?

24   A.    That was one of the reasons, yes.

25   Q.    What were the rest of the reasons that he gave you?

PDF created with pdfFactory trial version www.pdffactory.com

1   A.   The first time I spoke to him, it was basically that, it

2   was just that he was running the buses.  Subsequently, during

3   the investigation, it was determined that he was running the

4   buses to build the air pressure on cold days.  It wasn't like

5   every day he ran the buses.

6        He was very upset with me the first time we spoke.  So I

7   went back and spoke to him again, and I wanted to clarify what

8   he was doing, because he was well aware that -- he had made the

9   announcements about the five-minute idling rule.  So, I said,

10  Well, what are you doing?  You know you're not supposed to run

11  the buses more than five minutes.  He said, I got to get them

12  started on the cold days to make sure there's enough air

13  pressure that the buses build up before they go out in the

14  street, and they have to do that.

15  Q.   There are different types of issues, mechanical issues,

16  that you have in the morning, correct?

17  A.   Yes, sir.

18  Q.   Some of them require mechanics?

19  A.   Yes, sir.

20  Q.   Others don't require mechanics?

21  A.   That's correct.  It depends on what the problem is.

22  Sometimes they won't start; sometimes they don't build air

23  pressure.

24  Q.   Now, you were asked about what was cold, and I think you

25  said, It's a combination of factors.  Do you recall saying

1  that?

2  A.    Yes, sir.

3  Q.    What are the factors that you need the combination of to

4  determine if the buses need to be started?

5  A.    Again, it depends on the weather.  If it's zero degrees

6  out, you have to bring people in to make sure that the buses

7  are going to start, to begin with.  The main problem we have is

8  building up air pressure, and you have to have the -- there's

9  got to be a combination of factors.

10      And it's just from experience, too.  Once the humidity

11  gets in the lines and you have 25, 30 degrees out, you have

12  high humidity, it's raining out, it's snowing out, and then you

13  throw the wind chill factor in there, buses are going to

14  freeze, you're not going to get the buses to build up air

15  pressure.  You have to get at least 80 pounds or 90 pounds of

16  air pressure just to release the brakes.  So, you can't put the

17  buses out.

18      Depends on -- all it has to be is the size of a BB to

19  freeze the bus up.  90 percent of the function of the bus runs

20  on the air pressure.  It's your doors, your suspension system.

21  If there's four air tanks on the bus and all these little, tiny

22  lines in between, that condensation gets in that line.  If

23  there's enough water in there, the air pressure won't go

24  through to the tanks.  You've got to get all four tanks to

25  build up before the air bags on the bus, those big air bags,

1   the air suspension builds up.

2        The bus will run at 80 pounds, 70 pounds, 60 pounds, until

3   that moisture gets out of the line, and I talked about that

4   before.  The old days, on a truck, when you drove a truck,

5   there was a petcock that you opened up and all the water came

6   out.  They don't have that anymore, and, especially, on a bus,

7   you can't get underneath a bus.

8        This just popped into my head.  It's an air dryer.  Once

9   the air pressure builds up over 120 pounds, you hear a (Witness

10  makes oral sound).  It blows out any condensation that's in the

11  line.  Once that happens, your air pressure will come up.  If

12  that freezes, we need a mechanic to come.  If that condensation

13  freezes, they have a torch, and they go underneath the bus, or

14  they have to put the bus up in the air to thaw that out.  That

15  bus will run, but it won't build up any air pressure beyond the

16  amount we need.

17       90 pounds is to release the brake, which is an air brake.

18  You need between 90 and 120 pounds for the operator to drive

19  the bus safely on the street, because every time he steps on

20  the brakes, air pressure comes out.  If the air pressure is not

21  building up and you only have 90 and you step on the brake,

22  it's going to drop down to 85, the next time it's going to be

23  80, and then you're not going to have any brakes.  So, there's

24  a safety factor with that.

25  Q.   So, the weather conditions are air, that is wind, humidity

PDF created with pdfFactory trial version www.pdffactory.com

1    and temperature?

2    A.    Yes, sir.

3    Q.    Those are the things --

4    A.    That's a bad day.

5            MR. FRIEDMANN:  I have no further questions, your

6    Honor.

7                    RECROSS-EXAMINATION

8    BY MS. HANKEY:

9    Q.    Just one point of clarification, Mr. Daley.  You said, if

10   a line was frozen, you would have to have a mechanic address

11   the issue, correct?

12   A.    Yes, ma'am.

13   Q.    And you would reassign the bus, correct?

14   A.    Yes.  The bus can't go out.

15   Q.    And I'm looking at the May 16th letter, 2006 to Mr.

16   Swartz.  When you wrote --

17           THE COURT:  This is in evidence, right?

18           MS. HANKEY:  Yes.

19           THE COURT:  I'll display it to the jury.

20   BY MS. HANKEY:

21   Q.    And I'm reading from the second paragraph.

22         "Over the past three weeks, I have investigated the

23   complaint, and during the investigation, it was determined that

24   Jim Powers, the a.m. dispatcher, ordered the buses to be

25   started on cold days to allow the buses to build up air

PDF created with pdfFactory trial version www.pdffactory.com

1    pressure and warm up.  This act is, in fact, a violation of the

2    EPA five-minute idling rule."

3        When you wrote this letter, you had already spoken with

4    Mr. Powers, correct?

5    A.   Yes, ma'am.

6    Q.   And your testimony earlier was that Mr. Brown had

7    instructed you to discipline employees if you found that there

8    was a violation, correct?

9    A.   Yes, ma'am.

10            MS. HANKEY:  I have no further questions, your Honor.

11            THE COURT:  All right, sir.  Thank you.  You may step

12   down.

13                    (Witness stepped down)

14            THE COURT:  That's as far as we'll go today.

15            MR. FRIEDMANN:  Would you like me to rest?

16            THE COURT:  If you would like.

17            MR. FRIEDMANN:  I'd like to rest.

18            THE COURT:  All right.  Defense rests, which is a sign

19   that -- there may be some additional evidence from the

20   plaintiff -- but we are moving along very well with the

21   presentation of the evidence, and I'm not guarantying, but it

22   may well be that we'll finish the evidence in the case

23   tomorrow.  All right?

24            So, enjoy the rest of the day.  We'll see you tomorrow

25   morning and continue with the case.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE CLERK:  All rise for the jury.  Court is in

2    recess.

3    (The Honorable Court and the Jury exited the courtroom at 1:05

4    p.m.)

5    (Whereupon, proceedings adjourned at 1:05 p.m.)

6                    C E R T I F I C A T E

7

8

9          I, Marcia G. Patrisso, RMR, CRR, and Brenda K.

10   Hancock, RMR, CRR, Official Court Reporters of the United

11   States District Court, do hereby certify that the foregoing

12   transcript, from Page 4-1 to Page 4-167, constitutes, to the

13   best of my skill and ability, a true and accurate transcription

14   of my stenotype notes taken in the matter of *United States of*

15   *America v. Paul Revere Transportation, LLC*, No.

16   1:06-cv-12297-GAO.

17

18                          /s/ *Marcia G. Patrisso*

19                          Marcia G. Patrisso, RMR, CRR

20                          Official Court Reporter

21

22                           /s/ *Brenda K. Hancock*

23                          Brenda K. Hancock, RMR, CRR

24                          Official Court Reporter

25