UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                )
UNITED STATES OF AMERICA,        )
                                )
        Plaintiff,               )
                                )  Civil Action
v.                               )  No. 06-12297-GAO
                                )
PAUL REVERE TRANSPORTATION, LLC, )
                                )
        Defendant.               )
                                )
```

BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE

**DAY FIVE**
**JURY TRIAL**

John J. Moakley United States Courthouse
Courtroom No. 9
One Courthouse Way
Boston, Massachusetts 02210
Friday, June 5, 2009
9 a.m.

Marcia G. Patrisso, RMR, CRR
Brenda K. Hancock, RMR, CRR
Official Court Reporters
John J. Moakley U.S. Courthouse
One Courthouse Way, Room 3510
Boston, Massachusetts 02210
(617) 737-8728

Mechanical Steno - Computer-Aided Transcript

```
 1   APPEARANCES:

 2       UNITED STATES DEPARTMENT OF JUSTICE
         ENVIRONMENTAL ENFORCEMENT SECTION
 3       By: Rachel A. Hankey, Esq.
         P.O. Box 7611
 4       Ben Franklin Station
         Washington, D.C. 20044-7611
 5       - and -
         U.S. AIR FORCE DEPARTMENT OF LAW
 6       By: Jeffrey K. Sands, Esq.
         HQ USAFA/DFL Suite 8J100
 7       USAFA, Colorado 80840
         On Behalf of the Government
 8
         RUDOLPH FRIEDMANN, LLP
 9       By: Jonathon D. Friedmann, Esq.
             Zachary J. Tuck, Esq.
10       92 State Street
         Boston, Massachusetts 02109
11       On Behalf of the Defendant

12
     IN ATTENDANCE:
13
         Gregory Dain, Senior Enforcement Counsel
14       Environmental Protection Agency

15

16

17

18

19

20

21

22

23

24

25
```

1                         I N D E X

2                    DIRECT   CROSS   REDIRECT   RECROSS
        REBUTTAL
3   WITNESSES FOR THE
       GOVERNMENT:

4

5   WILLIAM PARSLEY

6        By Ms. Hankey          14                 41
         By Mr. Friedmann              32

7

    CHRISTINE SANSEVERO

8

         By Ms. Hankey          42                 53
9        By Mr. Friedmann              50

10  ABDI MOHAMOUD

11       By Ms. Hankey          53
         By Mr. Friedmann              60

12

    STEVEN CALDER

13

         By Ms. Hankey          63

14

15                      E X H I B I T S

16  GOVERNMENT'S
      EXHIBIT NO.          DESCRIPTION                RECEIVED

17
    No. 124      Videotape                               60
18

    No. 148      Notes by Steven Calder                  65
19

20

21  Motions and Charge Conference              Page 70

22

23

24

25

1           (The following proceedings were held in open court

2     before the Honorable George A. O'Toole, Jr., United States

3     District Judge, United States District Court, District of

4     Massachusetts, at the John J. Moakley United States Courthouse,

5     One Courthouse Way, Boston, Massachusetts, on June 5, 2009.)

6           THE COURT:  All rise.

7     (The Honorable Court entered the courtroom at 9:10 a.m.)

8           THE COURT:  Court is now in session.  Please be

9     seated.

10          Continuation of the trial in *USA v. Paul Revere*

11    *Transportation Transportation*.

12          THE COURT:  Good morning.

13          MR. FRIEDMANN:  Good morning, your Honor.  I wanted to

14    just bring two motions again, technically, to put them in the

15    record for your Honor and to preserve our appellate rights, if

16    that need be.  I'd like to -- the motion for directed finding,

17    now that we're at the close of defendant's case, I'd like to

18    renew, and our general motion for directed finding, the two

19    motions that I had presented before that your Honor had

20    previously ruled on, I'd like to renew those motions, for the

21    record.

22          Some courts, particularly the United States Supreme

23    Court, has interpreted that if they are not renewed at the

24    close of the defendant's case, it may cut off appellate rights.

25    So, I'm doing it for the record to preserve those rights.

```
 1              THE COURT:  Okay.  Same rulings.

 2              MR. FRIEDMANN:  I had assumed that, your Honor.

 3              Your Honor, I also just had a question on the scope.

 4    I understand you're going to permit rebuttal.  I wanted to

 5    inquire about the scope of rebuttal that you will be

 6    permitting.  I've been told there are four rebuttal witnesses,

 7    including an expert.  So, I just wanted to inquire about that

 8    scope.

 9              THE COURT:  Well, I don't know what is offered.

10              MS. HANKEY:  The expert, Mr. Bill Parsely, will be

11    offered to testify, and he is in direct rebuttal to the

12    testimony offered pretty much specifically by Mr. Powers.  He's

13    worked in the bus industry for more than 30 years.  He was the

14    Director of Maintenance at the New York Transit Authority, and

15    he's going to testify about his experience regarding buses'

16    operation in cold weather.

17              MR. FRIEDMANN:  The reason for my inquiry particularly

18    about him, your Honor, is we do have a report from him that was

19    provided to us under Rule 26(a)(2).  However, his report is in

20    rebuttal to a report or series of reports of Dr. Wong, and I

21    would suggest that the expert is only permitted to testify at

22    all, whether it's on rebuttal or otherwise, on the scope of

23    what he has disclosed previously as his expert report.

24              And I would suggest that -- and if your Honor would

25    like to look at his -- it's an 11-page report, it's not that
```

```
 1    long, but there are, perhaps, three or four sentences, at best,
 2    that deal with this issue in the 11 pages.  His report
 3    substantially says -- and his report, in fairness to him, was
 4    on two different subjects.  One was how long it takes to warm
 5    up the engine, which was something that Dr. Wong had opined on,
 6    and the second was on how long it took to, if you would, air up
 7    a vehicle, and when you go through -- so, certainly the first
 8    of those two issues is not something that any of us are
 9    suggesting he's going to, at least I believe --
10            MS. HANKEY:  Well, I can tell you, to the extent it
11    will be limited to what -- in his report he has an explanation
12    of the Proheat heater and a block heater.  So, his testimony
13    would be limited in that respect, which is -- that was offered.
14            MR. FRIEDMANN:  With regard to his comments in his
15    report, his report goes through and essentially comments
16    paragraph by paragraph on, Dr. Wong said this, and this is why
17    I find Dr. Wong to be wrong.
18            MS. HANKEY:  I think, if I can make a proffer, I think
19    it might help a little bit.
20            THE COURT:  Yes.
21            MS. HANKEY:  His testimony -- in his report he has
22    explanations of, for example, how the air system is operated
23    and how the compressor is operated, and his testimony would be
24    limited to that.  He won't be testifying about Dr. Wong's
25    reports, and these statements are all statements that are, in
```

PDF created with pdfFactory trial version www.pdffactory.com

1  fact, in his expert report.  And he has statements about, in

2  his experience, how long it takes for the air pressure to

3  build, even in cold weather, and, in fact, he reviewed the

4  specific observations by the EPA inspector and weather data for

5  the days of the EPA inspector, and offered an opinion with

6  respect to whether, for example, the lines could be freezing

7  and whether, for example, the air pressure could build in a

8  vehicle in less than five minutes, and that is direct rebuttal

9  to the testimony that was proffered by the defendants, and it

10 is within the scope of his report.

11          THE COURT:  So, is he going to focus on air pressure

12 and the Proheaters?

13          MS. HANKEY:  Yes.

14          THE COURT:  Nothing else?

15          MS. HANKEY:  Nothing else.

16          MR. FRIEDMANN:  With regard to the air pressure, your

17 Honor, the report we have of what he's going to say, and I'm

18 happy -- I have an extra copy, if the Court would like it.

19          MR. FRIEDMANN:  And I'm just addressing the area of

20 air pressure now.  It begins at page 6, is his discussion of

21 his analysis of air pressure times in bus engines.

22          "Dr. Wong performed an analysis of the time required

23 to pressurize the bus air system.  The issues that we have with

24 Dr. Wong's analysis are as follows:"  And then he goes through

25 and lists paragraph 1 what he finds wrong with Dr. Wong's

1   report, paragraph 2 what he finds wrong with Dr. Wong's report,

2   paragraph 3 what he finds wrong with Dr. Wong's report,

3   paragraph 4 what he finds wrong with Dr. Wong's report and

4   paragraph 5 what he finds wrong with Dr. Wong's report.

5          Then he gives his conclusions and opinions, and I

6   would suggest to your Honor, that the conclusions and opinions,

7   the following sentences are, at best, what he would be entitled

8   to testify to.  The conclusion that it may take -- I'm sorry --

9   this is in the first paragraph of the conclusion section.  I

10  believe it's the third sentence.

11         The conclusion that it may take from 10 minutes to

12  over an hour to pressurize the bus system contradicts design

13  requirements and my experience of what is normal practice.  I

14  would suggest that that he could testify to.  And that, "In my

15  experience, a properly designed and maintained transit bus will

16  take no longer than five minutes to come to operating

17  temperature and pressure," that he would be entitled to testify

18  to.

19         MS. HANKEY:  That's exactly what he's being offered to

20  testify to.

21         MR. FRIEDMANN:  But, on those he would have to have

22  some substantive evidence for those conclusions, and he has no

23  calculations, conclusions.  So, he would be limited, I would

24  assume, then, to his personal experiences on different buses in

25  a different geographic region.

1          MS. HANKEY:  He reviewed the vehicle manuals for the

2     vehicles in issue, and his report contains explanations, for

3     example, of how the compressor is driven, the speed at which it

4     operates.  He also, you know, looked at the weather data and

5     the alleged events and has in here, for example, that 104 of

6     the 144 idling events witnessed by the EPA inspector were on

7     days when the temperature was above freezing.

8          THE COURT:  Where are you reading?

9          MS. HANKEY:  I'm sorry.  On page 9.

10         THE COURT:  Oh.  In paragraph 5 at the top?

11         MS. HANKEY:  Right.  In fact, 104 of the 104 (sic)

12    idling events witnessed by the EPA were on days where the

13    temperature was above freezing and 80 of the idling events were

14    on days when the temperature was above 42 degrees.  In my

15    experience, a properly designed and maintained air system will

16    be able to build pressure and reach operating pressure in less

17    than five minutes even at the lowest temperature cited at 18

18    degrees Farenheit.

19         And, in addition, your Honor, he has citations -- he

20    has, for example, information on what the manuals state is the

21    required idling time at start, and he has citations to those

22    manuals and will testify to what those manuals inquire (sic).

23    In addition, not only did he look at the manuals; he looked at

24    Massachusetts State law with respect to what is required in

25    terms of air pressure at startup; he looked at federal law in

1   terms of what is required at startup; he did research with

2   respect to the specific components in Paul Revere's vehicles

3   and what the manufacturers of those components said with

4   respect to idling at startup and how they operated.

5          And based on his 30 years in the bus industry, and, in

6   fact, your Honor, while he was at the New York Transit

7   Authority, one of the things he was responsible for was

8   cold-weather operation of their vehicles.  And I guess I think

9   it's -- you know, everyone who came in and testified gave

10   general testimony about what their experience in cold weather

11   was, and there wasn't, you know, specific testimony, On this

12   day I had this problem, on this day I had this problem.  The

13   witnesses gave general testimony about what the conditions are

14   in cold-weather startup, and Mr. Parsley has direct experience

15   and, in fact, he has operated some of the -- at the New York

16   Transit Authority they operated some of the exact vehicles that

17   Paul Revere has.

18          MR. FRIEDMANN:  Your Honor, that is precisely why we

19   have the problem.  What my sister just articulated is precisely

20   the reason we have the problem with the habit evidence in this

21   case, because, as she has indicated, there were nebulous

22   testimony about what is cold and what is this alleged habit.

23          The government, as the proponent of the habit under

24   406(b) has to prove with particularity the causative factors.

25   By example, if you're trying to prove by habit that Jon

1    Friedmann on Tuesdays always has cheeseburgers, you have to

2    prove that enough times to believe that it's a reaction from

3    the stimulus, which is Tuesday.  Then they have to prove that

4    it was, in fact, a Tuesday for the habit conclusion to be

5    reached that, therefore, the cheeseburger was eaten.

6           As my sister says, the alleged habit that they have

7    the burden of proof on, which they've not raised and not proven

8    but, yet, want to keep dates in on is that buses were started

9    in cold weather without giving a definition to the jury.

10          Yesterday, when we argued this, your Honor said that

11   they -- and my sister argued successfully to your Honor -- that

12   they could make that jump from point A to point B, based on the

13   seven days of observed; that they could conclude, a jury could

14   find by a fair preponderance of evidence that there were

15   violations on that day.

16          But that's separate and distinct from the predicate

17   finding that the Court has to make that the proponent of the

18   habit established by its evidence that the habit existed and

19   that on those individualized dates, without observation, that

20   those conditions existed.  And that was what I was arguing to

21   your Honor, not that once you find habit that the jury can't

22   conclude that a violation existed, but they are the proponents,

23   and they're trying to shift the burden onto us to have to prove

24   what the habit is.  They have to prove with particularity --

25   and they could have asked Mr. Powers yesterday when he was on

PDF created with pdfFactory trial version www.pdffactory.com

1    the stand, because he's the one that allegedly had this habit.

2    They could have asked him, When did you do it, tell me the

3    specifics.  They didn't, and, so, they haven't established the

4    habit, and that's the whole problem here.  They haven't

5    established, first, what the habit is, and then they haven't

6    established that it existed on the days they're claiming.

7         THE COURT:  I understand your argument with respect to

8    that.  I want to tie it to the proffered evidence of this

9    witness.  That's the question now.  And I'm not sure whether

10   your habit argument affects the admissibility of the witness.

11        MS. HANKEY:  No, and, if I could, your Honor, I mean,

12   I think it might be appropriate that the United States moves

13   for a directed verdict.  I mean, you put -- the way that you

14   set the burden framework was that the -- if I could, the way

15   that you set the burden framework was that the United States

16   had to meet its *prima facie* case, and the defendant had to come

17   forward with some evidence of necessity.

18        THE COURT:  Right.

19        MS. HANKEY:  And Mr. Friedmann just described that

20   evidence himself as nebulous and unspecific.  That was his

21   categorization, not mine, right, with respect to when and why

22   vehicles were idling in cold weather.  It's the defendant's

23   position that the vehicles had to idle in cold weather because

24   of necessity, and Mr. Friedmann just described it as nebulous

25   and unspecific.

PDF created with pdfFactory trial version www.pdffactory.com

1           I guess my question is, how does that meet their

2   burden with respect to --

3           THE COURT:  Because it's a burden of production only;

4   that's why.

5           MS. HANKEY:  But -- and with respect to the question

6   of Mr. Parsley's testimony, they did, in fact, give general

7   testimony about why you would idle in cold weather, and that

8   you have to idle in cold weather.

9           MR. FRIEDMANN:  All I'm suggesting, your Honor, is

10  he's limited to the scope of his report --

11          THE COURT:  Yeah.

12          MR. FRIEDMANN:  -- on those issues that are not long

13  issues.

14          THE COURT:  He can testify about pressurization and, I

15  guess, Pro Heaters -- I don't see that in the report, but I

16  haven't read the report fully -- consistent with statements,

17  including supporting statements made in the report.

18          MR. FRIEDMANN:  That's all I was --

19          THE COURT:  Okay.  Ready for the jury?

20          MR. FRIEDMANN:  Yes, your Honor.

21          MS. HANKEY:  Yes, your Honor.

22          THE CLERK:  All rise for the jury.

23  (The Jury entered the courtroom at 9:29 a.m.)

24          THE CLERK:  Please be seated.

25          THE COURT:  Good morning, Jurors.

1          All right.  Ms. Hankey.

2          MS. HANKEY:  The United States calls Mr. Bill Parsley.

3                         (Pause)

4          MS. HANKEY:  Apparently, the witness is in the

5     restroom.

6                         (Pause)

7          THE CLERK:  Step up to the box, sir.  Step up there.

8     Watch your step.  Remain standing.  Raise your right hand.

9                   WILLIAM PARSLEY, SWORN

10         THE CLERK:  Please be seated.  State your name, spell

11    your last name for the record, keep your voice up and speak up

12    into the mic.

13         THE WITNESS:  William Parsley, P-A-R-S-L-E-Y.

14         MS. HANKEY:  May I continue, your Honor?

15         THE COURT:  Yes.

16                REBUTTAL DIRECT EXAMINATION

17    BY MS. HANKEY:

18    Q.   Mr. Parsley, where are you currently employed?

19    A.   I work part-time.  I have my own company, a consulting --

20    transportation consulting company.  I work also part-time for a

21    company called Lee & Elliot.

22    Q.   And what kind of consulting work do you provide?

23    A.   Transportation consulting, especially on buses.

24    Q.   And do you provide consulting in any specific areas

25    related to buses?

1    A.    Especially the procurement of buses, specifications for

2    buses, technical issues, maintenance of buses, training.  Those

3    sorts of things.

4    Q.    And how long have you been so employed?

5    A.    Since 2004.

6    Q.    And, as a consultant, can you give us some specific

7    examples of the kinds of projects you've undertaken?

8    A.    Well, I did a training program for the FTA on the

9    maintenance of fuel cell buses.  I recently helped Houston

10   Metro with parts issues.  I've helped Honolulu Airport purchase

11   new buses.  Those are a few examples.

12   Q.    And what did you do before you were a consultant?

13   A.    I worked for New York City Transit for almost 30 years.

14   Q.    Just briefly, could you tell us what your educational

15   background is?

16   A.    I have a bachelor's degree in psychology with credits in

17   science and engineering.

18   Q.    And did you take any other college courses?

19   A.    I did.  I went to Manhattan College, and I took

20   engineering courses at Manhattan College.

21   Q.    Was there something that you did in between those two sets

22   of college courses?

23   A.    I was in the Army.

24   Q.    How long were you in the Army?

25   A.    I was in the Army for two years, the Vietnam era.

1    Q.   And can you describe for us some of the various positions

2    you held at the New York City Transit Authority over those 30

3    years?

4    A.   I started as a bus cleaner there, and I was a mechanic.  I

5    was a supervisor or foreman, a supervisor of mechanics.  I was

6    an instructor.  I trained mechanics in the Maintenance Training

7    Center.  New York City Transit has its own training center, and

8    I trained mechanics in all systems, engines, electrical

9    systems, air systems.

10        I worked as a manager in Standards and Compliance, making

11   sure the Transit Agency complies with its policies, its

12   internal policies, and for about the last 10 or 12 years I was

13   in charge of -- I was the Director of Research and Development

14   there, where we developed natural and deployed natural gas

15   buses, hybrid electric buses.  We put particulate filters on

16   our buses, we purchased low-sulfur diesel fuel, all to reduce

17   emissions from buses to eliminate black smoke from buses.

18   Q.   In your various positions, have you had experience dealing

19   with the procedures for idling during startup of vehicles?

20   A.   I have.

21   Q.   And have you had experience with the operation of a

22   transit fleet in cold weather?

23   A.   I have.  I actually -- I actually -- I forgot to mention

24   that I was in charge of bus maintenance at several of New York

25   City Transit's bus garages.  So, there's typically, maybe, 200

PDF created with pdfFactory trial version www.pdffactory.com

1    buses there, and my job was to get them ready in the morning,

2    and we did that over the course of a number of winters.  So, I

3    was actually responsible for having the buses ready in cold

4    weather to be running.

5    Q.    And, so, how many years, approximately, would you say that

6    your work entailed in some form or another issues dealing with

7    the operation of motor vehicles?

8    A.    Over the entire period, we had, you know, issues involving

9    the operation.  I mean, even when we were doing the latest

10    buses, the hybrid electric buses, those sorts of things, the

11    specification for those buses includes all of the things that

12    go on with how a bus should operate, including air systems,

13    cold weather, starting systems, engines.

14    Q.    And did your work include implementing policies regarding

15    the idling of vehicles?

16    A.    It did, it did.  We had a policy.  New York City Transit

17    has a policy for reducing idling from the buses.  So, I was

18    responsible at certain times for either the specification of

19    the new buses so that they would not idle.

20        For example, we installed anti-idling devices on buses to

21    limit the amount of idling.  If they were just left idling,

22    they would shut off automatically.  But, most of all, it was

23    preventative maintenance.  It was the maintenance of the buses

24    that I would be involved in, and I would define how the buses

25    should be maintained in order that they don't need to be idled.

1    Q.   And in your over 30 years working in the transit industry,

2    were you required to have knowledge regarding the technologies

3    related to idling or reducing idling?

4    A.   I was.

5    Q.   And in those 30 years of working in the bus industry, have

6    you gained knowledge regarding the operation of diesel

7    vehicles, including transit buses, in cold weather?

8    A.   Absolutely, yes.

9    Q.   And do you have any professional affiliations?

10   A.   I'm a member of SAE International, which is an

11   organization of automotive engineers, automotive and aerospace

12   engineers, and also APTA, the American Public Transit

13   Association, which is an organization of public transit

14   agencies to advance public transit.

15   Q.   And have those affiliations affected your knowledge

16   regarding the operation of vehicles?

17   A.   Yes.  I rely on the references from those organizations,

18   whether they're standards or people that I know, networking

19   with people that I know, to understand how, you know, problems

20   will be solved.

21        MS. HANKEY:  Your Honor, the United States would ask

22   the Court to recognize Mr. Parsley as an expert in the field.

23        THE COURT:  Well, it will depend on the questions he's

24   asked.  I don't give blanket approvals.

25        MS. HANKEY:  May I proceed, your Honor?

```
 1              THE COURT:  You may.
 2   BY MS. HANKEY:
 3   Q.    Are you being compensated for your time today?
 4   A.    I am.
 5   Q.    At what rate?
 6   A.    $105 an hour.
 7   Q.    And have you been compensated for the time you spent
 8   working in preparing for this matter?
 9   A.    Yes, I have.
10   Q.    And at what rate?
11   A.    $105 an hour.
12   Q.    Now, have you ever testified as an expert witness before?
13   A.    A long time ago.  Certainly, over 10 years ago for New
14   York City Transit.
15   Q.    In preparing to testify, did you review any materials
16   regarding Paul Revere Transportation's vehicles?
17   A.    I did.
18   Q.    Can you --
19              MS. HANKEY:  Actually, may I approach, your Honor?
20              For the record, your Honor, I've given the witness
21   government Exhibit 129, which is his report.
22   BY MS. HANKEY:
23   Q.    Can you tell me what information did you review?
24   A.    I reviewed operating and maintenance manuals for the buses
25   operated by Paul Revere; I reviewed a list of buses that were
```

PDF created with pdfFactory trial version www.pdffactory.com

1  found to be idling; I reviewed the weather records associated

2  with those buses; I reviewed other literature on bus idling and

3  on the operation of air systems, engines and electrical systems

4  associated with starting buses in cold weather and reducing

5  idling.

6  Q.    Did you look at any Massachusetts-related documents?

7  A.    I did.  I looked specifically at the Massachusetts CDL

8  manual, Commercial Driver License Manual, yes.

9  Q.    What does that manual contain?

10  A.    It contains the instructions for operators of commercial

11  vehicles, including transit buses, trucks, and it gives them,

12  among other things, directions on how to check out their

13  vehicle before operating the vehicle.

14  Q.    And based on the documents reviewed, are any of the Paul

15  Revere vehicles which were cited by the EPA inspector fitted

16  with auxiliary or block heaters?

17  A.    Yes.  Some of them are, yes.

18  Q.    Can you tell the jury what is a block or auxiliary heater?

19  A.    Well, an auxiliary heater is a heater that runs on diesel

20  fuel, the same diesel fuel as the engine runs on, and it

21  creates a flame, and it creates heat, and it heats up the

22  engine coolant, which is circulating in the engine block.

23        There's a pump, there's a heater, there's a pump, there's

24  a heat exchanger.  So, it circulates hot water through the

25  engine in order that the engine can be brought up to operating

1    temperature so you can just start the bus, start the engine

2    easily in cold weather.

3    Q.    Now, you reviewed the manuals for the Paul Revere vehicles

4    that were cited by the inspector; is that correct?

5    A.    Yes.

6    Q.    And what, if anything, did the manufacturer say about

7    idling of vehicles?

8              MR. FRIEDMANN:  Objection.

9              THE COURT:  Sustained.

10             MS. HANKEY:  If I could, your Honor, could we?

11             THE COURT:  All right.

12

13   (SIDEBAR CONFERENCE AS FOLLOWS):

14             MS. HANKEY:  I'm not sure what the objection is.  If

15   an expert relies on documents in preparing their expert report,

16   there is an exception to the hearsay rule, when they're

17   testifying about the documents that they relied on in their

18   report.

19             MR. FRIEDMANN:  No.  The expert can testify to his

20   opinions in reliance on the materials, but he can't testify as

21   to what the materials themselves say.  On cross-examination he

22   can be questioned on them but not on direct.

23             THE COURT:  I think that's right.

24   (END OF SIDEBAR CONFERENCE)

25

1    BY MS. HANKEY:

2    Q.   I want to ask you some questions about the air pressure

3    system in a vehicle.  What is the air pressure system for in a

4    transit bus?

5    A.   The air pressure system supplies air to allow the brakes

6    to work.  It also supplies air for other systems, the

7    suspension system.  The bus rides on air bags.  The doors

8    operate by air.  The windshield wipers may operate by air.  So,

9    the air system provides those.  But especially for the brakes,

10   the air brakes.

11   Q.   And how is the air pressure controlled?

12   A.   The air pressure is controlled by a governor.  There's an

13   air compressor, it's a pump that's on the engine, and there's a

14   governor on that that monitors the pressure in the tanks.  And

15   when the pressure reaches about 125 psi, it tells the

16   compressor to stop pumping, and then when the pressure drops

17   down to about 100 psi, it tells the compressor to start pumping

18   again, so that the pressure stays between about 125 and about

19   100 psi as the bus is being operated.

20   Q.   And what controls the rate at which the air pressure --

21   the air compressor is working?

22   A.   Well, the air compressor is driven by the engine, it's

23   connected to the engine, so the faster the engine goes, the

24   faster the air compressor turns.  And, so, it's related to

25   the -- it's related to the speed of the engine.  It's also

PDF created with pdfFactory trial version www.pdffactory.com

1   related to the size of the air compressor.  You could have a

2   bigger, heavier air compressor.

3   Q.   In your experience, how long does it take for the air

4   pressure to build in a vehicle in warm weather?

5            MR. FRIEDMANN:  Objection.

6            THE COURT:  Sustained.  Maybe you can focus it a

7   little bit more particularly.

8   BY MS. HANKEY:

9   Q.   Mr. Parsley, do you have any personal experience with some

10  of the vehicles involved in this matter?

11  A.   The Paul Revere vehicles?

12  Q.   Yes.

13  A.   I don't have personal experience with those vehicles,

14  except for a few of the vehicles that were listed were also

15  vehicles that Paul Revere obtained from New York City Transit,

16  and they happened to be vehicles that were in the garage that I

17  was in back in 1985.

18  Q.   And, in your experience, is the air pressure system in a

19  vehicle similar from vehicle to vehicle?

20           MR. FRIEDMANN:  Objection.

21           THE COURT:  You may answer that.

22  A.   Absolutely, they are very similar.

23  BY MS. HANKEY:

24  Q.   And, so, if one -- is there a large difference in the

25  amount of time it takes from vehicle to vehicle and how long it

PDF created with pdfFactory trial version www.pdffactory.com

1    takes for the pressure to build?

2            MR. FRIEDMANN:  Objection.

3            THE COURT:  Let me see you.

4

5    (SIDEBAR CONFERENCE AS FOLLOWS):

6            MR. FRIEDMANN:  Your Honor, I'm not sure what a large

7    difference is, when you're saying "from vehicle to vehicle,"

8    and I think we need to try to maybe focus on the vehicles in

9    question here.  There were different types of vehicles in

10   question here.  There were cut vans, there were large buses,

11   there were 35-footers, there were 40-footers.  Some have a 750

12   Tu-Flo system, some have a 700 Tu-Flo system.  There are all

13   sorts of different permutations.  So, I guess the question is

14   way too general.

15           MS. HANKEY:  He can bring that out on cross, and, I

16   guess, I would point out his expert provided a report saying

17   that the systems were similar.

18           THE COURT:  The problem is "vehicle" is a big

19   category.

20           MS. HANKEY:  Okay.  Buses.

21           THE COURT:  I mean, I think, if, for example -- and I

22   don't have any idea what his particular familiarity is -- but

23   if he has familiarity with a fleet of buses that was

24   significantly dissimilar, it would make his testimony

25   irrelevant, probably, and inadmissible.

```
 1          On the other hand, if he has familiarity with either

 2   vehicles of a like kind or in all pertinent respects similar,

 3   that's a different story, but we have to have that.

 4          MS. HANKEY:  Okay.

 5   (END OF SIDEBAR CONFERENCE)

 6

 7    BY MR. HANKEY:

 8   Q.   Mr. Parsley, when you were working at the New York Transit

 9   Authority, are the types of buses that were operated by the

10   Transit Authority similar to the types of buses that are

11   operated by Paul Revere?

12   A.   They are.

13   Q.   And when you were reviewing the manual for the Paul Revere

14   vehicles, were the components of the system in the vehicle

15   similar to the components of the vehicles in which you had

16   worked with at New York Transit Authority?

17   A.   They are.  And there's another reason they're similar,

18   too, is because transit buses --

19          MR. FRIEDMANN:  Objection, your Honor.

20          THE COURT:  Yes.  Limit your answers to the question,

21   and she'll get to other matters, if you need to get to them.

22   BY MS. HANKEY:

23   Q.   Are transit buses built similarly, in your experience?

24   A.   Specifically, the air system must comply with Federal

25   Vehicle Safety Standard 121 for air brakes.  That makes them
```

1   similar.

2   Q.   And based on your experience and the documents that you

3   reviewed in this matter, do you have an opinion as to how long

4   it would take the pressure to build in a properly-maintained

5   vehicle in cold weather?

6        MR. FRIEDMANN:  Objection, your Honor.  If we could

7   have just a yes or no.

8        THE COURT:  All right.  You may answer it yes or no,

9   whether you have an opinion.

10  A.   I'm sorry.  Repeat the question.

11  BY MS. HANKEY:

12  Q.   Based on your review of the -- based on the documents that

13  you reviewed in this matter and your experience working with

14  transit buses, do you have an opinion as to whether -- as to

15  how long it takes for the air pressure to build on a

16  properly-maintained vehicle?

17  A.   I do, yes.

18  Q.   And what is that opinion?

19       MR. FRIEDMANN:  Objection.

20       THE COURT:  Overruled.

21  A.   That it will take less than five minutes to build air

22  pressure.

23  BY MS. HANKEY:

24  Q.   And is that true in warm weather?

25  A.   It is.

1    Q.   And how about in cold weather?  Does that impact how long

2    the air pressure builds, in your experience?

3    A.   It doesn't materially affect it, not in a

4    properly-maintained vehicle.

5    Q.   And you have reviewed weather data for the dates of the

6    EPA inspections; is that correct?

7    A.   Yes, I did.

8    Q.   And did any of the observations by the EPA inspector occur

9    on days or times when the temperature was above freezing?

10   A.   Yes, it did.

11   Q.   Do you know how many?

12   A.   It was more than half, I believe, were above 40 degrees, I

13   believe.

14   Q.   And do you know specifically what the number was?

15   A.   I would have to refer to my notes.  I'm sorry, but --

16           MS. HANKEY:  Permission for the witness to refer to

17   his notes, your Honor?

18           THE COURT:  All right.

19   A.   I believe it was 59 percent of the buses were cited at

20   more than 40 degrees.

21   BY MS. HANKEY:

22   Q.   If I could direct your attention to page 9.

23   A.   Thank you.  72 percent of the events were on days where

24   the temperature was above freezing, and 55 percent were on days

25   where the temperature was above 42 degrees.

```
 1    Q.    What was the specific number that you used to calculate

 2    those percentages?

 3    A.    There was 104 of the 104 idling events.

 4    Q.    144 or 104?

 5    A.    104 out of 104 idling events -- 104 out of 144 idling

 6    events, I'm sorry, that 72 percent were on days when the

 7    temperature was above freezing.

 8              MR. FRIEDMANN:  Your Honor, may we be seen at sidebar,

 9    please?

10

11    (SIDEBAR CONFERENCE AS FOLLOWS):

12              MR. FRIEDMANN:  I thought we had a stipulation in the

13    case that the Brookline Avenue observations were not included.

14              MS. HANKEY:  That's true.

15              THE COURT:  Is that how you get 144?

16              MS. HANKEY:  Yes.

17              MR. FRIEDMANN:  Yes.

18              MS. HANKEY:  We're asking him to change his report

19    after he's prepared it.

20              MR. FRIEDMANN:  I'm going to ask that it be stricken,

21    your Honor.

22              THE COURT:  Yeah.  I think it should be stricken.  If

23    he can do another number, he can, but he can't put in an

24    irrelevant number.

25              MR. FRIEDMANN:  I'd ask that the jury be given an
```

1   instruction to ignore the statistics, 144 and the numbers.

2   (END OF SIDEBAR CONFERENCE)

3

4        THE COURT:  Jurors, the last couple of questions

5   related to numbers, statistics.  Those -- that testimony

6   concerning those specific numbers is stricken, and you are to

7   disregard it.

8   BY MS. HANKEY:

9   Q.   In your review of the weather data, what was the minimum

10  temperature that you saw under which vehicles were idling?

11  A.   It was 18 degrees.

12  Q.   And, in your experience, can a vehicle reach required

13  operating temperature in less than five minutes under those

14  kind of weather conditions?

15  A.   If it's properly maintained, absolutely.

16  Q.   And you testified earlier that a number of the events were

17  above 32 degrees; is that correct?

18  A.   Yes.

19  Q.   And, in your experience, do the lines freeze when the

20  temperature is above 32 degrees?

21  A.   No, they do not.

22  Q.   And how about if the temperature is below freezing?  Can

23  the lines freeze?

24  A.   Not if the bus is properly maintained.

25  Q.   And if you had a situation where the line -- where you had

1    blockage in the line, or the line was frozen, in your

2    experience, how do you address that issue?

3    A.    The line after the air compressor could be frozen, and

4    that would need to be replaced.  It's probably clogged and it

5    would need to be replaced.  If it was frozen elsewhere, I'd

6    have to look at where it was frozen and what's not working.

7    Q.    Would you idle the bus until it unfroze?

8    A.    No, absolutely not.

9    Q.    And, in your experience, if the humidity has increased,

10   what effect, if anything, does that have on the time it takes

11   for the air pressure to build?

12   A.    In my experience, it doesn't make any difference; humidity

13   doesn't make any difference.

14   Q.    And how about if the wind has increased?  In your

15   experience, does that have any effect on the time it takes for

16   the air pressure to build?

17   A.    It doesn't make any difference.

18   Q.    Now, there has been testimony that you cannot accelerate

19   the air pressure until the pressure reaches 60 psi.  You have

20   reviewed the manuals for these vehicles, correct?

21   A.    Mm-hmm, yes.

22   Q.    Have you seen anything in the manuals to indicate that the

23   operator cannot operate the vehicle at idle to increase from 60

24   psi?

25          MR. FRIEDMANN:  Objection, your Honor.  Beyond the

1    scope.

2          THE COURT:  Overruled.  No.  Overruled.

3    A.   You can increase the idle at less than 60 psi.  You can

4    increase the idle, yes, definitely.

5    BY MS. HANKEY:

6    Q.   Now, in your experience, does it ever take more than ten

7    minutes for the pressure to build unless the bus needs repair?

8    A.   That bus needs to be repaired.

9    Q.   In your experience, would it ever need 30 minutes for the

10   pressure to build unless it needs to be repaired?

11   A.   It needs to be repaired; it's defective.

12   Q.   How about an hour?

13   A.   Defective.

14   Q.   If the pressure did take as much as half an hour, would it

15   be safe to operate that vehicle without repairing it?

16   A.   Unsafe.

17   Q.   Why?

18   A.   Because it's the air brake system, and there's a recovery.

19   I described how it operates between 120 and 100 psi.  You need

20   to maintain air pressure to have air brakes.

21   Q.   And, in your experience, is it possible to operate a bus

22   fleet in less than five minutes if the vehicles are properly

23   maintained?

24          MR. FRIEDMANN:  Objection.

25          THE COURT:  Overruled.  You can answer.

1    A.   It's not just possible, it's common.  It's typical to idle

2    buses less than five minutes in properly maintained buses, yes.

3              MS. HANKEY:  I have no further questions, your Honor.

4                   REBUTTAL CROSS-EXAMINATION

5    BY MR. FRIEDMANN:

6    Q.   Good morning, Mr. Parsley.

7    A.   Good morning.

8    Q.   I don't think we've met before.

9    A.   Have we?

10   Q.   I don't think so.

11   A.   No, we have not.

12   Q.   I just want to discuss with you a couple of issues here.

13   When did you come up and look at the Paul Revere bus fleet?

14   A.   I have never looked at the Paul Revere bus fleet.

15   Q.   Oh.  When did you come up and look at Paul Revere's

16   Roxbury location and how it's set up?

17   A.   I've never looked at the Roxbury location.

18   Q.   When before this case had you ever dealt with the

19   Massachusetts five-minute idling rule?

20   A.   I've never dealt with the Massachusetts five-minute idling

21   rule.

22   Q.   Okay.  So, you're being paid to come up here and testify

23   about the five-minute idling rule in Massachusetts without ever

24   having seen the location or seen the bus fleet --

25             MS. HANKEY:  Objection, your Honor.

1  BY MR. FRIEDMANN:

2  Q.    -- is that correct?

3  A.    Overruled.

4        MS. HANKEY:  I believe that misrepresents the

5  testimony.

6        THE COURT:  He can answer the question.

7  BY MR. FRIEDMANN:

8  Q.    Is that correct, sir?

9  A.    That's correct.

10 Q.    When did you review the Paul Revere Transportation

11 maintenance records for the buses that you've been giving us

12 your opinions on?

13 A.    I have not reviewed the maintenance records.

14 Q.    Well, you know that they were made available to your

15 client -- excuse me -- to the government, the people you work

16 for, right?

17 A.    No, I don't know that.

18 Q.    So, they never gave the maintenance records to you?

19 A.    No.

20 Q.    What were the problems that Paul Revere was having with

21 the design of the doors on its buses?

22 A.    I don't know.

23 Q.    What were the problems with the card readers on the

24 Harvard route that Paul Revere was having?

25 A.    I don't know.

1    Q.    Nobody ever told you about that?

2    A.    No, sir.

3    Q.    Okay.  Now, you told us your experiences from working down

4    in New York, and we're not going to hold it against you that

5    you're a Yankees fan.

6    A.    I'm not a Yankees fan.

7    Q.    Maybe we will hold it against you, then.

8    A.    I'm a Mets fan.

9    Q.    New York Mass Transit; that's a public transit system,

10    right?

11    A.    Yes.

12    Q.    Paul Revere is a private transit system, right?  Were you

13    aware of that?

14    A.    I assumed it was private.

15    Q.    Okay.  Different type of system.  Is that a yes?

16    A.    Different, public or private.

17    Q.    Yeah.  Different setups, different client basis, different

18    needs?

19    A.    I don't know.

20    Q.    Okay.  You don't know that.  New York -- you said you did

21    this for how many years, 25 years?

22    A.    Almost 30 years.

23    Q.    Almost 30 years.  And your fleet there is maintained

24    indoors, correct?

25    A.    The fleet is maintained indoors; maintenance is done

1    indoors.  Much of the fleet is parked outdoors.

2    Q.   Did you check to see how close Paul Revere's lot is to the

3    bay here and which direction the winds come to check the wind

4    chills on any of the dates that you've testified about?

5    A.   No, I did not.

6    Q.   So, even though on some of these dates the ambient

7    temperature may have been above 40 degrees, you don't know,

8    based on the amount of wind that was coming, what the wind

9    chill was that these vehicles were subjected to overnight, do

10   you?

11   A.   I don't know the wind chill.

12   Q.   Now, there's a big difference, isn't there, between how

13   long it takes a bus to build up air pressure in its cold

14   condition than how long it takes it to raise the temperature

15   from, let's say, 85 degrees to -- excuse me -- 85 pounds to 100

16   pounds, once it's warmed up, right?

17   A.   I don't find a difference.  I don't find much of a

18   difference at all.

19   Q.   The CDL package that you say you looked at --

20   A.   Yeah.

21   Q.   -- that's the Commercial Driver's License?

22   A.   Right.

23   Q.   That's the instructions for a driver to do the circle

24   check, the ten-minute circle check?

25   A.   Mm-hmm.

1    Q.    Did anybody tell you that we weren't talking about the

2    ten-minute circle check in this case?

3                MS. HANKEY:  Objection, your Honor.  That's vague.

4                THE COURT:  You may answer it, if you can.

5    A.    No.

6    BY MR. FRIEDMANN:

7    Q.    Were you aware that this was early-morning starting to see

8    if the buses would build up air pressure and temperature?

9    A.    I could see that the violations were early morning.

10   Q.    The New York fleet, you did the same things; you would

11   start the buses early mornings to make sure that they would

12   start up, correct?

13   A.    We did not idle the buses for long periods of time

14   recently.

15   Q.    Recently you didn't?

16   A.    A long time ago we did, yes.

17   Q.    You used to run them for an hour at a time, right?

18   A.    Yes.  We were bad.

19   Q.    You would do that to build up the pressure, to make sure

20   the buses would operate, right?

21   A.    Wrong.  Absolutely wrong.  We did not care -- the idea

22   that it had anything to do with the air pressure was absolutely

23   not in our mind at all.

24   Q.    That's what New York did, right?

25   A.    Air pressure did not cross our mind.

1  Q.   I'm saying, that's what you in New York did in those early

2  mornings when you started buses.  You don't know what Paul

3  Revere did, do you?

4  A.   No, I don't.

5  Q.   Okay.  You don't know what was going on in Jimmy Powers'

6  mind, do you?

7  A.   No, I don't.

8  Q.   How much have you been paid to date to give this opinion?

9  A.   I'm not sure.  A few thousand.  3,000, maybe.  I'm not

10  sure.

11  Q.   And that's at a-hundred-and-some dollars an hour?

12  A.   Yes.

13  Q.   Did you ever ask to come up here to Boston, see a Red Sox

14  game, and test the buses in question to see how they functioned

15  in conditions like those that you're giving your opinion about?

16  A.   No, I did not.

17  Q.   You mentioned that there are these anti-idling devices.

18  A.   Yes, sir.

19  Q.   Where in the statue or the regulations does it require the

20  use of the anti-idling devices in Massachusetts?

21  A.   None that I know of.

22  Q.   You mentioned on direct examination about the auxiliary

23  and the block heaters.

24  A.   Yes, sir.

25  Q.   The auxiliary heaters and block heaters?

1    A.    Yes, sir.

2    Q.    Some of those are equipment in the bus, and some of the

3    auxiliary ones are not part of the bus; is that correct?  Or do

4    I have it the other way around?

5    A.    No.  I'm talking about the equipment that's on the bus.

6    Q.    Okay.  But there are also these so-called plug-ins, right?

7    A.    Yes.

8    Q.    Okay.  Which are for buses that don't have them as part of

9    the bus's equipment?

10   A.    They are -- that's available.

11   Q.    And that does the same thing as the block heaters?

12   A.    Yes.  It heats the engine coolant, yes.

13   Q.    It heats the engine coolant?

14   A.    Mm-hmm.

15   Q.    It doesn't affect in any way the pneumatic system that

16   fills the air bags, right?

17   A.    No.

18   Q.    No, it doesn't, or no, it does?

19   A.    No, it doesn't.

20   Q.    No relationship at all?

21   A.    No.

22   Q.    Okay.  It doesn't also affect if a bus has a dead battery

23   and how necessary it is to jump that bus, is it?  That was a

24   very poor question.  Let me try again.

25        The auxiliary heaters, the block heaters, if a bus has a

PDF created with pdfFactory trial version www.pdffactory.com

1    dead battery, an auxiliary heater or a block heater isn't going

2    to help the bus in terms of obtaining -- retaining its charge

3    or not retaining its charge, correct?

4    A.    It will help it start the bus.

5    Q.    It will help it start.  In fact, it might run the battery

6    down a little bit, because it's electric-operated, right?

7    A.    Starting a bus uses some battery power, yes.

8    Q.    And the auxiliary heaters and the block heaters also use

9    some electric power for the timers, etcetera, for the circuits

10   that run them?

11   A.    Yes.

12   Q.    So, they tend to drain the batteries, right?

13   A.    In my mind, it's not significant.

14   Q.    Okay.  You mentioned to us that the faster the engine

15   goes -- I'm sorry -- the faster the engine is running, the

16   faster the compressor goes?

17   A.    Yes.

18   Q.    So, at idle speed, the engine is running at a slow speed,

19   and out on the street or something, if it's going 30 miles an

20   hour, it would be going much faster, right?

21   A.    Well, the vehicle speed is not necessarily the engine

22   speed.

23   Q.    Okay.

24   A.    The engine speed is controlled by the accelerator or by

25   the fast idle switch.

1    Q.    Okay.  But the RPMs?

2    A.    Yeah.

3    Q.    Okay.  At the very beginning, you were talking about part

4    of your qualifications, and I remember you saying you have a

5    bachelor's degree in psychology?

6    A.    Yes, sir.

7    Q.    Okay.  And you were saying that one of the functions that

8    you do is that you work with companies to do things like using

9    ultra-low diesel fuel or particulate filters on buses.  Do you

10   recall that?

11   A.    Yes.  We did that with New York City Transit, yes.

12   Q.    And when you reviewed the records for Paul Revere

13   Transportation, you saw that they also did that, didn't you?

14   A.    Particulate filters?

15   Q.    Mm-hmm.

16   A.    I don't recall that.

17   Q.    They didn't show you the list of vehicles with particulate

18   filters?

19          MS. HANKEY:  Objection, your Honor.

20          THE COURT:  Sustained.

21   BY MR. FREIDMANN:

22   Q.    Were you aware that Paul Revere Transportation --

23          MS. HANKEY:  Objection, your Honor.

24          THE COURT:  Sustained, if it's the same line, which it

25   sounded like it was.

1          MR. FRIEDMANN:  It was going to be about ultra-low

2     diesel fuel, your Honor.

3          THE COURT:  I understand.

4          MR. FRIEDMANN:  Okay.  I have no further questions,

5     then, your Honor.

6          MS. HANKEY:  I just have a few questions.

7                    REBUTTAL REDIRECT EXAMINATION

8     BY MS. HANKEY:

9     Q.   Mr. Friedmann asked you about whether you looked at the

10    wind chill effect coming to the Roxbury facility.  If you had

11    come to the facility and felt a big wind chill, would that have

12    changed your testimony with the amount of -- about the amount

13    of time that was required to build air pressure?

14    A.   No.

15    Q.   And Mr. Friedmann also asked you whether you knew the

16    vehicles were idling during the ten-minute circle check versus

17    the start -- to check to see if they would start.  Would it

18    have changed your testimony as to the time that's required to

19    build air pressure whether it was during a circle check or at

20    startup?

21    A.   No.

22    Q.   Mr. Friedmann also asked you whether a Proheat heater

23    would affect whether a vehicle had to be jumped.  Does a

24    vehicle having to be jumped affect whether a vehicle can

25    operate in five minutes after it's been jumped?

1  A.   As far as the air pressure, increasing air pressure?

2  Q.   Well, can the vehicle operate after five minutes if it's

3  been jumped?

4  A.   Yes.

5  Q.   Defendant -- Mr. Friedmann also asked you whether you came

6  down and watched or tested a bus building.  If you had come

7  down and a bus had not built in five minutes, based on your

8  experience, what would you have recommended?

9       MR. FRIEDMANN:  Objection.

10      THE COURT:  Overruled.  You may answer.

11  A.   I would say that bus needs maintenance; it's defective.  I

12  would have asked maintenance to take a look at it.

13      MS. HANKEY:  No further questions, your Honor.

14      MR. FRIEDMANN:  No questions, your Honor.

15      THE COURT:  All right.  Mr. Parsley, thank you.  You

16  may step down.

17            (Witness stepped down)

18      MS. HANKEY:  Your Honor, the United States re-calls

19  Ms. Christine Sansevero.

20                  (Pause)

21      THE CLERK:  Step up, please, to the box.

22      THE COURT:  The witness was previously sworn.  She

23  remains under the same oath.

24        CHRISTINE SANSEVERO, PREVIOUSLY SWORN

25          REBUTTAL DIRECT EXAMINATION

1  BY MS. HANKEY:

2  Q.    Ms. Sansevero, were you present in court when Mr. Brown

3  testified?

4  A.    No, I was not.

5  Q.    And have you read any transcripts of Mr. Brown's

6  testimony?

7  A.    No, I have not.

8  Q.    Have you been informed of what Mr. Brown testified to?

9  A.    No, I have not.  I just know there was a discussion of the

10  meeting that we had after we issued the Notice of Violation,

11  but I don't know any of the details.

12        MR. FRIEDMANN:  Objection, your Honor, and I'd like a

13  side bar.

14

15  (SIDEBAR CONFERENCE AS FOLLOWS):

16        MR. FRIEDMANN:  I may be premature, but after hearing

17  some statistics come out that shouldn't have come out, I'm very

18  concerned about what's coming out on rebuttal.  If this witness

19  is being put on to try to rebut what Mr. Brown said, where

20  she's already testified once to the same meeting and

21  discussion, I don't think that's proper rebuttal.  She had her

22  opportunity.

23        We put on our witness who said what he thought the

24  discussions were.  They don't just get to go last.  Do I, then,

25  get to recall Mr. Brown and say, No, she said this, and we go

PDF created with pdfFactory trial version www.pdffactory.com

1    on endlessly back and forth like that?

2           That was part of their case.  They opened the door

3    about that meeting.  This witness testified about the meeting,

4    Mr. Brown gave his recollection of the meeting, and the jury

5    gets to decide who they believe and who they don't believe.

6    But it's not that you get the opportunity on rebuttal to bring

7    somebody back to testify to the same subject for a second time.

8           MS. HANKEY:  Ms. Sansevero testified with respect to

9    one subject at that NOV conference, and Mr. Brown came and

10   testified with respect to a whole host of other events that

11   happened at that conference.

12          THE COURT:  Be specific.

13          MS. HANKEY:  For example --

14          THE COURT:  But start with her.  You said she

15   testified to one.

16          MS. HANKEY:  She testified with respect to whether or

17   not they were told that it was mechanically necessary at the

18   NOV conference.  That's all she testified to.

19          THE COURT:  Right.

20          MS. HANKEY:  Mr. Brown came and testified about

21   whether threats were made about issuing press releases, whether

22   threats were made about judicial enforcement.  Ms. Sansevero is

23   here to provide the EPA's version of events of what actually --

24   what happened.

25          THE COURT:  On those two topics?

 1          MS. HANKEY:  (Nodding).

 2          MR. FRIEDMANN:  The fact -- your Honor, the fact that

 3    they didn't question her on a portion of the discussion when

 4    she was asked -- she was asked, What do you recall the

 5    discussion was?  And she told --

 6          MR. SANDS:  About maintenance.

 7          MR. FRIEDMANN:  -- and she said what she remembered

 8    from the discussion.  Mr. Brown told what he remembered from

 9    the discussion.  To bring her back to now say, I remember this

10    on the discussion is not the purpose of rebuttal.  They could

11    have brought it out on their direct.  If they chose not to, the

12    fact that somebody has a different memory doesn't give them the

13    right to rebuttal.

14          THE COURT:  Okay.  Overruled, you may have it.

15    (END OF SIDEBAR CONFERENCE)

16

17      MS. HANKEY:  I'm sorry.  Just, your Honor, if I could,

18    I'll try to direct the witness so that she limits her testimony

19    in accordance with your ruling.

20    BY MS. HANKEY:

21    Q.   Mr. Sansevero, you testified previously about an NOV

22    conference that was held with Paul Revere, correct?

23    A.   Yes.

24    Q.   At that NOV conference, was there discussion at all of

25    what the process would be after the NOV had been issued and

PDF created with pdfFactory trial version www.pdffactory.com

1    after the meeting?

2            MR. FRIEDMANN:  Objection.

3            THE COURT:  Overruled.

4    A.   Yes, there was.  It's actually very standard practice,

5    when we issue a Notice of Violation.  As I had mentioned

6    earlier, it's in the Notice of Violation.  We invite the

7    facility to meet with us, if they so choose.

8        In this case, Paul Revere did want to meet with us, and,

9    at the beginning of the meeting, it's always an opportunity

10   for -- it's really the facility's meeting; it's their

11   opportunity to tell us their side of the story.  They've heard,

12   through the Notice of Violation, what our perspective is.  So,

13   it's really their opportunity to come in and provide any

14   additional information and explain, you know, perhaps what they

15   think happened.

16       So, as part of that, we would also describe the process

17   related to enforcement, if there were an enforcement action,

18   that might take place.  There are a variety of aspects of that.

19   The first, and most important, piece is to discuss whether the

20   facility has been able to return to compliance.  So, in other

21   words, are they meeting -- if there was a violation that was

22   identified in the Notice of Violation, have they been able to

23   rectify that, and that would be the first piece.  And Paul

24   Revere did indicate that they were able to comply.

25           MR. FRIEDMANN:  Objection, your Honor.  If we could

1    have a question-and-answer format.

2            THE COURT:  Yeah.  I think that's a good idea.

3    BY MS. HANKEY:

4    Q.   And what, if anything, was said about whether an

5    enforcement action would be taken or what steps would be taken

6    with respect to enforcement?

7    A.   Well, you know, again, we first wanted to understand what

8    their perspective was, and that determines, necessarily,

9    what --

10           MR. FRIEDMANN:  Your Honor --

11           THE COURT:  Nonresponsive.  Try again.

12   BY MS. HANKEY:

13   Q.   And with respect to whether or not there would be a

14   judicial or administration action, was anything explained about

15   how that process worked?

16   A.   Yes.  We have two paths available to us.  One is the

17   administrative track, which is where a facility would deal

18   directly with the agency, the Environmental Protection Agency.

19   The other track is the judicial track, where we would refer the

20   matter to the Department of Justice.  And, generally, we have

21   those -- both of those are available to us, and we would

22   explain to any facility that came to a meeting that that could

23   be a possible outcome.  Either they could be dealing directly

24   with the agency, with the Environmental Protection Agency, or

25   they could be dealing with both the Environmental Protection

1    Agency and the Department of Justice, depending on the nature

2    of the violation.

3    Q.    And did anybody from EPA make representations about what

4    particular avenue would, in fact, be taken?

5    A.    We indicated that, based on the information that was

6    provided in the meeting, that it would be possible that we

7    would refer this matter to the Department of Justice.

8    Q.    And what, if anything, was the Paul Revere

9    representatives' response?

10   A.    Well, they were very upset by that.  In fact, Mr. Brown at

11   that point got very agitated and stood up from his chair and

12   made an effort to actually leave the room, at which point our

13   attorney, Mr. Dain, tried to explain that it would be useful if

14   we could continue our conversation, and we were able to do

15   that, and we were able to describe a bit more about the

16   process.

17   Q.    And was anything -- were any statements at all made about

18   whether press releases would be issued, and, if so, what was

19   the context of those statements?

20   A.    Yes.  It's actually common practice for the agency to

21   issue a press release whenever we begin an enforcement action,

22   and there's a lot of reasons why we would do that, but one

23   reason is that, if we're taking an enforcement action, it's

24   useful for the public to know that we're doing that.  It's also

25   useful for the regulated community to know; we can extend the

PDF created with pdfFactory trial version www.pdffactory.com

1    effect of our enforcement action by letting people know that

2    there are issues related to compliance.  So, in other words, if

3    a facility has a compliance issue, other similar facilities

4    would know that.

5            MR. FRIEDMANN:  Objection, again, your Honor.  It's

6    well beyond --

7            THE COURT:  Yeah.  I think we've gone beyond the

8    particular meeting into general policy.

9    BY MS. HANKEY:

10   Q.   Can you explain what statements were made at the meeting

11   with Paul Revere?

12   A.   Well, we had indicated that a press release would be

13   possible in this case, as it would be in any other case, and

14   the representatives from Paul Revere, particularly Mr. Brown,

15   was very concerned that, if we issued a press release, that

16   that could put Paul Revere in a bad situation.  They, at the

17   time, had a number of -- or they had explained to us that they

18   had a number of contracts that they were either about to get or

19   that they currently had, and they were concerned that a press

20   release from the agency would impair their ability to retain

21   those contracts.  So, they had asked that we not issue a press

22   release.

23   Q.   And what, if anything, did the representatives of EPA say

24   in response?

25   A.   Well, what we indicated was that we were not the final

PDF created with pdfFactory trial version www.pdffactory.com

1    decision makers, but that we would certainly share that

2    information with our upper management and that we would get

3    back to them, and, certainly, we would let them know prior to

4    issuing a press release.

5    Q.   And just going back one step, is it common practice for

6    you to discuss the possibility of a press release at an NOV

7    conference?

8    A.   Yes, it is.

9    Q.   And after this NOV conference, did EPA issue a press

10   release?

11   A.   No, we did not.

12        MS. HANKEY:  I have no further questions, your Honor.

13        MR. FRIEDMANN:  Just a couple, your Honor.

14                  REBUTTAL CROSS-EXAMINATION

15   BY MR. FRIEDMANN:

16   Q.   You indicated in the NOV conference you discussed with the

17   representatives of Paul Revere Transportation that there was

18   both an administrative and a judicial course that could be

19   taken, correct?

20   A.   Correct.

21   Q.   And Paul Revere pursued the administrative course with the

22   EPA for a period of time, didn't they?

23   A.   Well, it's not really the facility's choice to pursue the

24   track; it's the agency's choice.  We would decide whether it

25   would be administrative or judicial.

1   Q.   The administrative track was taken for a period of time,

2   wasn't it?

3   A.   No.

4   Q.   You're not aware of the meetings that Mr. Dain and Paul

5   Revere Transportation and other representatives of the EPA had

6   after the issuance of the NOV but before the lawsuit was filed

7   by the Department of Justice?

8   A.   Well, it may have been before --

9   Q.   I'm sorry.  You just have to answer my question, whether

10  you're aware of that.

11  A.   Well, we referred the matter to the Department of Justice

12  before that.

13  Q.   That wasn't my question.

14       MS. HANKEY:  Objection.  Assumes facts.

15       THE COURT:  No.  Go ahead.  You may have the question.

16  BY MR. FRIEDMANN:

17  Q.   My question was whether you were aware of the meetings

18  that took place between representatives of the EPA and

19  representatives of Paul Revere Transportation between the date

20  of the NOV and --

21       MS. HANKEY:  Objection, your Honor.  Could we have a

22  sidebar?

23       THE COURT:  All right.

24

25  (SIDEBAR CONFERENCE AS FOLLOWS):

1         MS. HANKEY:  I think I need a proffer, because I'm not

2    aware of any meetings.

3         THE COURT:  Okay.

4         MR. FRIEDMANN:  I'm aware of them, because I know Greg

5    and I met at them.

6         THE COURT:  Okay.  You can have the question, if you

7    take the article "the" out of the question before "meetings."

8         MR. FRIEDMANN:  "Of any"?

9         THE COURT:  Yes.

10        MR. FRIEDMANN:  Okay.  I agree, yeah.

11   (END OF SIDEBAR CONFERENCE)

12

13   BY MR. FRIEDMANN:

14   Q.   Are you aware of any meetings that took place between

15   representatives of Paul Revere Transportation and

16   representatives of the EPA between the time of that initial NOV

17   meeting and the date the lawsuit was filed by the EPA and

18   Department of Justice?

19   A.   Yes.

20   Q.   Okay.  And then when --

21        MS. HANKEY:  Objection, your Honor.

22        THE COURT:  Overruled.

23   BY MR. FRIEDMANN:

24   Q.   And then when the lawsuit was filed, a press release was

25   issued, wasn't it?

1  A.   Yes, it was.

2  Q.   Okay.

3          MR. FRIEDMANN:  No further questions, your Honor.

4          THE COURT:  Ms. Hankey, anything else?

5              REBUTTAL REDIRECT EXAMINATION

6  BY MS. HANKEY:

7  Q.   Ms. Sansevero, after that meeting with Paul Revere for the

8  NOV conference, are you aware of any further contacts by Paul

9  Revere in which they attempted to explain to EPA why the

10 vehicles were idling?

11 A.   No.

12         MS. HANKEY:  No further questions, your Honor.

13         THE COURT:  Okay.  Thank you, Ms. Sansevero.  You may

14 step down.

15              (Witness stepped down)

16         MS. HANKEY:  Your Honor, the United States re-calls

17 Mr. Abdi Mohamoud.

18         THE COURT:  Again, the witness was previously sworn

19 and remains under the oath.

20            ABDI MOHAMOUD, PREVIOUSLY SWORN

21              REBUTTAL DIRECT EXAMINATION

22 BY MS. HANKEY:

23 Q.   Mr. Mohamoud, since April of 2006 have you conducted any

24 further inspections at the Roxbury facility?

25 A.   Yes, I did.

1    Q.    How many?

2    A.    Two.

3    Q.    And when was the first inspection?

4          MR. FRIEDMANN:  Your Honor, may we have a sidebar on

5    this?

6

7    (SIDEBAR CONFERENCE AS FOLLOWS):

8          MS. HANKEY:  It's direct rebuttal to Mr. Powers'

9    testimony that he has continued to idle these vehicles for

10   extended lengths of time.  Mr. Mohamoud went back to the

11   facility in April of 2007 and then again in April of 2009, and

12   on both of those instances he didn't find vehicles idling for

13   any great lengths of time, like, the maximum would be something

14   like six minutes, and it's in direct contravention to

15   Mr. Powers' testimony that they have to idle.

16         MR. FRIEDMANN:  Mr. Powers, when I had put him on the

17   stand, when I put Mr. Powers on the stand, I asked him very

18   specifically to refrain from going beyond the timeframe that we

19   had outlined, the seven-week (sic) timeframe.  Your Honor may

20   recall that the very first instruction I gave to him was, I'm

21   only talking about this specific timeframe.

22         MS. HANKEY:  I asked him about that timeframe, and he

23   testified that they were continuing to idle the vehicles.

24         MR. FRIEDMANN:  And I don't see how, if they open an

25   issue, how they can then impeach on rebuttal on an issue that

PDF created with pdfFactory trial version www.pdffactory.com

1    they opened.  They're trying to impeach on something that

2    they --

3            THE COURT:  Well, what specifically will be his

4    testimony?

5            MS. HANKEY:  His testimony is going to be that he went

6    to the facility and that he didn't see vehicles idling.

7            THE COURT:  Did he do the same thing that he did, same

8    period, same time?

9            MS. HANKEY:  Just one day.

10           THE COURT:  But was he there for the same period of

11   time?

12           MS. HANKEY:  Yes, yes.

13           THE COURT:  You can have it.

14           MR. FRIEDMANN:  I'm sorry.  Is this to prove that the

15   events in '06 occurred by having him testify --

16           MS. HANKEY:  It's to prove that the events in '06 were

17   not necessary.

18   (END OF SIDEBAR CONFERENCE)

19

20   BY MS. HANKEY:

21   Q.   I think my last question to you, Mr. Mohamoud, was, do you

22   recall when you went back for the first time?

23   A.    Sometime in 2007.

24   Q.   Do you recall whether this was approximately the same time

25   of year as during the inspections in 2006?

1  A.   I believe so.

2  Q.   And approximately what hours did you go to the facility on

3  that day?

4  A.   Usually, I would go the same time, early in the morning,

5  close to 5:00 a.m.

6  Q.   And what happened during this inspection?

7  A.   I waited a long time to see any vehicle at Paul Revere's

8  location being turned on.

9  Q.   And did you see any vehicles idle for more than five

10  minutes on that occasion?

11  A.   I did.

12  Q.   And how long did they idle?

13       MR. FRIEDMANN:  Objection, your Honor.

14       THE COURT:  Overruled.

15  A.   Between five and eight minutes.

16  BY MS. HANKEY:

17  Q.   And you testified that, when you went to the Paul Revere

18  facility in 2006, you saw someone go from vehicle to vehicle,

19  turning vehicles on; is that correct?

20  A.   That's correct.

21  Q.   And when you went back in 2007, did you see any similar

22  behavior?

23  A.   No, I did not.

24  Q.   And when you saw the vehicles idle for five to eight

25  minutes, what happened after they idled?

1    A.    They'd been driven away.

2    Q.    And what was the date?

3          MR. FRIEDMANN:  I'm sorry.  What was the answer?

4          THE COURT:  "Driven away," I believe was the answer.

5    A.    Yes.  Driven away.

6          MR. FRIEDMANN:  I'm sorry.  I just didn't hear.

7    BY MS. HANKEY:

8    Q.    And what was the date of your second inspection?

9    A.    April 1st, 2009.

10   Q.    And what happened during that inspection?

11   A.    There was a colleague of mine with me at that time.  He

12   was taking the notes of the vehicles when they'd been turned

13   on, and I was videotaping.

14   Q.    And how long did you see vehicles idling on that occasion?

15   A.    Between five and seven minutes, maximum.

16   Q.    And what happened after they idled?

17   A.    They'd been also driven away.

18   Q.    And then did you see anyone go from vehicle to vehicle

19   turning them on, as you had before?

20   A.    No, I did not.

21   Q.    What was the weather on April 1st, 2009?

22   A.    37 degrees Farenheit.

23   Q.    And how do you remember what the weather was?

24   A.    My colleague took down the weather temperature.

25   Q.    You testified that you videotaped during that inspection;

1   is that correct?

2   A.   Yes.

3         MS. HANKEY:  Your Honor, the government moves to admit

4   government Exhibit 124.  The audio has been removed, as

5   requested.

6         MR. FRIEDMANN:  Your Honor, could we see you at

7   sidebar, please?

8         THE COURT:  All right.

9

10 (SIDEBAR CONFERENCE AS FOLLOWS):

11         MR. FRIEDMANN:  Your Honor, we have a motion to file

12   to exclude the second videotape.  This videotape was not

13   produced to us during discovery.  It was produced to us well

14   after the discovery deadline.  It was produced to us after the

15   summary judgment and on the throws of the final pretrial being

16   assembled.  This is from April 1, 2009, and it was sometime

17   after that that it was first produced to us.

18         MS. HANKEY:  Something like April 5th; is that

19   correct?

20         MR. FRIEDMANN:  Yeah, somewhere around there.

21         MS. HANKEY:  Approximately a few days after April 1st.

22         MR. FRIEDMANN:  Yeah.  However, it was well beyond

23   discovery being closed, and, certainly, you know, we've never

24   had the opportunity to examine Mr. Mohamoud, who was deposed

25   back in, I believe, early 2008, because it didn't exist, and

1    it's way outside of the discovery deadline.

2             MS. HANKEY:  It also is impeachment, your Honor, and

3    I'm not sure under what conditions Mr. Friedmann believes it

4    was required to be -- well, it didn't exist, so I don't think

5    that we have any obligation to produce a document that doesn't

6    exist or -- something that doesn't exist, but also it's being

7    admitted as impeachment, again, of Mr. Powers' testimony that

8    he is continuing to idle the vehicles.

9             MR. FRIEDMANN:  Mr. Powers said that in cold weather

10   on some occasions he would -- in other words, not every day,

11   but only on certain types of weather, that he would start

12   vehicles.

13            There's nothing to establish -- even though he said

14   it's 37 degrees, there's nothing to establish, number one, it's

15   the same vehicles, because we have sold vehicles, we have

16   bought vehicles.  They're not, necessarily, the same vehicles;

17   they're not under, necessarily, the same conditions.  There are

18   all sorts of different effects that could be working here three

19   years later to try to prove that back in '06 this wasn't what

20   he was doing.

21            THE COURT:  I think that goes to the weight.  I'll let

22   you use it.

23            MS. HANKEY:  I'm just going to admit it without

24   playing it.

25            THE COURT:  Okay.

1          MS. HANKEY:  Unless you want me to.

2          THE COURT:  She's not going to play it, just admit it.

3    (END OF SIDEBAR CONFERENCE)

4

5          MS. HANKEY:  Your Honor, I move to admit government

6    Exhibit 124.

7          THE COURT:  It will be admitted.

8    (Exhibit No. 124 received into evidence)

9          MS. HANKEY:  I have no further questions, your Honor.

10                    REBUTTAL CROSS-EXAMINATION

11   BY MR. FRIEDMANN:

12   Q.   Mr. Mohamoud, you didn't take any of the notes for your

13   2007 visit, correct?

14   A.   Notes.  Yes, I did.

15   Q.   Okay.  You did take notes on the '07 visit?

16   A.   I did take notes, yes.

17   Q.   What was the temperature that day?

18   A.   38 degrees.

19   Q.   What was the humidity that day?

20   A.   I did not record humidity.

21   Q.   What was the wind chill that day?

22   A.   I did not record that.

23   Q.   How many of the buses that you observed in your '07 visit

24   were the same buses that you observed in your '06 visit?

25   A.   Could you please clarify the question?

1   Q.   Yeah.  Each bus has a different bus number, right?  You

2   made a list of the bus numbers, the plate numbers, which then

3   tells you the age of the bus, the type of bus, its

4   characteristics, and you told us that that was how you

5   identified the buses when you were there in '06 looking at the

6   buses.

7        How many of the buses that you observed idling in 2006

8   were the same buses you were observing idling in 2007,

9   understanding that people sell buses, buy buses and things like

10  that in the ordinary course?

11           MS. HANKEY:  Your Honor, I guess it assumes facts not

12  in evidence.  He's making a proffer.

13           THE COURT:  Well, the question is about -- well, never

14  mind.  You may have it.

15           You may answer the question.

16           MR. FRIEDMANN:  Thank you, your Honor.

17  A.   In general, the buses were lined up the same manner they

18  were --

19  BY MR. FRIEDMANN:

20  Q.   I understand that.  That wasn't my question to you, sir.

21  My question to you was, you observed specific buses in 2006.

22  A.   Yes.

23  Q.   Some of them were as old as 1997 buses, right?

24  A.   I don't know that.

25  Q.   The buses that you observed in 2007, how old were those

1    buses?

2    A.    I didn't have that information to know that.

3    Q.    So, you don't know if it's the same buses; you don't know

4    if they are the same age.

5    A.    That was not my observation.  My observation was to find

6    out how many buses were idling.

7    Q.    Sir, that wasn't my question to you.  If you don't know,

8    just tell me you don't know.  I'm not saying you did anything

9    wrong; I'm just asking you what you know.

10   A.    You're asking me the question yes or no.  I will answer

11   the question yes or no.

12   Q.    Do you know that the buses that you observed in 2006

13   idling were the same buses you observed in 2007 idling?

14   A.    No.

15   Q.    I'm sorry?

16   A.    No.

17   Q.    And do you know if the buses in 2009 that you observed

18   idling were the same buses that you observed in 2006 idling?

19   A.    No.

20   Q.    Okay.  Thank you.

21         THE COURT:  Anything else?

22         MS. HANKEY:  No further questions, your Honor.

23         THE COURT:  All right.  Thank you, sir.  You may step

24   down.

25         THE WITNESS:  Thank you.

```
 1                    (Witness stepped down)

 2          MS. HANKEY:  Your Honor, the United States calls Steve

 3    Calder.

 4          THE CLERK:  Step up to the box, please.  Remain

 5    standing.  Raise your right hand.

 6                    STEVEN CALDER, SWORN

 7          THE CLERK:  Please be seated.  State your name, spell

 8    your last name, for the record, keep your voice up and speak

 9    into the mic.

10          THE WITNESS:  My name is Steven Calder.  S-T-E-V-E-N,

11    last name Calder, C-A-L-D-E-R.

12                REBUTTAL DIRECT EXAMINATION

13    BY MS. HANKEY:

14    Q.   Mr. Calder, did you accompany Mr. Mohamoud on an

15    inspection of the Paul Revere Roxbury facility?

16          MR. FRIEDMANN:  I'm sorry, your Honor.  Could we be

17    seen at sidebar, for a moment?

18

19    (SIDEBAR CONFERENCE AS FOLLOWS):

20          MR. FRIEDMANN:  This witness is not listed in the

21    government's witness list and pretrial memorandum, your Honor,

22    so I would just make an inquiry.

23          MS. HANKEY:  All he's going to do is authenticate the

24    notes from the visit, the notes he took.  He's not going to

25    testify to anything else.  I'm just going to have him
```

1   authenticate the notes.  Mr. Mohamoud testified that there were

2   notes taken.

3          MR. FRIEDMANN:  So, he's going to testify to nothing,

4   but he's going to authenticate the notes.  I have no objection

5   to the authentication of the notes.

6          MS. HANKEY:  Okay.

7          MR. FRIEDMANN:  If they're just going to offer the

8   exhibit, I do object, as I did to the videotape.  I assume

9   these are the notes of the videotape, but it's because of the

10  late production of these that not until after April 1, 2009 --

11         MS. HANKEY:  On that point, your Honor, Mr. Friedmann

12  just basically represented to the jury that the vehicles were

13  not the same as during the inspection and, in fact --

14         MR. FRIEDMANN:  I made no representation to the jury

15  of that.

16         MS. HANKEY:  Well, he certainly attempted to make that

17  inference.

18         THE COURT:  You have no objection to the

19  authentication; is that what you're saying?

20         MR. FRIEDMANN:  I have no objection if they just want

21  to authenticate that.

22         THE COURT:  And you have the same objection to this

23  that you had to the videotape.

24         MR. FRIEDMANN:  To the videotape, right.

25         MS. HANKEY:  Okay.

```
 1              THE COURT:  The objections are overruled.

 2              MR. FRIEDMANN:  So, if the exhibit is being admitted,

 3     then you don't need him, if that's all they're doing is

 4     authenticating it.

 5              THE COURT:  Yeah, I guess.

 6              The question was, do you need the witness if he

 7     stipulates to the authenticity?

 8              MS. HANKEY:  No.  We'll excuse this witness.

 9              THE COURT:  Okay.

10     (END OF SIDEBAR CONFERENCE)

11

12              MS. HANKEY:  Your Honor, I move to admit government

13     Exhibit 148.

14              THE COURT:  Okay.  Subject to the objection and

15     ruling, it will be admitted.

16     (Exhibit No. 148 received into evidence)

17              MS. HANKEY:  No further questions.

18              THE COURT:  Thank you, Mr. Calder.  That's all we

19     needed.

20                           (Laughter)

21              MS. HANKEY:  The United States rests, your Honor.

22              MR. FRIEDMANN:  We, likewise, rest, your Honor.

23              THE COURT:  Okay.  That, apparently, completes the

24     evidence in the case.  So, we'll take a short break because I

25     have a couple of things I want to talk with the lawyers about
```

1    before we proceed any further.  So, we'll excuse the jury, but

2    I want to stay in session.

3              THE CLERK:  All rise for the jury.

4    (The Jury exited the courtroom at 10:42 a.m.)

5              THE COURT:  Okay.  I don't know.  We have a few things

6    we would have to deal with before proceeding to the next

7    stages.  I don't know what your views are on whether we should

8    do that today, do the next stages today, or on Monday.

9              MR. FRIEDMANN:  Your Honor, I have a couple of motions

10   that I'm going to be making, now that all the evidence is in.

11   I have two motions.  I would prefer, if we can do those today,

12   while we still have some court time --

13             THE COURT:  Yes.

14             MR. FRIEDMANN:  I also have a proposed jury form for

15   your Honor's review.  We've submitted our proposed --

16             THE COURT:  That's one of the things I want to talk

17   about.

18             MR. FRIEDMANN:  We've already submitted to you some

19   proposed jury instructions.

20             THE COURT:  I guess my question is, can we do all of

21   those things, which are normal in a case, and go to the next

22   stages, or do you want to just -- because I don't like sending

23   cases to juries too late on Fridays, because there may be a

24   temptation to rush.  On the other hand, we are fairly early in

25   the day.  So, I just wanted to get your views on it, whether

1    you had any views.  I don't know how long your arguments will

2    be.

3             Who's arguing for the plaintiff?

4             MR. SANDS:  I am.

5             THE COURT:  Do you have an estimate, even if it's a

6    rough estimate?

7             MR. SANDS:  One question first, your Honor.  Are we

8    allowed to reserve rebuttal time in closing?

9             THE COURT:  I don't know.  It's not automatic.  I

10   don't think it's usual, but -- it is in criminal cases.

11            MR. FRIEDMANN:  I don't see why they would --

12            THE COURT:  Usually the burden -- usually our practice

13   here in a civil case is the defendant argues first; the party

14   with the burden argues second.

15            MR. SANDS:  Then, that's fine.

16            THE COURT:  You wouldn't need, I guess, to rebut

17   yourself.

18            MR. FRIEDMANN:  If you want to go first, I'm happy to

19   let you go first.

20            MR. SANDS:  I don't need to rebut myself.  That's

21   fine.

22            Sure, throw me under the bus.

23            MR. FRIEDMANN:  Then, we would like to reserve some

24   time, your Honor, if we could.

25            THE COURT:  Well, I guess, rather than put any

1    pressure on rushing things, I guess I'd just as soon excuse the

2    jury, have them come back first thing on Monday.  I think I

3    told you that we're going to impanel another case on Monday,

4    but the way we do -- if we have arguments and charge in this

5    case at 9:00, in the normal course we wouldn't have -- as with

6    this case -- it will be 10:30 or so before we get to the next

7    jury, anyway.  So, I think it will dovetail very nicely,

8    frankly.  So, I think that's probably a more orderly way of

9    doing it.

10            MR. FRIEDMANN:  I certainly have no problem with that,

11   your Honor.

12            THE COURT:  Because I can let the jurors go along now,

13   if that's the agreement.

14            MR. SANDS:  That's fine with the United States, your

15   Honor.

16            MR. FRIEDMANN:  We, obviously, need some of your

17   rulings on motions before we can craft a final jury verdict

18   form.

19            THE COURT:  Right.  This has gone a little bit faster

20   than people estimated, anyway, so going into Monday I don't

21   think is a big problem.

22            So, let me bring the jurors back in.  I'll excuse them

23   for the weekend.  Then we'll take a break and come back and

24   deal with whatever business.

25            While he's doing that, Mr. Friedmann has said he has a

1    proposed verdict slip.  Does the government have one?  It's one
2    of the topics I want to consider, because I think there are
3    various ways of doing it.
4              MR. FRIEDMANN:  Is it okay to just bring this up to
5    your Honor?
6              THE COURT:  Yes.
7              MR. SANDS:  We do have one, your Honor.  I can provide
8    it to you after the break.
9              THE COURT:  Fine.
10             THE CLERK:  All rise for the jury.
11   (The Jury entered the courtroom at 10:48 a.m.)
12             THE COURT:  Jurors, as I indicated, the evidence has
13   closed.  The next stages of the case will be the closing
14   statements by the lawyers and some instructions by me, and then
15   deliberations will begin.  That usually takes a fair amount of
16   time.
17             I think we're just going to let you go today a little
18   bit earlier than usual.  We'll do that first thing on Monday
19   morning; we'll reach those two stages of the case.  So, there
20   is a little bit more business, and rather than have you sitting
21   around while we do that, I think we'll just -- it's Friday.
22   You can get an early start on the weekend.
23             I remind you, please, no discussion of the evidence in
24   the case among yourselves or with anyone else, and don't try to
25   form any conclusions yet.  Although the evidence is before you,

1   you haven't heard everything you need to hear before you begin

2   your deliberations.  So, take the weekend off -- not hard for

3   you to do, probably -- and come Monday morning we'll return to

4   these matters.

5          But enjoy the weekend, and we'll see you Monday

6   morning.

7          (Clerk confers with the Court)

8          THE COURT:  Oh, yes.  The Clerk reminds me, of course,

9   that once deliberations begin, we go from the 9:00 to 1:00 that

10  we've been on to a full day.  So, if you would make those

11  arrangements.  It may be necessary to go past 1:00 on Monday

12  and any succeeding day, if there is any.  Okay?  Thanks.

13         We will be in recess, and then we'll come back in 10

14  or 15 minutes.

15         THE CLERK:  Court will be in recess.

16         Jurors.

17  (The Honorable Court and Jury exited the courtroom at 10:50

18  a.m.)

19  (Recess taken at 10:50 a.m.)

20  (The Honorable Court entered the courtroom at 11:45 a.m.)

21         THE CLERK:  All rise.

22         The case of United States versus Paul Revere

23  Transportation.

24         THE COURT:  Okay.  I have, I guess, two motions, from

25  the defendant.

1           MR. FRIEDMANN:  Yes, your Honor.

2           THE COURT:  Okay.  I haven't looked at them.  Do I

3    need to do that before you argue?

4           MR. FRIEDMANN:  I'm sorry.  I didn't hear you.

5           THE COURT:  Would it be worth my taking a minute to

6    read them or will you summarize it for me?

7           MR. FRIEDMANN:  I'll summarize it for you.

8           If you'll remember, at the end of plaintiff's case I

9    filed two motions, one about habit and a general motion, each

10   one under Rule 50 for directed findings for the defendant.

11   These are the same motions on those subjects but at the close

12   of all evidence now.

13          When we spoke about them last time with your Honor,

14   you had indicated that you would let the government continue to

15   proceed on the habit portion at least for the balance of the

16   case, and then you would make a decision ultimately before it

17   went to the jury on the dates that are interspersed between the

18   observed dates during the seven-week period.

19          We're moving in our habit motion to have those

20   interspersed business dates dismissed out also on the basis

21   that the government has not, number one, established a habit

22   and practice; and, number two, that even if they have

23   established a habit and practice, that they haven't made out

24   their burden of proof on each of the elements on those

25   interspersed days.  So I'm just talking about the dates that

PDF created with pdfFactory trial version www.pdffactory.com

1    are unobserved dates, not the seven observed dates and not

2    Ms. Fay's dates.

3          Habit and routine under 406(b) requires the proponent

4    to establish with specificity and with a preponderance of the

5    evidence that a habit or routine exists.  The testimony that we

6    have here on those interspersed days is that Mr. Viola

7    testified that under certain weather conditions he would start

8    busses for what he believed to be proper purposes.  And I'm not

9    even getting into the merits of the purposes yet with your

10   Honor, but I'm just talking about the habit testimony.

11          In order for the government to even get the jury to be

12   able to consider habit, or the inference of habit, they have to

13   first prove with specificity that there was a habit, and then,

14   secondarily, that there were specific instances that comported

15   with that habit.  And the example I used earlier this morning

16   for your Honor was if the habit that's trying to be proven is

17   that Jon Friedmann eats cheeseburgers on Tuesday, you have to

18   first have enough occurrences of Jon Friedmann eating

19   cheeseburgers on Tuesday for it to become a habit, and then he

20   has --

21          THE COURT:  Or testimony that he does.

22          MR. FRIEDMANN:  Or testimony that he does, yeah.

23          And then you have to have it actually be Tuesday for

24   there to be the inference that Jon Friedmann ate a cheeseburger

25   that day.

1          So if we make the assumption here that the habit or

2    routine -- and this is, I think, the government's best case --

3    that the habit or routine was what Mr. Powers said he did,

4    which was on cold days that he started vehicles and ran them --

5    and, again, putting aside whether it was necessary or not

6    necessary -- and just ran them in excess of five minutes, they

7    have to prove first his habit and what the terms and conditions

8    of that were with specificity; and then, secondly, that those

9    specific conditions existed on those unobserved dates.

10          And they haven't proven that.  They -- at best you

11   have testimony -- if you take Mr. Powers' testimony, he said,

12   "If it was below freezing I would start the busses and see -- I

13   would check them out.  And that's how I would do it."  You had

14   Mr. Daley yesterday say, "Well, if it was below 40 degrees,

15   that's what we would do."

16          That's the testimony that we have of habit or routine.

17   So at least they, the government, would have the burden of

18   putting in records for those interspersed dates to say there

19   were days where the temperature was below 40, because until and

20   unless it reaches -- it's under 40 degrees, the busses weren't

21   started.  That's their burden.  It's not our burden as the

22   opponent to disprove the habit.  They have to prove that the

23   habit, number one, existed; and, number two, if they prove that

24   a habit existed, that there were those predicate conditions for

25   the habit to occur.  And I would suggest to your Honor that is

PDF created with pdfFactory trial version www.pdffactory.com

1    not present in this case.

2         Then once you get past habit, if you do, they still

3    have to prove all of the necessary elements of their burden of

4    proof, which is they were started; that they were left on for

5    more than five minutes without moving; and that there was some

6    observation plus, which is their burden of proof on those

7    unobserved.  Then it would shift back to us to give a reason

8    for it, and then it would shift back to them to establish that

9    the reason was pretextual.

10        I would suggest to your Honor that other than the

11   testimony today of their expert when he said on these four days

12   or seven days that it was -- you know, that he checked the

13   weather reports on, there is no evidence on any of the

14   unobserved days of that third element.  His testimony went only

15   to the observed days and not to the unobserved days.

16        So I would suggest, your Honor, they first don't make

17   out the components of habit in terms of specificity.  In terms

18   of numerosity, the First Circuit has said that 75 to 100

19   occurrences does not equal habit, that it has to be reflexive.

20   And certainly the only testimony you have about being reflexive

21   is it was either below 40 or it was below freezing.  And even

22   if you do go to there, then you have the issue of the proposed

23   unobserved dates, whether they had those weather conditions

24   that would even initiate the process, initiate the starting of

25   the vehicles, which could then result in a violation.

 1          And so -- and I would suggest, your Honor, that the

 2    government has not made out either its burden of proof or the

 3    pattern required under Rule 406(b).  That's on the first

 4    motion.

 5          THE COURT:  Let's take that.  Ms. Hankey, did you want

 6    to say something?

 7          (Laughter.)

 8          MS. HANKEY:  Do you think?

 9          First, with respect to Rule 406:  Rule 406 is a rule

10    of evidence; it's not a standard with respect to burden of

11    proof.  Mr. Friedmann isn't asking the Court to preclude the

12    introduction of any evidence.  All of the evidence has already

13    been admitted.  And Rule 406 applies when a party is seeking to

14    introduce conduct which is not the subject of the complaint.

15    Here all of the evidence is evidence of the subject of the

16    complaint.  We are not seeking to admit, for example, what Paul

17    Revere did in 2001 with respect to its habit to prove what

18    happened in 2006, which would apply when you're trying to admit

19    habit evidence under Rule 406.  Rule 406 does not establish a

20    burden of proof with respect to how you prove an allegation.

21          And secondly, your Honor, Mr. Friedmann says we didn't

22    introduce evidence regarding the weather on the days in

23    between.  In fact, we did.  The weather data is in evidence for

24    all of the days in between.  Mr. Friedmann had Mr. Powers

25    testify with respect to the weather.  And, in fact, the

PDF created with pdfFactory trial version www.pdffactory.com

```
 1    weather, for example, was as much as 46 degrees on some of the
 2    days that he was sending people out.  That's what Mr. Powers is
 3    saying is cold.  And there aren't any days in the seven weeks
 4    that we're talking about in which the weather is warmer than
 5    that 46 degrees.  We've introduced evidence to show there is,
 6    in fact, no anomalies in the weather between those dates in
 7    between.
 8            Again, what Mr. Friedmann is arguing is that you
 9    should -- that somehow you should preclude the government from
10    arguing circumstantial evidence to prove a violation.
11            THE COURT:  The motion is denied.
12            MR. FRIEDMANN:  Your Honor, may I address that for
13    just a second?
14            THE COURT:  Well, okay.
15            MR. FRIEDMANN:  Exhibit 33 is the weather data that my
16    sister speaks about that they introduced.  There are 31
17    days between -- 31 business days, which is what we were talking
18    about -- between the start of examinations and the end of
19    examinations.  Of those seven are the observed dates, which
20    leaves 24 dates.  Of the 24 dates that are left, there are 11
21    of them where the minimum temperature was over 40 degrees on
22    every single one of those days.
23            So the evidence that they've introduced is that it had
24    to be below 40 for the busses to be started, but the evidence
25    with the dates is that those are not habit dates; those are
```

1  dates that don't qualify.  They're not a Tuesday, in my

2  example; they're a Wednesday or a Thursday.  They said that the

3  habit is based on what my clients testified was the minimum

4  temperature, and 11 of those dates are over that temperature.

5       And I would suggest, your Honor, that at best if

6  they're going to have habit testimony, they have to have --

7  excuse me -- habit dates, they have to be dates that comport

8  with the habit because that's what the habit is used to do:  It

9  is used to prove that on a specific occurrence somebody acted

10  within -- in conformity with the habit.  And here the predicate

11  of being below 40 doesn't exist, so how can it be our habit?

12       THE COURT:  I understand.  But basically, I'm in

13  agreement with the argument by Ms. Hankey, that the issue here

14  is the strength of the potential inference from the admitted

15  evidence; it's not a question of whether the evidence should

16  have been admitted or not.  And I think the inference is

17  permissible, so it's a matter for the jury.  And so that's why

18  the motion is denied.

19       MR. FRIEDMANN:  We had also a second motion that was a

20  general one on burden of proof, and we put that in to preserve

21  our rights.

22       THE COURT:  Right.  Okay.  That's denied as well.

23  Again, it's a matter of the evidence is there and whether the

24  inference in favor of the plaintiff's case is sufficient to

25  persuade the jury to draw -- whether it's a strong-enough

PDF created with pdfFactory trial version www.pdffactory.com

1    inference, we'll see, from the jury.

2            So let's talk about the way we ask the jury for their

3    verdict.  I've had a chance to look at the defendant's

4    submission.  And has the plaintiff had a chance to look at it?

5            MR. SANDS:  We have had a chance to look at theirs,

6    your Honor.  And as we stated earlier, we do have a draft for

7    the Court to consider that we could provide to the Court at the

8    end of the day.

9            THE COURT:  Is it different from this?

10           MR. SANDS:  It is a little different.

11           THE COURT:  Substantially different?  I mean,

12   everybody does it slightly differently.  But, I mean --

13           MR. SANDS:  It's shorter, I can say that.

14           THE COURT:  Who wins?

15           (Laughter.)

16           THE COURT:  Well, let me work backwards from it.  One

17   feature of the proposed one is the specific enumeration of the

18   dates in question and asking the jury for a focused answer on

19   each of those dates.

20           MR. FRIEDMANN:  There was one error on there, and I

21   made the government aware of this.  But one of the dates that

22   Ms. Fay had in her notes was, unfortunately, left off.  We'll

23   correct that.  There was one date that was missing.  So I just

24   wanted the Court to be aware of that.

25           THE COURT:  I wanted to get the plaintiff's reaction

PDF created with pdfFactory trial version www.pdffactory.com

1    to that.  I had actually -- I prepared, for my own purposes of

2    thinking about it, two versions.  One was very general -- or

3    more general, I should say, I guess, and one that looked very

4    much like this; in other words, enumerating the dates and

5    asking the jurors to indicate for each date whether they found

6    for a violation or not and, if so, how many vehicles were

7    involved.

8            Is there any quarrel with that approach, day by day?

9            MR. SANDS:  Not in general, your Honor.  I believe the

10   draft that we had prepared does enumerate the dates,

11   particularly for the dates observed by Ms. Fay, as well as the

12   dates observed by the inspector.  And then I think we had a

13   more general instruction -- or question regarding the dates --

14   number of violations between March 1st and April 12th without

15   enumerating each one day by day.

16           THE COURT:  I see.

17           MR. SANDS:  Conceptually it's the same.

18           THE COURT:  Okay.  I think -- okay.

19           Go ahead.

20           MR. FRIEDMANN:  I was going to say not just because

21   it's our form, but I put some thought into why we wanted

22   specific dates, because I think we want to preserve a record if

23   there is a determination --

24           THE COURT:  Right.  I think it will be interesting to

25   see.  I mean, there may be some circumstantial evidence of the

PDF created with pdfFactory trial version www.pdffactory.com

1    jury's deliberations if we ask more questions.  So that's fine.

2    So I think we'll do something like that.

3          Now, let me work backwards.  Preceding that in the

4    defendant's form was a question with six subparts, I guess.

5    Let me deal with the last three, which are the exemptions.  I

6    don't think the exemptions are at issue here; I think the

7    question is whether there was unnecessary idling.  Certainly,

8    there's no -- well -- and so I would leave the exemptions out.

9    In other words, I think the question is whether on the main

10   clause of the regulation a violation has been made out for a

11   particular date and number of vehicles.

12         (Pause.)

13         MR. FRIEDMANN:  Your Honor, it seems to me that the

14   first one which relates to being serviced and the operation of

15   the engine for repair --

16         THE COURT:  Well, as I understand both the state of

17   the evidence and I think the approach we've taken, given the

18   way we solved the burden question, was that the defendant has,

19   in the burden-shifting process, offered some evidence of why it

20   should be concluded that the idling was not unnecessary -- or

21   why it should not be concluded that it was unnecessary.  And

22   that, then, shifted the burden back to the plaintiff to show

23   that, indeed, it was unnecessary; that the reasons proffered

24   were insufficient to counter an inference of unnecessariness,

25   all right?

PDF created with pdfFactory trial version www.pdffactory.com

1          But all of that is within the question posed by the

2   main clause rather than the invocation of an exemption.  And,

3   again, the way we parsed it was that the exemptions -- one of

4   the things I'm calling exemptions were kind of safe harbors,

5   that if it were approved the regulation would not apply.  It's

6   not a question of defining what is necessary.

7          So I think we haven't tried the question of whether

8   the regulation applied or not; we've tried whether or not it

9   was violated.

10         MR. FRIEDMANN:  My concern, your Honor, is with the

11  first exemption, is there was testimony about vehicles being

12  jumped and things like that, whether they viewed that as

13  servicing as contrasted from the operation.

14         THE COURT:  You're actually -- well, I think you're

15  making the burden higher on yourself, actually.

16         MR. SANDS:  If that is the case, your Honor, that

17  they're arguing, we would move for a directed verdict on that

18  issue.

19         THE COURT:  Because to have the benefit of the

20  exemption you may have to show they're being serviced, whereas

21  to counter the inference in the plaintiff's favor, you just

22  would have to raise enough to let the jury think that they were

23  plausibly necessary, whether serviced or not.

24         So, anyway, apart from that, the effect of it, I just

25  think that the focus has been -- my concern is getting too

1    technical with some of these concepts that the jury will not be

2    familiar with and it may be very confusing to them, and I think

3    it's unnecessary given the way -- unnecessary -- given the way

4    the case has been presented to them.

5            MR. FRIEDMANN:  Understood, your Honor.

6            THE COURT:  And so I would leave those questions out.

7            And largely for the same reason, my thought was to

8    simply ask the preamble I had sketched out, in thinking about

9    it, doesn't even break the first part into pieces and simply

10   asks "For the following dates" -- and I have a list of dates --

11   "has the plaintiff proved by a preponderance of the evidence

12   that the defendant, Paul Revere Transportation, violated the

13   Massachusetts anti-idling regulation by permitting the

14   unnecessary operation of the engine of a motor vehicle while

15   the vehicle was stopped for a foreseeable period of time in

16   excess of five minutes?"

17           It's a general question, and they will answer it by

18   going to the first date and say yes or no, and if yes, how many

19   vehicles.  But the point being that I didn't break -- I just

20   basically parroted the language of the regulation.  That's what

21   they've heard about so far; that's what they're going to hear

22   about in your arguments.  I think it's sufficient, frankly,

23   rather than try to --

24           This isn't a case where one or -- the only question

25   here is whether idling in excess of five minutes was necessary

PDF created with pdfFactory trial version www.pdffactory.com

1   or not -- or it was unnecessary or not, I guess is the way to

2   put it properly.  There's no need to break the cause of action

3   into elements as we're accustomed to doing.

4          MR. SANDS:  Generally we agree, your Honor.  In fact,

5   our proposed instructions didn't have any of this.  We were

6   relying on -- our proposed verdict sheet didn't have any of

7   this.  We were relying on the instruction.

8          My only question in including that, that which you've

9   just read, is whether or not there's going to be an instruction

10  to the jury about what constitutes unnecessary for the purpose

11  of --

12         THE COURT:  Yes, that is an important question about

13  the instruction, but -- fine.  And we'll get to that maybe now.

14  But I've just indicated I think it's sufficient to ask a

15  general question.

16         Now, the question is what do they get told about what

17  it takes to violate the regulation and what's unnecessary.  My

18  inclination is to tell them the word is to be given its

19  ordinary meaning -- in the context of the regulation, if you

20  want.  I may add that.  I don't think it's necessary to

21  instruct them as to what's necessary.  They'll understand.

22         We tell them to think about whether certain things are

23  reasonably prudent, for example; we don't tell them what

24  prudence is.  So this is going to be a minimalist instruction,

25  I think.  This case turns on the argument and their assessment

1    of the evidence, basically, not on the instructions.

2    MR. SANDS:  Again, your Honor, I just wanted to -- for

3    clarification, will there be an instruction that the plaintiff

4    has satisfied its burden if it --

5    THE COURT:  Go ahead.  Sorry.

6    MR. SANDS:  Again, the question is of the prima facie

7    burden, that there were no observed or apparent --

8    THE COURT:  I don't intend to split the burden or go

9    into the shifting at all.  That's all preliminary.  They don't

10    have to consider -- it's for purposes of Rule 50 motions,

11    basically, to police the process of the case.  But now that

12    it's in, the question is simply whether the plaintiff has

13    satisfied what would be its ultimate burden anyway to show a

14    violation on any given occasion.

15    So there will be a general burden instruction and it's

16    not going to be a shifting.  Again, I don't want to introduce

17    ideas that I think are superfluous and -- but potentially

18    confusing to a lay jury.  That's my concern.

19    MR. FRIEDMANN:  We're fine with that, your Honor.  I

20    think that's the McDonald-Douglas standard anyway that --

21    THE COURT:  Well --

22    MR. FRIEDMANN:  -- you're not supposed to do that.

23    THE COURT:  Whether or not it's going to -- I made a

24    little note to say you used the word "pretext."  We're beyond

25    that now.  I disavow the use of the word "pretext," because

PDF created with pdfFactory trial version www.pdffactory.com

1    that's not exactly what we're talking about.  We're talking

2    about a proffer.  It was a going -- burden-of-production kind

3    of issue.  I just want clarity for the powers that be that was

4    a paradigm that was suggestive rather than controlling.

5             MR. FRIEDMANN:  Understood.

6             THE COURT:  Okay.  I think that may be it.

7             So my practice, which I guess is less important in

8    this case than it is in many -- because I think the

9    significance of the instructions are not as important as they

10   are in many, given the plain language of the regulation -- my

11   practice, generally, is to instruct on the substantive elements

12   of the claim before you argue, just so they have those

13   instructions in mind as you argue.  And then after you've

14   argued, I give the evaluation of the evidence and that kind of

15   stuff.  So I divide it.

16            So I'll go first, but it will be brief, I think, and

17   then you'll argue, and then I'll follow up with evaluation of

18   the evidence.

19            And is 30 minutes enough?

20            MR. FRIEDMANN:  I think I might need 40, if your

21   Honor -- there's a lot of evidence to go over.

22            THE COURT:  All right.  Forty.

23            I guess that may be it.  I'll see you Monday morning.

24            MR. FRIEDMANN:  Thank you, your Honor.

25            MS. HANKEY:  Thank you, your Honor.

PDF created with pdfFactory trial version www.pdffactory.com

1          THE CLERK:  All rise.

2          Court is in recess.

3          (The proceedings adjourned at 12:05 p.m.)

4

5                    C E R T I F I C A T E

6

7          I, Marcia G. Patrisso, RMR, CRR, and Brenda K.

8    Hancock, RMR, CRR, Official Court Reporters of the United

9    States District Court, do hereby certify that the foregoing

10   transcript, from Page 5-1 to Page 5-86, constitutes, to the

11   best of our skill and ability, a true and accurate

12   transcription of my stenotype notes taken in the matter of

13   *United States of America v. Paul Revere Transportation, LLC*,

14   No. 1:06-cv-12297-GAO.

15                              /s/ Marcia G. Patrisso
                                Marcia G. Patrisso, RMR, CRR
16                              Official Court Reporter

17                              /s/ Brenda K. Hancock
                                Brenda K. Hancock, RMR, CRR
18                              Official Court Reporter

19

20

21

22

23

24

25