UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>PAUL REVERE TRANSPORTATION, LLC<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  C.A. NO.: 06 CA 12297 GAO<br>)<br>)  Honorable George A. O'Toole, Jr.<br>)<br>)<br>)<br>) |

## **DEFENDANT'S TRIAL MEMORANDUM FOR PENALTY PHASE**

The Plaintiff is attempting to have this Court impose upon Paul Revere Transportation,

LLC ("PRT") a $27,500 or $32,500 fine for each violation of the Massachusetts Idling

Regulation, 310 C.M.R. 7.11(b) (the "Regulation").[1]  The Plaintiff originally claimed

approximately 4,797 violations.[2]  However, the jury concluded that PRT had violated the

Regulation 234 times, or approximately 5% of the violations initially alleged by the government.

Although the Plaintiff argues that imposing the maximum fine for each violation is the

appropriate penalty in this case, PRT disputes the imposition of this fine for several reasons. First,

PRT submits that 42 U.S.C.A. 7413(b) violates the Excessive Fines Clause of the Eighth

Amendment as it relates to violations of the Regulation. Next, while the government argues that

---

[1] 40 C.F.R. § 19.4 (the Civil Monetary Penalty Inflation Provision under the Clean Air Act) states that penalties of up to $27,500 may be assessed from January 30, 1997 through March 15, 2004, and penalties of up to $32,500 may be assessed after March 15, 2004 through January 12, 2009. Since 45 of the violations found by the jury were prior to March 15, 2004, the maximum penalty that can be applied to those violations is $27,500.

[2] The government claimed: 143 violations on days observed by the EPA inspector; 364 additional (unobserved) violations during the seven week period the inspector was visiting the Roxbury facility; 6 days of violations observed by Mary Jane Fay, with an estimated 15 violations per day; and 280 additional days of unobserved violations since December, 2002, with an estimated 15 violations per day, totaling 4,797 violations.

the Court should use a "top down" approach in assessing the appropriate fines for PRT, the

Defendant submits that this approach is not only discretionary, but is inappropriate considering

the circumstances of this case. Instead, the Court should use the accepted "bottom up" approach

of assessing PRT's penalty in this case. Finally, the Defendant submits that because PRT was

held to be in violation of the Massachusetts Idling Regulation, rather than in direct violation of

the Clean Air Act ("CAA"), the penalty provisions of the Massachusetts Idling Statute, G.L. c. 90

§ 16A should be used as guidance to assess the applicable fine.

### (1) 42 U.S.C.A. 7413(b) Violates the Excessive Fines Clause of the Eighth Amendment

During the hearing on both parties' motions for summary judgment, PRT argued that the

penalty section of the CAA violates the Excessive Fines Clause of the Eighth Amendment. Judge

Young declined to rule on the excessive fines challenge, stating that such a challenge would not

ripen until the actual or impending imposition of a challenged fine. See April 14, 2009 Order of

Judge Young, attached hereto as **Exhibit "1."** Now that the imposition of an actual fine is at issue

and the specifics of the possible fine have been enumerated by the government, PRT's Eighth

Amendment challenge to the impending fine is ripe and appropriate for review.

PRT submits that the civil penalty enumerated in 42 U.S.C.A. § 7413(b) violates the

Excessive Fines Clause of the Eighth Amendment as it relates to violations of the Regulation.

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines

imposed, nor cruel and unusual punishments inflicted." *U.S. Const., Amendment 8*. The Eighth

Amendment's prohibition of excessive fines applies to the states through the Due Process Clause

of the Fourteenth Amendment. *See* Cooper Industries, Inc. v. Leatherman Tool Group, Inc. 532

U.S. 424, 433-34 (2001). The Excessive Fines Clause limits the government's power to extract

payments as punishment for some offenses. United States v. Bajakajian, 524 U.S. 321, 328

(1998). The Supreme Court has held that the Excessive Fines Clause applies to civil fines. *See*

Byrd v. Hunt, 136 F. Supp. 2d 511, 516 (2001) *citing* Hudson v. United States, 522 U.S. 93, 103

(1997) ("The Eighth Amendment protects against excessive civil fines, including forfeitures").

The Supreme Court also held that civil sanctions can constitute punishment, if the civil sanctions serve retributive or deterrent purposes, and therefore are subject to the limitations of the Excessive Fines Clause. *See* Austin v. United States, 509 U.S. 602, 610 (1993). *See also* Alexander v. United States, 509 U.S. 544 (1993).

The constitutional standard to determine whether a fine is excessive for purposes of the Excessive Fines Clause was first enumerated in the Bajakajian decision and is known as the "grossly disproportional" test. If a fine, forfeiture or other type of penalty is grossly disproportional to the gravity of a defendant's offense, it is unconstitutional. Bajakajian at 337. The "grossly disproportional" test first enumerated by the Supreme Court in Bajakajian was expounded upon by the Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), as well as in Cooper. In all three of these decisions, the Supreme Court treated the question of excessiveness as a question of law. In determining whether a particular fine was unconstitutional, the Cooper Court cited three factors specifically outlined in the Gore decision: 1) the degree of the defendant's reprehensibility or culpability; 2) the relationship between the penalty and the harm to the victim caused by the defendant's actions; and 3) the sanctions imposed in other cases for comparable misconduct (the "Gore factors"). Cooper at 435. *See also* MacLean v. State Board of Retirement, 432 Mass. 339 (2000) (court applied Bajakajian principles to facts of particular case where plaintiff argued revocation of pension benefits was an "excessive fine" prohibited by the Eighth Amendment to the United States Constitution).

In the present action, the Plaintiff is attempting to impose upon PRT a $27,500 - $32,500.00 fine (depending on the date of the event, see fn. 1) for each alleged violation of the Regulation, an amount either 325 times or 65 times greater than the $100 or $ 500 fine imposed on violators of the Massachusetts anti-idling statute, M.G.L. Chapter 90, §16A (the "Statute") and many other anti-idling statutes found in other jurisdictions throughout the United States. This fine

is excessive and in violation of the federal Constitution because the degree of reprehensibility of

PRT's conduct is minimal, the penalty is not proportional to the harm caused or the harm likely to

be caused by PRT's conduct, and the penalty the Plaintiff is attempting to impose on PRT is not

comparable to the penalty under the Massachusetts anti-idling statute and other jurisdictions' anti-

idling laws.

### a) Degree of Reprehensibility or Culpability

The degree of reprehensibility of the defendant's conduct may be the most important

indicator as to the reasonableness of a fine or other civil penalty. Gore at 575 ($2,000,000

punitive damages award found to be grossly excessive by the Court in light of low level of

reprehensibility of defendant's conduct). "Exemplary damages imposed on a defendant should

reflect 'the enormity of his offense'." Gore at 575, *quoting* Day v. Woodworth, 13 How. 363,

371 (1852). The Gore Court found that the aforementioned principle reflected the accepted view

"that some wrongs are more blameworthy than others." Gore at 575. The Gore Court went on to

note that it had found in past decisions that non-violent crimes are less serious than violent crimes

and that trickery and deceit are more reprehensible than negligence. *See* Solem v. Helm, 463 U.S.

277, 292-293 (1983) and TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 462

n. 28 (1993).

In the present matter, none of the aggravating factors related to reprehensible conduct

enumerated in the Gore decision are present. The PRT employees in this case violated the

Regulation mistakenly, unintentionally, in good faith, and/or for good cause. As discussed in

more detail below, PRT had no motivation for violating the idling law, because idling its buses is

far more expensive for PRT than having them turned off. Furthermore, at the time of the claimed

violations PRT had already been using Number 1 Ultra Low Sulfur Diesel Fuel for three (3)

years, and had utilized 634,510 gallons of the environmentally friendly fuel. PRT had also

implemented many environmentally responsible devices in its buses to minimize the negative

environmental impact of its buses, which measures establish that PRT had no bad intent. PRT's

actions certainly do not evidence any conduct which could be considered reprehensible, and the penalty sought by the government in this case far outweighs the seriousness of PRT's offense given the mitigating circumstances.

Not only are PRT's actions in and of themselves non-repugnant, but penalties for excessive idling under Massachusetts law, as well as penalties under other jurisdiction's anti-idling laws, confirm a minimum level of culpability as to any person who violates anti-idling laws. "In considering an offense's gravity, the other penalties that the Legislature has authorized are certainly relevant evidence." Bajakajian at 339 n.14. The amount of the fine contained in the Massachusetts idling Statute is highly relevant evidence in this action as to the nominal gravity of PRT's offenses, and is supportive of the argument that the Regulation's fine is excessive and unconstitutional. The prohibitory language of the Statute is identical to the prohibitory language of the Regulation; however the fines for violating the Statute are one hundred dollars ($100) for a first offense and no more than five hundred dollars ($500) for every successive offense. *See* G.L. c. 90, §16A, attached hereto as **Exhibit "2."**

Furthermore, anti-idling laws in many other jurisdictions contain similar fines to the fines found in the Massachusetts anti-idling Statute. The following are examples of fines/civil penalties contained in anti-idling laws of other jurisdictions:

1. Maricopa County – Arizona, $100 for the first violation and $300 for a second and subsequent violation;
2. State of Delaware, no less than $50 and not more than $500 for each offense;
3. State of Illinois, $50 for the first violation and $150 for a second or subsequent violation;
4. City of St. Louis – Missouri, no less than $1.00, nor more than $500;
5. Washoe County - Nevada, not more than $500 for first violation, not more than $1000 for second violation;
6. City of New Rochelle – New York, not more than a $50 fine for first violation, not more than a $100 fine for a second violation;
7. Alleghany County- Pennsylvania, warning for first offense, $100 fine for second offense and $500 fine for third and subsequent offenses;

8.    State of Rhode Island, $100 fine for first offense and not more than $500 for each succeeding offense.

Further evidence that the EPA views the reprehensible nature of a violators' conduct as minimal can be found in the EPA's own Model State Idling Law, where the penalty for the first offense is a warning and the penalty for the second and/or subsequent offense is $500. Copies of the aforementioned anti-idling laws and the EPA's model state idling law are attached hereto as **Exhibit "3."**

The Massachusetts Department of Environmental Protection ("DEP") does not seem to be of the opinion that a violation of the Regulation is malicious conduct based on the fact that the DEP virtually ignores the Regulation as an effective means to control air pollution in Massachusetts. For example, emission inventories compiled by the DEP which are used to quantify the emissions of different pollutants such as carbon monoxide and particulate matter do not reflect any emission reduction benefit from the Regulation. See June 9, 2008 Expert Report James M. Lyons at p. 10 (hereinafter "Lyons Report at p"____", attached hereto as **Exhibit "4"**). Even more notable is the fact that the various State Implementation Plans ("SIP") created by the DEP (and presented to the EPA) to mitigate air pollution do not even describe or list the Regulation as a tool to reduce air pollution in Massachusetts. (Lyons at p. 10.)

PRT's alleged misconduct was non-violent in nature and did not involve any sort of dishonesty or deceit justifying a $27,500 - $32,500.00 fine for each alleged violation. One need only look at the $1,000 fine for the crime of assault and battery under Massachusetts law (M.G.L. Chapter 265, §13A) or the $2,000 fine for fiduciary embezzlement under Massachusetts law (M.G.L. c. 266, §57) to see that a $27,500 - $32,500.00 fine for violation of an anti-idling regulation is a punishment which does not fit the crime.

Lastly (and as discussed in detail below), PRT's voluntary use of anti-pollution devices on many of its vehicles, coupled with PRT's voluntary use of environmentally friendly diesel fuel in all of its diesel fuel powered vehicles, further minimizes the "reprehensible" nature of its

conduct. These environmentally conscious actions on the part of PRT lend additional support to the argument that PRT's actions do not justify the exorbitant fines which the Plaintiff is attempting to impose in this action.

### b) Ratio of Harm to Penalty

While the reprehensibility of the violator's conduct may be the most important factor in determining whether a fine is excessive, the most commonly cited indicator of an unreasonable or excessive fine or penalty is its ratio to the actual harm inflicted on the plaintiff. Gore at 581 *citing* TXO at 459. With regard to the second Gore factor in the excessive fines analysis, the TXO Court held that the proper inquiry is "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred". TXO at 460, *quoting* Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1 (1991). In short, "[t]he amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." Bajakajian at 334.

In Haslip, the Court concluded that a punitive damages award more than four (4) times the amount of compensatory damages may be crossing the line into the area of constitutional impropriety, while in TXO the Court found that a ratio of approximately 10 to 1 was acceptable under the circumstances. The TXO Court expounded on its proportionality analysis from Haslip by requiring an examining court to take into account *the harm likely to result* (from the defendant's actions) in addition to the actual harm caused by the defendant's actions.

In the present matter, the Plaintiff is attempting to impose a fine on PRT which is either 325 or 65 times greater than the civil fine for the *exact same offense* under the Massachusetts anti-idling Statute. This comparison will be discussed more fully below when the third Gore factor is addressed; however it is important to touch on this issue now because the circumstances of this case require us to compare civil fines as opposed to a comparison of compensatory damages

versus punitive damages after a trial on the merits as was the case in the Haslip and TXO

decisions.[3]

Given the small amount of the civil penalties under the Massachusetts anti-idling Statute,

similar anti-idling statutes in other jurisdictions and the EPA's model idling law, it is evident that

the federal and state authorities charged with monitoring and controlling air pollution believe the

harm to the environment and the public likely to result from PRT's alleged actions or the actual

harm committed by PRT is minimal. Further evidence that PRT's actions caused minimal harm to

the environment or the public is PRT's voluntary, proactive steps in controlling the amount of air

pollution caused by its vehicles. At the time of the 2006 violations, all PRT diesel vehicles were

using Ultra Low Sulfur Diesel Fuel ("ULSDF").[4] In Suffolk County, Massachusetts during March

and April 2006, the sulfur content of allowed diesel fuel was limited by federal regulation to

approximately 500 parts per million ("ppm"). However, the sulfur content of ULSDF is, by

definition, less than 15 ppm. In short, the sulfur content of the diesel fuel voluntarily used by PRT

during 2006 was more than thirty (30) times lower than the average on-road diesel fuel available

in Suffolk County. (See Lyons at p. 13).

More than half of the diesel fuel powered PRT vehicles allegedly involved in the

violations were also equipped with one of two types of diesel particulate matter filter devices

("DPF"). Prior to 2006, twelve (12) vehicles were voluntarily retrofitted by PRT with a DPF

device called the *Cleaire Longview* Device (the "Longview Device"), while seven (7) of the

vehicles came with manufacturer installed DPF devices (the "OEM PM traps").[5] (Lyons at p. 13.)

According to the Lyons Report, the Longview Devices reduced particulate matter emissions by at

---

[3] Civil fines are subject to constitutional scrutiny and the Eighth Amendment protects against excessive civil fines. See Hudson, Austin and Alexander.
[4] PRT began using this type of fuel in 2003, more than three (3) years before its use was federally mandated.
[5] Similar to PRT's use of ULSDF installation and use of particulate matter filters on many of its diesel fuel powered vehicles is environmentally conscientious, was not mandated, was voluntary and is not the norm throughout the industry.

least 85% while reducing hydrocarbon and carbon monoxide emissions by 90%. (Lyons at p. 15).
*See also* April 25, 2008 *Estimate of Total Idling Emissions* and July 31, 2008 *Supplemental*
*Estimate of Total Idling Emissions* by Plaintiff's expert witness David Brzezinski (hereinafter
"Brzezinski Report" and "Brzezinski") (which concurs with Lyons' findings) attached hereto as
**Exhibit "5"**. The PRT vehicles with the OEM PM traps reduced emissions of particulate matter,
hydro carbon and carbon monoxide by 80 to 90%. (Lyons at p. 17, and Brzezinski Report and
Brzezinski Supplemental Report). Therefore, according to the Lyons Report it would take the
PRT vehicle equipped with the Longview device approximately 33 minutes to emit the same
amount of particulate matter a vehicle would have emitted in 5 minutes of idling without the
Longview device, and it would take a OEM PM trap vehicle approximately 30 minutes to emit
the same amount of particulate matter a vehicle would have emitted in 5 minutes of idling with
the OEM PM trap. (Lyons at p. 16-17.) Lyons' findings are supported by the February 2007
report on diesel exhaust by the Clean Air Task Force (the "CATF Report")[6] and the attached
Brzezinski reports. According to the CATF Report, diesel fuel powered vehicles with DPFs emit
approximately 90% less particulate matter into the atmosphere compared to diesel powered
engines without DPFs. A true accurate copy of the CATF Report is attached hereto as **Exhibit**
**"6"**. One Boston test from the CATF Report even suggested that emissions from DPF equipped
buses may be cleaner than the actual outdoor air. <u>CATF Report</u> at 6.

  Given PRT's voluntary use of ULSDF and DPFs in its vehicles (as well as the small
amount of the fines in other jurisdictions for the exact same offense), it is clear that the fine which
the Plaintiff is attempting to impose on PRT is not reasonably or rationally related to the actual
harm PRT caused to the environment. Therefore the penalty sought by the Plaintiff is "grossly
disproportional" to the gravity of PRT's offenses and is unconstitutional.

---

[6] The CATF Report studied diesel emissions in four U.S. cities: 1) Columbus, OH; 2) Austin, TX; 3)
Boston, MA; and 4) New York, NY.

### c) **Sanctions for Comparable Misconduct**

"Comparing a punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." Gore at 583. The Court in Gore also noted that a reviewing court determining whether an award of punitive damages is excessive "should accord 'substantial deference' to legislative judgments concerning appropriate sanctions for the conduct at issue." Gore at 583 *quoting* Browning-Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc. 492 U.S. at 301. *See also* Bajakajian at 336 ("judgments about the appropriate punishment for an offense belong in the first instance to the legislature").

In the present matter, we are confronted with the comparison of the federal civil fine under 42 U.S.C.A §7413(b) for a violation of the Regulation to the civil fine under the Statute. Both the Regulation and the Statute prohibit the *exact same conduct*. The Statute imposes a fine of $100 for a first offense and $500 for each subsequent offense. However, the Plaintiff is attempting to impose a fine of $27,500 - $32,500.00 per violation on PRT through the circuitous route of Plaintiff's supposed authority under the Clean Air Act.[7] In this case it is obvious that the $27,500 - $32,500.00 fine the Plaintiff is attempting to impose on PRT is substantially greater than the statutory fine under the Statute and other jurisdictions' anti-idling statutes for the identical offense. Upon information and belief, it is also the first time the Plaintiff has charged a violator of the Regulation with the civil penalties under 42 U.S.C.A. § 7413(b).

Lastly, it is clear from the language of the Statute that the Massachusetts Legislature intended to impose a fine of $100 or $500 for excessive idling. It is wholly illogical that the Legislature also intended to impose a $32,500 fine on an offender for excessive idling – the exact same conduct being regulated by the Statute. The rationale behind the legislature's decision to place a relatively small fine on the conduct at issue is clear. Because the language of the Statute

---

[7] The aforementioned analysis is proper because the TXO, Haslip and Gore courts compared punitive damages awards to related civil fine while in Gore the Court not only compared the jury's punitive damages award with the Alabama statute for a comparable offense but it also compared the award with that of civil fines from other states.

is both nebulous and far reaching, the Massachusetts legislature understood that a large fines

would be inappropriate.  Furthermore, because the conduct prescribed by the Statute and

Regulation are substantially different and less serious than most conduct regulated under the

CAA, a substantially smaller fine is appropriate in this matter.

### (2)  This Court Should Assess Penalties by Using a "Bottom Up" Approach Rather than a "Top Down" Approach

42 U.S.C.A. § 7413(e)(1) sets forth the different factors the Court must take into

consideration when assessing a civil penalty pursuant to 42 U.S.C.A. § 7413(b).  This section

states as follows:

> [the court] shall take into consideration (in addition to such other factors as justice may require) the size of the business, the economic impact of the penalty on the business, the violator's full compliance history and good faith efforts to comply, the duration of the violation as established by any credible evidence (including evidence other than the applicable test method), payment by the violator of penalties previously assessed or the same violation, the economic benefit of noncompliance, and the seriousness of the violation.

42 U.S.C.A. § 7413(e)(1).

There are two methods of analysis employed by the federal courts utilizing the above

factors – the "top down" approach and the "bottom up" approach.  The government contends that

the Court should utilize the "top down" approach, whereby the Court begins its analysis with the

maximum penalty possible and then uses the factors identified in 42 U.S.C.A. § 7413(e)(1) to

mitigate the penalty downward. *See* Pound v. Aerosol Company, Inc. 408 F.3d 1089 (10th Cir.

2007).  PRT contends that the "bottom up" approach is more appropriate in this case.  This

method is one in which the Court first establishes the economic benefit the violator gained by

non-compliance and then adjusts the penalty upward or downward from this number based on the

factors identified in 42 U.S.C.A. § 7413(e)(1).  *See* U.S. v. Mun. Auth. of Union Twp., 150 F.3d

259, 265 (3rd Cir. 1998).  The most important rationale for applying the "bottom up" approach is

that there is no economic benefit gained from noncompliance in this case.  The fact that PRT did

not economically benefit from noncompliance should be assessed as a positive factor when considering to mitigate damages. It is nonsensical for the Court to use the "top down" approach given that the economic benefit is zero and no adjustments would be made for this factor. On the other hand, if the Court starts at zero (PRT's economic benefit) and adjusts upward from there using the "bottom up" approach, the Court is assessing economic benefit factor as a positive in PRT's favor, as it should.

A review of the penalty cases under § 7413(b) establishes that the first circuit has not been confronted with the issue of which approach to use, and it does not appear to have any established policy with regard thereto. Courts from other circuits have addressed the issue, and while some courts use the "top down" approach, this is not required and is not always appropriate. U.S. v. Dell'Aquillla, 150 F.3d 329, 339 (1998) (finding that the court can use either approach, or may simply rely on the factors set forth in § 7413(e)(1), as long as the fine is consistent with each of the factors the court is required to evaluate); U.S. v. Mun. Auth. of Union Twp., 150 F.3d 259, 265 (1998) (applying the "bottom up" approach and stating that because the statute does not prescribe either method, it appears that a court is free to use its discretion in choosing the appropriate method); U.S. v. Smithfield Foods, Inc., 191 F.3d 516 (1999) (affirming District Court's decision to use "bottom up" approach after considering both methods); U.S. v. Allegheny Ludlum Corp., 366 F.3d 164 (2004) (affirming district court's use of "bottom up" approach).

In Dell'Aquillla, the court stated that "although courts may, and frequently do, begin at the maximum, we have never suggested that such a procedure is always appropriate. Moreover, our research has not found any appellate decision that would suggest that method of determining a fine under the Clean Air Act is always the best way of proceeding." The court in Dell'Aguilla went on to explain that there are circumstances where starting with the maximum penalty and mitigating downward will set the bar so high initially that it would remain at a height that is inconsistent with the mitigating factors in § 7413(e)(1) even after the penalty is lowered.

Dell'Aguilla, 150 F.3d at 338. PRT submits that this is such a case; the multi-million dollar fine

the government seeks to impose on PRT simply bears no relation to nature of the violation, is

disproportionate to both the violations and the violators' ability to pay, and as a result, the only

method that could achieve a fair penalty is the "bottom up" approach.

a) *Factors to be Considered Whether Using "Bottom Up" Approach or "Top Down" Approach*

If this Court decides to use the "top down" approach, as the government recommends,

PRT is entitled to substantial downward mitigation of the proposed penalty.[8] If the Court uses the

"bottom up" approach, it should start its analysis at $0 (based on the fact that there was no

economic benefit to PRT) and impose penalties if it deems such penalties are necessary when

considering the factors of the §7413(e)(1) factors. PRT submits that regardless of the approach

used, an analysis of the §7413(e)(1) factors clearly weighs in favor of a minimal penalty for PRT.

Whether implementing the "top down" or "bottom up" approach, the Court must consider the

following factors:

I.   *Size of business*

PRT is a small, privately owned, Massachusetts corporation with approximately 147

vehicles (both buses and vans) and four hundred (400) employees. Mr. Richard Brown ("Mr.

Brown") will be testifying at the penalty phase of the trial regarding the size of the business, the

number and types of employees of the business, the competitive nature of the business, and how

PRT compares to other transportation providers. The Defendant submits that Mr. Brown's

testimony will provide the Court with ample information to establish that the relative size of PRT

is a factor that should mitigate the penalty assessed.

---

[8] It should be noted that the burden is not on PRT to present evidence supporting a reduction from the statutory maximum; the Court is required to consider all of the mitigating factors in §7413(e)(1) in light of all of the evidence. *See U.S. v. Midwest Suspension and Brake*, 824 F.Supp. 713, 735 n. 30 (1993).

## II.   *Economic Impact of Penalty*

The central purpose of the CAA penalties is to deter a defendant from committing future violations. The Plaintiff itself clearly established at trial that PRT is no longer violating the CAA. Additional deterrence in the form of a large penalty, therefore, is not necessary and would not serve a useful function at this time.

In U.S. v. Midwest Suspension and Brake, 824 F.Supp. 713, 736 (1993) the court reduced maximum proposed penalty from $600,000 to $50,000 in considering the economic impact of the penalty alone.  The court stated that $50,000 (8.3% of the proposed maximum penalty) represented 25% of the company's net income from the year in question. While that court found that the other mitigating factors did not apply because no evidence was presented to justify further mitigation, if evidence had been presented with respect to the other factors it seems clear from the court's discussion that it would have mitigated the penalty further. Midwest Suspension and Brake, 824 F.Supp. 713.

Not only is the imposition of a large fine unnecessary in this case, as PRT is already complying with the anti-idling laws, but a penalty of the magnitude suggested by the Plaintiff would devastate PRT.  A large fine has the capacity to cause substantial job loss during this time of severe economic hardship.  PRT employs approximately 400 people. Over 80% of these employees are female and minority workers. In addition, a large percentage of PRT's employees are residents of Roxbury, an economically disadvantaged area of Boston.  It is anticipated that Mr. Brown will be testifying as to the disastrous economic effect a large penalty would have on the business of PRT, and the Court should consider this as a factor in favor of mitigating the penalty assessed.

## III.   *PRT's Full Compliance History and Good Faith Efforts to Comply*

Since PRT's inception, the company has been committed to compliance with EPA standards, and has prided itself as a leader in the industry with respect to its efforts to achieve high environmental standards for the operation of its vehicles. Both the economic investments

14

PRT has made in outfitting its buses to be as environmentally sound as possible and the

company's every-day actions underscore PRT's commitment to complying with EPA standards,

and establish that PRT has always acted in good faith with respect to its anti-idling compliance

efforts.

In assessing PRT's history of violations, the Court should consider not only similar

violations in the past, but also the duration and continuity of PRT's present violations. *See* U.S. v.

Smithfield Foods, Inc. 972 F. Supp. 338, 349 (E.D. Va. 1997).   PRT has an extremely strong

compliance history.  Although the government argues that a weak history of compliance is

established because PRT was cited for two (2) days of violations at Logan Airport in 2002, PRT

submits that the 2002 violations do little to detract from PRT's strong history of compliance.

PRT has been in existence approximately 20 years.  It has facilities in two locations within the

Commonwealth, and provides services state-wide on a daily basis.  Throughout this widespread

and long history of operation, PRT was served with only one Notice of Violation ("NOV") prior

to or subsequent to the NOV that is the subject of this case.  That NOV was sent in response to

the EPA's observations of eleven (11) PRT buses idling for a total of 294 minutes at Logan

Airport over a two-day period in 2002.  After discussions with the EPA about its NOV, PRT

accepted responsibility for its wrongdoings and paid $20,580 in fines.[9]

After the 2002 idling PRT became even more vigilant in its efforts to comply with the

EPA's anti-idling regulations.  Management at PRT had discussions with the Union

representatives for PRT employees through which an agreement to implement a progressive

discipline policy with respect to idling violations was reached. Additionally, daily announcements

were made regarding the anti-idling policy at PRT.  In 2005, before most of the subject violations

occurred, PRT hired Ms. Patricia Cargill to head PRT's training program. She developed PRT's

written "special order" which outlined PRT's no-idling policy. This order was given to all

---

[9] This was equivalent to approximately $70.00 per minute, or $1,870 per violation, with no mitigating
factors taken into consideration.

employees when trained, and twice a year thereafter. The policy was also posted around the facilities.

Furthermore, as established by PRT at trial, PRT believed, based on its experience in the bus industry and its understanding of the Regulation, that it was in compliance with the anti-idling laws. Even though the CAA is a strict liability statute, courts have discretion to adjust damages based on culpability. *See, e.g.* Smithfield Foods, 972 F.Supp. at 353.[10] While one of PRT's employees had a different understanding of what was allowed under the Regulation, it is clear that the violations that are the subject of this action were confined to the Roxbury facility where this employee worked, and that once the subject employee learned that the government disagreed with his understanding of the anti-idling law he changed his practices with respect to the idling of buses. In fact, once the subject employee and management learned that the necessity of idling its buses was not as clearly defined as it had thought, it imposed an even more rigorous idling policy.[11]

PRT has taken numerous steps to ensure that its operation is in full compliance with the five-minute idling law. The steps PRT has taken include, but are not limited to, the following:

- Hiring Division Manager Frederick P. Jones on November 7, 2006 to manage PRT's Boston Division operations. The hire of Mr. Jones added an additional managerial level, allowing for increased supervision of existing supervisory staff, with a special emphasis on maintaining a strict policy of adherence to the five-minute idling law, both in the yard and in the

---

[10] While Smithfield Foods was a Clean Water Act case, the penalty provision of the CAA and the Clean Water Act are virtually identical and courts often rely on interpretation of the Clean Water Act to assist them with analysis under the Clean Air Act. *See, e.g.,* U.S. v. Dell' Aquillla, 150 F.3d 329, 328 n 9 (3rd Cir. 1998).

[11] PRT imposed a policy that no bus could idle for longer than 5 minutes, regardless of necessity, without being recorded in the maintenance log and serviced by the maintenance department. While this has caused many problems with respect to PRT servicing its daily runs on time, the company understands that it has no control over what the government will accept as "necessary" idling now or in the future and that this is an unavoidable hardship PRT is forced to accept as a consequence of the government's enforcement procedures.

field. Mr. Jones will testify at the penalty phase of the trial regarding the changes made by PRT after the 2006 violations with respect to compliance with the anti-idling law.

- PRT implemented a policy of placing a supervisor in the yard at pullout times (both in the morning and the evening) to ensure that all operators did not idle unnecessarily during pullout operations in the yard.

- PRT implemented a policy of making periodic radio announcements throughout the morning and evening shifts. These announcements state, "No unnecessary idling allowed. Please remember the five minute idling rule, per order of PRT." The announcement dates and times are logged in the Dispatchers Red Log Book.

- PRT implemented increased field supervision, employing mobile supervisors who are required to check all layover, departure, and arrival locations to ensure that operators are adhering to the five minute idling rule.

- PRT implemented a mystery rider program, whereby the company employs undercover riders to monitor its operators' compliance on the road with the five minute idling rule.

- PRT changed the training it administers to new hires regarding the five minute idling rule. This includes a pre-release training checklist which it gives all operators before they are allowed to operate on their own. PRT also requires its operators to acknowledge that they have been made aware of and will adhere to the five minute idling law. PRT expects that Ms. Patricia Cargill will testify at the penalty phase of the trial regarding the safety and training procedures given to PRT employees related to the anti-idling law.

- PRT installed perimeter signage on the fence of the yard and its building that details the five minute idling restriction, and includes the site manager's phone number so that employees can report violations.

17

- Every PRT employee receives a notice with their pay stubs that references the five minute idling law and the need for strict adherence.

- PRT periodically distributes a Special Order with employees' pay checks which informs employees of the five minute idling law and the need for strict adherence.

Overall, PRT's compliance history and good faith efforts to comply certainly militate in favor of a reduction in the penalty sought to be imposed against PRT. In fact, the only non-compliance with the idling regulations since the 2002 incident at Logan Airport stem from a pure misunderstanding of how the government interpreted the idling Regulation, which can in no way be portrayed as a bad faith attempt to circumvent the Regulation.

### IV.   *Economic Benefit of Noncompliance*

Courts use the economic benefit analysis to level the economic playing field and prevent violators from gaining an unfair advantage over their competitors. *See* Smithfield Foods, 972 F. Supp. at 348. The purpose of considering this factor is to ensure that violators do not reap an economic benefit by failing to comply with the statutory mandates. In "bottom up" cases, the economic benefit is often the starting point from where the court adjusts downward or upward depending on the § 7413(e)(1) factors. In "top down" cases, the economic benefit is often the floor below which the maximum civil penalty is not mitigated.

As discussed above, PRT gained no economic benefit from noncompliance. Economic benefit is often established by a showing that a defendant purposefully disposed of waste in a manner that is in direct contravention of the CAA (or Clean Water Act). This is clearly not the case here; PRT established that when it was idling its buses it was doing so because one of its employees, at one location, believed the idling to be necessary. PRT had over 400 employees working at multiple locations, as well as driving throughout the state. The EPA observed PRT at all of its locations, including its regular bus stops, and after 2002 did not find any violations that were unassociated with the single mistaken employee at the Roxbury facility. PRT was not purposely avoiding the installation of any required pollutant control devices because of a cost

associated with doing so.  In fact, the government's case established that it was entirely possible for PRT to run its buses with no additional costs or components; in essence, the fact that the idling was deemed "unnecessary" establishes that PRT was not reaping an economic benefit from violating the statute.

To the contrary, if the idling was in fact unnecessary, PRT was actually expending more money and resources than necessary by idling its buses in excess of five minutes, while using more expensive, environmentally friendly fuel. The government's expert, David J. Brzezinski ("Brzenzinski") estimated that the PRT buses idled for a total of 6,109[12] minutes. See July 31, 2008 Export Report of Brzezinski at Section 4 (hereinafter "July 31 Brzezinski Report"). PRT obviously disputes this number.  However, assuming *arguendo* that Mr. Brzezinski's estimate is correct, PRT would have actually spent significantly more money by having its ULSDF #1 caro, a high-grade, more expensive and environmentally sound fuel, go to waste by allowing its buses to idle unnecessarily.  In effect, PRT has already paid a fairly substantial penalty for violating the Regulation.  It should not be forced to pay twice for the same violation.  The Court should be aware that while PRT "unnecessarily" used this diesel fuel, because PRT began using Ultra Low Sulfur Diesel Fuel in 2003 the actual emissions resulting from the excess was only 5% of what it would have been if PRT was using the quality of fuel accepted by the EPA. *See* July 31 Brzezinski Report at p. 2 ("I estimate the sulfate contribution to total PM emissions at idle to be about .75 grams per hour without the use of low sulfur diesel fuel. This contribution will be reduced by 95% in those diesel vehicles using low sulfur diesel fuel, but not equipped with after-treatment devices."). Therefore, while the penalty to PRT in terms of cost was substantial, the actual impact to the environment was minimal. As a result, if the Court considers an amount with

---

[12] It is unclear whether the 6,109 minutes is minutes in excess of five minutes, or total idling minutes for each bus.

respect to the economic benefit of noncompliance, it should consider this as a mitigating factor rather than an added penalty.[13]

### V. *Seriousness of the Violation*

PRT does not dispute that every violation of the CAA is of concern to the EPA. However, given the facts and circumstances of PRT's case, as well as its unique and major efforts to eliminate emissions from its buses, PRT's violations are far less serious than other violations of the CAA.[14] To determine the seriousness of PRT's violations, the Court should consider the frequency and severity of the violations as well as their effect on the environment. *See* Smithfield Foods, 972 F. Supp. at 343. Although the government has established 234 violations by PRT, these 37 days were the only days of violations established over a six-year period.[15] PRT submits that for a bus company which operates 147 buses on a daily basis, these violations are neither frequent nor severe. Furthermore, the impact of these violations was minimal considering the emission control devices PRT had already installed, and ULSDF already being used, by the time the violations occurred.

Beginning in 2002, PRT began undertaking voluntary emission control measures in order to reduce overall emissions of its buses. First, in 2002 and 2003 twelve (12) buses underwent the retrofit installation of Cleaire Longview exhaust aftertreatment devices. Next, starting in 2003, PRT began to use ultra low-sulfur diesel fuel in all of its buses at the Roxbury facility. Finally, seven (7) 2003 model-year buses equipped with Detroit Diesel Diesel Engines operated by PRT

---

[13] It should be noted that if this Court does somehow find that PRT did gain an economic benefit from noncompliance, that the economic benefit analysis should be based on the least costly method of compliance. *See, e.g.* U.S. v. Allegheny Ludlum Corp., 366 F.3d at 185 ("economic benefit analysis should be based on the least costly method of compliance"); Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd., 611 F.Supp 1542, 1563 n. 25 (E.D. Va. 1985) (holding that economic benefit calculations could not be based on a more expensive, "permanent solution" when a less expensive "interim solution" had already achieved compliance).

[14] By the time the violations at issue here occurred, PRT was in the process of spending millions of dollars to convert its fleet into more environmentally sensitive vehicles, including by using alternative energy (CNG, electric, bio-diesel). PRT continues to update its fleet today, in ways that are not required by law, and is still committed to making as little negative impact on the environment as possible.

[15] PRT submits that the highly inflated number of originally-charged violations negatively impacted the jury's understanding of the conduct at issue by depicting the possible culpability of PRT far more broadly than was supported by the evidence.

from the Roxbury facility were bought by PRT already equipped with manufacturer-installed catalyzed Diesel particulate traps.

These voluntary emission control measures are certainly relevant to the seriousness of the violations found. Because of these measures, the sulfur content of the diesel fuel voluntarily used by PRT during 2006 was approximately 30 times lower than the average on-road diesel fuel available in the Boston area. (See Lyons Report at p. 14.) Furthermore, the retrofit of the Longiew devices, which twelve (12) 2002 and 2003 model-year Thomas buses were equipped with, has been verified to reduce particulate matter emissions by at least 85% even while a bus is idling.[16] PRT's expert concluded in his study that for PRT's twelve (12) buses that were retrofitted with the Cleaire Longiew devices, it would take about 33 minutes of idling to emit the same mass of particulate matter it would have emitted in 5 minutes before being retrofit. Id. at 17. This retrofitting is not a requirement under the Clean Air Act, but an expense PRT assumed in order to gradually make its buses as environmentally sound as possible. In addition, the seven (7) 2003 model-year Neoplan buses equipped with catalyzed particulate traps would have had to have run approximately 30 minutes in order for cumulative particulate matter emissions to equal those emitted in five minutes of idling by buses without particulate filters.

PRT submits that to be assessed a penalty for any crime or violation, the precise damages for that crime or violation must be proved with particularity.  Sonoran Scanners, Inc. v. PerkinElmer, Inc., 590 F.Supp.2d. 196, 211 (2008).  Damages certainly cannot be alleged (much less assessed) based on conjecture or estimates. In this case, there were only 132 violations that were even arguably established with sufficient specificity to support a reliable damage estimate. Out of those 132 violations, there were only 96 violations that were established to have been in excess of 30 minutes. Evidence from the experts establishes that buses using ULSDF and/or those equipped with Longview Devices or OEM PM traps caused the same amount of emissions in 30

---

[16] It should be noted that PRT's voluntary emission control measures have reduced the company's overall emissions not only with respect to the specific violations in question, but on every day of bus operation since implementation during 2003-2006.

minutes as other buses cause in five minutes. Because PRT only caused emissions in excess of what the Regulation allows on, at most, 96 occasions, PRT should not be faced with penalties on any of the other occasions. For these 96 instances which arguably have enough support for a damages finding, there are several methods available for the Court to assess damages.[17]

A substantial reduction in the maximum statutory penalty is warranted where the violations cause minimal environmental damage. Smithfield Foods, 972 F.Supp. at 343, *citing* U.S. v. Avatar Holdings, Inc., 1996 WL 479522 *6 (M.D. Fla. Aug. 20, 1996). Because of the infrequency and lack of seriousness of the violations, as well the fact that buses idled by PRT had far less of a negative impact on the environment than which buses the Statute and Regulation were designed to regulate, this Court should substantially mitigate PRT's penalty.

## VI.    *Duration of Violation*

In the present case, the duration of the violation found against PRT was actually a very short period of time. Although the Plaintiff sought to establish violations against PRT over an entire five year period, the jury only found violations against the company occurring on 37 days. In addition, the jury found only one violation to have occurred on 24 of those days. These violations were found to have occurred at only one location, and were caused by one PRT employee. The Plaintiff failed to establish that violation of the idling law was the routine practice of PRT, and the violations against PRT were only found on limited discrete occasions. As such, the duration of PRT's violations was extremely limited, and the Court should consider this as a factor in limiting the penalty assessed against the Defendant.

---

[17] PRT proposes 3 methods which could achieve fair results: First, the Court consider the total number of minutes (minus 5 minutes for each instance, as the allowed amount of idling time) from these 96 instances of violation and assess a $70 fine per minute as a starting point from where it would then consider the mitigating factors outlined above. Similarly, the Court could simply take the number of violations proved with some specificity (96) and multiply that by $1,870 as a starting point before considering the mitigating factors. (The government accepted both $70/minute and $1,870/violation a reasonable assessment without considering or determining whether any mitigating factors were present in 2002.) Finally, as discussed in more detail below, the Court should use the Statute as guidance for assessing fines and assess a $100 to $500 dollar penalty for each of the 96 violations, as a maximum/starting point, and mitigate the maximum as the Court deems appropriate considering the factors outlined above.

VII.   *Payment by PRT of Penalties Previously Assessed for the Same Violation*

PRT has never been assessed penalties for the violations at issue here; the EPA went straight from its NOV to judicial enforcement action. Therefore, this factor has no impact on the fine to be assessed.

### (3) Massachusetts Idling Regulation, 310 C.M.R. 7.11 and Massachusetts Idling Statute, G.L. c. 90, §16A

Even if the Court finds that the fines imposed by the CAA are not excessive, and regardless of whether it uses the "top down" or "bottom up" approach in assessing the applicable fines, the maximum fines under this law should not be applied to PRT in this case. In order for PRT to be found liable in this case, the jury was required to find that PRT violated the Massachusetts Idling Regulation. The Massachusetts Idling Regulation is identical to the Massachusetts Idling Statute, G.L. c. 90, §16A (the "Statute"), except for the last sentence of the Statute, which provides as follows: "[w]hoever violates any provision of this section shall be punished by a fine of not more than one hundred dollars for the first offense, nor more than five hundred dollars for each succeeding offense." It is inconceivable that identical laws, enacted to achieve the same results, could have such disparate results solely because the two laws are being enforced by different bodies. The application of such differing penalties is misguided, inconsistent, and unfair. It is incongruous to consider that in Massachusetts, two buses operating side by side for the same amount of time could be subject to penalties differing by up to $32,400 depending on the title of the law being enforced, and the title of the person enforcing it.

As a result, even if the Court does not strictly adhere to the $500 maximum penalty imposed by the Massachusetts Idling Statute, it should look to the Massachusetts Statute as persuasive guidance to determine the appropriate penalty in this case, considering the circumstances of the violations found. *See, e.g.,* United States v. Bajakajian, 524 U.S. 321, 339 n. 14 (1998) (stating that "[i]n considering an offense's gravity, the other penalties that the Legislature has authorized are certainly relevant evidence."). Seeking guidance from the

Massachusetts Statute is also appropriate given the disproportionality between the maximum penalty allowed under the CAA versus the maximum penalty allowed under each state that has an anti-idling regulation.

**WITNESS LIST**

The Defendant anticipates calling the following witnesses on subjects as designated below:

1.     James M. Lyons – Defendant's expert who will testify as to the matter raised in his expert report.

2.     Richard Brown – will testify as to the practices and procedures of PRT, the efforts made by PRT to comply with the anti-idling law, the costs incurred by PRT in efforts to comply with the anti-idling law, the efforts made by PRT to be environmentally conscious, the effect of a penalty on PRT's business, and other aspects of PRT's finances.

3.     Patricia Cargill – will testify as to the practices and procedures of PRT, including the safety and training procedures given to PRT employees related to the anti-idling law.

4.     Frederick Jones – will testify as to the practices and procedures of PRT, including the changes made by PRT after the 2006 violations with respect to compliance with the anti-idling law, and the steps PRT took to limit emissions and comply with the anti-idling law.

5.     James Viola – will testify as to the practices and procedures of PRT, including the maintenance of PRT's vehicles, the steps PRT took to limit emissions and comply with the anti-idling law, and the costs incurred by PRT in efforts to comply with the anti-idling law.

6.     Richard "Doc" Daley – will testify as to the practices and procedures of PRT, the efforts made by PRT to comply with the anti-idling law, and the efforts made by PRT to be environmentally conscious.

The Defendant reserves the right to supplement this list prior to trial. The

Defendant reserves the right to call any witness called by the Plaintiff, and any witness

necessary for foundation and/or rebuttal purposes.


Respectfully submitted,

Defendant, Paul Revere Transportation, LLC
By its Attorney,


s/___Jonathon D. Friedmann
Jonathan D. Friedmann
BBO: # 180130
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA   02109
617-371-7700

Certificate of Service

I, Jonathon Friedmann, do hereby certify on the 26th[th] day of June, 2009, I filed

the **Defendant's Pre-Trial Memorandum for Penalty Phase** by filing said motion with

the Clerk of the Court using CM/ECF.


_____/s/ Jonathon Friedmann_____
Jonathon Friedmann
BBO # 180130
RUDOLPH FRIEDMANN LLP
92 State Street
Boston, MA   02109
617-723-7700
jfriedmann@rflawyers.com